**Docket No. 23-16031**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

AURORA REGINO,

*Plaintiff-Appellant,*

v.

KELLY STALEY, Superintendent,

*Defendant-Appellee,*

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO;
EILEEN ROBINSON; MATT TENNIS,

*Defendants.*

_____

*Appeal from a Decision of the United States District Court for Eastern California, Sacramento,
No. 2:23-cv-00032-JAM-DMC Honorable John A. Mendez*

# BRIEF OF APPELLANT

Harmeet K. Dhillon
DHILLON LAW GROUP, INC
177 Post Street, Suite 700
San Francisco, California 94108
(415) 433-1700
harmeet@dhillonlaw.com

Joshua W. Dixon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mt. Airy, Maryland 21771
(703) 687-6212
jdixon@libertycenter.org

*Counsel for Appellant
Aurora Regino*

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ......................................................3

CONSTITUTIONAL AUTHORITIES ................................................3

ISSUES PRESENTED......................................................................3

STATEMENT OF THE CASE ..........................................................4

I.     FACTUAL BACKGROUND.......................................................4

     Background on Gender Dysphoria ...................................................4

          Terminology .........................................................................4

          The Treatment of Gender Dysphoria in Children ................................5

          Social Transitioning is a Form of Psychological Treatment................5

          Parental Involvement is Necessary to Socially Transition Children ........................................................................7

     The District Socially transitioned A.S. under the Parental Secrecy Policy ..............................................................................8

          The Parental Secrecy Policy.................................................8

          A.S. Begins Experiencing Emotional Difficulties in Fifth Grade ........................................................................9

          The District Socially Transitions A.S. ................................9

          Ms. Regino Learns of A.S.'s Social Transition ...................10

          Ms. Regino Seeks to Enjoin the Parental Secrecy Policy..................10

II.    PROCEDURAL HISTORY ......................................................11

SUMMARY OF THE ARGUMENT ................................................12

STANDARD OF REVIEW ............................................................15

ARGUMENT ..............................................................................16

i

I.     THE DISTRICT COURT ERRED IN CONCLUDING THE COMPLAINT DID NOT PLAUSIBLY ALLEGE THE POLICY INTERFERED WITH MS. REGINO'S LIBERTY INTERESTS...............16

    A.     The Complaint plausibly alleges that the Policy violates Ms. Regino's substantive due process and First Amendment rights .........16

    B.     The Complaint plausibly alleges that the Policy violates Ms. Regino's procedural due process rights ...............................22

II.     THE DISTRICT COURT ERRONEOUSLY APPLIED HEIGHTENED LEGAL STANDARDS TO THE COMPLAINT...............25

    A.     The district court erroneously applied the standard appliable to qualified immunity. ..........................................................25

    B.     The district court erroneously applied the standard applicable to the creation of new substantive due process rights.........................26

III.     THE DISTRICT COURT ERRONEOUSLY DISREGARDED THE COMPLAINT'S ALLEGATIONS THAT SOCIAL TRANSITIONING CONSTITUTES PSYCHOLOGICAL TREATMENT ..............................................................................30

    A.     The Complaint plausibly alleges that social transitioning constitutes psychological treatment ....................................30

    B.     Granting Ms. Regino leave to amend would not be futile ................36

IV.     THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT MINOR CHILDREN, NOT PARENTS, HAVE THE AUTHORITY TO MAKE IMPORTANT DECISIONS FOR THEMSELVES..................37

V.     THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT SOCIAL TRANSITIONING DOES NOT INTERFERE WITH THE RIGHT TO FAMILY INTEGRITY ......................................................40

VI.     THE DISTRICT COURT ERRONEOUSLY APPLIED RATIONAL BASIS REVIEW ......................................................42

    A.     Strict Scrutiny Applies ........................................................42

    B.     The Policy Does Not Satisfy Strict Scrutiny.......................................44

       1.     Student privacy against their parents is not a legitimate governmental interest, much less a compelling one ................44

2.    The putative purposes of the prevention of child abuse and discrimination do not satisfy strict scrutiny ......................48

      a.    The Policy was not motivated by the prevention of child abuse and such purpose is irrationally overbroad ........................................................................49

      b.    The Policy does not serve the purpose of the prevention of discrimination at school. .........................51

C.    The Policy Does Not Satisfy Rational Basis or "Shocks the Conscience" Review.................................................................52

VII.   EVEN IF THE POLICY SATISFIES SUBSTANTIVE REVIEW, IT DOES NOT COMPLY WITH PROCEDURAL DUE PROCESS ..........53

CONCLUSION ........................................................................................53

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfonso v. Fernandez,*
606 N.Y.S.2d 259 (N.Y. App. Div. 1993).....................................................39

*Arnold v. Bd. of Educ. of Escambia Cnty.,*
880 F.2d 305 (11th Cir. 1989) ...................................................................43

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................15

*Bd. of Dir. v. Rotary Club,*
481 U.S. 537 (1987)..................................................................................17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................................15

*Bellotti v. Baird,*
443 U.S. 622 (1979), *overruled on other grounds by*
*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)....45, 46, 47

*Brittain v. Hansen,*
451 F.3d 982 (9th Cir. 2006) ......................................................................43

*Brown v. Entertainment Merchants Ass'n,*
564 U.S. 7863 (2011 .................................................................................29

*C.N. v. Ridgewood Bd. of Educ.,*
430 F.3d 159 (3d Cir. 2005) ..................................................................18, 20

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998)...............................................................................43, 44

*Cox v. Bunnell,*
919 F.2d 144 (9th Cir. 1990) ......................................................................47

*David v. Kaulukuki,*
38 F.4th 792 (9th Cir. 2022) .......................................................................26

*Doe v. Dickenson,*
615 F. Supp. 2d 1002 (D. Ariz. 2009) .........................................................22

*Doe v. Heck,*
327 F.3d 492 (7th Cir. 2003) ......................................................................23

*Doe v. Horne*,
    No. CV-23-00185-TUC-JGZ, 2023 WL4661831
    (D. Ariz. July 20, 2023) ................................................................32

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) .......................................................32

*Ferrari v. Nat. Partners, Inc.*,
    No. 15-CV-04787-LHK, 2016 WL 4440242
    (N.D. Cal. Aug. 23, 2016) ...........................................................16

*Fields v. Palmdale Sch. Dist.*,
    427 F.3d 1197 (9th Cir. 2005) .....................................................20

*Fields v. Palmdale Sch. Dist. (PSD)*,
    447 F.3d 1187 (9th Cir. 2006) .....................................................20

*Franz v. United States*,
    707 F.2d 582 (D.C. Cir. 1983) ....................................................43

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ................................................................51

*Gantt v. City of Los Angeles*,
    717 F.3d 702 (9th Cir. 2013) .......................................................53

*Goss v. Lopez*,
    419 U.S. 565 (1975) ....................................................................24

*Green v. Miss United States of Am., LLC*,
    52 F.4th 773 (9th Cir. 2022) .......................................................51

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ..................................................20, 43

*H.L. v. Matheson*,
    450 U.S. 398 (1981) ........................................................18, 46, 47

*Hawkins v. Freeman*,
    195 F.3d 732 (4th Cir. 1999) .......................................................43

*Hodgson v. Minnesota*,
    497 U.S. 417 (1990) ..........................................20, 22, 29, 45

*In re Crawford*,
    194 F.3d 954 (9th Cir. 1999) .......................................................48

*Jewel v. NSA*,
673 F.3d 902 (9th Cir. 2011) ..........................................................................36

*Jones v. Johnson*,
781 F.2d 769 (9th Cir. 1986), *overruled on other grounds by*
*Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) ................................... 15-16

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
927 F.3d 396 (6th Cir. 2019) ...................................................................17, 43

*Keates v. Koile*,
883 F.3d 1228 (9th Cir. 2018) .................................................................*passim*

*Kelson v. City of Springfield*,
767 F.2d 651 (9th Cir. 1985) ....................................................................21, 41

*Koe v. Noggle*,
No. 1:23-CV-2904-SEG, 2023 WL 5339281
(N.D. Ga. Aug. 20, 2023) ..............................................................................32

*Lamb v. Norwood*,
899 F.3d 1159 (10th Cir. 2018) .....................................................................32

*Lawrence v. Texas*,
539 U.S. 558 (2003)........................................................................................45

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ....................................................................21, 41

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*,
608 F.3d 1084 (9th Cir. 2010) .......................................................................25

*Loving v. Virginia*,
388 U.S. 1 (1967)............................................................................................45

*Lytle v. Nutramax Lab'ys, Inc.*,
No. EDCV19835JGBSPX, 2019 WL 8060077
(C.D. Cal. Dec. 6, 2019) ................................................................................16

*Mahanoy Area Sch. Dist. v. B.L.*,
141 S. Ct. 2038 (2021).....................................................................................20

*Mann v. Cnty. of San Diego*,
907 F.3d 1154 (9th Cir. 2018) ..................................................................17, 38

*Mario V. v. Armenta*,
No. 18-CV-00041-BLF, 2021 WL 1907790
(N.D. Cal. May 12, 2021) ........................................................17, 40

*Marsh v. Cnty. of San Diego*,
680 F.3d 1148 (9th Cir. 2012) ...........................................21, 28, 41

*Mathews v. Eldridge*,
424 U.S. 319 (1976).........................................................................24

*McCabe v. Sharrett*,
12 F.3d 1558 (11th Cir. 1994) ........................................................42

*McKinney v. Pate*,
20 F.3d 1550 (11th Cir. 1994) ........................................................43

*Meyer v. Nebraska*,
262 U.S. 390 (1923).........................................................17, 18, 28

*Mirabelli v. Olson*,
No. 3:23-cv-00768-BEN-WVG, 2023 WL 5976992
(S.D. Cal. Sept. 14, 2023).........................................................21, 47

*Monroe v. Meeks*,
584 F. Supp. 3d 643 (S.D. Ill. 2022) ..............................................33

*Moore v. City of E. Cleveland*,
431 U.S. 494 (1977).........................................................................21

*Mullins v. State of Or.*,
57 F.3d 789 (9th Cir. 1995) ............................................................23

*Nunez by Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) ..................................................*passim*

*Obergefell v. Hodges*,
576 U.S. 6441 (2015 .......................................................................28

*Ortez v. Washington Cnty.*,
88 F.3d 804 (9th Cir. 1996) ............................................................15

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012) .........................................15, 26, 36

*Ovando v. City of Los Angeles*,
92 F. Supp. 2d 1011 (C.D. Cal. 2000) ...........................................22

*Parham v. J.R.*,
442 U.S. 584 (1979)...............................................................*passim*

*Patel v. Searles*,
305 F.3d 130 (2d Cir. 2002) .........................................22

*Perry v. Sindermann*,
408 U.S. 593 (1972)......................................................39

*Pierce v. Jacobsen*,
44 F.4th 853 (9th Cir. 2022) ........................................44

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925).................................................18, 42

*Pinson v. Hadaway*,
No. 18-CV-3420-NEB-KMM, 2020 WL 6121357
(D. Minn. July 13, 2020) .............................................33

*Polich v. Burlington N., Inc.*,
942 F.2d 1467 (9th Cir. 1991) .....................................36

*Pope v. Illinois*,
481 U.S. 497 (1987)......................................................45

*Porter v. Allbaugh*,
No. 18-CV-0472-JED-FHM, 2019 WL 2167415
(N.D. Okla. May 17, 2019)...........................................33

*Ram v. Rubin*,
118 F.3d 1306 (9th Cir. 1997) .....................................40

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*,
No. 522CV04015HLTGEB, 2022 WL 1471372
(D. Kan. May 9, 2022)............................................19, 50

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)......................................................42

*Roper v. Simmons*,
543 U.S. 551 (2005)......................................................38

*Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*,
628 F. App'x 527 (9th Cir. 2016)............................40, 41

*Shaw v. Hunt*,
517 U.S. 899 (1996)......................................................49

*Stanley v. Illinois*,
  405 U.S. 645 (1972)..................................................................23, 49

*T.F. v. Kettle Moraine School Dist.*,
  No. 2021CV1650, 2023 WL 6544917 (Wis. Cir. Oct. 03, 2023) ...........18, 50

*Troxel v. Granville*,
  530 U.S. 57 (2000).................................................................*passim*

*United States v. Salerno*,
  481 U.S. 739 (1987).......................................................................53

*Usher v. City of Los Angeles*,
  828 F.2d 556 (9th Cir. 1987) ...................................................15, 35

*Vance v. Barrett*,
  345 F.3d 1083 (9th Cir. 2003) .......................................................26

*Vasquez v. Rackauckas*,
  734 F.3d 1025 (9th Cir. 2013) .......................................................23

*Vernonia Sch. Dist. 47J v. Acton*,
  515 U.S. 646 (1995)........................................................................45

*Wakefield v. Thompson*,
  177 F.3d 1160 (9th Cir. 1999) .........................................................3

*Wallis v. Spencer*,
  202 F.3d 1126 (9th Cir. 2000) ...............................17, 27, 38, 49

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)....................................................27, 29, 44-45

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020)...................................................19

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)...........................................................18, 28, 30

*Witt v. Dep't of Air Force*,
  527 F.3d 806 (9th Cir. 2008) .........................................................52

## Statutes & Other Authorities:

U.S. Const., amend. I ......................................................*passim*

U.S. Const., amend. XIV ................................................*passim*

ix

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

Blackstone, 1 *Commentaries on the Laws of England* .......................29, 45

Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health
Care Organizations in Support of Appellee in *Adams v. The School
Board of St. Johns County*, Case No. 18-13592 ...........................33

Cal. Family Code § 302 ......................................................................46

Cal. Penal Code § 261.5 .....................................................................46

Cal. Penal Code § 313.1 .....................................................................46

Cal. Penal Code § 11164 ....................................................................50

Fed. R. Civ. Proc. 4(a)(1) .....................................................................3

Fed. R. Civ. Proc. 12(b)(6) .....................................................3, 11, 15, 16

Fed. R. Evid. 56 .................................................................................16

Kent, 2 *Commentaries on American Law* .........................................29, 45

*Nondiscrimination in Health Programs and Activities*, Proposed Rule, 87
FR 47,824-01 ............................................................................ 33-34

Zucker, Ken J., *The myth of persistence: Response to "A Critical
Commentary on Follow-Up Studies and Desistance Theories about
Transgender and Gender Non-Conforming Children" by Temple
Newhook et al.*, 19 INTERNATIONAL JOURNAL OF TRANSGENDERISM 7
(2018) .................................................................................... 34-35

## INTRODUCTION

For over one hundred years, the Supreme Court has recognized that parents have the fundamental right to direct and control the upbringing of their children. This right gives parents the authority to direct their children's healthcare, to make important decisions in their children's lives, and to maintain the integrity of their family against unwarranted state interference. The district court ignored these well-established constitutional protections in dismissing Ms. Regino's Complaint.

The Chico Unified School District (the "District") has a policy—the "Parental Secrecy Policy" or the "Policy"—that governs schools' obligations when students ask to go by a new name and pronouns associated with a transgender identity. This is known as "social transitioning." Social transitioning is a form of psychological treatment. Indeed, its purpose is to alleviate the psychological distress that can accompany having a transgender identity. Under the Policy, schools are required to perform this treatment on students without their parents' knowledge or consent based on nothing more than the child's request that their parents not be involved.

Ms. Regino's daughter, A.S., was one of these children. As an eleven- year-old fifth grader, A.S. was experiencing anxiety and depression, and she began to feel like she was a boy. She asked her elementary school to socially transition her and to keep it secret from her mother. Acting under the Policy, the District complied. From that point forward, the District required everyone in the school environment—

1

administrators, teachers, and staff—to refer to A.S. by her new male name and male pronouns. By socially transitioning A.S., the District provided her psychological treatment, despite the fact she had not even seen a mental health professional.

The district court erred in dismissing Ms. Regino's Complaint. Not only did the district court apply the wrong legal standard two times over, but it also ignored the Complaint's detailed factual allegations, the weight of case law—including case law from this Court—and expert opinion reflecting the widely accepted consensus that social transitioning constitutes psychological treatment. Instead, and without analysis, the district court dismissed this allegation as "conclusory." This was error.

The Complaint plausibly alleges that the Policy violates Ms. Regino's parental rights. It plausibly alleges that the Policy authorizes the District to perform psychological treatment on her children behind her back. It plausibly alleges that the Policy authorizes the District to make important decisions in her children's lives. And it plausibly alleges that the Policy authorizes the District to interfere with the integrity of her family by fostering and facilitating secrecy between her and her children. Moreover, the District's asserted interests in keeping its actions secret from parents are not compelling, nor is the Parental Secrecy Policy narrowly tailored to achieve them. The Court should reverse the district court's decision and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On July 11, 2023, the district court entered an order ("Order") dismissing Ms. Regino's First Amended Complaint ("Complaint"), with prejudice, under Rule 12(b)(6) of the Federal Rules of Civil Procedure and a judgment for the District ("Judgment"). ER-3–23. On July 20, 2023, Ms. Regino timely filed her appeal under Rule 4(a)(1) of the Federal Rules of Appellate Procedure. ER-253.

The Order and Judgment were "final decision[s]" under 28 U.S.C. § 1291. *Wakefield v. Thompson*, 177 F.3d 1160, 1162 (9th Cir. 1999). This Court has jurisdiction over the appeal. *Id.*

## CONSTITUTIONAL AUTHORITIES

All relevant constitutional authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1.  Did the district court err by concluding the Complaint failed to allege an infringement of Ms. Regino's liberty interests?

2.  Did the district court err by applying heightened legal standards to the Complaint?

3.  Did the district court err by failing to presume the truth of the allegations in the Complaint?

4.    Did the district court err by concluding that minor children have the authority to make important decisions for themselves?

5.    Did the district court err by concluding violation of the right to family integrity requires a separate constitutional violation and literal infringement with family association?

6.    Did the district court err by applying rational basis review and in its application of that standard?

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

**Background on Gender Dysphoria**

Terminology

A person's "sex" refers to their biological reproductive capabilities. ER-58 ¶ 26. "Gender" refers to the characteristics of males and females that are socially constructed and mutable. *Id.* A person's "gender identity" is the person's felt experience of their gender. ER-58 ¶ 27. Persons with a "transgender" identity feel their gender identity does not match their sex. ER-58 ¶ 28.

"Gender dysphoria" is a psychiatric condition in which the mismatch in a person's gender identity and sex produces significant psychological distress. ER-58 ¶ 29. A person can have a transgender identity without gender dysphoria, but many transgender-identifying children have gender dysphoria. ER-58 ¶¶ 29–30. Many also

have other developmental and psychiatric conditions such as autism, depression, anxiety, and ADHD. ER-58 ¶ 30.

The Treatment of Gender Dysphoria in Children

There are four general approaches to treating gender dysphoria in children. ER-59 ¶ 35. Under the "hands off" model, the mental health professional simply allows the child's gender identity to evolve naturally with no ongoing treatment. ER-59 ¶ 37. Under the "watchful waiting" model, the mental health professional allows the child's gender identity to evolve naturally while treating any other co-morbidities without a focus on gender. ER-59 ¶ 36. Under the "psychotherapy" model, the mental health professional seeks to identify and address the causes of the child's distress through psychotherapy. ER-59 ¶ 38.

The "affirmation" model is starkly different from the other three. ER-59 ¶ 39. It holds that the child's expression of a transgender identity should be accepted as decisive and permanent, and that the child's psychological condition will improve with "affirmation" of that identity. ER-59 ¶¶ 39–40.

Social Transitioning is a Form of Psychological Treatment

A primary pillar of the "affirmation" model of treatment is social transitioning. ER-59 ¶ 40. Social transitioning refers to the active affirmation of a person's transgender identity. ER-53 ¶ 2. In the school setting, it primarily refers to calling students by a new name and pronouns associated with their transgender

identity. *Id.* Social transitioning is a significant form of psychological treatment. ER-54 ¶ 5; ER-53 ¶ 2. Its purpose is to alleviate psychological distress associated with the mismatch between a person's gender identity and sex, regardless of whether that distress rises to the level associated with gender dysphoria. *Id.*

Social transitioning is no mere benign psychological intervention. ER-60 ¶ 43. It substantially reduces the likelihood that a transgender-identifying child will desist—that is, lose their transgender identity—prior to adulthood. *Id.* Absent social transitioning, many transgender-identifying children will desist. ER 59 ¶¶ 33–34. Socially transitioning children, however, makes it significantly more likely that the transgender identity will persist into adulthood. *Id.*; ER 60 ¶ 43.

Moreover, in the vast majority of cases, children who are socially transitioned go on to receive graduated "affirmative" care in the form of puberty blockers and cross-sex hormones. ER-60 ¶ 44. For this reason, before social transitioning is considered, the risks of this additional "affirmative" care must be considered. *Id.* These risks are significant, and include bone weakness, cardiovascular harm, depression, decreased sexual response, sterility, and increased risk of suicide. *Id.*

Socially transitioning every child who asks for it is a "one-size-fits-all" treatment approach that fails to account for the broader and unique issues the child is facing. ER-60 ¶ 42; ER 73 ¶ 101m; ER 76 ¶ 108m. Instead of social transitioning,

some children simply need counseling to understand the vast array of possibilities of how life can be lived as a man or a woman. ER-58 ¶ 32.

<u>Parental Involvement is Necessary to Socially Transition Children</u>

Parental involvement is necessary for the adequate and ethical assessment, diagnosis, and treatment of children with a transgender identity and gender dysphoria. ER 60 ¶ 46. This includes providing social transitioning. *Id.* By socially transitioning children in secret, schools are making decisions regarding the child's psychological treatment—treatment that can have serious, life-long consequences—that the child's parents should be making with assistance from a mental health professional. ER-61–62 ¶¶ 48–50.

Schools that socially transition children without their parents' knowledge and consent also violate bedrock principles of medical ethics. ER-61 ¶ 49. Minor children are incapable of making sound judgments regarding their own health care and of understanding the risks associated with it. *Id.* And school personnel lack the necessary education, training, and expertise to explain the risks associated with social transitioning and the graduated "affirmative" care that is likely to follow. *Id.*

Finally, schools that socially transition children in secret from their parents harm students' well-being. ER-61 ¶ 48. It keeps children who are experiencing a transgender identity—and who may have gender dysphoria—from even being seen by a qualified mental health professional. ER-61 ¶ 47. It results in the ill-advised

social transitioning of some percentage of children, leading to increased persistence and the serious consequences that follow. ER-58–59 ¶¶ 32–33; ER-59 ¶ 39; ER-60 ¶¶ 42–44. And it is inherently psychologically unhealthy. ER-61 ¶ 48. It causes children to secretly inhabit different gender identities at home and school and increases their sense that their parents are the "enemy," driving a wedge in the family just when it is needed most. ER-61 ¶ 50.

**The District Socially transitioned A.S. under the Parental Secrecy Policy**

<u>The Parental Secrecy Policy</u>

The District operates twenty-three schools—twelve elementary schools, four junior high schools, three high schools, and four other schools. ER-56 ¶ 18. Under the Policy, if a student informs District personnel that they want to be referred to by a new name and pronouns associated with a transgender identity, the school "shall accept the student's assertion of [that] gender identity." ER-99. In addition, the Policy requires everyone at school—administrators, teachers, and students—to refer to the child by that name and pronouns. ER-97, ER–100. Unless the child says otherwise, the Policy requires the school to conceal the social transition from the student's parents, except when disclosure is either required by law or "necessary," in the District's judgment, for the child's "physical or mental well-being." ER-99. Violations of the Policy are punishable by "appropriate disciplinary action." ER-97.

A.S. Begins Experiencing Emotional Difficulties in Fifth Grade

During the 2021–2022 school year, A.S. was in the fifth grade at Sierra View Elementary School ("Sierra View"), a school operated by the District. ER-63 ¶ 55. In the fall of 2021, when A.S. was eleven years old, she began experiencing depression and anxiety brought on by the onset of puberty and major changes in her home life. ER-63 ¶ 56.

In December 2021, a Sierra View counselor, Mandi Robertson, invited A.S. to join an arts-and-crafts girls' group (the "Girls Group"). ER-64 ¶ 61. Ms. Robertson provided A.S. a parental consent form for her mother to sign. ER-64 ¶ 62.

The District Socially Transitions A.S.

In early 2022, after attending one or two Girls Group meetings, A.S. told Ms. Robertson that she "felt like a boy." ER-64 ¶ 64. A.S. told Ms. Robertson her boy's name was "J.S." and that she wanted to go by male pronouns. ER-65 ¶ 64. Ms. Robertson asked A.S. if she wanted her mother to be informed about her new identity. *Id.* A.S. said she did not. *Id.*

Pursuant to the Parental Secrecy Policy, Ms. Robertson and / or A.S.'s teacher arranged for school personnel to begin referring to her by "J.S." and male pronouns without consulting Ms. Regino. ER-65 ¶ 66. Despite requiring parental consent for A.S. to participate in an arts-and-crafts club, the District socially transitioned A.S. without even informing her mother, much less obtaining her consent. ER-66 ¶ 70.

<u>Ms. Regino Learns of A.S.'s Social Transition</u>

On or about April 8, 2022, A.S. told her grandmother about her male identity at school. ER-66 ¶ 72. A.S.'s grandmother informed Ms. Regino later that day. *Id.*

Ms. Regino was shocked that the District had socially transitioned A.S. without informing her, but she was supportive of her daughter. ER-66 ¶ 73. Ms. Regino is a fit parent who loves her children, and she wanted (and wants) her daughter to be happy and healthy in whatever identity she chooses. ER-56 ¶ 17; ER-66 ¶ 73. Had Ms. Regino been consulted, however, she would not have allowed the District to socially transition A.S. without first seeking guidance from a mental health professional. ER-66–67 ¶ 75. In Ms. Regino's judgment, A.S. lacked the cognitive capability to understand what it means to have a transgender identity. ER-67 ¶ 75.

After A.S. "came out" to her grandmother, Ms. Regino arranged for A.S. to begin counseling with a licensed marriage and family therapist to discuss her depression and anxiety. ER-66 ¶ 74. A.S. is still in counseling. ER-69 ¶ 94.

<u>Ms. Regino Seeks to Enjoin the Parental Secrecy Policy</u>

A.S. and her younger sister, C.S., both attend schools operated by the District. ER-56 ¶ 16; ER-69 ¶ 93. Ms. Regino is concerned the District will take the same actions toward A.S. again and that it will do the same thing with C.S. ER-70 ¶ 95.

Ms. Regino attempted to persuade the District to abandon the Parental Secrecy Policy, but the District refused. ER-67–69 ¶¶ 78–91.

Ms. Regino brought this action, seeking prospective relief in the form of an injunction against the Parental Secrecy Policy and a declaration that the Policy violates her constitutional rights under the substantive and procedural components of the Due Process Clause and the First Amendment, both facially and as applied. ER-70–80 ¶¶ 99–133.

## II.    PROCEDURAL HISTORY

On January 6, 2023, Ms. Regino filed her complaint. ECF 1. On that same day, she filed a motion for preliminary injunction seeking to preliminarily enjoin the District from continuing to apply the Parental Secrecy Policy. ECF 2. On March 9, 2023, the district court denied Ms. Regino's request for preliminary relief. ECF 37.

On March 27, 2023, the District filed a Rule 12(b)(6) motion to dismiss. ECF 40. On April 10, 2023, Ms. Regino amended her complaint. ER-52–104. On April 25, 2023, the District filed a Rule 12(b)(6) motion to dismiss the amended complaint. ER-30–51. On June 27, 2023, the district court held a hearing on the motion to dismiss. ECF 56. On July 11, 2023, the district court entered its Order granting the

motion to dismiss and Judgment dismissing the case, with prejudice. ER-3–23. On July 20, 2023, Ms. Regino timely filed a notice of appeal. ER-253.[1]

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing the Complaint. The district court dismissed all of Ms. Regino's claims because it concluded the Complaint did not plausibly allege the Policy interferes with her liberty interests. But the Complaint plausibly alleges that the Policy violates Ms. Regino's fundamental parental rights to consent when the state performs psychological treatment on her children, to make important decisions in the lives of her children, and to be free from unwarranted state interference in her family.

The district court erroneously applied heightened legal standards. For one thing, the district court applied the legal standard applicable to qualified immunity. But Ms. Regino seeks only prospective relief; thus, qualified immunity is not at issue. For another thing, the district court applied the legal standard in *Washington v. Glucksberg* that is applicable to the creation of new substantive due process rights. The district court ignored the fact that the Complaint also alleged First Amendment

---

[1] In addition to naming Superintendent Staley as a defendant, in her official capacity, the original complaint also named the individual members of the District's Board of Education, also in their official capacities, as defendants. ECF 1. In its original motion to dismiss, the District argued that the Board members were not proper parties because only Superintendent Staley had the authority to enforce the Policy. ECF 40 at 20–21. On April 12, 2023, the district court dismissed the District's Board members. ECF 45. Ms. Regino does not appeal their dismissal.

claims, which are not subject to *Glucksberg*. In addition, even as to the Complaint's substantive due process claims, the district court ignored the fact that the parental right is not a new right. Further, the Complaint satisfies *Glucksberg* in any event.

The district court erroneously concluded the Complaint's allegation that social transitioning constitutes a form of psychosocial treatment was conclusory. The district court simply ignored the Complaint's detailed factual recitation explaining why social transitioning constitutes psychological treatment, case law holding that social transitioning is psychological treatment, and expert opinion reflecting the widely accepted consensus that social transitioning is psychological treatment. In the alternative, the district court erred by dismissing the Complaint with prejudice without affording Ms. Regino the opportunity to amend.

The district court erroneously concluded that minor children—and not their parents—have the authority to make important decisions for themselves. A foundational concept underlying the parental right is that parental involvement in the lives of their children is necessary to protect them from their own immature decisions. The district court's decision assigns the primary role in bringing up children to the children themselves, which is antithetical to this foundational concept.

The district court erroneously concluded that a violation of the right to family integrity requires the existence of another constitutional violation. This conclusion

was based on a misinterpretation of the lone unpublished case upon which the district court relied. Moreover, the district court erroneously concluded that the Policy did not infringe with the right to family integrity because it does not prohibit literal family association. The right to family integrity precludes *any* unwarranted state interference with the family, literal or otherwise. Socially transitioning children in secret from their parents satisfies this standard.

The district court erroneously applied rational basis review. Because the parental right is fundamental, strict scrutiny applies. Moreover, the District cannot satisfy strict scrutiny. Below, the District argued that the Policy was necessary to protect student privacy and to prevent child abuse and discrimination at school. But children do not have a privacy right to keep the fact their school is socially transitioning them secret from their parents. Thus, student privacy is not a compelling interest. Moreover, the Policy is not narrowly tailored to the prevention of child abuse. Rather, it presumes that parents will abuse their children based on nothing more than child's statement that they do not want their parents to know they are being socially transitioned. This presumption impermissibly flips the constitutionally mandated presumptions of parental fitness and affection on their heads. Further, the Policy does not actually serve the purpose of the prevention of discrimination, much less do so in a narrowly tailored way, because it assumes that

14

every child who asks to be socially transitioned should be and utterly disregards the role that parents play in upbringing their children.

Finally, even if the District had satisfied strict scrutiny (and it did not), the Policy still fails to comply with the requirements of procedural due process.

For these reasons, the Court should REVERSE the district court's Order and Judgment and REMAND for further proceedings.

## STANDARD OF REVIEW

This Court reviews *de novo* dismissals for failure to state a claim under Rule 12(b)(6). *Ortez v. Washington Cnty.*, 88 F.3d 804, 807 (9th Cir. 1996). To survive a Rule 12(b)(6) motion, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the allegations give rise to a "plausible inference" that a legal violation has occurred. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). This requirement applies to all allegations, including those of a scientific or technical nature. *Jones v. Johnson*, 781 F.2d 769, 772 n.1 (9th Cir. 1986) (presuming truth of allegations regarding medical causation), *overruled on other grounds by*

*Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014); *see also Ferrari v. Nat. Partners, Inc.*, No. 15-CV-04787-LHK, 2016 WL 4440242, at *5 (N.D. Cal. Aug. 23, 2016) (same). Failing to accept the truth of scientific or technical allegations at the motion to dismiss stage impermissibly imports Rule 56 and the Federal Rules of Evidence into a Rule 12(b)(6) proceeding. *Lytle v. Nutramax Lab'ys, Inc.*, No. EDCV19835JGBSPX, 2019 WL 8060077, at *4 (C.D. Cal. Dec. 6, 2019).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN CONCLUDING THE COMPLAINT DID NOT PLAUSIBLY ALLEGE THE POLICY INTERFERED WITH MS. REGINO'S LIBERTY INTERESTS

The district court concluded the Complaint did not plausibly allege that the Policy interfered with Ms. Regino's constitutionally protected liberty interests. This conclusion was error.

### A. The Complaint plausibly alleges that the Policy violates Ms. Regino's substantive due process and First Amendment rights.

Parents have a fundamental right to direct the "care, custody, and control" of their minor children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). This right rests on the common-law presumptions of parental fitness and affection—*i.e.*, that (1) "parents possess what a child lacks in maturity, experience, and capacity for judgment" and (2) the "natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). The right arises under both the

substantive Due Process Clause, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), and the First Amendment's concept of "intimate association," *Bd. of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987); *see also Keates*, 883 F.3d at 1235.

The Complaint plausibly alleges that the Policy interferes with Ms. Regino's parental rights under the First and Fourteenth Amendments in three ways:

*First,* the Complaint plausibly alleges that the Policy violates Ms. Regino's right to consent when the state performs psychological treatment on her children. *See Parham*, 442 U.S. at 602; *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (holding that the state must "notify[] parents" and "obtain[] either the parents' consent or judicial authorization" before conducting medical examinations on children); *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th Cir. 2000) ("The right to family association includes the right of parents to make important medical decisions for their children . . . ."); *see also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019) (noting parents have the "right to direct their children's medical care"); *Mario V. v. Armenta*, No. 18-CV-00041-BLF, 2021 WL 1907790 (N.D. Cal. May 12, 2021) (holding teacher violated "right to family association" by performing blood sugar testing on students without parental consent).

As the Complaint alleges, social transitioning constitutes a significant form of psychological treatment. ER-53 ¶ 2; ER-54 ¶ 5; ER-60 ¶ 43; ER-61–62 ¶ 50; ER-63

17

¶ 54; ER 72–73 ¶ 101f-p; ER 75–77 ¶ 108f-p. Indeed, "the very purpose of social transitioning is to alleviate the psychological distress that can be caused by a mismatch between one's body and gender identity." ER-54 ¶ 5. By authorizing the District to socially transition Ms. Regino's children without her consent, the Policy impermissibly usurps her right to direct and control their psychological treatment. *T.F. v. Kettle Moraine School Dist.*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Oct. 03, 2023) (holding that socially transitioning child against parents' wishes "directly implicates an infringement against the parental . . . right to direct the care for their child").

**Second,** the Complaint plausibly alleges that the Policy violates Ms. Regino's right to make "important decisions" in her children's lives. *H.L. v. Matheson*, 450 U.S. 398, 411 (1981). Parents have the "primary role" in raising their children, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), and the Constitution protects those decisions that go to the "heart of parental decision-making," *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005). The Supreme Court and this Court have held, for example, that the state may not unduly interfere with parents' decisions regarding child visitation, *Troxel*, 530 U.S. 57, whether to send their children to private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), the subjects children can be taught at school, *Meyer*, 262 U.S. 390, and whether their children can go out

in public at night, *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 952 (9th Cir. 1997).

Even if social transitioning were not psychological treatment (and it is), the decision whether to socially transition a child falls squarely within these precedents. Social transitioning is a "monumental decision in the life of the child" with "long term consequences that will drastically impact the child's life course." ER-54 ¶ 6. In addition to changing the child's gender identification, it results in the odds of desistence dropping dramatically, it is likely to lead to a life of medicalization and the complications that come with it, and—when done by schools behind parents' backs—it results in the child being without the parental guidance that they need. ER-60 ¶¶ 43–44; ER-61–62 ¶¶ 47–50; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 48 (D.D.C. 2020) (citing scholarship concluding that "childhood social transitions [are] important predictors of persistence" (cleaned up)). Because of these serious and potentially life-long consequences, parents must "have a say in what [their] minor child[ren are] called" by their school. *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 522CV04015HLTGEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022).

Socially transitioning students in secret from their parents also does not fall within the scope of schools' implied authority under the *in loco parentis* doctrine. Under that doctrine, schools have "inferred parental consent" that gives them "a

degree of authority . . . commensurate with the task that the parents ask the school to perform"—namely, to educate their children. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2052 (2021) (Alito, J., concurring). Consistent with that authority, schools must have the freedom to (1) control "the information to which [students]" are exposed as part of the curriculum and (2) decide "how" students are taught, including things like "the hours of the school day, school discipline, [and] the timing and content of examinations." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1200, 1206 (9th Cir. 2005) ("*Fields I*"), *opinion amended on denial of reh'g sub nom. Fields v. Palmdale Sch. Dist. (PSD)*, 447 F.3d 1187 (9th Cir. 2006) ("*Fields II*"). But socially transitioning students without parental notification is not within the scope of that inferred delegation—parents do not hand children off so schools may secretly facilitate changing their gender identity.

In short, parents' rights do not stop at "the threshold to the schoolhouse door," *C.N.*, 430 F.3d at 185 n.6; *Fields II*, 447 F.3d at 1190–91 (deleting language from opinion stating otherwise). "It is not educators, but parents who have primary rights in the upbringing of children," *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000), and parents cannot play this crucial role if their children's school is actively concealing its actions from them, *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) ("Under the common law, parents had the right "not merely to be notified of their children's actions, but to speak and act on their behalf.") (Kennedy, J., concurring

in part and dissenting in part); *see also Mirabelli v. Olson*, No. 3:23-cv-00768-BEN-WVG, 2023 WL 5976992, at *9 (S.D. Cal. Sept. 14, 2023) (concluding that school district's "policy of elevating a child's gender-related choices to that of paramount importance, while excluding a parent from knowing of, or participating in, that kind of choice, is . . . foreign to federal constitutional . . . law").

**Third,** the Complaint plausibly alleges that the Policy infringes Ms. Regino's right to the "integrity of [her] family." *Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985) (cleaned up); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) (noting that "freedom of personal choice in matters of . . . family life" is constitutionally protected) (plurality op.). As this Court has held, parents have the right to be free from "unwarranted state interference" in their relationships with their children. *Keates*, 883 F.3d at 1235 (cleaned up); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012) (holding that parents have the right to determine how photographs of their deceased children's bodily remains are disseminated).

The Policy constitutes "undue state interference" in Ms. Regino's relationship with her children. From the clothing and toys parents give their children, to the friends parents allow their children to have, to the sports parents allow their children to play, the parent-child relationship is deeply shaped by the child's gender identity. By authorizing the District to socially transition Ms. Regino's children without her

21

consent, the Policy fundamentally alters the nature of her "emotional bond[s]" with them. *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1021 (C.D. Cal. 2000); *see also Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1014 (D. Ariz. 2009) (holding parent stated a claim for violation of family integrity where state action causing physical injury to child fundamentally altered the nature of the parent-child relationship). Moreover, by granting her children's request that she be excluded from their social transitioning, the Policy treats Ms. Regino as the enemy, impermissibly driving a wedge into the parent-child relationship that lies at the heart of the family. *Patel v. Searles*, 305 F.3d 130, 134, 140 (2d Cir. 2002) (holding state's acts that created "mistrust among the members of [plaintiff's] family towards him" violated right to family integrity).

In the alternative, even if Ms. Regino does not have the right to *consent* when the state socially transitions her children (and she does), the constitution requires the District must at least *notify* her that it is socially transitioning her children for the same reasons as discussed above. *Hodgson*, 497 U.S. 483 (noting common-law right of parents to be "notified of their children's actions") (Kennedy, J., concurring in part and dissenting in part).

### B.  The Complaint plausibly alleges that the Policy violates Ms. Regino's procedural due process rights.

Because the Policy interferes with Ms. Regino's rights under the substantive Due Process Clause and First Amendment, it is subject to the procedural Due Process

Clause. *Mullins v. State of Or.*, 57 F.3d 789, 795 (9th Cir. 1995) (holding that interference with substantive due process rights triggers right to procedural due process); *Vasquez v. Rackauckas*, 734 F.3d 1025, 1043 (9th Cir. 2013) (same with respect to First Amendment rights). The Complaint plausibly alleges that the Policy violates Ms. Regino's procedural due process rights in two ways.

*First*, the Policy violates the constitutionally mandated presumptions of parental fitness and affection that underlie the parental right. *Parham,* 442 U.S. at 602; *see also Troxel*, 530 U.S. at 68 (reversing state court visitation decision that failed to presume parental fitness and affection) (plurality op.); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (invalidating statute that that presumed unmarried fathers were unfit parents); *see also Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003) (holding parents' rights violated where state actors "not only failed to presume that . . . parents would act in the best interest of their children, they assumed the exact opposite"). The Policy violates this requirement because it is predicated on the idea that parental secrecy is necessary in *all* cases because *some* parents might harm their transgender-identifying children. ER-71–72 ¶ 101e; ER-75 ¶ 108e; ER-78 ¶ 114–16; ER-79 ¶ 119–20. In fact, the District *admits* the Policy is based on this idea. ER-46 (arguing that the Policy is justified because it creates a "zone of protection from potential domestic abuse"). But as the Supreme Court has cautioned, the "statist notion that governmental power should supersede parental authority in *all* cases because *some*

parents abuse and neglect [their] children is repugnant to American tradition." *Parham*, 442 U.S. at 603 (emphasis in original).

***Second***, and related, the Policy creates insufficient procedural protections when the District determines whether to interfere with Ms. Regino's parental rights. Under the Policy, Ms. Regino does not have the right to notice or an opportunity to be heard before (or after) the District socially transitions her children. But because socially transitioning her children behind her back constitutes an interference with her constitutionally protected liberty interests, it must "at a minimum . . . be preceded by notice and opportunity [to be heard]." *Goss v. Lopez*, 419 U.S. 565, 579 (1975); *see also Mathews v. Eldridge*, 424 U.S. 319, 338 (1976) ("The essence of due process is the requirement that "a person . . . be given notice of the case against him and opportunity to meet it." (cleaned up)). The Policy's failure to provide Ms. Regino notice and an opportunity to be heard prior to the District socially transitioning her children violates procedural due process.

*   *   *

To be clear, Ms. Regino does not assert that the District must inform her if it merely has a suspicion—or even direct knowledge—that her children are asserting a transgender identity (or, for that matter, *any* identity or orientation). Thus, this case is not about the "outing" of transgender children. Rather, Ms. Regino asserts only that the District may not take *affirmative steps* to socially transition her children to

24

a different gender—*i.e.*, referring to her children by a name and pronouns associated with an alleged transgender identity and requiring others in the District to do the same—without first obtaining her consent. The District violates Ms. Regino's parental rights when *it* takes affirmative steps to socially transition Ms. Regino's children without her consent, as it is required to do under the Policy.[2]

## II. THE DISTRICT COURT ERRONEOUSLY APPLIED HEIGHTENED LEGAL STANDARDS TO THE COMPLAINT

In concluding Ms. Regino did not plausibly allege that the District infringed her liberty interests, the district court erroneously held the Complaint to heightened legal standards. The district court erred in two ways.

### A. The district court erroneously applied the standard appliable to qualified immunity.

First, the district court erroneously evaluated the Complaint under the qualified immunity standard. Specifically, the district court concluded that the Complaint did not state any plausible claims because it did not allege the violation of a "clearly established" right. ER-12; ER-17. According to the district court, this

---

[2] The Complaint alleges both facial and as-applied substantive and procedural due process and First Amendment claims. ER-70–80 ¶¶ 99–133. In its Order, the district court did not rely on any differences between the facial and as-applied nature of the claims. ER-15; ER-17, ER-21 (citing *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) (holding that the underlying constitutional standard for an as-applied challenge is the same as a facial challenge)). Accordingly, any distinction between Ms. Regino's facial and as-applied claims is irrelevant for purposes of this appeal.

means that "existing precedent must have placed the . . . constitutional question beyond debate." ER-12; ER-17 (quoting *David v. Kaulukuki*, 38 F.4th 792, 800 (9th Cir. 2022)). But the "clearly established" standard is the legal standard for assessing whether a government official is entitled to *qualified immunity from civil damages*. *Kaulukuki*, 38 F.4th at 800 ("Qualified immunity shields government officials from liability for civil damages unless their conduct violated a clearly established constitutional right." (cleaned up)). This standard does not apply in cases where the plaintiff seeks only injunctive or declaratory relief. *Vance v. Barrett*, 345 F.3d 1083, 1091 (9th Cir. 2003) ("Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief." (cleaned up)).

Here, Ms. Regino seeks only prospective declaratory and injunctive relief. ER-81. Thus, qualified immunity is not at issue. Rather than asking whether the rights Ms. Regino invokes are "clearly established," the district court should have asked whether the Complaint sets forth sufficient factual content to allow the court to draw the "plausible inference" that the Policy violates her rights. *OSU Student All.*, 699 F.3d at 1076. For the reasons discussed, it does.

### B. The district court erroneously applied the standard applicable to the creation of new substantive due process rights.

Second, the district court erroneously applied *Washington v. Glucksberg*. Specifically, the district court held that the Complaint did not state a plausible claim pursuant to *Glucksberg*'s requirement that the plaintiff set forth a "'careful

description' of the asserted liberty interest" at issue. ER-12 (quoting *Glucksberg*, 521 U.S. 702 (1997)). This was erroneous for two reasons. For one thing, *Glucksberg*'s "careful description" requirement applies only to new *substantive due process rights*. 521 U.S. at 723–36 (evaluating whether substantive due process clause protects right to assisted suicide). Here, in addition to alleging substantive due process claims, the Complaint also alleges *First Amendment claims*. ER-79–80 ¶¶ 123–33. First Amendment claims are not subject to *Glucksberg's* "careful description" requirement. 521 U.S. at 719–22.

The district court acknowledged that the right to family integrity arises under both the substantive Due Process Clause and the First Amendment, but it appears to have concluded parents' rights to (1) make medical decisions for their children and (2) make important decisions in the lives of their children arise under the substantive Due Process Clause only. ER-9–16; ER-18–21. This is incorrect. *Wallis*, 202 F.3d at 1141 (holding that the "right to *family association* includes the right of parents to make important medical decisions for their children" (emphasis added)); *see also Keates*, 883 F.3d at 1236 (suggesting the scope of parental rights under First and Fourteenth Amendments are coextensive).

For another thing, *Glucksberg*'s "careful description" requirement applies only to *new* substantive due process rights. 521 U.S. at 722–36. Unlike the asserted right to assisted suicide at issue in *Glucksberg*, the Supreme Court first held the

substantive Due Process Clause gives rise to parents' right to control their children's upbringing over a century ago. *Meyer*, 262 U.S. 390; *see also Yoder*, 406 U.S. at 232 (noting that parents' rights to control their children's upbringing is "established beyond debate as an enduring American tradition"). Indeed, parental rights are "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel*, 530 U.S. at 65–66 (plurality op.); *Keates*, 883 F.3d at 1236 (same). Accordingly, *Glucksberg*'s "careful description" requirement is not applicable here. Instead, the sole question is whether the Complaint's claims fall within the scope of the previously recognized—and well-established—parental right. *Troxel*, 530 U.S. at 65–66 (plurality op.) (evaluating whether statute violated parental right to control child visitation without considering "careful description" requirement); *id.* at 77–78 (same) (Souter, J., concurring); *id.* at 80 (same) (Thomas, J., concurring); *Nunez*, 114 F.3d at 952 (same with respect to right to control whether children are allowed to go to public places at night); *Marsh*, 680 F.3d at 1152 (holding that "a parent's right to control a deceased child's remains and death images *flows from* the well-established substantive due process right to family integrity" (emphasis added)); *see also Obergefell v. Hodges*, 576 U.S. 644, 671 (2015) (noting that question at issue was not whether the Court should create a "*new* . . . right to same-sex marriage" but whether the right to same-sex marriage *falls within* "the right to marry in its comprehensive sense" (emphases added)). And the parental rights Ms. Regino seeks

to vindicate here—the rights to consent when the state performs psychological care on her children, to make important decisions in their lives, and to be free from unwarranted state intrusion into her family—fall squarely within the scope of the right as defined by the Supreme Court and this Court.

In any event, the Complaint satisfies *Glucksberg*'s "careful description" requirement. Ms. Regino has carefully described the rights at issue, each of which is supported by existing precedent. *Supra* at 17–22. Moreover, these rights are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 722. Under the common law, parents had the right "to speak and act on . . . behalf" of their minor children. *Hodgson*, 497 U.S. at 483 (Kennedy, J., concurring in part and dissenting in part). Indeed, "the founding generation believed parents had absolute authority over their minor children." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 822–23 (2011) (Thomas, J., concurring); *see also* Blackstone, 1 *Commentaries on the Laws of England* at 447 (recognizing the obligation of children to absolute parental "subjection and obedience"). And this concept of the "authority of parents in the lives of their children persisted in the decades leading up to the ratification of the Fourteenth Amendment." *Brown*, 564 U.S. at 835 (Thomas, J., concurring); *see also* Kent, 2 *Commentaries on American Law* at 207 (providing that children's duties to their parents include unqualified "obedience"). Based on these common-law principles

29

and traditions, it is "beyond debate" that parents have the right to have a say in whether the state socially transitions their children. *Yoder*, 406 U.S. at 232.

## III. THE DISTRICT COURT ERRONEOUSLY DISREGARDED THE COMPLAINT'S ALLEGATIONS THAT SOCIAL TRANSITIONING CONSTITUTES PSYCHOLOGICAL TREATMENT

The Complaint squarely alleges that social transitioning a child at school "is a significant form of psychological treatment." ER-54 ¶ 5; ER-60 ¶ 43; *see also* ER-53 ¶ 2; ER-61–62 ¶ 50; ER-63 ¶ 54; ER 72–73 ¶ 101f-p; ER 75–77 ¶ 108f-p. In its briefing below, the District did not dispute this allegation. Instead, it argued that parents do not have a right to consent to "psychological care their minor children voluntarily seek." ER-43.[3] Regardless, the district court failed to credit the Complaint's allegation that social transitioning constitutes psychological treatment, stating, without any analysis whatsoever, that it was "conclusory" and thus entitled to no weight. ER-13. This was error.

### A. The Complaint plausibly alleges that social transitioning constitutes psychological treatment.

The Complaint does not simply assert, without any supporting justification, that social transitioning constitutes psychological treatment. Instead, the Complaint supports that characterization with detailed allegations, including:

- A child who asks to be socially transitioned should be seen by a mental health professional. ER-60 ¶ 44. While not every child with a transgender identity has gender dysphoria, such a request may indicate the presence of gender dysphoria or related conditions. ER-58 ¶¶ 29-30.

---

[3] The District first raised the argument that social transitioning does not constitute psychological treatment at the hearing on its Motion to Dismiss. ER-27 at 6:16–18.

- The purpose of social transitioning is to alleviate the psychological distress caused by a mismatch between a transgender-identifying person's body and their self-perception of their gender. ER-54 ¶ 5.

- Social transitioning is a "primary pillar" of the affirmation model of treatment for transgender-identifying children. ER-59 ¶ 40.

- Adherents of the affirmation model assume (1) that social transitioning will fulfill its purpose of alleviating psychological distress and (2) "that any psychological co-morbidities will [also] improve with social transition." *Id.*

- Like other forms of psychological treatment, social transitioning is not without risks. For one thing, because "[l]iving in a transgender identity" has the psychological effect of making "desistence more difficult," social transitioning "substantially reduces the number of children who desist from a transgender identity" ER-60 ¶ 43. Thus, social transitioning can cause "psychological complications" for children who are mistaken about whether they have a transgender identity, ER-60 ¶ 42, including the risk of "stabilizing what might otherwise be a temporary identity state," ER-61 ¶ 50.

- Similarly, social transitioning leads, in the vast majority of cases, to future "affirmative care" in the form of puberty blockers and cross-sex hormones, the risks of which are significant and include sterility and increased risk of suicide. ER-60 ¶ 44.

- Socially transitioning every child who asks to be socially transitioned is a "one-size-fits-all" treatment approach that fails to account for the broader and unique psychological issues each child is facing. ER-59–60 ¶ 41.

- Because social transitioning is not a mere "benign intervention" in the child's life, parental involvement is necessary when socially transitioning children. ER-60 ¶ 43; ER-60–61 ¶ 46. As a practical matter, parental involvement is necessary for their children to be seen by a mental health professional. ER-61 ¶ 47. Moreover, parental involvement is necessary for the mental health professional to diagnose the child and devise a treatment plan. *Id.*

31

- Socially transitioning a child without parental consent is psychologically harmful to children. It causes the child to inhabit different gender identities at home and school, a situation that increases the child's "anxiety and sense of alienation" from their parents, ER-61 ¶ 50, and is "inherently psychologically unhealthy for the child," ER-61 ¶ 48.

- Schools "lack the necessary education, training, and expertise" to decide when children should be socially transitioned. ER-61 ¶ 50.

In its rush to dismiss this case, the district court ignored every one of these allegations. This was erroneous, and egregiously so.

What is more, this Court—along with many others—has already concluded that social transitioning constitutes psychological treatment. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019) (noting that "[t]reatment options for individuals with gender dysphoria" include "changes in gender expression and role (which may involve living . . . in another gender role, consistent with one's gender identity"); *Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) (noting that "[t]reatment forms [for gender dysphoria] currently include . . . [c]hanges in gender expression and role (which may involve living . . . in another gender role, consistent with one's gender identity"); *Koe v. Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *6 (N.D. Ga. Aug. 20, 2023) (noting that "gender dysphoria treatment plans include therapy, support, and assistance with elements of a social transition"); *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *3 (D. Ariz. July 20, 2023) ("Undergoing treatment to alleviate gender dysphoria is commonly referred to as

'transition' and includes . . . social transition . . ."); *Monroe v. Meeks*, 584 F. Supp. 3d 643, 678 (S.D. Ill. 2022) (holding that "[s]ocial transition . . . is a medically necessary component of treatment for some . . . with gender dysphoria"); *Pinson v. Hadaway*, No. 18-CV-3420-NEB-KMM, 2020 WL 6121357, at *1 (D. Minn. July 13, 2020) (noting that "[g]ender dysphoria treatment can involve . . . social transition"); *Porter v. Allbaugh*, No. 18-CV-0472-JED-FHM, 2019 WL 2167415, at *2 n.3 (N.D. Okla. May 17, 2019) (noting that "[c]urrent treatments for gender dysphoria include . . . social transition"). The district court simply disregarded this precedent. This too was error.

In addition, many leading medical associations consider social transitioning to be a form of psychological treatment. The American Academy of Pediatrics, the American College of Physicians, the American Medical Association, and the Endocrine Society, for example, hold the view that the appropriate "treatment" for gender dysphoria "is to assist the patient to live in accordance with his or her gender identity, . . . . include[ing] . . . social transition." Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations in Support of Appellee *in Adams v. The School Board of St. Johns County*, Case No. 18-13592, at 17, Request for Judicial Notice ("RJN") Ex. B. The United States Department of Health and Human Services also views social transitioning as a form of treatment. *Nondiscrimination in Health Programs and Activities*, Proposed Rule, 87 FR

47,824-01, *47,867 (August 4, 2022) (observing that social transitioning can, in certain circumstances, be the "clinically indicated next step for [a gender non-conforming] child"), RJN Ex. E.

Further, experts in the field consider social transitioning to be psychological treatment. In litigation filed earlier this year by the Attorney General of the State of California against the Chino Valley Unified School District seeking to enjoin its policies requiring parental notification when students ask to be socially transitioned, the State's expert, Dr. Christine Brady, a psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health, candidly admitted that "social transition . . . is a medically recognized treatment for gender dysphoria." Declaration of Dr. Christine Brady, dated August 24, 2023, ¶ 19.C; *see also id.* ¶¶ 30, 34–35, 92, RJN Ex. C. Thus, the State of California views social transition as "treatment." *Id.* Similarly, Dr. Erica Anderson, a leading clinician in the field of gender dysphoria treatment, submitted an expert declaration in that litigation on behalf of the school district agreeing with Dr. Brady that "social transition [is] a type of psychosocial treatment." Declaration of Dr. Erica Anderson, dated October 2, 2203, ¶¶ 32, 35, RJN Ex. D.

Like Drs. Brady and Anderson, Dr. Ken Zucker, another leading clinician in the field, has opined that "social transition" is a form of "psychosocial treatment that will increase the odds of long-term persistence." Zucker, Ken J., *The myth of*

34

*persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International Journal of Transgenderism at 7 (2018), RJN Ex. F. And Dr. Stephen Levine, yet another leading expert in the field, holds the view that social transitioning is a "powerful psychotherapeutic intervention" that constitutes "significant [psychological] treatment in the life of the child." Affidavit of Dr. Stephen Levine, dated January 6, 2023 ("Levine Affidavit"), ER-162–63 ¶¶ 105–106; ER-164–65 ¶ 109.[4]

Indeed, Ms. Regino submitted Dr. Levine's expert affidavit in connection with her request for a preliminary injunction *in this very case. Id.* And at the hearing on the District's motion to dismiss, the district court acknowledged that the Complaint's allegations that social transitioning constituted psychological treatment were "based on [Dr. Levine's] expert's testimony." ER-28 at 19:18–20. Yet remarkably, the district court still failed to credit the Complaint's allegations. In doing so, the district court failed to "presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher*, 828 F.2d at 561.

---

[4] As Ms. Regino explained in her Request for Judicial Notice, she does not rely on the documents that are the subject of her Request—or Dr. Levine's affidavit—for the truth of the matters asserted therein. Rather, Ms. Regino relies on these documents to demonstrate that their authors have opined that social transitioning is a form of psychological treatment, a fact that dispels any notion her allegation of the same is conclusory.

Correctly applying that rule, the Complaint's detailed allegations regarding the purpose and effect of social transitioning and its centrality within the affirmation model of treatment are plainly sufficient to give rise to the "plausible inference" that social transitioning constitutes psychological treatment. *OSU Student All.*, 699 F.3d at 1077. The district court erred in holding otherwise.

**B.      Granting Ms. Regino leave to amend would not be futile.**

In the alternative, the district court erred in dismissing the Complaint with prejudice. "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint would not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991). The district court believed that allowing amendment would be futile, ER-22, but this was wrong. If this Court concludes that the Complaint fails to plausibly allege that social transitioning constitutes psychological treatment, Ms. Regino should be given the opportunity to amend to set forth more detailed factual material in support of that allegation. This is particularly true considering the District did not argue in its briefing that the Complaint failed to allege that social transitioning constituted psychological treatment. *See Jewel v. NSA*, 673 F.3d 902, 907 n.3 (9th Cir. 2011) (holding that the district court erred in denying leave to amend where it "*sua sponte* dismissed the complaint" without providing the plaintiff with "an opportunity to remedy any perceived defects in the complaint" (cleaned up)).

In the Order, the district court asserted that "the parties conceded at oral argument on [the motion to dismiss] that this case presents purely legal issues that can be resolved at this stage of the proceedings." ER-22–23. But counsel for Ms. Regino made no such admission. In fact, counsel said the exact opposite—*i.e.*, that it might be possible to "resolve this case on a stipulated set of facts *only* if the District were willing to stipulate that "social transition constitutes psychological treatment." ER-26–27 at 5:23–6:4. And at the hearing, the District took the position that social transitioning does not constitute psychological treatment. *Id.* Thus, there is a factual dispute on this point and, at the very least, Ms. Regino should be given the opportunity to amend to support her allegations with additional factual material.

## IV. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT MINOR CHILDREN, NOT PARENTS, HAVE THE AUTHORITY TO MAKE IMPORTANT DECISIONS FOR THEMSELVES

The district court also concluded the Complaint did not plausibly allege the Policy violates Ms. Regino's liberty interests because, under the Policy, it is her children—and not the District—who decide to be socially transitioned in secret. ER-13. While this is factually true, it does not undermine Ms. Regino's claims.

Under the constitutionally mandated presumptions of parental fitness and affection, *Parham*, 442 U.S. at 602, parents' primary role in raising their children applies not only against *the state*, but also against *their children*. This is so because "[m]ost children, even in adolescence, simply are not able to make sound judgments

concerning many decisions, including their need for medical care or treatment." *Id.* (emphasis added); *see also Roper v. Simmons*, 543 U.S. 551, 569 (2005) (noting that children are "vulnerable . . . to negative influences and outside pressures, including peer pressure" and often make "impetuous and ill-considered . . . decisions"). And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision [away] from the parents." *Id.*; *see also id.* at 603–04 ("We cannot assume that the result in [*Meyer* and *Pierce*] would have been different if the children there had announced a preference to learn only English or a preference to go to a public, rather than a church, school."). Assigning primary decision-making authority to parents protects children not only from unwarranted interference from the state; it also protects children from their own immature choices. *Parham*, 442 U.S. at 603; *Wallis*, 202 F.3d at 1141 (noting that right to family association includes children's rights to have healthcare decisions made by their parents).

Children's need for parental guidance is particularly important in connection with their "medical care or treatment." *Parham*, 442 U.S. at 603. As this Court has held, "parental consent is critical in medical procedures involving children because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Mann*, 907 F.3d at 1162 (cleaned up). And "[t]he fact that a child may balk at hospitalization or complain

about a parental refusal to provide . . . surgery does not diminish the parents' authority to decide what is best for the child." *Parham*, 442 U.S. at 604. Indeed, in *Parham*, the Supreme Court held that parents had the authority to commit their child to a mental institution over the child's contrary wishes. *Id.*

Accordingly, here, it does not matter that the Policy contemplates that children are the ones deciding that they want to be socially transitioned by the District in secret. Parents, not children, have the right to determine the psychological treatment their children receive, to make the important decisions in their children's lives, and to be free from unwarranted interference in their families. Just as the state may not directly interfere with these rights, it may not create a paradigm in which it facilitates children assuming the primary role in their own upbringing. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting that the state may not "produce a result which it could not command directly" (cleaned up)); *see also See Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 265–66 (N.Y. App. Div. 1993) (holding in-school condom distribution program violated parental rights, despite students' voluntary participation, because it lacked parental notification and opt-out provision). Under the district court's logic, it would be constitutionally permissible for the District to employ doctors to secretly provide Zoloft to a minor child because she wanted to stop her sad thoughts, to grant a minor child's grandmother visitation rights because she wanted to see her Nana, or to retain custody of a child who ran away from home

because she did not want to go to bed before sunset. Of course, none of this is the law. *Mario V.*, 2021 WL 1907790 (N.D. Cal. May 12, 2021) (holding public school teacher violated parents' rights by secretly conducting blood-sugar tests on students despite the fact students willingly engaged in such tests); *Troxel*, 530 U.S. at 65–66 (plurality op.) (holding parents have right to determine child visitation without mentioning wishes of child); *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) (holding that, prior to parental rights termination proceedings, state may maintain custody of child only where the child is in "imminent danger").

In short, the district court's logic would put minor children—not parents—at the apex of the family and allow minor children to make life-altering decisions before they are competent to do so. That is not just bad policy. It is legal error.

## V. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT SOCIAL TRANSITIONING DOES NOT INTERFERE WITH THE RIGHT TO FAMILY INTEGRITY

The district court concluded that the Complaint did not plausibly allege a violation of Ms. Regino's right to family integrity because violation of that right "is generally contingent on the existence of an underlying constitutional violation." ER-19. In support of that conclusion, the district court cited this Court's unpublished opinion in *Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016). But *Schwarz* says nothing of the kind.

In *Schwarz*, a mother whose son died in police custody asserted a claim for violation of the right to family integrity based on her allegation that the police were deliberately indifferent to the son's need for medical care. *Id.* at 527–28. The Court held, first, that there was insufficient evidence of deliberate indifference. *Id.* Then, because the mother's family integrity claim was "predicated on the [officers'] purportedly unconstitutional care" of the son, the Court held that there was no violation of her right to family integrity either. *Id.* at 528.

Here, by contrast, Ms. Regino's family integrity claim is not predicated on the existence of another constitutional violation. Accordingly, *Schwarz* is inapposite. Indeed, an unbroken line of published Ninth Circuit cases do not predicate the right to family integrity on the existence of some underlying constitutional violation. *Keates*, 883 F.3d at 1235; *Marsh*, 680 F.3d at 1152; *Lee*, 250 F.3d at 686; *Kelson*, 767 F.2d at 654.

The district court also concluded that the Complaint did not plausibly allege a violation of Ms. Regino's right to family integrity because "nothing in the [Policy] prohibits or discourages students and their parents from associating with each other." ER-20. But the right to family integrity protects more than literal "association." Instead, it prohibits "unwarranted state interference" with the parent-child relationship. *Keates*, 883 F.3d at 1235. For reasons already discussed, *supra* at 21–22, the District violates this prohibition by secretly performing acts on children—

41

whether constituting psychological treatment or not—that substantially reduce the odds of desistence, are likely to lead to a life of medicalization, alter the nature of the emotional bonds between parent and child, and drive a wedge into the heart of the parent-child relationship. In short, allowing schools to socially transition students without parental involvement impermissibly treats children as if they were "mere creatures of the state." *Pierce,* 268 U.S. at 535. Ms. Regino's allegations are sufficient to allege that the Policy constitutes unwarranted state interference into her family.

## VI. THE DISTRICT COURT ERRONEOUSLY APPLIED RATIONAL BASIS REVIEW

The district court applied rational basis review to Ms. Regino's substantive due process claims based on its erroneous conclusion that the Complaint did not plausibly allege the Policy interfered with Ms. Regino's protected liberty interests. ER-14. Because the Complaint plausibly alleges the Policy interferes with Ms. Regino's fundamental liberty interests, strict scrutiny applies. Moreover, the District cannot satisfy its burden of demonstrating that the Policy satisfies strict scrutiny.

### A. Strict Scrutiny Applies

Strict scrutiny applies to Ms. Regino's First Amendment claims. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *McCabe v. Sharrett*, 12 F.3d 1558, 1566 (11th Cir. 1994) (noting that "burdens on . . . intimate association rights[] are generally subjected to strict scrutiny"). Strict scrutiny also applies to Ms. Regino's

Fourteenth Amendment claims. *Nunez*, 114 F.3d at 952 (evaluating whether "infringement [with parental rights] is narrowly tailored to serve a compelling government interest"); *see also Kanuszewski*, 927 F.3d at 420 (applying strict scrutiny to parental rights claim); *Gruenke*, 225 F.3d at 305–07 (same); *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989) (same); *Franz v. United States*, 707 F.2d 582, 602–03 (D.C. Cir. 1983) (same).

In dicta, the district court stated that it would have applied the "shocks the conscience" test if it had concluded the Policy interfered with Ms. Regino's liberty interests. ER-11; ER-15; ER-19. But the "shocks the conscience" test applies only to arbitrary "executive" action. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (noting, in case involving high-speed police chase, that the legal standard differs "depending on whether it is legislation or a specific act of a governmental officer that is at issue"); *see also Brittain v. Hansen*, 451 F.3d 982, 987 (9th Cir. 2006) (applying "shocks the conscience" test to aggressive police investigation). Here, Ms. Regino seeks prospective relief against a school policy, which is plainly a "legislat[ive]" enactment that infringes on her fundamental rights. *Lewis*, 523 U.S. at 846; *see also Hawkins v. Freeman*, 195 F.3d 732, 738–39 (4th Cir. 1999) (explaining difference between "executive" and "legislative" action); *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (same). Thus, strict scrutiny—and not

the "shocks the conscience" test—applies. *Lewis*, 523 U.S. at 846; *see also Nunez*, 114 F.3d at 952 (applying strict scrutiny to minor curfew ordinance).

### B.     The Policy Does Not Satisfy Strict Scrutiny.

To satisfy strict scrutiny, the government must demonstrate that "the infringement is narrowly tailored to serve a compelling government interest." *Nunez*, 114 F.3d at 952; *see also Pierce v. Jacobsen*, 44 F.4th 853, 862 (9th Cir. 2022) (observing that the state bears the burden of proof). The District cannot satisfy this burden here.

> 1.     <u>Student privacy against their parents is not a legitimate governmental interest, much less a compelling one.</u>

The district court concluded that the Policy was justified because it created a "zone of protection for transgender students." ER-14. To the extent this conclusion was based on the idea that children have a privacy right under the United States Constitution to keep secret from their parents the fact that their school is socially transitioning them—as the District argued below, *see* ER-41–44— children do not have such a right.

The Supreme Court has never held that children have a privacy right to keep secret from their parents the fact that they are being socially transitioned by their school. And for new, extra-textual rights to be located in the Constitution, the right at issue must be "carefully described," "deeply rooted in this Nation's history and tradition," and "essential to the concept of ordered liberty." *Glucksberg*, 521 U.S. at

720. The novel privacy right the District is advancing plainly does not satisfy this standard. Indeed, the District's argument would be anathema to the framers of the constitution and the Fourteenth Amendment. *See* Blackstone, 1 Commentaries on the Laws of England at 440–41 (recognizing the obligation of children to parental "subjection and obedience"); Kent, 2 Commentaries on American Law at 207 (providing that children's duties to their parents include "obedience"); *Hodgson*, 497 U.S. at 483 (noting that, under the common law, "parents had the right . . . to be notified of their children's actions") (Kennedy, J., concurring in part and dissenting in part).

Even if the constitution protected *adults*' right to keep the state's social transitioning of them secret (and neither this Court nor the Supreme Court has held that it does), that holding would not extend to *minor children*. "[T]he constitutional rights of children cannot be equated with those of adults." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). As the Supreme Court has noted, "unemancipated minors lack some of the most fundamental rights of self-determination." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, (1995). For example, adults have the constitutional right to marry, *Loving v. Virginia*, 388 U.S. 1, (1967), to engage in consensual sexual relations, *Lawrence v. Texas*, 539 U.S. 558 (2003), and to view indecent material, *Pope v. Illinois*, 481 U.S. 497 (1987), yet almost every state in the

union, including California, has laws restricting children from engaging in these activities. *See, e.g.*, Cal. Family Code § 302 (requiring parental consent and court order for minor to marry); Cal. Penal Code § 261.5 (restricting sexual intercourse with minor); Cal. Penal Code § 313.1 (prohibiting distribution of indecent material to minors).

Further, the right the District advocates for is not some abstract privacy right. Rather, it is a new privacy right *in children against their parents*. As this Court has observed, minor children generally "lack . . . rights *vis-à-vis* [their] parents." *Nunez*, 114 F.3d at 944–45. And considering "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing," the Court should be skeptical of arguments that seek to interpose the Constitution between parents and their children. *Bellotti*, 443 U.S. at 640. This conclusion is especially true considering the significant long-term "medical, emotional, and psychological consequences" associated with social transitioning, which leave children particularly vulnerable to their own immature choices. *H.L.*, 450 U.S. at 411.

Below, the District invoked the line of cases requiring a judicial bypass of a parental consent requirement in the abortion context, *see, e.g.*, *Bellotti*, 443 U.S. 622, but those cases cannot be extended to schools' secret social transitioning of students. For one thing, the judicial bypass requirement is no longer good law after *Dobbs*—

because there is no longer a federal constitutional right to an abortion, minors who are seeking an abortion have no basis for the assertion of a privacy right against their parents. Moreover, the Supreme Court has only ever required a judicial bypass to a parental consent requirement in the unique context of abortion, where the (former) right must be exercised within the short window of human gestation or lost forever. *Bellotti*, 443 U.S. at 642 ("A pregnant adolescent . . . cannot preserve for long the possibility of aborting, which effectively expires in a matter of weeks from the onset of pregnancy."). The same is not true with social transitioning, which—like most major life decisions—minor children can choose for themselves when they reach the age of majority. *Id.* (observing that no judicial bypass is required for marriage laws prohibiting minors from marrying because "[a] minor not permitted to marry before the age of majority is required simply to postpone her decision").[5]

In addition, privacy rights only exist when the claimant has a "reasonable expectation of privacy." *Cox v. Bunnell*, 919 F.2d 144 (9th Cir. 1990). There is no such expectation when a child is socially transitioned at school. The Policy requires *everyone* in the school environment—administrators, teachers, and other students—to refer to students by their new name and pronouns. ER-98. In this scenario, children have no reasonable expectation of privacy. *Mirabelli*, 2023 WL 5976992, at *10

---

[5] As for Ms. Regino's alternative claim that parental notice is required, even before *Dobbs* overruled *Roe v. Wade*, the Supreme Court upheld a parental notification requirement in an abortion statute. *H.L.*, 450 U.S. 398.

(concluding that a student who "is referred to by teachers and students and others by said new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy"). This is particularly true for Ms. Regino, who "engages with her children's schools to ensure that she is informed about what occurs in their lives." ER-56 ¶ 17.

Finally, any right to privacy minor children may have must yield to a "proper . . . interest." *In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999) (holding that right to privacy "is not absolute" (cleaned up)). Here, Ms. Regino is a fit parent who will do what is in her children's best interests. ER-56 ¶ 17; ER 66 ¶¶ 73–74. Her parental rights thus outweigh any privacy right her children might have against her.

For these reasons, student privacy is not a legitimate governmental interest, much less a compelling one.

### 2. The putative purposes of the prevention of child abuse and discrimination do not satisfy strict scrutiny.

The district court also concluded that the Policy was justified on the ground that it prevented child abuse at home and discrimination at school—including student "bullying"—based on students' transgender identity. ER-14. These purposes do not satisfy strict scrutiny.

a. *The Policy was not motivated by the prevention of child abuse and such purpose is irrationally overbroad.*

The putative purpose of the prevention of child abuse is not evident on the face of the Policy, nor does the Complaint allege that this was one of the Policy's actual purposes. Thus, the Court may not consider it at this stage in the proceedings. *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (holding that Court may only consider law's "actual purpose" when evaluating strict scrutiny).

In any event, this purpose is not narrowly tailored. The Policy does not require the District to make a finding that students who want to be socially transitioned in secret would be subject to child abuse if that information were disclosed to their parents. Rather, the Policy provides that secrecy is the rule and parental disclosure the exception if the child simply requests that the District socially transition them in secret. ER-98–99. But the constitutionally mandated presumptions of parental fitness and affection require the District to presume that parents will act in their children's best interests absent a showing otherwise. *Parham*, 442 U.S. at 603; *Troxel*, 530 U.S. at 68 (plurality op.); *Stanley*, 405 U.S. at 652. And as this Court has held, the state "has no interest . . . in protecting children from their parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger." *Wallis*, 202 F.3d at 1142 n.14. By presuming parents will harm their children based on nothing more than the child's desire that their parents not be told about their social transitioning, the Policy impermissibly reverses the

constitutionally mandated presumptions of parental fitness and affection that underlie the parental right. *Ricard*, 2022 WL 1471372, at *8 (holding parental secrecy policy overbroad "because it prohibits the disclosure of preferred name and pronoun information to parents without any assessment of whether disclosure would actually pose a risk" of harm to the child); *T.F.*, 2023 WL 6544917, at *8 (holding socially transitioning child without parental consent was "not narrowly tailored because there [were] not the necessary procedural protections in place that are necessary to override a parent's choice of how to medically treat their child"). This is particularly true for Ms. Regino, who is a fit parent and will do what is in her children's best interests. ER-56 ¶ 17; ER 66 ¶¶ 73–74.

Moreover, if the District has reason to believe a student who wishes to be socially transitioned is in imminent danger of being subjected to child abuse due to the student's transgender identity (or otherwise), California law already provides a way for the District to address those concerns—the District may report the parents to the appropriate authorities, who are better able than schools are to evaluate that risk. Indeed, many District personnel are mandated reporters under the Child Abuse and Neglect Reporting Act. *See* Cal. Penal Code § 11164, *et seq.* The District may not, however, fail to obtain parental consent to socially transitioning their children simply because the children do not want them to know.

> b. *The Policy does not serve the purpose of the prevention of discrimination at school.*

As for the prevention of discrimination, the Policy does not actually serve that purpose, much less do so in a narrowly tailored way. Ms. Regino does not argue that the District may not socially transition students; instead, she argues only that the District must obtain parents' consent before doing so. Because Ms. Regino challenges the Policy's secrecy requirement, the District must demonstrate that *parental secrecy* satisfies strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (holding that governments may not satisfy their burden of satisfying strict scrutiny by proffering government interest at a "high level of generality" but must link the interest to the provision being challenged); *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 792 (9th Cir. 2022) (same). But the District—and the district court—utterly failed to explain how parental secrecy prevents discrimination at school. Simply invoking the concept of discrimination is insufficient to demonstrate that parental secrecy prevents it. That is all the District has done here.

To the extent the District's argument is predicated on the assumption that some parents would not allow their children to be socially transitioned if given the opportunity to consent, it fails. First, this argument assumes that every child who asks to be socially transitioned should be—which is an assumption that is directly contrary to the allegations in the Complaint. ER-59–60 ¶¶ 41–42. Rather, a child's

request to be socially transitioned merely *begins* the evaluation process between a mental health professional and parents regarding whether social transitioning is appropriate for that child, a process that can appropriately lead to the child not being socially transitioned in some circumstances. ER-60–61 ¶¶ 44–47.

Second, the argument that bypassing parental consent prevents discrimination assumes that children play the primary role in their own upbringing. But parents have the right to play this role, and if parents do not consent to their children's social transitioning at school, then—absent a finding of parental unfitness—that decision controls, and the District lacks any anti-discriminatory interest with respect to those children. Accordingly, like the prevention of child abuse, the District's alleged anti-discrimination purpose is not narrowly tailored.

### C. The Policy Does Not Satisfy Rational Basis or "Shocks the Conscience" Review.

In the alternative, and for the same reasons, the Policy does not satisfy any legal standard that might arguably apply. Under rational basis review, because Ms. Regino's children have no privacy right against her, student privacy is not a "legitimate state interest." *Witt v. Dep't of Air Force*, 527 F.3d 806, 814 (9th Cir. 2008). In addition, by assuming that all parents whose children want to be socially transitioned in secret are child abusers, the Policy is irrationally overbroad. *Id.* (holding that rational basis requires a "rational[] relation"). Further, the Policy does

not actually serve the putative interest in anti-discrimination. Thus, the Policy fails rational basis review.

Under "shocks the conscience" review, the Policy does not involve heat-of-the-moment decisions and is deliberately indifferent to Ms. Regino's rights. *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (holding that deliberate indifference shocks the conscience "[w]here actual deliberation is practical" (cleaned up)). Thus, the Policy does not satisfy any standard of review that might arguably apply.

## VII. EVEN IF THE POLICY SATISFIES SUBSTANTIVE REVIEW, IT DOES NOT COMPLY WITH PROCEDURAL DUE PROCESS

Finally, because the Complaint plausibly alleges that the Policy interferes with Ms. Regino's liberty interests, it states plausible procedural due process claims even if the Court were to conclude the Policy satisfied the applicable substantive standard of review, whatever it may be. *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("When government action depriving a person of . . . liberty . . . . survives substantive due process scrutiny, it must still be implemented in a fair manner."). Accordingly, the district court erroneously dismissed Ms. Regino's procedural due process claims.

## CONCLUSION

For the foregoing reasons, Ms. Regino respectfully asks this Court to REVERSE the district court's Order and Judgment and REMAND to the district court for further proceedings.

October 30, 2023

Respectfully submitted,

By: */s/Harmeet K. Dhillon*
Harmeet K. Dhillon
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108
T: (415) 433-1700
harmeet@dhillonlaw.com

Joshua W. Dixon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, Md 21771
jdixon@libertycenter.org

*Attorneys for Appellant*
AURORA REGINO

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16031

I am the attorney or self-represented party.

**This brief contains** 12,888 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Harmeet K. Dhillon **Date** 10/30/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-16031

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Harmeet K. Dhillon | **Date** | Oct 30, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# ADDENDUM

**<u>U.S. Const. amend. I</u>:**

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**<u>U.S. Const. amend. XIV</u>:**

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.".