**Docket No. 23-16031**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

AURORA REGINO,

*Plaintiff-Appellant,*

v.

KELLY STALEY, Superintendent,

*Defendant-Appellee,*

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO;
EILEEN ROBINSON; MATT TENNIS,

*Defendants.*

_____

*Appeal from a Decision of the United States District Court for Eastern California, Sacramento,
No. 2:23-cv-00032-JAM-DMC Honorable John A. Mendez*

# APPELLANT'S REQUEST FOR JUDICIAL NOTICE

<div style="display:flex">

Harmeet K. Dhillon
DHILLON LAW GROUP, INC
177 Post Street, Suite 700
San Francisco, California 94108
(415) 433-1700
harmeet@dhillonlaw.com

Joshua W. Dixon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mt. Airy, Maryland 21771
(703) 687-6212
jdixon@libertycenter.org

</div>

*Counsel for Appellant
Aurora Regino*

 COUNSEL PRESS · (213) 680-2300                    PRINTED ON RECYCLED PAPER 

Pursuant to Federal Rule of Appellate Procedure 27, Ninth Circuit Rule 27-1, and Federal Rule of Evidence 201, Appellant Aurora Regino hereby requests that this Court take judicial notice of the following court records and other documents:

(1)     Brief of Amici Curiae Medical, Nursing, Mental Health, and Other Health Care Organizations in Support of Plaintiff in *Adams v. The School Board of St. Johns County*, Case No. 18-13592 (Brief filed January 5, 2022), RJN Ex. B;

(2)     Declaration of Dr. Christine Brady, dated August 24, 2023, filed by the State in *The People of the State of California, ex rel. Rob Bonta, Attorney General of the State of California v. Chino Valley Unified School District*, Case No. CIV-SB-2317301, RJN Ex. C;

(3)     Declaration of Dr. Erica Anderson, dated October 2, 2023, filed by the Chino Valley Unified School District in *The People of the State of California, ex rel. Rob Bonta, Attorney General of the State of California v. Chino Valley Unified School District*, Case No. CIV-SB-2317301, RJN Ex. D;

(4)     Relevant excerpts from *Nondiscrimination in Health Programs and Activities*, United States Department of Health and Human Services ("DHHS") Proposed Rule, 87 FR 47,824-01 (August 4, 2022), RJN Ex. E;

(5)     Zucker, Ken J., *The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International

Journal of Transgenderism, at 7 (2018), available online at https://www.researchgate.net/publication/325443416, RJN Ex. F.

## ARGUMENT

## I.      Judicial Notice is Appropriate on Appeal

Under the Federal Rules of Evidence, judicial notice may be taken of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Federal Rules of Evidence apply in this Court, *see* Fed. R. Evid. 1101(a), and they allow for judicial notice "at any stage of the proceeding," Fed. R. Evid. 201(d). Taking judicial notice at the appellate level is a recognized "exception[] to that general rule" that the record on appeal normally consists of those materials that were before the district court. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 556 n.5 (9th Cir. 1992); *see also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 361 n.22 (8th Cir. 1984) (concluding that "the Court is fully empowered to take judicial notice" of document that was "not part of the record on appeal").

## II.     The Court Should Take Judicial Notice of the Documents at Issue Here

Under Rule 201, Courts are required to take judicial notice of facts where "a party requests it and the court is supplied with the necessary information." Ms. Regino has supplied the necessary information here.

As an initial matter, the five documents that are the subject of this Request are "relevant" to Ms. Regino's appeal. *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 756 (9th Cir. 2008) (granting judicial notice to "materials relevant to the dispositive . . . question"); *see also Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) (holding that the judicial notice doctrine allows courts to "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (cleaned up)). Ms. Regino is challenging a policy adopted by her children's public school district that requires schools in the district to socially transition[1] students in secret from their parents if the student asks that their parents not be informed. Ms. Regino alleges, among other things, that social transitioning is a form of psychological treatment and that schools who socially transition children in secret from their parents violate parents' right to consent when the State performs psychological treatment on their children. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th Cir. 2000).

---

[1] "Social transitioning" refers to the active affirmation of a person's transgender identity. In the school setting, it primarily refers to calling the student by a new name associated with their transgender identity and referring to the student by pronouns associated with their transgender identity.

3

Below, the district court held that the Complaint's allegation that social transitioning constitutes psychological treatment was "conclusory" and thus entitled to no weight. ER-13. In addition to ignoring the Complaint's well-pleaded allegations and the case law concluding that social transitioning is a form of psychological treatment, *see, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019) (observing that "treatment options for individuals with gender dysphoria" include "changes in gender expression and role (which may involve living . . . in another gender role"), the district court's holding flies in the face of medical consensus. The documents that are the subject of this Request reflect this consensus and all opine that social transitioning is a form of psychological treatment. *See* RJN Exhibit B at 12 (noting that the appropriate "treatment" for gender dysphoria "is to assist the patient to live in accordance with his or her gender identity, . . . . include[ing] . . . social transition"); Exhibit C ¶¶ 19.C (asserting that "social transition . . . is a medically recognized treatment for gender dysphoria"); *see also id.* ¶¶ 30, 34–35, 92; Exhibit D ¶¶ 32, 35 (asserting that "social transition [is] a type of psychosocial treatment"); Exhibit E at *47,867 (observing that social transitioning can, in certain circumstances, be the "clinically indicated next step for [a gender non-conforming] child"); Exhibit F at 7 (concluding that social transitioning is a "powerful psychotherapeutic intervention").

Moreover, the documents that are at issue in this Request are not subject to reasonable dispute. Exhibit B—the *Adams* amicus brief—was filed last year in other federal litigation regarding transgender-related issues. *See* RJN Exhibit B; *see also* Declaration of Jesse Franklin-Murdock, dated October 29, 2023 ("Franklin-Murdock Decl.") ¶ 3, attached hereto as Exhibit A. Exhibits C and D—the Declarations of Drs. Christine Brady and Erica Anderson—were filed in litigation brought earlier this year by the California Attorney General in California state court against the Chino Valley Unified School District ("CVUSD") regarding a policy adopted by CVUSD under which parental notification is required when schools socially transition students. *See* RJN Exhibits C and D; *see also* Franklin-Murdock Declaration, ¶¶ 4–5. It is well-established that "court filings and other matters of public record" are the proper subject of a request for judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (court may take judicial notice of court filings and other matters of public record); *see also Bennett*, 285 F.3d at 803 n.2.

Exhibit E—the DHHS Proposed Rule—is also the proper subject of judicial notice. Indeed, the contents of the Federal Register are judicially noticeable by statute. *United States v. Woods*, 335 F.3d 993, 1001 (9th Cir. 2003) ("The contents of the Federal Register shall be judicially noticed . . . ." (quoting 44 U.S.C. § 1507)); *Bayview Hunters Point Cmty. Advocs. v. Metro. Transp. Comm'n*, 366 F.3d 692, 702

n.5 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (June 2, 2004) (taking judicial notice of Proposed Rule); *see also* Declaration Franklin-Murdock Decl. ¶ 6.

And Exhibit F—Dr. Zucker's article—was downloaded from www.researchgate.net, a website to which researchers upload their publications to foster dialogue and discussion. Franklin-Murdock Decl. ¶ 7. That article bears all the hallmarks of what it purports to be, and there is no reason to deny judicial notice of it. *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 (9th Cir. 2012) (taking judicial notice of contents of non-governmental website).

Finally, Ms. Regino does not ask the Court to take judicial notice of these documents for the truth of the matters asserted therein, including but not limited to the assertion that social transitioning, in fact, constitutes psychological treatment. Rather, she asks the Court to take judicial notice only of the fact that these sources have opined that social transitioning is a form of psychological treatment, as this Court has concluded. *Edmo*, 935 F.3d at 770. Thus, there is no reason for the Court to refrain from taking judicial notice of these documents. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." (cleaned up)); *see also United*

6

*States v. Isaacs*, 359 F. App'x 875, 877 (9th Cir. 2009) (noting that it is proper to take judicial notice of out-of-court statements that are not offered for the truth of matter asserted).

Because the documents that are the subject of this request are relevant to the matters at issue and are not subject to reasonable dispute, judicial notice is appropriate. The Court should grant Ms. Regino's Request.

## CONCLUSION

For the foregoing reasons, Ms. Regino respectfully asks this Court to GRANT this Request for Judicial Notice and take judicial notice of the aforementioned documents.

October 30, 2023                                Respectfully submitted,

By: */s/Harmeet K. Dhillon*
Harmeet K. Dhillon
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108
T: (415) 433-1700
harmeet@dhillonlaw.com

Joshua W. Dixon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, Md 21771
jdixon@libertycenter.org

*Attorneys for Appellant*
AURORA REGINO

7

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16031

I am the attorney or self-represented party.

**This brief contains** 1,567 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Harmeet K. Dhillon **Date** 10/30/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# EXHIBIT A

**No. 23-16031**

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant*

v.

KELLY STALEY, Superintendent,

*Defendant-Appellee*,

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO;
EILEEN ROBINSON; MATT TENNIS,

*Defendants.*

_____

On Appeal from the United States District Court for the Eastern District of
California No. 2:23-cv-00032-JAM-DMC Hon. John A. Mendez
_____

### DECLARATION OF JESSE D. FRANKLIN-MURDOCK IN SUPPORT OF
### APPELLANT'S REQUEST FOR JUDICIAL NOTICE

I, Jesse D. Franklin-Murdock, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am above the age of 18, and I make this declaration from my own personal knowledge. If called upon to testify to the contents below, I could and would do so competently.

2.     I am an attorney duly licensed to practice law in the States of California and Hawaii. I work for the Dhillon Law Group Inc. ("DLG"). DLG, along with the Center for American Liberty ("CAL"), is counsel of record for Appellant Aurora Regino in this matter. DLG, along with CAL, is also counsel of record for Prospective Intervenors in the case captioned *The People of the State of California, ex rel. Rob Bonta, Attorney General of the State of California v. Chino Valley Unified School District*, Case No. CIV-SB-2317301 (the "Chino Valley Litigation"). Prospective Intervenors in the Chino Valley Litigation are parents of children in the Chino Valley Unified School District who will be Defendant-Intervenors following the court's entry of a proposed order as the Court granted Prospective Intervenors' application to intervene at a hearing on October 19, 2023.

3.     Attached as Exhibit B to Ms. Regino's Request for Judicial Notice ("RJN") is the Brief of Amici Curiae Medical, Nursing, Mental Health, and Other Health Care Organizations in Support of Appellee in *Adams v. The School Board of St. Johns County*, Case No. 18-13592 (Brief filed January 5, 2022). On or about

1

October 29, 2023, I personally downloaded this document from Pacer.gov at https://ecf.ca11.uscourts.gov/n/beam/servlet/TransportRoom. Exhibit B is a true and correct copy of that document.

4.      Attached as Exhibit C to Ms. Regino's RJN is the Declaration of Dr. Christine Brady, dated August 24, 2023 (the "Brady Declaration"). Dr. Brady is the State's expert witness in the Chino Valley Litigation. As Prospective Intervenors had not yet filed their application to intervene when the Brady Declaration was filed on August 29, 2023, DLG was not served with the Brady Declaration. Regardless, the Brady Declaration is available online at https://cap.sb-court.org/ (registration required), which is where I obtained it. Exhibit C is a true and correct copy of the Brady Declaration.

5.      Attached as Exhibit D to Ms. Regino's RJN is the Declaration of Dr. Erica Anderson, dated October 2, 2023 (the "Anderson Declaration"). Dr. Anderson is the expert witness of the Chino Valley Unified School District in the Chino Valley Litigation. On or about October 2, 2023, the Chino Valley Unified School District served on DLG a copy of the Anderson Declaration in the Chino Valley Litigation in its capacity as counsel for Proposed Intervenors. The Anderson Declaration is also available online at https://cap.sb-court.org/ (registration required). Exhibit D is a true and correct copy of the Anderson Declaration.

6.      Attached as Exhibit E to Ms. Regino's RJN is the Department of Health and Human Service Proposed Rule, *Nondiscrimination in Health Programs and Activities*, 87 FR 47,824-01, 2022 WL 3082867 (August 4, 2022). On October 29, 2023, I personally downloaded this document from Westlaw.com at https://1.next.westlaw.com/Document/I9067B6E013C311ED87CDC83BB074DF61/View/FullText.html?transitionType=UniqueDocItem&contextData=(sc.Search)&userEnteredCitation=87+FR+47%2c824-01#co_pp_sp_1037_47824-01.   Exhibit E is a true and correct copy of relevant excerpts from that document.

7.      Attached as Exhibit F to Ms. Regino's RJN is an article written by Ken J. Zucker called *The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, which was published in the International Journal of Transgenderism (2018). On or about October 29, 2023, I personally downloaded this document from https://www.researchgate.net/publication/325443416. Exhibit F is a true and correct copy of that document.

[SIGNATURE BLOCK ON NEXT PAGE]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of October 2023, in San Francisco, California.

_____

Jesse D. Franklin-Murdock

# EXHIBIT B

No. 18-13592

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

DREW ADAMS, *Plaintiff-Appellee*,

v.

THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,
*Defendant-Appellant.*

On Appeal from the United States District Court for the
Middle District of Florida
Case No. 17-cv-739-TJC-JBT (Hon. Timothy J. Corrigan)

## *EN BANC* BRIEF OF *AMICI CURIAE* MEDICAL, MENTAL HEALTH, AND OTHER HEALTH CARE ORGANIZATIONS IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Matthew D. Cipolla
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Illyana A. Green
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

Clifford W. Berlow
  *Counsel of Record*
Howard S. Suskin
D. Matthew Feldhaus
Connor S.W. Rubin
Scott M. De Nardo
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
cberlow@jenner.com
*Counsel for Amici Curiae*

Case No. 18-13592, *Adams v. The School Board of St. Johns County, Florida*

**AMENDED CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit
Rules 26.1-1 through 26.1-4, the undersigned counsel certifies that, to the best of
their knowledge, the Certificate of Interested Persons set forth in the Petition for
Rehearing *En Banc* of Appellant, The School Board of St. Johns County, Florida at
C-1–C-23 (Aug. 28, 2021) is complete, subject to the following amendments:

**Added:**

Cipolla, Matthew D. – Counsel for *Amici Curiae*

De Nardo, Scott M. – Counsel for *Amici Curiae*

Feldhaus, D. Matthew – Counsel for *Amici Curiae*

Florida Chapter of the American Academy of Pediatrics – *Amicus Curiae*

Green, Illyana A. – Counsel for *Amici Curiae*

Jenner & Block LLP – Counsel for *Amici Curiae*

Mental Health America – *Amicus Curiae*

Rubin, Connor S.W. – Counsel for *Amici Curiae*

Suskin, Howard S. – Counsel for *Amici Curiae*

World Professional Association for Transgender Health – *Amicus Curiae*

**Deleted:**

American Academy of Child and Adolescent Psychiatry (AACP)

Case No. 18-13592, *Adams v. The School Board of St. Johns County, Florida*

American Academy of Nursing

American Nurses Association

The undersigned will enter this information in the Court's web-based CIP contemporaneously with filing this Certificate of Interested Persons.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3 and 28-1(b), each *amicus curiae* hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: November 24, 2021                    /s/ Clifford W. Berlow

                                            Clifford W. Berlow
                                            JENNER & BLOCK LLP
                                            353 N. Clark Street
                                            Chicago, IL 60654
                                            (312) 222-9350
                                            cberlow@jenner.com

                                            *Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE
OF *AMICI CURIAE* .........................................................................1

STATEMENT OF THE ISSUE ............................................................2

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ........................................................................................4

I.    What It Means To Be Transgender And To Suffer From Gender
      Dysphoria...................................................................................4

      A.    Gender Identity.................................................................7

      B.    Gender Dysphoria...........................................................10

            1.    The Diagnostic Criteria And Seriousness Of Gender
                  Dysphoria. ...........................................................10

            2.    The Accepted Treatment Protocols For Gender
                  Dysphoria. ...........................................................12

II.   Excluding Transgender Individuals From Facilities Consistent With
      Their Gender Identity Endangers Their Health, Safety, And Well-
      Being...........................................................................................20

      A.    Exclusionary Policies Exacerbate Gender Dysphoria And Are
            Contrary To Widely Accepted, Evidence-Based Treatment
            Protocols...........................................................................21

      B.    Exclusionary Policies Expose Transgender Individuals To
            Harassment And Abuse....................................................22

      C.    Exclusionary Policies Exacerbate Stigma And Discrimination,
            Leading To Negative Health Outcomes............................24

      D.    Exclusionary Policies Lead To Avoidance Of Restroom Use,
            Harming Physical Health. ................................................26

i

E.    Exclusionary Policies Harm Adolescent Social And Emotional Development—With Lifelong Effects. .............................................29

CONCLUSION .........................................................................................31

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Boyertown Area Sch. Dist.*,
276 F. Supp. 3d 324 (E.D. Pa. 2017)....................................................21

*Students and Parents for Privacy v. United States Dep't of Educ.*,
No. 16-cv-4945, 2016 WL 6134121 (N.D. Ill. Oct. 18, 2016)..........................21

**Rules**

Fed R. App. P. 29 .......................................................................................1

**Other Authorities**

Am. Acad. of Pediatrics, *American Academy of Pediatrics Opposes
Legislation that Discriminates Against Transgender Children*
(May 1, 2016), https://www.aapdc.org/2016/05/01/american-
academy-of-pediatrics-opposes-legislation-that-discriminates-
against-transgender-children/........................................................23, 24

Am. Acad. of Pediatrics, *Gender Identity Development in Children*
(2015), https://healthychildren.org/English/ages-
stages/gradeschool/Pages/Gender-Identity-and-Gender-Confusion-
In-Children.aspx...............................................................................8

Am. Med. Ass'n, Comm. on Human Sexuality, *Human Sexuality* 38
(1972)..............................................................................................13

Am. Med. Ass'n et al., Issue Brief *LGBTQ change efforts (so-called
"conversion therapy")* 3 (2019), https://www.ama-
assn.org/system/files/2019-12/conversion-therapy-issue-brief.pdf....................6

Am. Med. Ass'n, Policy H-65.964, *Access to Basic Human Services
for Transgender Individuals* (2017)...................................................20

Am. Med. Ass'n, Policy H-185.950, *Removing Financial Barriers to
Care for Transgender Patients* (2016) ...............................................16

Am. Med. Ass'n, Policy H-160.991, *Health Care Needs of Lesbian, Gay, Bisexual, Transgender and Queer Populations* (2018), https://policysearch.ama-assn.org/policyfinder/detail/160.991?uri=%2FAMADoc%2FHOD.xml-0-805.xml ...................................................................15

Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs., *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* (2015), http://www.apa.org/about/policy/orientation-diversity.aspx ............................... 15, 20, 22, 24, 26, 29, 30

Am. Psych. Ass'n, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* (2014), http://www.apa.org/topics/lgbt/transgender.pdf ...............................................7, 8

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (2015) ...............................................................*passim*

Am. Psych. Ass'n, *Report of the APA Task Force on Gender Identity and Gender Variance* 26 (2008), https://.apa.org///reports/identity ...6, 11, 14, 15

Am. Psych. Ass'n, *Stress in America: The Impact of Discrimination* (2016), https://www.apa.org/news/press/releases/stress/2015/impact-of-discrimination.pdf ...............................................................25

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)...............................................10, 11, 12

Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012), https://psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2012-Tra nsgender-Gender-Variant-Discrimination.pdf...............................................7, 10

Am. Psychiatric Ass'n Workgroup on Treatment of Gender Dysphoria, *Assessment and Treatment of Gender Dysphoria and Gender Variant Patients: A Primer for Psychiatrists* 16 (2016)...............15

Am. Psychoanalytic Ass'n, *Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression* (2012), https://apsa.org/content/2012-position-statement-attempts-change-sexual-orientation-gender-identity-or-gender ........................................ 13, 15, 25

Am. Sch. Counselor Ass'n, *The School Counselor and LGBTQ Youth* (2016), https://www.schoolcounselor.org/asca/media/asca/PositionStatements/PS_LGBTQ.pdf .......................................................................................... 15

Lawrence E. Armstrong, *Challenges of Linking Chronic Dehydration and Fluid Consumption to Health Outcomes*, 70 Nutrition Rev. S121 (2012) ........................................................................................................ 28

Henk Asscheman et al., *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164 Eur. J. Endocrinology 635 (2011), https://eje.bioscientifica.com/view/journals/eje/164/4/635.xml ........................ 18

Walter Bockting & Eli Coleman, *Developmental Stages of the Transgender Coming-Out Process: Toward an Integrated Identity, in Principles of Transgender Medicine and Surgery* 137 (Randi Ettner, Stan Monstrey & Eli Coleman eds., 2d ed. 2016) ................................. 19

Judith Bradford et al., *Experiences of Transgender-Related Discrimination and Implications for Health: Results from the Virginia Transgender Health Initiative Study*, 103 Am. J. Pub. Health 1820 (2013) ..................................................................................... 25, 26

Stephanie A. Brill & Rachel Pepper, *The Transgender Child: A Handbook for Families and Professionals* 202 (2008) ............................... 12, 17

William Byne et al., *Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder*, 41 Arch. Sexual Behav. 759 (2012) ................................................................................. 18

Center of Excellence for Transgender Health, Univ. Cal., S.F., *Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People* 23 (Madeline B. Deutsch ed., 2d ed. 2016), https://transcare.ucsf.edu/guidelines ...................... 16

Ethan C. Cicero & Linda M. Wesp, *Supporting the Health and Well-Being of Transgender Students*, 33 J. Sch. Nursing 2 (2017).........................8, 9

Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights* 5 J. Sexual Med. 1892 (2008).......................9

Halley P. Crissman et al., *Transgender Demographics: A Household Probability Sample of US Adults*, 2014, 107 Am. J. Pub. Health 213 (2017).............................................................................................5

Hillary Daniel et al., *Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper from the American College of Physicians*, 163 Annals Internal Med. 135 (2015).........................................................................................15

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) ..........................................................................18

Arianne B. Dessens et al., *Gender Dysphoria and Gender Change in Chromosomal Females with Congenital Adrenal Hyperplasia*, 34 Arch. Sexual Behav. 389 (2005).................................................9

Jack Drescher, *Controversies in Gender Diagnoses*, 1 LGBT Health 9 (2013)...........................................................................................13

Jack Drescher, *Queer Diagnoses: Parallels and Contrasts in the History of Homosexuality, Gender Variance, and the Diagnostic and Statistical Manual*, 39 Arch. Sexual Behav. 427 (2010)...........................12

Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017)......................................................16

Diane Ehrensaft, *From Gender Identity Disorder to Gender Identity Creativity: True Gender Self Child Therapy*, 59 J. Homosexuality 337 (2012)..................................................................................11

Marla E. Eisenberg et al., *Suicidality Among Gay, Lesbian and Bisexual Youth: The Role of Protective Factors*, 39 J. Adolescent Health 662 (2006) ........................................................................30

Jan Eldh et al., *Long-Term Follow Up After Sex Reassignment Surgery*, 31 Scand. J. Plastic & Reconstructive Surgery & Hand Surgery 39 (1997). .............................................................19

Randi Ettner et al., *Secrecy and the Pathogenesis of Hypertension*, Int'l J. Family Med. (2012).............................................26

Alessandra D. Fisher et al., *Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data*, 101 J. Clinical Endocrinology & Metabolism 4260 (2016).........................................................17

Andrew R. Flores et al., The Williams Inst., *Race and Ethnicity of Adults Who Identify as Transgender in the United States* 2 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Race-and-Ethnicity-of-Transgender-Identified-Adults-in-the-US.pdf ........................5

Gary J. Gates & Jody L. Herman, The Williams Inst., *Transgender Military Service in the United States* (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Military-Service-US-May-2014.pdf ...........................................5

Anas I. Ghousheh et al., *Advanced Transitional Cell Carcinoma of the Bladder in a 16-Year-Old Girl with Hinman Syndrome*, 80 Urology 1141 (2012).........................................................28

Luk Gijs & Anne Brewaeys, *Surgical Treatment of Gender Dysphoria in Adults and Adolescents: Recent Developments, Effectiveness, and Challenges*, 18 Ann. Rev. Sex Rsch. 178 (2007) .......................19

Jamie M. Grant et al., Nat'l Center for Transgender Equality, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), http://www.thetaskforce.org/static_html/downloads/reports//ntds_full.pdf .........................................................24

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009).........................29

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017)........................................................16, 17, 18

Michael L. Hendricks & Rylan J. Testa, *A Conceptual Framework for Clinical Work with Transgender and Gender Nonconforming Clients: An Adaptation of the Minority Stress Model*, 43 Pro. Psych: Research & Practice 460 (2012) ...........................................12

Jody L. Herman et al., The Williams Inst., *Age of Individuals Who Identify as Transgender in the United States* 2 (2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf............................................................5

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013)....................23, 27, 28

Darryl B. Hill et al., *An Affirmative Intervention for Families with Gender Variant Children: Parental Ratings of Child Mental Health and Gender*, 36 J. Sex & Marital Therapy 6 (2010)..............................13

Inst. of Med. Comm. on LGBT Health Issues and Rsch. Gaps and Opportunities, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* (2011)..........................................................26

Gianna E. Israel & Donald E. Tarver II, *Transgender Care: Recommended Guidelines, Practical Information & Personal Accounts* (1997) ...........................................................19

Sandy E. James et al., Nat'l Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 2 (2016), https://transequality.org/sites/default/files/docs/usts/USTS%20Full %20Report%20%20FINAL%201.6.17.pdf........................................5, 6, 22, 28

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth In Our Nation's Schools* (2016) .............................................24

David A. Levine & Comm. on Adolescence, Am. Acad. of Pediatrics Technical Report, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132 Pediatrics (2013), https://publications.aap.org/pediatrics/article/132/1/e297/31402/Office-Based-Care-for-Lesbian-Gay-Bisexual ......................... 4, 14, 15, 16, 24, 30

Colt Meier & Julie Harris, Am. Psych. Ass'n, Fact Sheet: *Gender Diversity and Transgender Identity in Children* 1, http://www.apadivisions.org/division-44/resources/advocacy/transgender-children.pdf; ........................... 8, 9

Mohammad Hassan Murad et al., *Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes*, 72 Clinical Endocrinology 214 (2010) ............................................................................................... 19

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016) ................ 16

Jason Rafferty, Am. Acad. of Pediatrics, *Gender-Diverse & Transgender Children* (2015), https://healthychildren.org//stages///Non-Conforming-Transgender-Children.aspx ..................................................................... 9

Stephen T. Russell et al., *Youth Empowerment and High School Gay-Straight Alliances*, 38 J. Youth Adolescence 891 (2009) ................... 30

Francine Russo, *Is There Something Unique About the Transgender Brain?* Sci. Am. (Jan. 1, 2016) https://www.scientificamerican.com/article/is-there-something-unique-about-the-transgender-brain/ ..................................... 9

Caitlin Ryan, Family Acceptance Project, *Supportive Families, Healthy Children: Helping Families with Lesbian, Gay, Bisexual, & Transgender Children* 17 (2009), http://familyproject.sfsu.edu/sites/default/files/FAP_English%20Booklet_pst.pdf ................................................................................. 7

Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378 (2016) .............................................................. 27

Rebecca L. Stotzer et al., The Williams Inst., *Transgender Parenting: A Review of Existing Research* (2014), http://williamsinstitute.law.ucla.edu/research/parenting/transgender-parenting-oct-2014 ...................................................................................5

Substance Abuse and Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 13 (2015), http://store.samhsa.gov/shin/content/SMA15-4928/SMA15-4928.pdf..................................................................6, 11, 13

Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psych. 1580 (2010)...................................................................................26, 30

Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation,* 145 Pediatrics 2 (2020) .....................................18

Paul J. Van Kesteren et al., *Mortality and Morbidity in Transsexual Subjects Treated with Cross-Sex Hormones*, 47 Clinical Endocrinology 337 (1997) ..................................................................18

Robert Wallace & Hershel Russell, *Attachment and Shame in Gender-Nonconforming Children and Their Families: Toward a Theoretical Framework for Evaluating Clinical Interventions*, 14 Int'l J. Transgenderism 113 (2013) ...................................................13

Sam Winter et al., *Transgender People: Health at the Margins of Society*, 388 Lancet 390 (2016) ..................................................21

World Pro. Ass'n for Transgender Health ("WPATH"), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 5 (7th Version, 2011), http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=4655............................8, 13, 14, 16, 18, 19

Jessica Xavier et al., Va. Dep't of Health, *The Health, Health-Related Needs, and Lifecourse Experiences of Transgender Virginians* (2007), https://www.vdh.virginia.gov/content/uploads/sites/10/2016/01/THISFINALREPORTVol1.pdf ..............................................12

Emily B. Zimmerman et al., U.S. Dep't of Health and Human Servs.,
  *Understanding the Relationship Between Education and Health: A
  Review of the Evidence and an Examination of Community
  Perspectives* (2015),
  http://www.ahrq.gov/professionals/education/curriculum-
  tools/population-health/zimmerman.html ........................................................29

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE OF *AMICI CURIAE*[1]

*Amici* are leading medical, and other health care organizations:

- American Academy of Pediatrics

- American College of Physicians

- American Medical Association

- American Medical Women's Association

- Endocrine Society

- Florida Chapter of the American Academy of Pediatrics

- GLMA—Health Professionals Advancing LGBT Equality

- Mental Health America

- World Professional Association for Transgender Heath ("WPATH")

Collectively, *amici* represent hundreds of thousands of physicians and mental health professionals, including specialists in pediatrics and adolescent care, family medicine, internal medicine, and endocrinology. Through its more than 25,000 members, the Florida Chapter of the American Academy of Pediatrics (FCAAP) promotes the health and welfare of Florida's children (newborns, infants, children,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, *amici* hereby certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amici* and their counsel contributed money intended to fund preparation or submission of the brief. All parties have consented to the filing of this *amicus* brief.

adolescents, and young adults), and supports pediatricians and pediatric specialists as the best qualified providers of their healthcare. *Amici* share a commitment to improving the physical and mental health of all Americans— regardless of gender identity—and to informing and educating lawmakers, the judiciary, and the public regarding the public health impacts of laws and policies.

*Amici* submit this brief to inform the Court of the medical consensus regarding what it means to be transgender; the protocols for the treatment of gender dysphoria; and the predictable harms to the health and well-being of transgender adolescents when they are excluded from restrooms that match their gender identity.

## STATEMENT OF THE ISSUE

Whether the District Court properly found unconstitutional and in violation of Title IX Defendant's policy prohibiting Plaintiff from using the boys' restrooms.

## SUMMARY OF ARGUMENT

Transgender individuals have a gender identity that is incongruent with the sex they were assigned at birth. The medical community's understanding of what it means to be transgender has advanced greatly over the past century. The medical community now understands that being transgender implies no impairment in a person's judgment, stability, or general social or vocational capabilities. According to recent estimates, approximately 1.4 million transgender adults live in the United States—0.6% of the adult population.

Many transgender individuals, like Plaintiff, have a condition called gender dysphoria, which is characterized by clinically significant distress and impairment of function resulting from the incongruence between one's gender identity and the sex assigned at birth. The international medical consensus regarding treatment for gender dysphoria is to assist the patient to live in accordance with his or her gender identity, thus alleviating the distress. Treatment may include any or all of the following: counseling, social transition (through, *e.g.*, use of a new name and pronouns; new clothes and grooming; and use of single-sex facilities, including restrooms, most consistent with the individual's gender identity), hormone therapy, and surgical interventions.

Access to single-sex facilities that correspond to one's gender identity is a critical aspect of social transition and, thus, the successful treatment of gender dysphoria. By contrast, excluding transgender individuals from facilities consistent with their gender identity undermines their treatment; exposes them to stigma and discrimination; harms their physical health by causing them to avoid restroom use; and impairs their social and emotional development. Similarly, transgender students who must use separate facilities that other students are not required to use are at risk of being bullied and discriminated against and suffer psychological harm. The stigma and minority stress that result from discrimination can, in turn, lead to poorer health outcomes for transgender individuals.

## ARGUMENT

### I.    What It Means To Be Transgender And To Suffer From Gender Dysphoria.

Transgender individuals have a "gender identity"—a "deeply felt, inherent sense" of their gender—that is not aligned with the sex assigned to them at birth.[2] Transgender people differ from cisgender (*i.e.*, non-transgender) individuals, whose gender identity aligns with the sex assigned at birth.[3] A transgender man is someone who was assigned the sex of female at birth, but is male and transitions to live in accordance with that male identity. A transgender woman is an individual who was assigned the sex of male at birth but is female and transitions to live in accordance with that female identity. A transgender man is a man. A transgender woman is a woman.

---

[2] Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 834 (2015) [hereinafter "Am. Psych. Ass'n *Guidelines*"]; *see also* David A. Levine & Comm. on Adolescence, Am. Acad. of Pediatrics Technical Report, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132 Pediatrics e297, e298 (2013), https://publications.aap.org/pediatrics/article/132/1/e297/31402/Office-Based-Care-for-Lesbian-Gay-Bisexual [hereinafter "AAP Technical Report]. Although most people have a gender identity that is male or female, some individuals have a gender identity that is "a blend of male or female[,] or an alternative gender." Am. Psych. Ass'n *Guidelines*, at 834.

[3] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 861.

4

While recent estimates suggest that approximately 1.4 million transgender adults live in the United States (0.6% of the adult population),[4] these "population estimates likely underreport the true number of [transgender] people."[5] People of all different races and ethnicities identify as transgender.[6] They live in every state, serve in our military, and raise children.[7] Gender identity is distinct from and does not

---

[4] Jody L. Herman et al., The Williams Inst., *Age of Individuals Who Identify as Transgender in the United States* 2 (2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf

[5] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 832.

[6] *See* Halley P. Crissman et al., *Transgender Demographics: A Household Probability Sample of US Adults*, 2014, 107 Am. J. Pub. Health 213, 214-15 (2017); Andrew R. Flores et al., The Williams Inst., *Race and Ethnicity of Adults Who Identify as Transgender in the United States* 2 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Race-and-Ethnicity-of-Transgender-Identified-Adults-in-the-US.pdf.

[7] Gary J. Gates & Jody L. Herman, The Williams Inst., *Transgender Military Service in the United States* (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Military-Service-US-May-2014.pdf; Sandy E. James et al., Nat'l Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 2 (2016), https://transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20%20FINAL%201.6.17.pdf [hereinafter "*Report of 2015 U.S. Transgender Survey*"]; Rebecca L. Stotzer et al., The Williams Inst., *Transgender Parenting: A Review of Existing Research* (2014), http://williamsinstitute.law.ucla.edu/research/parenting/transgender-parenting-oct-2014.

predict sexual orientation; transgender people, like cisgender people, may identify as heterosexual, gay, lesbian, bisexual, or asexual.[8]

The medical profession's understanding of gender has advanced considerably over the past fifty years. Throughout much of the twentieth century, individuals who were not gender conforming were often viewed as "perverse or deviant."[9] Practices during that period of time tried to "correct" this perceived deviance by attempting to force transgender people to live in accordance with the sex assigned to them at birth. These efforts failed and caused significant harm to the individuals subjected to them.[10] As *amicus curiae*, the American Medical Association has made clear, "[a]ll leading professional medical and mental health associations reject 'conversion therapy' as a legitimate medical treatment."[11]

---

[8] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 835-36; *Report of 2015 U.S. Transgender Survey*, *supra* note 7.

[9] Am. Psych. Ass'n, *Report of the APA Task Force on Gender Identity and Gender Variance* 26-27 (2008), https://.apa.org///reports/identity [hereinafter Am. Psych. Ass'n, *Task Force Report*].

[10] *Id*.; Substance Abuse and Mental Health Servs. Admin. ("SAMHSA"), *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 13, 25 (2015), http://store.samhsa.gov/shin/content/SMA15-4928/SMA15-4928.pdf.

[11] Am. Med. Ass'n et al., Issue Brief *LGBTQ change efforts (so-called "conversion therapy")* 3 (2019), https://www.ama-assn.org/system/files/2019-12/conversion-therapy-issue-brief.pdf.

Much as our professions recognize that homosexuality is a normal form of human sexuality—and that stigmatizing gay people causes significant harm—we now recognize that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities—and that stigmatizing transgender people also causes significant harm."[12]

### A.  Gender Identity.

"[G]ender identity" refers to a person's internal sense of being male, female, or another gender.[13] Every person has a gender identity,[14] which cannot be altered

---

[12] Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012), https://psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2012-Tra nsgender-Gender-Variant-Discrimination.pdf.

[13] Am. Psych. Ass'n, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 1 (2014), http://www.apa.org/topics/lgbt/transgender.pdf [hereinafter "*Answers to Your Questions About Transgender People*"].

[14] *See* Caitlin Ryan, Family Acceptance Project, *Supportive Families, Healthy Children: Helping Families with Lesbian, Gay, Bisexual, & Transgender Children* 17 (2009), http://familyproject.sfsu.edu/sites/default/files/FAP_English%20Booklet_pst.pdf.

voluntarily[15] or ascertained immediately after birth.[16] Many children develop stability in their gender identity between the ages of three and four.[17]

"[G]ender expression refers to the way a person communicates gender identity to others through behavior, clothing, hairstyles, voice, or body characteristics."[18] There are many individuals who depart from stereotypical male and female appearances and roles, but who are not transgender.[19] Indeed, most people who express their gender in a non-stereotypical or non-conforming manner are or become comfortable with the sex they were assigned at birth.[20] In contrast, a transgender boy or transgender girl "consistently, persistently, and insistently" identifies as a gender

---

[15] Colt Meier & Julie Harris, Am. Psych. Ass'n, Fact Sheet: *Gender Diversity and Transgender Identity in Children* 1, http://www.apadivisions.org/division-44/resources/advocacy/transgender-children.pdf; *see also* Am. Acad. of Pediatrics, *Gender Identity Development in Children* (2015), https://healthychildren.org/English/ages-stages/gradeschool/Pages/Gender-Identity-and-Gender-Confusion-In-Children.aspx.

[16] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 862.

[17] *Id*. at 841. "Although gender identity is usually established in childhood, individuals may become aware that their gender identity is not in full alignment with sex assigned at birth in childhood, adolescence, or adulthood." *Id*. at 836.

[18] *Answers to Your Questions About Transgender People*, *supra* note 13, at 1.

[19] Ethan C. Cicero & Linda M. Wesp, *Supporting the Health and Well-Being of Transgender Students*, 33 J. Sch. Nursing 2 (2017).

[20] World Pro. Ass'n for Transgender Health ("WPATH"), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 5 (7th Version, 2011), http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=4655 [hereinafter "WPATH *Standards of Care*"].

8

different from the sex they were assigned at birth.[21] The District Court relied on this very definition in its decision enjoining Defendant's bathroom policy, Findings of Fact and Conclusions of Law at 7, No. 17-cv-739 (M.D. Fla. July 26, 2018), Dkt. 192, and used the definition to support its rejection of Defendant's argument that permitting Plaintiff to use the boys' restroom will result in the elimination of separate sex restrooms, *id*. at 47.

Psychologists, psychiatrists, and neuroscientists are not certain why some people are transgender. Some research suggests there may be biological influences,[22] including, for example, exposure of natal females to elevated levels of testosterone in the womb.[23] Brain scans and neuroanatomical studies of transgender individuals may also support these biological explanations.[24]

---

[21] *See* Meier & Harris, *supra* note 15, at 1; *see also* Cicero & Wesp, *supra* note 19, at 6.

[22] *See* Jason Rafferty, Am. Acad. of Pediatrics, *Gender-Diverse & Transgender Children* (2015), https://healthychildren.org//stages///Gender-Non-Conforming-Transgender-Children.aspx; Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1895 (2008).

[23] Arianne B. Dessens et al., *Gender Dysphoria and Gender Change in Chromosomal Females with Congenital Adrenal Hyperplasia*, 34 Arch. Sexual Behav. 389, 395 (2005).

[24] *See, e.g.*, Francine Russo, *Is There Something Unique About the Transgender Brain?* Sci. Am. (Jan. 1, 2016), https://www.scientificamerican.com/article/is-there-something-unique-about-the-transgender-brain/.

## B.    Gender Dysphoria.

Being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[25] However, many transgender individuals are diagnosed with gender dysphoria, a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex.[26]

The District Court's factual findings are consistent with, and rely on, this medical consensus. *See* Dkt. 192 at 7-8.

### 1.    The Diagnostic Criteria And Seriousness Of Gender Dysphoria.

The Diagnostic and Statistical Manual of Mental Disorders codifies the diagnostic criteria for gender dysphoria in adolescents and adults as follows: "A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two" out of six criteria, and "clinically significant distress or impairment in social, occupational, or other important areas of functioning."[27] The six criteria include: (1) "[a] marked

---

[25] *Position Statement on Discrimination Against Transgender and Gender Variant Individuals*, *supra* note 12.

[26] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451-53 (5th ed. 2013) [hereinafter "*DSM-5*"].

[27] *Id*. at 452-53.

incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics"; (2) "[a] strong desire to be rid of one's primary and/or secondary sex characteristics"; (3) "[a] strong desire for the primary and/or secondary sex characteristics of the other gender"; (4) "[a] strong desire to be of the other gender (or some alternative gender)"; (5) "[a] strong desire to be treated" as a gender different from one's assigned gender; and (6) "[a] strong conviction that one has the typical feelings and reactions" of a different gender.[28]

Transgender children often experience intensified gender dysphoria and worsening mental health as the hormonal and anatomical changes associated with puberty cause the body to develop in ways that diverge from the child's gender identity.[29] For instance, a deepening voice for male-assigned individuals or the growth of breasts and the beginning of a menstrual cycle for female-assigned individuals can cause severe distress. For some, puberty manifests as "a sudden trauma that forces to consciousness the horror that they are living in a body that is totally at odds with the gender they know themselves to be but which has been kept securely underground."[30]

---

[28] *Id*. at 452.

[29] Am. Psych. Ass'n *Task Force Report*, *supra* note 9, at 45; *Ending Conversion Therapy*, *supra* note 10, at 3.

[30] Diane Ehrensaft, *From Gender Identity Disorder to Gender Identity Creativity: True Gender Self Child Therapy*, 59 J. Homosexuality 337, 345 (2012).

If untreated, gender dysphoria can contribute to debilitating distress, depression, impairment of function, substance use, self-mutilation to alter one's genitals or secondary sex characteristics, other self-injurious behaviors, and suicide.[31] Like other minority groups, transgender individuals also are frequently subjected to prejudice and discrimination in multiple areas of their lives (*e.g.*, school, employment, housing, healthcare), which exacerbates these negative health outcomes and makes access to appropriate medical care all the more important.[32]

### 2.    The Accepted Treatment Protocols For Gender Dysphoria.

Until the middle of the twentieth century, most mental health practitioners treated transgender people by attempting to make the patient's gender identity consistent with the patient's sex assigned at birth.[33] There is no evidence that these

---

[31] *See, e.g.*, *DSM-5*, *supra* note 26, at 455, 458; Stephanie A. Brill & Rachel Pepper, *The Transgender Child: A Handbook for Families and Professionals* 202 (2008) (discussing risk of self-mutilation).

[32] Michael L. Hendricks & Rylan J. Testa, *A Conceptual Framework for Clinical Work with Transgender and Gender Nonconforming Clients: An Adaptation of the Minority Stress Model*, 43 Pro. Psych: Research & Practice 460 (2012); Jessica Xavier et al., Va. Dep't of Health, *The Health, Health-Related Needs, and Lifecourse Experiences of Transgender Virginians* (2007), http://www.vdh.virginia.gov/content/uploads/sites/10/2016/01/THISFINALREPORTVoll.pdf.

[33] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 835; Jack Drescher, *Queer Diagnoses: Parallels and Contrasts in the History of Homosexuality, Gender Variance, and the Diagnostic and Statistical Manual*, 39 Arch. Sexual Behav. 427, 436-40 (2010).

methods alleviate gender dysphoria or that they can prevent someone from being transgender.[34] To the contrary, they can "often result in substantial psychological pain by reinforcing damaging internalized attitudes,"[35] and can damage family relationships and individual functioning by increasing feelings of shame.[36]

In the last few decades, transgender people suffering from gender dysphoria have gained widespread access to gender-affirming medical and mental health support and treatment.[37] For over thirty years, the generally-accepted treatment protocols for gender dysphoria[38] have aimed at alleviating the distress associated with the incongruence between gender identity and birth-assigned sex.[39] These

---

[34] *Ending Conversion Therapy*, *supra* note 10, at 26; Jack Drescher, *Controversies in Gender Diagnoses*, 1 LGBT Health 9, 12 (2013).

[35] Am. Psychoanalytic Ass'n, *Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression* (2012), https://apsa.org/content/2012-position-statement-attempts-change-sexual-orientation-gender-identity-or-gender.

[36] Darryl B. Hill et al., *An Affirmative Intervention for Families with Gender Variant Children: Parental Ratings of Child Mental Health and Gender*, 36 J. Sex & Marital Therapy 6, 10 (2010); Robert Wallace & Hershel Russell, *Attachment and Shame in Gender-Nonconforming Children and Their Families: Toward a Theoretical Framework for Evaluating Clinical Interventions*, 14 Int'l J. Transgenderism 113, 119-20 (2013).

[37] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 835; WPATH *Standards of Care*, *supra* note 20, at 8-9.

[38] Earlier versions of the DSM used different terminology, *e.g.*, gender identity disorder, to refer to this condition. Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 861.

[39] Am. Med. Ass'n, Comm. on Human Sexuality, *Human Sexuality* 38 (1972).

protocols are laid out in the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th Version 2011) developed by *amicus curiae* WPATH.[40] Indeed, the District Court described WPATH as having "established the accepted standard of care for transgender persons suffering from gender dysphoria" Dkt. 192 at 8, in its decision enjoining Defendant from enforcing its policy against Plaintiff. The major medical and mental health groups in the United States expressly recognize WPATH's Standards of Care as representing the consensus of the medical and mental health communities regarding the appropriate treatment for gender dysphoria.[41]

The recommended treatment for transgender people with gender dysphoria includes assessment, counseling, and, as appropriate, social transition, puberty-blocking drug treatment, hormone therapy, and surgical interventions to bring the

---

[40] WPATH *Standards of Care*, *supra* note 20.

[41] Am. Psych. Ass'n *Task Force Report*, *supra* note 9, at 32; AAP Technical Report, *supra* note 2, at e307-08.

14

body into alignment with one's gender identity.[42] However, each patient requires an

individualized treatment plan that takes into account the patient's specific needs.[43]

Social transition—*i.e.*, living one's life fully in accordance with one's gender

identity—is often a critically important part of treatment. This typically includes

publicly identifying oneself as that gender through all of the ways that people signal

their gender to others such as through their name, pronoun usage, dress, manner and

appearance, and social interactions. One key aspect of social transition is the ability

---

[42] Am. Psych. Ass'n *Task Force Report*, *supra* note 9, at 32-39; Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs., *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* (2015), http://www.apa.org/about/policy/orientation-diversity.aspx [hereinafter "APA/NASP Resolution"]; Am. Psychiatric Ass'n Workgroup on Treatment of Gender Dysphoria, *Assessment and Treatment of Gender Dysphoria and Gender Variant Patients: A Primer for Psychiatrists* 16-18 (2016); AAP Technical Report, *supra* note 2, at e307-09. Some clinicians still offer versions of "reparative" or "conversion" therapy based on the idea that being transgender is a mental disorder. However, all of the leading medical professional organizations that have considered the issue have explicitly rejected such treatments. *See* Am. Med. Ass'n, Policy H-160.991, *Health Care Needs of Lesbian, Gay, Bisexual, Transgender and Queer Populations* (2018), https://policysearch.ama-assn.org/policyfinder/detail/160.991?uri=%2FAMADoc%2FHOD.xml-0-805.xml; Am. Sch. Counselor Ass'n, *The School Counselor and LGBTQ Youth* (2016), https://www.schoolcounselor.org/asca/media/asca/PositionStatements/PS_LGBTQ.pdf; Hillary Daniel et al., *Lesbian, Gay, and Transgender Health Disparities: Executive Summary of a Policy Position Paper from the American College of Physicians*, 163 Annals Internal Med. 135, 136 (2015); AAP Technical Report, *supra* note 2, at e301; *Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression*, *supra* note 35.

[43] Am. Psych. Ass'n *Task Force Report*, *supra* note 9, at 32.

to use restrooms and other single-sex facilities consistent with that individual's gender identity.[44] Transgender children who have not transitioned report higher levels of anxiety and depression than their non-transgender peers, while studies of transitioned children suggest that they report statistically similar levels of anxiety and depression as their peers.[45]

For some adults and adolescents, hormone treatment to feminize or masculinize the body may be medically necessary to treat their gender dysphoria.[46] *Amicus curiae* the Endocrine Society, the oldest and largest global professional membership organization representing the field of endocrinology, considers these treatments to be the standard of care for gender dysphoria.[47] A transgender boy

---

[44] AAP Technical Report, *supra* note 2, at e308; Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 840.

[45] Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016).

[46] *See* Am. Med. Ass'n, Policy H-185.950, *Removing Financial Barriers to Care for Transgender Patients* (2016); Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 861, 862; Center of Excellence for Transgender Health, Univ. Cal., S.F., *Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People* 23 (Madeline B. Deutsch ed., 2d ed. 2016), https://transcare.ucsf.edu/guidelines; WPATH *Standards of Care*, *supra* note 20, at 33-34, 54.

[47] *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3869-70 (2017); *see*

undergoing hormone treatment, for example, will be exposed to the same levels of testosterone as other boys who go through male puberty; and just as they would in any other boy, these hormones will affect most of his major body systems.[48] Hormone treatment alters the appearance of the patient's genitals and produces secondary sex characteristics such as increased muscle mass, increased facial hair, and a deepening of the voice in transgender boys and men, and breast growth and decreased muscle mass in transgender girls and women.[49] For children experiencing the onset of puberty, treatment may include medication to prevent further progression of puberty ("pubert[y] blockers").[50] This fully reversible treatment allows children with gender dysphoria to delay the development of secondary sex characteristics that do not match their gender identity, giving them additional time to decide whether hormone treatment to feminize or masculinize the body is

---

*also* Alessandra D. Fisher et al., *Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data*, 101 J. Clinical Endocrinology & Metabolism 4260 (2016).

[48] Hembree et al., *supra* note 47, at 3869, 3871; *see also* Brill & Pepper, *supra* note 31, at 217.

[49] Hembree et al., *supra* note 47, at 3886-89.

[50] *Id*. at 3880-83.

appropriate.[51] Hormones have been clinically proven as an effective treatment for gender dysphoria with a low rate of complications.[52]

Surgical interventions may also be an appropriate and medically necessary treatment for some patients. These procedures could include chest reconstruction surgery for transgender men, breast augmentation for transgender women, or genital surgeries, including removal of the testicles, the primary source of testosterone production, in women who are transgender.[53] Decades of clinical evidence show these surgical procedures are effective in reducing gender dysphoria and improving mental health.[54] Because these surgical procedures are largely irreversible, some are

---

[51] *Id.* at 3880; Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 842; WPATH *Standards of Care*, *supra* note 20, at 18-20.

[52] *See* Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation,* 145 Pediatrics 2, 8 (2020) (finding a significant inverse association between treatment with pubertal suppression during adolescence and lifetime suicidal ideation among transgender adults who sought out this treatment); Henk Asscheman et al., *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164 Eur. J. Endocrinology 635 (2011), https://eje.bioscientifica.com/view/journals/eje/164/4/635.xml; Paul J. Van Kesteren et al., *Mortality and Morbidity in Transsexual Subjects Treated with Cross-Sex Hormones*, 47 Clinical Endocrinology 337 (1997).

[53] Hembree et al., *supra* note 47, at 3893-94; *see also* WPATH *Standards of Care*, *supra* note 20, at 57-58.

[54] William Byne et al., *Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder*, 41 Arch. Sexual Behav. 759, 778-79 (2012); Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014);

recommended only for transgender individuals who have reached the age of legal majority.[55] Empirical studies reflect the importance of the interplay among treatments, finding hormone therapy in conjunction with psychotherapy and, for some, surgery, to be necessary elements of treating severe levels of gender dysphoria.[56]

Ultimately—regardless of the particular treatments required for a specific individual and when such treatment begins—the goal is for individuals with gender dysphoria to experience "identity integration," where "being transgender is no longer the most important signifier of one's identity," and the individual can refocus on their relationships, school, job, and other life activities.[57]

---

Mohammad Hassan Murad et al., *Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes*, 72 Clinical Endocrinology 214 (2010); Luk Gijs & Anne Brewaeys, *Surgical Treatment of Gender Dysphoria in Adults and Adolescents: Recent Developments, Effectiveness, and Challenges*, 18 Ann. Rev. Sex Rsch. 178 (2007); Jan Eldh et al., *Long-Term Follow Up After Sex Reassignment Surgery*, 31 Scand. J. Plastic & Reconstructive Surgery & Hand Surgery 39 (1997).

[55] WPATH *Standards of Care*, *supra* note 20, at 21.

[56] *See* Gianna E. Israel & Donald E. Tarver II, *Transgender Care: Recommended Guidelines, Practical Information & Personal Accounts* 56-73 (1997).

[57] Walter Bockting & Eli Coleman, *Developmental Stages of the Transgender Coming-Out Process: Toward an Integrated Identity, in Principles of Transgender Medicine and Surgery* 137, 153 (Randi Ettner, Stan Monstrey & Eli Coleman eds., 2d ed. 2016).

**II.    Excluding Transgender Individuals From Facilities Consistent With Their Gender Identity Endangers Their Health, Safety, And Well-Being.**

Transgender students should have access to the sex-segregated facilities, activities, and programs that are *consistent* with their gender identity—including but not limited to bathrooms, locker rooms, sports teams, and classroom activities.[58] Evidence confirms that policies excluding transgender individuals from facilities consistent with their gender identity (hereinafter, "exclusionary policies") have detrimental effects on the physical and mental health, safety, and well-being of transgender individuals.[59] And while schools often provide private restrooms for any student who seeks greater privacy for any reason, forcing transgender students to use those separate facilities sends a stigmatizing message that may have a lasting and damaging impact on the health and well-being of the young person.

In contrast, there is no evidence of any harm to the physical or mental health of other children and adolescents when transgender students use facilities that match their gender identity. *Amici* are not hearing from their members about students experiencing any such harm—even though numerous states and school districts have

---

[58] APA/NASP Resolution, *supra* note 42, at 9.

[59] In fact, the AMA, whose mission statement requires it to support public health, recently confirmed its support for transgender individuals' accessing public restrooms according to their gender identities. Am. Med. Ass'n, Policy H-65.964, *Access to Basic Human Services for Transgender Individuals* (2017).

policies allowing transgender individuals to use restrooms that match their gender identity. Furthermore, in two cases brought by cisgender students challenging school policies allowing transgender students to access the restrooms and locker rooms consistent with their gender identity, the courts rejected the cisgender plaintiffs' preliminary injunction motions and their claims of harm.[60]

## A. Exclusionary Policies Exacerbate Gender Dysphoria And Are Contrary To Widely Accepted, Evidence-Based Treatment Protocols.

For transgender individuals, being treated differently from other men and women can cause tremendous pain and harm.[61] Indeed, exclusionary polices that force transgender people to disregard or deny their gender identity every time they must use a restroom disrupt medically appropriate treatment protocols. While those protocols provide that transgender individuals should live all aspects of their lives in the gender with which they identify, *see supra* pp. 12-19, exclusionary policies require transgender individuals to live one facet of their lives in contradiction with their gender identity. As a result, exclusionary policies threaten to exacerbate the

---

[60] *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 382, 409-11 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019); *Students and Parents for Privacy v. United States Dep't of Educ.*, No. 16-cv-4945, 2016 WL 6134121, at *28-29, *36-39 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted by* 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017).

[61] *See, e.g.*, Sam Winter et al., *Transgender People: Health at the Margins of Society*, 388 Lancet 390, 394 (2016).

risk of "anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness, and eating disorders among other adverse outcomes" that many transgender individuals face.[62] Those risks are already all too serious: in a comprehensive survey of over 27,000 transgender individuals, 40% reported a suicide attempt—a rate nine times that reported by the general U.S. population.[63]

### B. Exclusionary Policies Expose Transgender Individuals To Harassment And Abuse.

Exclusionary policies expose transgender individuals to harassment and abuse by forcing them to occupy gender-segregated spaces where their presence may be met with hostility, harassment, and abuse. For example, transgender men are visually recognized as men by other individuals; the presence of a transgender man in a women's restroom would be just as alarming as the presence of a cisgender man in the same women's restroom.

Exclusionary policies thus force transgender individuals to disclose their transgender status, because it is only transgender individuals who must use facilities that are incongruent with their gender identity and how they live and are recognized in the world. Because some children will have transitioned before they arrive in a

---

[62] APA/NASP Resolution, *supra* note 42, at 4.
[63] *Report of 2015 U.S. Transgender Survey*, *supra* note 7, at 114.

particular school, exclusionary policies may be the only way that they are forcibly "outed" to their peers as transgender.

This compelled disclosure of one's transgender status is harmful for at least two reasons. First, control over the circumstances in which a person may choose to disclose being transgender is fundamental to the development of individuality and autonomy.[64] Exclusionary policies rob transgender individuals of the personal choice regarding whether and when to reveal their transgender status. Disclosure of one's status as transgender is often anxiety-inducing and fraught; it is critical to a person's sense of safety, privacy, and dignity to have control over when and how that information is shared.

Second, such compelled disclosure exposes transgender individuals to the risk of harassment or abuse. In a 2013 survey, 68% of transgender respondents reported experiencing at least one instance of verbal harassment, and 9% reported suffering at least one instance of physical assault in gender-segregated bathrooms.[65]

---

[64] Am. Acad. of Pediatrics, *American Academy of Pediatrics Opposes Legislation that Discriminates Against Transgender Children* (May 1, 2016), https://www.aapdc.org/2016/05/01/american-academy-of-pediatrics-opposes-legislation-that-discriminates-against-transgender-children/.

[65] Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 73 (2013) [hereinafter "*Gendered Restrooms and Minority Stress*"].

These harms affect youth and adults alike. "[M]any gender and sexual orientation diverse children and adolescents experience harassment, bullying, and physical violence in school environments."[66] Because unwanted disclosure may cause such significant harm, the American Academy of Pediatrics' states that care should be confidential, and it is not the role of the pediatrician to inform parents/guardians about a patient's sexual identity or behavior as doing so could expose the patient to harm.[67] Indeed, the American Academy of Pediatrics announced its opposition to exclusionary policies by noting that these policies undermine children's ability "to feel safe where they live and where they learn."[68]

### C.    Exclusionary Policies Exacerbate Stigma And Discrimination, Leading To Negative Health Outcomes.

It is well documented that transgender individuals experience widespread prejudice and discrimination, and that this discrimination frequently takes the form of violence, harassment, or other abuse.[69] For example, in a Virginia survey of

---

[66] APA/NASP Resolution, *supra* note 42, at 5; *see* Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth In Our Nation's Schools* 12 (2016).

[67] AAP Technical Report, *supra* note 2, at e305.

[68] *American Academy of Pediatrics Opposes Legislation that Discriminates Against Transgender Children*, *supra* note 64.

[69] Jamie M. Grant et al., Nat'l Center for Transgender Equality, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 2-8 (2011), http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf.

transgender individuals, 50% of participants reported that they had experienced discrimination in healthcare, employment, or housing, and many individuals had experienced discrimination in more than one area.[70]

Exclusionary policies perpetuate such stigma and discrimination, both by forcing transgender individuals to disclose their status, and by marking transgender individuals as "others" who are unfit to use the restrooms used by everyone else. Such policies inherently convey the state's judgment that transgender individuals are different and deserve inferior treatment.

Research increasingly shows that stigma and discrimination can have deleterious health consequences,[71] including striking effects on the daily functioning and emotional and physical health of transgender persons.[72] A 2012 study of transgender adults found a rate of hypertension of twice that found in the general population, which it attributed to the known effects of emotions on cardiovascular

---

[70] Judith Bradford et al., *Experiences of Transgender-Related Discrimination and Implications for Health: Results from the Virginia Transgender Health Initiative Study*, 103 Am. J. Pub. Health 1820, 1825 (2013).

[71] *See generally* Am. Psych. Ass'n, *Stress in America: The Impact of Discrimination* (2016), https://www.apa.org/news/press/releases/stress/2015/impact-of-discrimination.pdf.

[72] *See, e.g.*, *Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression*, *supra* note 35 ("bias against individuals based on actual or perceived sexual orientation, gender identity or gender expression negatively affects mental health").

health.[73] Another study concluded that "living in states with discriminatory policies . . . was associated with a statistically significant increase in the number of psychiatric disorder diagnoses."[74] And a third study demonstrated that past school victimization may result in greater risk for post-traumatic stress disorder, depression, anxiety, and suicidality.[75] As the American Psychological Association has concluded, "the notable burden of stigma and discrimination affects minority persons' health and well-being and generates health disparities."[76] There is thus every reason to anticipate that exclusionary policies will negatively affect the health of transgender individuals.

### D. Exclusionary Policies Lead To Avoidance Of Restroom Use, Harming Physical Health.

Exclusionary policies have more immediate health effects as well. Though most of us take it for granted, all individuals require regular access to a restroom.

---

[73] Randi Ettner et al., *Secrecy and the Pathogenesis of Hypertension*, Int'l J. Family Med. (2012).

[74] Bradford et al., *supra* note 70, at 1827.

[75] Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psych. 1580, 1581 (2010).

[76] APA/NASP Resolution, *supra* note 42, at 3-4; *see also* Inst. of Med. Comm. on LGBT Health Issues and Rsch. Gaps and Opportunities, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* 13 (2011) (noting that "prejudice, discrimination, and violence" underlie the "health disparities" between transgender and cisgender populations).

Exclusionary policies that preclude transgender individuals from using restrooms consistent with their gender identity put transgender individuals to a difficult choice: (1) violate the policy and face potential disciplinary consequences; (2) use the restroom inconsistent with their gender identity or "special" single-user restrooms, which undermines their health care needs and risks discrimination or harassment; or (3) attempt not to use the restroom at all.

This difficult choice produces heightened anxiety and distress around restroom use, which may make it difficult for transgender individuals to concentrate or focus at school or work and potentially cause them to eschew social activities or everyday tasks.[77] At least one study of transgender college students associated being denied access to restrooms consistent with one's gender identity to an increase in suicidality.[78]

Studies also show that it is common for transgender students to avoid using restrooms.[79] But that avoidance can have medical consequences, including recurrent urinary tract infections and constipation, as well as the possibility of more serious health complications, including hematuria (blood in the urine), chronic kidney

---

[77] *Gendered Restrooms and Minority Stress*, *supra* note 65, at 75.

[78] Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378, 1388-89 (2016).

[79] Am. Psych. Ass'n *Guidelines*, *supra* note 2, at 840.

disease or insufficiency, urolithiasis (stones in the kidney, bladder, or urethra), infertility, and cancer.[80]

Some transgender students experiencing fear and anxiety about restroom usage may attempt to dehydrate themselves so that they will need to urinate less frequently.[81] Chronic dehydration has been linked to a variety of conditions, including urinary tract infections, kidney stones, blood clots, kidney disease, heart disease, and colon and bladder cancers.[82]

These negative outcomes are not alleviated by forcing students into separate single-user restrooms. Being required to use separate facilities may force disclosure of one's transgender status and cause anxiety and fear related to being singled out and separated from peers. Additionally, single-user facilities are generally less available and more inconvenient, causing people to further avoid restroom use or disrupt their schedules to go to the restroom. Separate restrooms thus do not alleviate

---

[80] *See, e.g.*, *Gendered Restrooms and Minority Stress*, *supra* note 65, at 75 (surveying transgender and gender non-conforming people in Washington D.C., and finding that 54% of respondents reported a "physical problem from trying to avoid using public bathrooms" including dehydration, urinary tract infections, kidney infection, and other kidney-related problems); *Report of 2015 U.S. Transgender Survey*, *supra* note 7, at 246; Anas I. Ghousheh et al., *Advanced Transitional Cell Carcinoma of the Bladder in a 16-Year-Old Girl with Hinman Syndrome*, 80 Urology 1141 (2012).

[81] *Gendered Restrooms and Minority Stress*, *supra* note 65, at 75.

[82] Lawrence E. Armstrong, *Challenges of Linking Chronic Dehydration and Fluid Consumption to Health Outcomes*, 70 Nutrition Rev. S121, 122 (2012).

the anxiety, fear, or negative health consequences that result from exclusionary bathroom policies.

### E.    Exclusionary Policies Harm Adolescent Social And Emotional Development—With Lifelong Effects.

Finally, exclusionary policies have a particularly deleterious effect on the social and emotional development of children and adolescents. Discrimination and harassment of children and adolescents in their formative years may have effects that linger long *after* they leave the school environment. Unsurprisingly, unwelcoming school environments produce particularly poor educational outcomes for transgender individuals.[83] Poorer educational outcomes, alone, may lead to lower lifetime earnings, and an increased likelihood of poorer health outcomes later in life.[84]

Moreover, and as already discussed, exclusionary policies may produce and compound the stigma and discrimination that transgender children and adolescents face in the school environment. That stigma and discrimination, in turn, is associated

---

[83] *See* APA/NASP Resolution, *supra* note 42, at 6; Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009).

[84] *See, e.g.*, Emily B. Zimmerman et al., U.S. Dep't of Health and Human Servs., *Understanding the Relationship Between Education and Health: A Review of the Evidence and an Examination of Community Perspectives* (2015), http://www.ahrq.gov/professionals/education/curriculum-tools/population-health/zimmerman.html.

with an increased risk of post-traumatic stress disorder, depression, anxiety, and suicidality in subsequent years.[85]

Conversely, evidence demonstrates that a safe and welcoming school environment may promote positive social and emotional development and health outcomes. Numerous studies show that safer school environments lead to reduced rates of depression, suicidality, or other negative health outcomes.[86]

With appropriate support—including safe and supportive schools— transgender youth can become happy and productive adults who contribute much to our society. By making schools into places of stress and conflict rather than welcoming spaces, exclusionary policies worsen stigma and discrimination against transgender students, causing myriad harms to their health, safety, and overall well-being.

---

[85] Toomey et al., *supra* note 75, at 1581; *see also* APA/NASP Resolution, *supra* note 42, at 6.

[86] AAP Technical Report, *supra* note 2, at e301, e302, e304-05; *see, e.g.*, Marla E. Eisenberg et al., *Suicidality Among Gay, Lesbian and Bisexual Youth: The Role of Protective Factors*, 39 J. Adolescent Health 662 (2006); Stephen T. Russell et al., *Youth Empowerment and High School Gay-Straight Alliances*, 38 J. Youth Adolescence 891 (2009).

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to affirm the District Court's decision enjoining Defendant from preventing Plaintiff from using single-sex multi-user facilities in accordance with his gender identity.

Dated: November 24, 2021

Respectfully submitted,

/s/ Clifford W. Berlow

Matthew D. Cipolla
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Illyana A. Green
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

Clifford W. Berlow
*Counsel of Record*
Howard S. Suskin
D. Matthew Feldhaus
Connor S.W. Rubin
Scott M. De Nardo
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
cberlow@jenner.com
*Counsel for Amici Curiae*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,291 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman.

Dated: November 24, 2021          /s/ Clifford W. Berlow

Clifford W. Berlow
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
cberlow@jenner.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2021, I caused the foregoing *amici curiae* brief to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: November 24, 2021          /s/ Clifford W. Berlow

Clifford W. Berlow
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
cberlow@jenner.com

*Counsel for Amici Curiae*

# EXHIBIT C

1  ROB BONTA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  LAURA L. FAER
   JAMES F. ZAHRADKA II
4  Supervising Deputy Attorneys General
   EDWARD NUGENT
5  GARY ROWE
   ALEXANDER SIMPSON
6  DELBERT TRAN
   XIYUN YANG
7  Deputy Attorneys General
   State Bar No. 323993
8   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
9   Telephone: (415) 229-0110
    E-mail: Delbert.Tran@doj.ca.gov
10 *Attorneys for California Secretary of State*

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    COUNTY OF SAN BERNARDINO

13

14

15 **THE PEOPLE OF THE STATE OF**          Case No. CIV SB 2 3 17 3 0 1
   **CALIFORNIA, EX REL. ROB BONTA,**
16 **ATTORNEY GENERAL OF THE STATE**       **DECLARATION OF DR. CHRISTINE**
   **OF CALIFORNIA,**                       **BRADY IN SUPPORT OF THE PEOPLE**
17                                          **OF THE STATE OF CALIFORNIA'S EX**
                                 Plaintiff, **PARTE APPLICATION FOR**
18                                          **TEMPORARY RESTRAINING ORDER**
                                            **AND ORDER TO SHOW CAUSE RE:**
      **v.**                                **PRELIMINARY INJUNCTION**
19
20 **CHINO VALLEY UNIFIED SCHOOL**         Date:  4/6/2023
   **DISTRICT,**                            Time:  9:30 AM
21                                          Dept:  S 27
                                Defendant.  Judge: Hon Thomas S. Garza
22                                          Trial Date:
                                            Action Filed: 8/28/2023

23

24

25

26

27

28

                                1

**DECLARATION OF CHRISTINE BRADY, PH.D.**

I, Christine Brady, declare:

1.　I am over the age of 18 years, a resident of the State of California, and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

**Background and Experience**

2.　I am a licensed psychologist in the State of California.

3.　I am the full-time psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health. I am also a Clinical Assistant Professor in the Department of Pediatric Endocrinology and Diabetes, and the Department of Psychiatry and Behavioral Sciences (by courtesy) at Stanford University School of Medicine.

4.　At Stanford, I provide direct therapeutic services to an average of 350 children and families per year. I also clinically supervise and train psychology graduate students and psychiatry fellows. I give lectures on gender-affirming care to psychology students, residents, and fellows and psychiatry fellows. I have conducted scholarly research on evidence based practices and supports for transgender and gender nonconforming youth.

5.　In this declaration, when I use the term transgender and gender nonconforming, I mean to include gender diverse, gender non-binary, and gender non-conforming individuals.

6.　I received my Bachelor of Science and Master of Arts in Psychology from James Madison University, Harrisonburg, VA, and my Ph.D. in Clinical Psychology from Ohio University, Athens, OH in 2014. I completed a year-long Pre-Doctoral Internship at the University of Washington/Seattle Children's Hospital as well as a year-long Post-Doctoral Fellowship at the University of Louisville/Norton Children's Hospital.

7.　In 2015, I co-founded and was Co-Director of the Gender Clinic at Hennepin Healthcare in Minneapolis, MN. After a year in Minnesota, I became Co-Director of the Pediatric Gender Clinic at the University of Louisville and was there for three years before coming to Stanford, where I have been working for almost three years.

2

8. In the eight years I have been working with individuals with gender dysphoria, I have treated over 1,000 youth and families.

9. Currently, 100 percent of my clinical patients are transgender and gender nonconforming youth.

10. In my career, I have provided therapy to patients presenting issues including ADHD, depression, anxiety, trauma, and coping with medical illnesses such as cancer.

11. Thus, I have extensive experience and strong therapeutic skills in working with patients with gender dysphoria as well as other common diagnoses in adolescents and young adults.

12. Since 2017, I have been a member of the World Professional Association for Transgender Health, a non-profit, interdisciplinary professional and educational organization promoting evidence based care, education, research, public policy and respect in transgender and gender nonconforming health.

13. Articles, book chapters, commentaries, and presentations of which I have authored or contributed in this subject include:

- Turban, **Christine Brady** and Johanna Olson-Kennedy, *Understanding And Supporting Patients With Dynamic Desires For Gender-Affirming Medical Interventions*, J. of the American Medical Assn. Network Open (2022) available at: doi:10.1001/jamanetworkopen.2022.24722.

- **Brady**, and Tandy Aye, T. *Supporting Gender Diverse Youth with Medical Conditions*, Workshop presented at the Gender Spectrum Professional Symposium (July 2021).

- **Brady** and Michelle Ernst, *Gender identity: Disorders/differences of sex development/intersex and transgender concerns*, Clinician Handbook of Pediatric Psychological Consultation in Medical Settings (2020) p. 439.

- **Brady**, et al., (2012) *Evaluating School Impairment with Adolescents: A Psychometric Evaluation of the Classroom Performance Survey*, School Psychology Review, p. 429.

3

14. Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as **Exhibit A** to this declaration.

15. The Office of the Attorney General has provided me with a copy of the Chino Valley Unified School District Board Policy 5020.1 ("Policy 5020.1"), and I have reviewed it.

16. In this declaration, I cite scientific research on both transgender and gender nonconforming individuals, and on broader research on LGBTQ individuals. Scientific research has historically focused on all sexual minorities, but has in recent years turned to transgender and gender nonconforming individuals specifically.

17. Based on my clinical and academic experience, there are many shared experiences between sexual minorities and transgender and gender nonconforming individuals, especially as it pertains to the issues discussed in this declaration and as it relates to Policy 5020.1.

18. My opinions below are based on my professional experience, both as a scientific researcher and as a clinician, my review of scientific research and other surveys and studies pertaining to transgender and gender nonconforming youth and students, and my review of Policy 5020.1.

### Summary of Opinions

19. In this declaration, I cite relevant research and studies to support my opinions that:

    A. Gender identity is not the same as sex assigned at birth based on externally observed genitalia. Policy 5020.1 creates social pressure for transgender and gender nonconforming youth to maintain their sex assigned at birth;

    B. Transgender and gender nonconforming identity is not pathological. Not all transgender and gender nonconforming individuals have gender dysphoria. Policy 5020.1 may cause an increase in symptoms of mental distress in transgender and gender nonconforming youth by intensifying social pressure to maintain a transgender or gender nonconforming individual's assigned sex at birth. It could

1         lead to development of gender dysphoria for those youths who do not have such a

2         diagnosis.

3      C. Social transition is the individualized process in which a person changes their

4         behavior and appearance, such as clothing, name, pronouns and hair style, to align

5         with their gender identity. By itself, social transition is psychologically beneficial

6         and is a medically recognized treatment for gender dysphoria. Policy 5020.1

7         discourages this medically recognized treatment of gender dysphoria, thus harming

8         transgender and gender nonconforming youths who have not yet socially

9         transitioned.

10     D. Policy 5020.1 mandates that teachers inform a parent or guardian regardless of

11        whether or not the youth and their family is ready. This can cause significant

12        psychological, emotional, and sometimes even physical harm to the youth.

13     E. Policy 5020.1 incentivizes youths to hide their identity, colloquially referred to as

14        "being in the closet," which causes psychological and emotional harm with long-

15        term consequences into adulthood; and

16     F. Policy 5020.1 contributes to a harmful school climate, which negatively impacts

17        LGBTQ youths mentally, socially and academically.

18
19                         **Gender Identity Is Not Assigned Sex**

20     20.    A person's sex is typically assigned at birth by a physician based on externally

21 observed genitalia. A person's assigned sex, or designated sex, may or may not align with their

22 gender identity. Transgender and gender nonconforming individuals have a gender that does not

23 align with their assigned sex. Cisgender individuals have a gender that does align with their

24 assigned sex.

25     21.    Gender identity is a person's core, innate, sense of self gender, such as male, female

26 or non-binary. Every person, transgender, gender nonconforming, or cisgender, has a gender

27 identity.

28

Declaration of Dr. Christine Brady

22. Gender identity is not a choice. It is an essential part of one's identity and being. Moreover, gender identity is not something that can be voluntarily changed with great effort, like using a dominant hand to write with.

23. Efforts to try to change a person's gender identity through therapy have been shown to be ineffective and harmful. For example, in a survey of transgender adults, those who reported receiving talk therapy aimed at changing their gender identity to match their sex assigned at birth (sometimes referred to as conversion therapy) indicated a lack of effectiveness of that treatment, higher psychological distress, and increased risk of suicide attempts.[1] The survey found that conversion efforts in children under the age of 10 correlated with a four-fold increase in attempted suicides.

24. Psychological attempts to force a transgender or gender nonconforming person to be cisgender are considered unethical by the American Psychiatric Association.[2] Major U.S. professional medical organizations have published statements warning against the dangers of conversion therapy and recommend that it should not be used with transgender or gender nonconforming individuals (e.g., American Psychological Association, American Medical Association, and American Academy of Child and Adolescent Psychiatry).[3]

25. Policy 5020.1 privileges a student's birth name, which, based on my academic and clinical experience, is most often based on an individual's assigned sex at birth. For transgender and gender nonconforming students, this birth name likely does not align with an individual's gender identity.

[1] Turban, et al., Association Between Recalled Exposure To Gender Identity Conversion Efforts And Psychological Distress And Suicide Attempts Among Transgender Adults, JAMA Psychiatry (2020) p. 68.
[2] American Psychiatric Association, *What is Gender Dysphoria* (2023) available at: https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria
[3] American Psychological Association, *APA Resolution on Gender Identity Change Efforts* (Feb. 2021) available at: https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf; American Medical Academy, *Sexual Orientation And Gender Identity Change Efforts (So-Called "Conversion Therapy")* (2022) available at: https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf; American Academy of Child and Adolescent Psychiatry, *Conversion Therapy Policy Statement* (Feb. 2018) available at: https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx

Declaration of Dr. Christine Brady

26. As such, based on my academic and clinical experience, Policy 5020.1 creates social pressure at school and at home for all students to maintain the gender identity that is the current status quo. For transgender and gender nonconforming students who are concealing their gender identity, colloquially known as being "in the closet," Policy 5020.1 creates social pressure in a students' school and family environment to maintain a gender identity that does not align with their authentic gender identity.

27. As discussed below, this will increase the transgender or gender nonconforming student's psychological distress and increase the likelihood of a mental health diagnosis.

28. Social pressures created by Policy 5020.1 may result in numerous psychological, emotional, physical, and social harms, which are particularly devastating for children, adolescents and young adults because of their ongoing brain development.

**Not All Transgender and Gender Nonconforming Individuals Have Gender Dysphoria**

29. Transgender and gender nonconforming identity is not a mental illness.

30. Gender dysphoria refers to the psychological distress caused by an incongruence between one's assigned sex at birth and one's gender identity. The treatment for gender dysphoria includes an open-ended exploration of the individuals' feelings and experiences of gender identity without any pre-defined, preferable gender identity. Treatment also includes social affirmation of the individual's preferred pronouns and names.

31. Transgender and gender nonconforming individuals may experience gender dysphoria at some point in their lives. However, some transgender and gender nonconforming individuals may feel at ease with their bodies, and may not experience gender dysphoria. The experience of every transgender or gender nonconforming individual is different. Although some can treat their incongruence through social transition and gender expression, others may also seek medical intervention.

32. A transgender or gender nonconforming individual is more likely to have certain symptoms of gender dysphoria such as significant distress or impairment in social functioning if

Declaration of Dr. Christine Brady

1   they live in an unsupportive or unaccepting household and experience a hostile school
2   environment.

3       33.   Unaccepting, unsupportive, or hostile school or family environments can exacerbate
4   mental health symptoms such as depression and anxiety.[4]

5       34.   Policy 5020.1 could also lead to development of gender dysphoria because it creates
6   social pressure for the student to maintain their assigned sex at birth and deters social transition.

7
8                       **Social Transition Is a Treatment for Gender Dysphoria**

9       35.   Transgender and gender nonconforming individuals may choose social transitioning
10  to align their gender expression with their gender identity. As described above, social transition
11  describes an individualized process in which a person changes various aspects of their gender
12  expression (e.g., clothing, name, pronouns, hair style) to align with their gender identity. In other
13  words, social transitioning allows others to see the transgender and gender nonconforming
14  individual as they feel on the inside and live as their authentic selves.

15      36.   Social transition is non-medical.

16      37.   A positive social transition experience allows the transgender or gender
17  nonconforming youth to feel safe, included and protected, improving mental health and reducing
18  depression and anxiety.

19      38.   I have seen my patients who are youths become more confident, and outgoing after
20  social transition because they are being treated as their affirmed gender. I have seen them sit up
21  straighter and make friends.

22      39.   For several patients, their mental distress was preventing them from participating in
23  extracurricular activities like dance, martial arts, badminton and soccer. After social transitioning,
24  these patients blossomed and thrived and joined or rejoined their sports and dance teams.

25

26      _____

27  [4] Pariseau, et al., *The Relationship Between Family Acceptance-Rejection And Transgender Youth Psychosocial Functioning*, Clinical Practice in Pediatric Psychology (2019) p. 267.

28

Declaration of Dr. Christine Brady

40. Research shows that transgender and gender nonconforming children who socially transition have mental health outcomes that mirror their cisgender peers.[5]

41. A recent study examined the impact of name and pronoun use on depression, suicidal ideation and suicide attempts among transgender and gender nonconforming youth.[6] Results showed that adding one context (e.g., school, work, friends) where affirmed gender was used consistently decreased suicidal behavior by 56%.[7]

42. Because gender identities and how people choose to express themselves are diverse, social transition can manifest differently for different people. Moreover, the process of social transition can occur in stages wherein individuals may transition in one area of life but not others (e.g., only at home, only at school, only with friends, or any combination of these contexts).

43. A survey of LGBT adults showed that most started questioning their identity around age 12 but did not come out to family until the average age of 20.[8]

44. In my experience as a clinician, a majority of youth come out first to peers, then teachers, then parents.

45. Adolescence is a time of great change physically, neurologically and socially. It's a time when individuals are learning to become autonomous and independent from their caregivers. As a result of this development, adolescents often gravitate towards same age peers for the support that they had previously received from the adults in their lives. This often results in adolescents confiding in their friends because they have more relatable experience.

46. Nonetheless, youths do want to share important life developments with adults. However, because parents and other primary caregivers are the most important adults in a youth's

---

[5] Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, J. of the American Academy of Child & Adolescent Psychiatry (Feb. 2017) p. 116, available at: https://doi.org/10.1016/j.jaac.2016.10.016.
    [6] Russell, et al., Chosen Name Use Is Linked To Reduced Depressive Symptoms, Suicidal Ideation, And Suicidal Behavior Among Transgender Youth, J. of Adolescent Health (Oct. 2018) p. 503.
    [7] *Id.*
    [8] Pew Research Center, *A Survey of LGBT Americans* (June 13, 2013) available at: https://www.pewresearch.org/social-trends/2013/06/13/chapter-3-the-coming-out-experience/

9

1  life, there is often heightened anxiety due to the desire for acceptance. In a 2017 Human Rights

2  Campaign survey of LGBTQ youth in California, 36% reported coming out to parents as

3  "extremely stressful" and only 21% were out to all caregivers.[9]

4       47.    The 2015 U.S. Transgender Survey found that only 53% of transgender people

5  disclosed their gender identity to all of their immediate family members, whereas 22% of

6  transgender people have not revealed their gender identity to a single member of their immediate

7  family.[10]

8       48.    Coming out to a teacher is a lower risk action and is a practice run of the very

9  important conversations youths may be planning with their parents.

10       49.    I have treated many patients for whom school is a more accepting environment than

11  their home.

12       50.    I have patients who feel that their school is their safe haven because the school

13  conscientiously uses the patient's authentic name and pronouns. In contrast, the patients' parents

14  are often misgendering them. School is a place where the hurt and anxiety they experience at

15  home cannot touch them. My patients' experiences reflects national data.

16       51.    The Trevor Project's 2022 LGBTQ survey indicated that 55 percent of LGBTQ youth

17  identified their school as affirming, compared with only 37 percent of LGBTQ youth who felt

18  that their home was affirming.[11]

19       52.    Under these circumstances, the youth's experience at school gives them the hope that

20  they can one day live a life where they can be their authentic selves. This allows them to focus on

21  their academic work.

22       53.    Policy 5020.1 discourages this healthy, incremental way of social transitioning and its

23  benefits. Instead, it incentivizes students to either go back into the closet, or discloses a student's

24  
25      [9] The Human Rights Campaign Foundation, *LGBTQ Teen Survey* (2017) p. 6, available at: https://assets2.hrc.org/files/assets/resources/YouthReport-California-Final.pdf

26      [10] James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat. Center For Transgender Equality (Dec. 2016) p. 51, available at: https://tinyurl.com/yn3hpcey.

27      [11] The Trevor Project, *2022 National Survey of LGBTQ on Youth Mental Health* (2022) p. 20, available at: https://www.thetrevorproject.org/survey-

28  2022/assets/static/trevor01_2022survey_final.pdf

10

1  gender identity before the student and the family is ready. Policy 5020.1 disregards the potential

2  harm that disclosure may put students in if families are unsupportive.

**The Severe Harms of Premature Disclosure**

5  54.   There are serious risks associated with disclosing someone's transgender or gender

6  nonconforming identity without consent, and Policy 5020.1 requires school officials to disclose

7  the gender identity of a transgender or gender nonconforming student who has not come out to

8  their parents.

9  55.   It is a potentially traumatic experience for a transgender or gender nonconforming

10  youth to be outed to unsupportive parents. Even for youth who do have supportive parents, it is a

11  violation of their privacy and undermines the autonomy that adolescents are so desperately

12  seeking to build at this point in their development.

13  56.   Disclosing a youth's identity without understanding how caregivers will respond to

14  their identity places them at risk for devastating consequences.

15  57.   Children and youths are dependent on their caregivers for shelter, food, and basic

16  necessities, and therefore do not have the ability remove themselves from psychologically and

17  physically abuse environments.

18  58.   In the 2015 U.S. Transgender Survey, 10 percent of respondents said that an

19  immediate family member had been violent toward them because they are transgender, and 15

20  percent ran away from home or were kicked out of their home because they were transgender.[12]

21  59.   The Williams Institute LGBTQ Homeless Youth Provider Survey found that a

22  disproportionate amount of homeless youth belonged to the LGBTQ community and 67% of

23  homeless youth cited the reason for running away or being forced out was because of their sexual

24  orientation or gender identity.[13]

---

[12] James et al., *supra*, at p. 65.

[13] Choi, et al., SERVING OUR YOUTH 2015: The Needs and Experiences of Lesbian, Gay, Bisexual, Transgender, and Questioning Youth Experiencing Homelessness, Williams Institute (June 2015) p. 5, available at: https://williamsinstitute.law.ucla.edu/wp-content/uploads/Serving-Our-Youth-Update-Jun-2015.pdf

11

60. As a psychologist, my practice is to keep my youth patients' gender identity confidential until they are ready to disclose it and I have ensured that they are well supported if they are met with rejection.

61. I have worked with youth who have been accidentally outed by family members, teachers, health care professionals or other adults in their lives. In most cases, youth express hurt, upset, distrust, and general regret that they were not able to come out on their own terms.

62. Youths who are outed prematurely will not have had time to adequately prepare what they want to say to their parents and family members. This contributes to miscommunication and misunderstandings within families that is difficult to reverse, with far reaching consequences. For example, lesbian, gay and bisexual young adults who experience parental rejection are more than eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.[14]

63. Even though Policy 5020.1 claims to prioritize parental rights, in my clinical experience, it is actually taking away a potentially healing experience for supportive parents and their children: the experience of a child sharing one of the most important parts of their identity with their parents.

64. For youths with unaccepting or unsupportive parents, Policy 5020.1 places the transgender and gender nonconforming youth at risk for trauma, physical harm, homelessness and long-term mental health issues.

**Forcing a Transgender or Gender Nonconforming Youth to Hide Can Also Cause Significant Harm**

65. Because Policy 5020.1 mandates that the school disclose a student's gender identity regardless of the student's wishes, Policy 5020.1 pressures the student to hide their gender identity, which is psychologically harmful. A transgender or gender nonconforming youth who is

---

[14] Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, Pediatrics (Jan. 2009) p. 346, available at: https://pubmed.ncbi.nlm.nih.gov/19117902/

Declaration of Dr. Christine Brady

fearful of disclosure to parents may be forced to go "into the closet," and internalize the identity that the school and parents want them to be. It will not make them cisgender.

66. A study of adults living in California showed that coming out in high school was associated with positive psychosocial adjustment in young adulthood, even after accounting for school victimization.[15]

67. Based on my clinical experience, Policy 5020.1 is also likely to create feelings of distrust for transgender and gender nonconforming youth who have made social transition steps. I have treated youths whose parents have not agreed to the youth's social transition, essentially forcing the youth to stay in the closet. My patients struggled with anger, rejection and psychological pain under these circumstances.

68. Some of these patients present with depression and anxiety to the extent that impairment begins to show in academic settings. If there is significant stress, academic work is not a high priority.

69. These patients have told me, "what's the point? If I'm so depressed that I can't see a future, then there's no point in doing academic work because why worry about going to college when I don't know if I'm going to make to tomorrow?"

70. I have patients who have also experienced significant trauma and hopelessness due partly to social and familial rejection and the inability to live as their authentic selves.

71. A meta-analysis of 193 studies on the psychological impacts of concealing an individual's gender identity and sexual orientation concluded that youth may be more harmed from being forced to be "closeted" than adults. [16]

72. The mental health burden is greater and more harmful to youth than adults because youth might have fewer coping mechanisms.[17] Youth cannot control their own environments and

---

[15] Russell, et al., Being Out At School: The Implications For School Victimization And Young Adult Adjustment, American Journal of Orthopsychiatry (Nov. 2014) p. 635.

[16] Pachankis, et al., Sexual orientation concealment and mental health: A conceptual and meta-analytic review, Psychological Bulletin (Oct. 2020) p. 831, available at: doi: 10.1037/bul0000271.

[17] Id.

Declaration of Dr. Christine Brady

1    cannot seek mental health help without parental support.[18] This burden may drive chronic and

2    anxious expectations of rejection and shame, which have their greatest mental health impact

3    during the developmentally sensitive periods of adolescence.[19]

4    73.    Policy 5020.1 increases the risk of negative mental health impacts on transgender and

5    gender nonconforming youth by encouraging youth to stay in the closet at school and at home,

6    with lasting negative academic, mental and social consequences as the youth ages into adulthood.

**An Unsupportive School Climate Causes Mental, Social and Academic Harm**

9    74.    When schools are not supportive environments for transgender and gender

10   nonconforming youth, very serious harms can result.

11   75.    Based on my review of Policy 5020.1 and my scientific research and clinical

12   experience, I believe that Policy 5020.1 creates an unsupportive and unsafe environment for

13   transgender and gender nonconforming students. Policy 5020.1 intensifies the existing social

14   rejection and discrimination experienced generally by transgender and gender nonconforming

15   students across the state. These unsupportive environments result in mental, social, and academic

16   harm to transgender and gender nonconforming students.

17   76.    Data from California shows experiences of physical and psychological harm

18   generally experienced by transgender and gender nonconforming students. One report examined

19   2017-2019 data concerning students across 2,749 California schools—in grades seven, nine, and

20   11—and it found that transgender students in California reported negative mental health

21   outcomes and school experiences "at higher rates" than any other "sexual orientation

22   subgroup[]."[20]

23   77.    California public school data from 2015-2016 show that more than 40 percent of

24   transgender students reported being bullied because of their gender identity, while only 7.3

---

26   [18] *Id.*
     [19] *Id.*
27   [20] Hanson et al., *Understanding the Experiences of LGBTQ Students in California,* The
     California Endowment (Oct. 2019) at pp. 9, 52, available at: https://tinyurl.com/v452ty7s.
28

14

1  percent of non-transgender students reported gender-based bullying or bullying on the basis of

2  perceived gender identity.[21]

3      78.    California data from 2015-2016 show that more than half (55.6 percent) of

4  transgender students in California reported physical victimization (such as being threatened with

5  a weapon, threatened with harm, shoved, or in a physical fight), and more than two-thirds (69.2

6  percent) reported nonphysical victimization, for example, being called a demeaning name or

7  being the recipient of demeaning sexual jokes or gestures.[22]

8      79.    Transgender students also are at risk of suicide and other mental health harms due to

9  the discrimination they receive because of their gender identity.[23] 86 percent of transgender youth

10  reported suicidal thoughts, and 56 percent of transgender youth reported a previous suicide

11  attempt.[24]

12      80.    In my clinical experience, I have also worked with many youths who avoid school

13  and social situations because being mis-gendered is too painful. Based on my clinical experience,

14  it is the social rejection and discrimination experienced by transgender and gender

15  nonconforming students that harms them, and not any inherent aspect of their gender identity.

16      81.    Because Policy 5020.1 encourages a transgender or gender nonconforming youth to

17  hide themselves because they are not yet ready to come out to their parents, this policy innately

18  communicates to the students, that the school district does not accept them, and that their school

19  is not a safe environment for them.

20      82.    This makes transgender and gender nonconforming youths more vulnerable to the

21  negative psychological effects of bullying.

22

23      [21] De Pedro et al., Exploring Physical, Nonphysical, and Discrimination-Based
   Victimization among Transgender Youth in California Public Schools, International Journal of
24  Bullying Prevention (2019) p. 222.
      [22] Id.
25      [23] James et al., *supra* at 132; Herman, et al., *Suicide Thoughts and Attempts Among
   Transgender Adults*, Williams Institute (Sept. 2013) p. 2, available at:
26  https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf
      [24] Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of
27  Interpersonal Risk Factors*, 37 J. of Interpersonal Violence (Mar. 2022) p. 5, available at:
28  https://pubmed.ncbi.nlm.nih.gov/32345113/

Declaration of Dr. Christine Brady

83.    My patients have told me that social transition gives them confidence to withstand bullying. Without social transitioning, my patients struggle with self-doubt: "what if the bullies are right?" they may ask.

84.    Social transition fosters resilience, or the ability to bounce back from negative impacts. After my patients who are youths have socially transitioned and are able to express their authentic selves, they are more able to challenge negative social perceptions of themselves. "I know who I am, and the bullies are wrong about me," they might say.

85.    The U.S. Centers for Disease Control explained:

> "[s]chool connectedness, which is the feeling among adolescents that people at their school care about them, their well-being, and success, has long-lasting protective effects for adolescents. Youth who feel connected at school are less likely to experience risks related to substance use, mental health, violence, and sexual behavior."[25]

86.    A survey of 5,830 LGBT youth concluded in 2012 that a negative school climate contributed to lower academic outcomes and lower self-esteem for LGBT students.[26] Conversely, academic outcomes improved where schools implemented supports including gay-straight alliances or clubs, supportive educators, inclusive curriculums, and a comprehensive antibullying/harassment policy. [27]

---

[25] Centers for Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021* (2023) p. 72, available at:
https://www.cdc.gov/healthyyouth/data/yrbs/pdf/yrbs_data-summary-trends_report2023_508.pdf
[26] Kosciw, et. al, The Effect of Negative School Climate on Academic Outcomes for LGBT Youth and the Role of In-School Supports, Journal of School Violence (2013) p. 45, available at: DOI: 10.1080/15388220.2012.732546.
[27] *Id.* at p. 51-52.

Declaration of Dr. Christine Brady

**Conclusions**

87.    The best possible outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into supportive, loving environments. This type of social transition aligns with the natural process of a child growing up and learning how to navigate the different environments around them.

88.    The process of coming out is often protracted, as youth try to understand how various people in their lives will respond to their identity. It is critical that youth be allowed to control that process, as it is their private information to share in their own time.

89.    Policy 5020.1 disrupts this process and harms transgender and gender nonconforming youth in numerous ways.

90.    It creates social pressures to reject a transgender or gender nonconforming youth's gender identity, thereby intensifying psychological distress and increasing the risk of depression and anxiety in transgender and gender nonconforming youth.

91.    It disincentives social transitioning, which is not only an essential process of self-actualization for a transgender or gender nonconforming individual, but also a medically indicated treatment for those who have a diagnosis of gender dysphoria.

92.    It increases the possibility of a forced disclosure of a student's transgender or gender nonconforming identity to potentially unaccepting family members, which not only causes psychological distress to the student, but also increases the risk of trauma, physical abuse, homelessness and long term negative mental health outcomes.

93.    Policy 5020.1 pressures transgender and gender nonconforming youth to remain or return to hiding their gender identity, resulting in additional psychological distress, manifesting in depression, anxiety, and feelings of hopelessness.

94.    Finally, Policy 5020.1 creates an environment that is actively hostile to transgender and gender nonconforming students, which research has shown to result not only in mental and social harm, but also academic harm.

17

95.   All these harms have serious long-term consequences. A foundation of negative experiences in childhood, adolescence and young adulthood contributes to lower quality of life and increased mental health issues as an adult.

1        I declare under penalty of perjury that the foregoing is true and correct under the laws of the

2  State of California, and that this declaration was executed on August 24, 2023, in Albuquerque,

3  New Mexico.

Dr. Christine Brady, Ph.D.

Declaration of Dr. Christine Brady

# EXHIBIT A

Curriculum Vitae
**Christine Erin Lam Brady, PhD**
bradyce@stanford.edu
California License # PSY31431
Updated 05/30/2023

## A. IDENTIFYING DATA

| | |
|---|---|
| **Name** | **Christine Erin Lam Brady, PhD** |
| **Current Position** | **Clinical Assistant Professor** |
| | **Psychologist Gender Clinic** |
| **Current Affiliation** | **Stanford University** |

## II. EDUCATIONAL BACKGROUND

### Colleges and Universities Attended

2009 - 2014    Ph.D.
Child Clinical Psychology, Ohio University, Athens, OH
Dissertation: *Adolescent Social Functioning: Theory, Measure Development and Preliminary Validation.*
Advisor: Dr. Steven W. Evans

2007- 2009    M.A.
Psychological Sciences, Clinical, James Madison University, Harrisonburg, VA
Thesis: *Psychometric properties of the Alabama Parenting Questionnaire Using an Adolescent Sample*

2001- 2005    B.S.
Psychology, minor in English, James Madison University, Harrisonburg, VA
Previously attended Mary Washington College August 2001-May 2002

### Residency and Fellowship Training

2014 – 2015    Post-Doctoral Fellowship Pediatric Psychology, Consultation Liaison
University of Louisville, Norton Children's Hospital

2013 – 2014    Pre-Doctoral Internship, Child Track
University of Washington School of Medicine, Seattle Children's Hospital

### Board Certifications

2019 - present    California Board of Psychology – Licensed Psychologist (# 31431)

Previously licensed in Minnesota and Kentucky (expired)

## III. EMPLOYMENT

**Academic Appointments:**

2020 – present    Clinical Assistant Professor, Stanford University, Palo Alto, CA
                  Psychologist, Pediatric and Adolescent Gender Clinic

2016 – 2019       Assistant Professor, University of Louisville School of Medicine, Louisville, KY
                  Pediatric Psychologist, Bingham Clinic
                  Director Pediatric Consultation Liaison Service, Norton Children's Hospital
                  Co-Director, Pediatric Gender Clinic

**Other Appointments:**

2019 – 2020       Gender Specialist, Gender Case Manager, and Child Psychologist
                  Kaiser Permanente Santa Clara, CA

2015 – 2016       Senior Clinical Pediatric Psychologist
                  Hennepin County Medical Center, Minneapolis, MN

## IV. HONORS AND AWARDS

2020    1st Place Poster Award Diversity Special Interest Group APA Division 54
2017    Building Block Award for Psychology, Excellence in Teaching

## V. BIBLIOGRAPHY

**Peer-Reviewed Original Research (6 total)**

1. Carter, B., Kronenberger, W., Cruce, S., Mizell, D., Threlkeld, B., **Brady, C. E.\***, & Jones, L. (2015). Factors associated with dropout versus completion of a manualized treatment for pediatric chronic pain. *Clinical Practice in Pediatric Psychology*, 3, 327-339.

2. Zoromski, A. K., Owens, J. S., Evans, S. W., **Brady, C. E\***. (2015). Identifying ADHD symptoms that best predict disorder-related impairment in early, middle, and late childhood. *Journal of Abnormal Child Psychology*, 43, 1243-1255.

3. Evans, S.W., **Brady, C.E.\***, Harrison, J.R., Bunford, N., State, T., Kern, L., & Andrews, C. (2013). Measuring ADHD Symptoms and Impairment Based on High School Teachers' Ratings. *Journal of Clinical Child and Adolescent Psychology,* 42, 197-207.

4. Evans, S.W., Koch, R., **Brady, C.E.\***, Meszaros, P., & Sadler, J.M. (2013). Community and school mental health professionals' knowledge and use of evidence based substance

use prevention programs. *Administration and Policy in Mental Health and Mental Health Service Research*, 40, 319-330.

5. **Brady, C.E.,** Evans, S.W., Berlin, K.S., Bunford, N., & Kern, L. (2012). Evaluating School Impairment with Adolescents: A Psychometric Evaluation of the Classroom Performance Survey. *School Psychology Review.* 41, 429-446.

6. Evans, S. W., Schultz, B., White, C. L., **Brady, C. E.\***, Sibley, M. H., & Van Eck, K. (2009). A school-based organization intervention for young adolescents with ADHD: Patterns of responding. *School Mental Health,* 1, 78-88.

**Invited Commentaries (1 total)**

1. Turban, J., **Brady, C. E.,** & Olson-Kennedy, J. (2022). Understanding and supporting patients with dynamic desires for gender-affirming medical interventions. *Journal of the American Medical Association Network Open.* doi:10.1001/jamanetworkopen.2022.24722

**Book Chapters (4 total)**

1. Carter, B., Tsang, K., & **Brady, C. E.** (2020). Models of Consultation-Liaison. In B. Carter and K. Kullgren (Eds.), *Clinician Handbook of Pediatric Psychological Consultation in Medical Settings*, 11-24.

2. **Brady, C. E.** & Ernst, M. M. (2020). Gender identity: Disorders/differences of sex development/intersex and transgender concerns. In B. Carter and K. Kullgren (Eds.), *Clinician Handbook of Pediatric Psychological Consultation in Medical Settings*, 439-450.

3. Carter, B., Kronenberger, W., Scott, E., Kullgren, K., Piazza-Waggoner, C., & **Brady, C. E.** (2017). Inpatient pediatric consultation-liaison. In M. Roberts and R. Steele (Eds.), *Handbook of pediatric psychology (5th Ed.),* 105-118.

4. Evans, S.W., Sadler, J.M., & **Brady, C.E.** (2009). *Treating Children and Adolescents with ADHD in the Schools.* In A. Roberts (Ed.), Social Workers Desk Reference 2nd Edition. New York, NY: Oxford University Press.

**Books (1 total)**

1. Carter, B., Kronenberger, W., Scott, E., & **Brady, C. E.** (2020). *Children's Health and Illness Recovery Program: Clinician's Handbook.* Oxford, England: Oxford University Press, Programs that Work Series.

**Abstracts (39 total)**

1. Aye, T., **Brady, C. E.,** & Orr, A. (July 2022). Multidisciplinary Lessons Learned from the Care of Transgender and Gender Expansive AAPI Youth and Adolescents. Symposium presented at Gender Spectrum 2022 Professional Symposium (virtual conference).

2. Aye, T., **Brady, C. E.,** & Orr, A. (Nov 2021). Multidisciplinary Lessons Learned from the Care of Transgender and Gender Expansive AAPI Youth and Adolescents. Mini Symposium presented at the US Professional Association for Transgender Health (virtual conference).

3. **Brady, C.E.,** & Aye, T. (July 2021). Supporting Gender Diverse Youth with Medical Conditions. Workshop presented at the Gender Spectrum Professional Symposium (virtual conference).

4. Bazier, A., Anastasiadis, W., Gilbert, E., **Brady, C.,** Schwartzkopf, K., & Naramore, S. (April 2021). Optimizing Equity of Healthcare for Transgender Youth within a Pediatric Gastroenterology Subspecialty Clinic. Poster presented at the 51st annual Society of Pediatric Psychology Conference (virtual conference).

5. **Brady, C. E.,** Gilbert, E., & Kellison, J. (April, 2019). *Health Disparities in Pediatric Populations: Recommendations for Sensitive and Inclusive Care.* Professional development workshop given at the 50th annual Society for Pediatric Psychology Annual in New Orleans, LA.

6. Carter, B. D. & **Brady, C. E.** (July, 2015). *Innovations in the Treatment of Children and Adolescents with Chronic Pain and Medically Unexplained Conditions.* Talk given at the annual meeting of the Indiana Psychological Association, Evansville, IN.

7. **Brady, C. E.,** Evans, S. W., Bunford, N., & Weist, M. (February, 2013). *Measuring school impairment in secondary schools.* Paper presentation given at the annual meeting of the National Association of School Psychologists, Seattle, WA.

8. Zoromski, A. K., Evans, S. W., Owens, J. S., & **Brady, C. E.** (February 2013). *Relationship between ADHD symptoms and impairment across three age ranges.* Paper presented at the National Association of School Psychologists 2013 Annual Convention, Seattle, Washington.

9. Zoromski, A. K., **Brady, C. E.,** & Evans, S. W. (November, 2012). Poster presented at the 46th annual meeting of the Association for Behavioral and Cognitive Therapies, National Harbor, MD.

10. Evans, S. W., **Brady, C. E.,** Harrison, J.R., Bunford, N., State, T., & Kern, L. (November, 2011). *Measuring ADHD symptoms and impairment in adolescence.* Paper presented at the 45th annual meeting of the Association for Behavioral and Cognitive Therapies, Toronto, Canada.

11. Zoromski, A. K., **Brady, C. E.,** & Evans, S.W. (November, 2011). *ADHD Symptoms in Adolescence: Which are most predictive of impairment?* Poster presented at the 45th annual meeting of the Association for Behavioral and Cognitive Therapies, Toronto, Canada.

12. Sadler, J.M., **Brady, C. E.,** & Evans, S. W. (September, 2011). *Interpersonal Skills Group: A social functioning intervention for adolescents with ADHD.* Talk presented at the annual meeting of the Center for School Mental Health, Charleston, SC.

13. Davis, H. I., **Brady, C. E.,** & Evans, S. W. (August 2011). *Rates of Assignment Completion in High School Students Meeting Symptom Criteria for a Disruptive Behavior Disorder.* Poster presented at the 119th American Psychological Association Conference, Washington, D.C.

14. **Brady, C. E.** & Evans, S. W. (February, 2011). Measuring parenting practices: Implications for school mental health. In J. S. Owens (Chair), *Impact of family factors on school-based assessment and treatment.* Symposium presented at the annual meeting of the National Association of School Psychologists, San Francisco, CA.

15. Evans, S. W., Schultz, B. K., Sadler, J. M., **Brady, C. E.,** & Demars, C. (November, 2010). *Psychosocial and educational school based interventions for high school students with ADHD.* In S. W. Evans (Chair), *Providing evidence-based interventions in secondary schools.* Symposium presented at the 44th annual meeting of the Association for Behavioral and Cognitive Therapies, San Francisco, CA.

16. Zoromski, A. K., Sadler, J. M., **Brady, C. E.,** Schultz, B. K., & Evans, S. W. (November, 2010). *An organization intervention for high school students with Attention Deficit Hyperactivity Disorder.* Poster presented at the 44th annual meeting of the Association for Behavioral and Cognitive Therapies, San Francisco, CA.

17. Evans, S. W., Owens, J. S., Sadler, J. M., **Brady, C. E.,** Storer, J., Zoromski, A. (October, 2010). *Evidence-based Interventions for Helping Children & Adolescents with ADHD.* Intensive Training Session presented at the 15th annual conference on Advancing School Mental Health, Albuquerque, NM.

18. **Brady, C. E.,** Sadler, J. M., Zoromski, A. K., & Evans, S.W. (October, 2010). *Youth with ADHD and Sports Participation: A Preliminary Investigation.* Poster presented at the 15th annual conference on Advancing School Mental Health, Albuquerque, NM.

19. Evans, S. W., Cloth, A., **Brady, C. E.,** & Sadler, J. M. (August, 2010). *Overcoming Obstacles to Implementing Evidence Based Mental Health Practices in Secondary Schools.* In C. Paternite (Chair), *Development of Effective Interventions for Adolescents with ED.* Symposium presented at the 118th annual conference of the American Psychological Association, San Diego, CA.

20. Evans, S. W., **Brady, C. E.,** Kern, L., Andrews, C. & CARS Research Team. (June 2010). Measurement development and inclusion criteria: Developing meaningful standards. In J. Buckley (Chair), *It's Time to Stem the Tide of Failure: Building Interventions to Support High School Students with Emotional and Behavioral Disorders*. Symposium presented at 5th Annual IES Research Conference, Washington D.C.

21. Evans, S. W., **Brady, C. E.,** Sadler, J. & Schultz, B. (November, 2009). The relationship between improvement in symptoms and functioning for young adolescents with ADHD. In J.S. Owens (Chair), *Symptoms and Beyond: The Importance of Assessing Treatment-Related Changes in Functioning in Youth and Parents with ADHD*. Symposium presented at the 43rd annual meeting of the Association for Behavioral and Cognitive Therapies, New York, New York.

22. Koch, R. J., Meszaros, P. S., Evans, S. W., Meyer, B. L., **Brady, C. E**., Duncan Lane, C. L, Mays, S.A., & Sadler, J. M. (November 2009). *An evidence-based substance abuse preventive intervention for youth with psychiatric disorders: Initial results.* Presentation given at the American Public Health Association Meeting and Expo, Philadelphia, PA.

23. **Brady, C. E.,** Sadler, J., Sibley, M., Zoromski, A., & Evans, S. (November 2009). *Peer characteristics preferred by youth with and without ADHD.* Poster presented at the 43rd annual meeting of the Association for Behavioral and Cognitive Therapies, New York, NY.

24. Sadler, J., **Brady, C. E.,** Zoromski, A., Light, C., Schultz, B., & Evans, S. (October 2009). *Treatment of high school students with ADHD: Adolescent, parent, and teacher satisfaction.* Poster presented at the 14th annual conference on Advancing School Mental Health, Minneapolis, MN.

25. Sadler, J., **Brady, C. E.,** Zoromski, A., & Evans, S. (October 2009). *Does mastery of goal effect outcomes in a psychosocial intervention?* Poster presented at the 14th annual conference on Advancing School Mental Health, Minneapolis, MN.

26. Eid, R. K., Hawkins, M. E., Davis, H. I., Redford, E. S., Ross, J. M., Sadler, J. M., **Brady, C. E.,** & Evans, S. W. (August 2009). *Parental Perspective on ADHD: Household Issues that Predict Strain & Conflict.* Poster presented at the American Psychological Association Conference, Toronto, ON Canada.

27. **Brady, C. E.,** Sadler, J. M., Evans, S. W., Koch, J. R., Lane, C., Mays, S., Meszaros, P., & Meyer, B. (April 2009). *The Effectiveness of SFP for Youth with Psychiatric Disorders.* Poster presented at the Virginia Forum on Youth Tobacco Use: Translating Research into Policy and Practice Conference, Richmond, VA.

28. Serpell, Z. N., Evans, S. W., & **Brady, C. E.** (November 2008). *Preventing Youth Tobacco Use by Treating the Risk-Factor of ADHD: A Follow-up Study of Adolescents with ADHD.* Symposium presented at the Virginia Youth Tobacco Project Research Coalition Meeting, Richmond, VA.

29. Sadler, J.M., Christensen, O.A., **Brady, C.E.**, Sax, K., Rainear, C., & Evans, S.W. (November 2008). *The Effect of Pacing on Academic Interventions in a Six-Week Summer Treatment Program.* Poster presented at the Association for Behavioral and Cognitive Therapy Conference, Orlando, FL.

30. Sadler, J.M., **Brady, C.E.,** Neugroschel, R.A., Moore, S., Evans, S.W., Koch, J.R., & Meszaros, P.S. (September 2008). *Current Practices and Best Practices for Substance Use Prevention in Schools: Implications for Training.* Poster presented at the 13th Annual Conference on Advancing School Mental Health, Phoenix, AZ.

31. Christensen, O.A., Sadler, J.M., **Brady, C.E.,** Schultz, B.K., & Evans, S.W. (August 2008). *Teacher Satisfaction with a School-Based Treatment for Adolescents with ADHD.* Poster presented at the 116th annual American Psychological Association Conference, Boston, MA.

32. Davis, H., Sax, K., & **Brady, C.E.** (March 2008). *Parental Strain in Relation to the Characteristics of Children with ADHD.* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, Va. and the 2008 Psychology Student Symposium, Harrisonburg, VA.

33. Chen, C., Christensen, O., Hawkins, M., **Brady, C.E.**, Schultz, B., & Evans, S.W. (March 2008). *Interactive Media Games: A Fun New Treatment for ADHD?* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, VA.

34. Neugroschel, R., Sadler, J.M., & **Brady, C.E.** (March 2008). *Factors Associated with the Implementation of Evidence Based Practices for Substance Use Prevention.* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, VA.

35. Evans, S. W., Serpell, Z. N., Sibley, M. H., Van Eck, K., **Brady, C. E.,** Sadler, J. M., & Schultz, B. (November, 2007). Developing interventions targeting social skills for youth with ADHD. In J. Langberg (Chair), *Innovations in the Assessment and Measurement of Children and Adolescents With ADHD: Implications for Developing Effective Interventions.* Symposium conducted at the annual Association for Behavioral Cognitive Therapy Conference, Philadelphia, PA.

36. **Brady, C. E.**, Sadler, J. M., Van Eck, K., & Evans, S. W. (November, 2007). *New directions in social skills interventions for youth with ADHD: Results of a pilot study.* Poster presented at the Association for Behavioral Cognitive Therapy Conference, Philadelphia, PA.

37. Van Eck, K., Christenson, O. A., **Brady, C. E.,** Sadler, J. M., Evans, S. W. (October, 2007). *Helping children with ADHD get a JumpStart on the school year.* Poster presented at the 12th Annual Conference on Advancing School Mental Health, Orlando, FL.

38. Blom, D., **Brady, C. E.,** Kremer, M. & Potts, H. (April 2005) *Virtual Pavlov 2000: Assessing Effectiveness of Computer Simulators.* Paper presented at Virginia Psychological Association, Williamsburg, VA.

39. **Brady, C. E.,** Donaghy, J. M., Tucker, K. D., Yuen, N. C., & Kerr, N. A. (April 2005) *The importance of performance feedback on self-efficacy and intrinsic motivation.* Poster presented at the Virginia Psychological Association, Williamsburg, VA.

## VI. GRANT FUNDING

None

## VII. CLINICAL TRIALS

None

## VIII. PATENTS

None

## IX. EDITORAL SERVICE

**Ad Hoc Reviewer**
2022 – present   *Journal of the American Medical Association*
2022 – present   *Perspectives on Psychological Science*
2011– 2014       *School Mental Health: A Multidisciplinary Research and Practice Journal*
2014– 2015       *Journal of Pediatric Psychology*
2014             *Pain Letter*

## X. SERVICE AS GRANT REVIEWER

None

## XI. UNIVERSITY CLINICAL/RESEARCH/ADMINISTRATIVE SERVICE

**Gender ECHO Hawaii** (2023 – present) Funding for this project was given through philanthropy. Project goals are to improve quality and access to gender affirming care on the islands of Hawaii. Duties include networking with local providers and systems, developing a survey of current knowledge base and comfort with providing services, developing culturally informed trainings and providing ongoing consultation to local providers working with gender diverse youth.

**Pediatric Endocrinology Search Committee** (2023) Search aimed to hire a Pediatric Endocrinologist to be split between Gender Clinic and Diabetes. Duties include reviewing applications, conducting candidate interviews and providing feedback regarding qualifications.

**CARE (Center for Asian Health Research and Education) Scholar Mentor, Stanford University** (2022) Provided research mentorship to three scholars and one implementation science fellow on a research conducted within the Pediatric and Adolescent Gender Clinic. Duties included holding weekly meetings, training on data entry, guidance on formulating research questions, and creating a poster presentation.

**Supervisor Parent Mentor Program Gender Clinic, Stanford Children's Health** (2021 – present) The Parent Mentor program is a Family-Centered Care service. It matches parents of children who are being cared for at Lucile Packard Children's Hospital with trained, veteran parents. Duties included training and now supervise the mentorship activities of two parent mentor, providing patient referrals and reviewing documentation of parent encounters.

**eQuality Steering Committee** (2018 - 2019) A University of Louisville School of Medicine project aimed at improving medical school education by infusing 200+ hours of LGBTQ+ content into the curriculum, I served as a representative from pediatrics/psychiatry. Duties included developing and reviewing curriculum as well as evaluating the efficacy of the project.

**Co-Director, Pediatric Gender Clinic University of Louisville** (2017 - 2019)

**Director Pediatric Consultation Liaison Service University of Louisville** (2019)

## XII. SERVICE TO PROFESSIONAL ORGANIZATIONS

Co-chair APA Division 54 Special Interest Group Consultation-Liaison (2018-2020)

American Psychological Association (APA) – Division 54 Pediatric Psychology (member) (2014 – present)

World Professional Association for Transgender Health (WPATH) (member) (2015 – present)

## XIII. INVITED PRESENTATIONS

**Ground Rounds:**

1. **Brady, C. E.** (October 2022). "Gender Affirming Care for Youth" Grand Rounds East Carolina University, NC.

2. **Brady, C. E.** (August 2022). "Working with Caregivers of Gender Diverse Youth" Behavioral Health ECHO.

3. **Brady, C. E.** (December 2021). "Gender Diverse Youth" Grand Rounds El Camino Hopsital Mountain View, CA.

4. **Brady, C. E.,** & Aye, T. (August 2021). "Supporting LGBTQ+ Youth." Webinar Stanford Corporate Partners Palo Alto, CA.

5. **Brady, C. E.** (July 2021). "Gender 101: A crash course on terminology, current research and affirmative care." Grand Rounds Dominican Hospital, Santa Cruz, CA.

6. **Brady, C. E.** (April 2021). "Gender 101: A crash course on terminology, current research and affirmative care." Invited Educational Seminar Bayside Medical Group, Berkley, CA.

7. **Brady, C. E.** (November, 2017). "Mental health issues and the LGBT community across the lifespan." Psychiatry Grand Rounds of the University of Louisville School of Medicine, Louisville, KY.

**National and Regional Meetings:**

1. **Brady, C. E.** (April, 2022). *Fireside Chat: Personal Gender Journeys.* Moderated panel given as part of the Diversity, Equity and Inclusion Panel for the Stanford University Department of Pathology. Stanford, CA.

2. **Brady, C. E.** (June, 2019). *Ethical Dilemmas in Pediatric LGBTQI Care.* Ethics workshop given as part of the Kentucky Psychological Association continuing education series. Louisville, KY.

3. **Brady, C. E.** (November, 2018). *Transgender and Gender Nonconforming Youth: Current Research and Best Practices.* Presentation given at the 7th annual Pediatric Behavioral and Mental Health Symposium in Louisville, KY.

4. **Brady, C. E.,** & Kingery, S. E. (November 2018). *Complex Cases: Ethics, Diversity and Legal Issues in Transgender Care.* Presentation given at the 7th annual Pediatric Behavioral and Mental Health Symposium in Louisville, KY.

5. **Brady, C. E.** (February, 2018). *Transgender and Gender Creative Youth: Mental Health and Evidence-Based Treatments.* Invited talk given at the LGBT Healthcare Summit sponsored by Humana, Louisville, KY.

**Lectures:**

**Psychology Internship and Fellowship Seminars**
**Child and Adolescent Psychiatry Fellow Seminar**
**Child and Adolescent Psychopathology Course (Pacific Graduate School of Psychology, Palo Alto University, Dr. Shea Finnegan)**

**Child and Adolescent Psychotherapy (Pacific Graduate School of Psychology, Palo Alto University, Dr. Jessika Hurts)**
**San Mateo Psychiatry Residency Program lecture series**

# EXHIBIT D

LIBERTY JUSTICE CENTER
Emily Rae (State Bar No. 308010)
  erae@ljc.org
440 N. Wells Street, Unit 200
Chicago, Illinois 60654
Telephone: (312) 637-2280

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Law Corporation
Anthony P. De Marco (State Bar No. 217815)
  ADeMarco@aalrr.com
William A. Diedrich (State Bar No. 233982)
  WDiedrich@aalrr.com
20 Pacifica, Suite 1100
Irvine, California 92618
Telephone: (949) 453-4260
Fax: (949) 453-4264

Attorneys for Defendant
CHINO VALLEY UNIFIED SCHOOL DISTRICT

*[Fee exempt Pursuant to Govt. Code § 6103]*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN BERNARDINO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, EX REL. ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,, <br><br> Plaintiff, <br><br> v. <br><br> CHINO VALLEY UNIFIED SCHOOL DISTRICT, <br><br> Defendant. | Case No.    CIVSB2317301 <br><br> **DECLARATION OF DR. ERICA E. ANDERSON, PHD, IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION** <br><br> Judge:    Hon. Michael A. Sachs <br> Date:    October 13, 2023 <br> Time:    8:30 a.m. <br> Dept.:    S28 <br><br> Complaint Filed:   August 28, 2023 |

DECLARATION OF DR. ERICA E. ANDERSON, PHD

**TABLE OF CONTENTS**

**Page**

I.   CREDENTIALS & SUMMARY OF OPINIONS ........................................ 4

II.  BACKGROUND ON TERMS AND SOURCES ...................................... 6

III. A CHILD OR ADOLESCENT WHO EXHIBITS A DESIRE TO CHANGE
     NAME AND PRONOUNS SHOULD RECEIVE A CAREFUL
     PROCESSIONAL ASSESSMENT BEFORE TRANSITIONING ............................ 8

     a.  A child's or adolescent's request or desire to go by a different name and
         pronouns is a sign that may indicate the presence of gender dysphoria – and
         may be the first specific sign .................................................................. 8

     b.  The recent surge of children and adolescents reporting a transgender identity
         suggests that social and cultural factors may play a significant role ..................... 9

     c.  A child or adolescent's experience or perception of a transgender identity may
         or may not persist ................................................................................ 10

     d.  When children or adolescents begin to experience gender incongruence, they
         should receive a careful evaluation and assessment by a professional mental
         health provider before transitioning, for a variety of reasons ............................. 11

IV.  SOCIAL TRANSITION IS AN IMPORTANT PSYCHOTHERAPEUTIC
     INTERVENTION THAT CAN CHANGE OUTCOMES IN CHILDREN AND
     ADOLESCENTS ..................................................................... 13

     a.  Multiple respected voices agree that social transition does or may affect
         gender identity outcomes, increasing the likelihood that identification with a
         transgender identity will persist .............................................................. 13

     b.  Social transition erects psychosocial barriers to potential desistence .................. 17

V.   SOCIAL TRANSITION IS NOT ALWAYS THE BEST OPTION FOR A
     CHILD OR ADOLESCENT ......................................................... 18

     a.  Some children and adolescents stop wanting to transition after an exploratory
         process to understand the cause of their feelings and self-perceptions ................. 18

     b.  We are becoming more aware of cases in which young people have
         transitioned and later desist or are detransitioning ...................................... 19

     c.  Social transition sets children down a path that often leads to medical
         interventions ..................................................................................... 20

     d.  Social transition upon request without assessment and a treatment plan is not
         endorsed by *any* medical or mental health organization ................................ 21

VI.  PARENTAL INVOLVEMENT IS ESSENTIAL AT EVERY STAGE IN THE
     PROCESS ........................................................................... 23

     a.  Parental involvement is essential as a practical matter in order for a child or
         adolescent to be seen by a mental-health provider ....................................... 23

     b.  Parental involvement is important for accurate diagnosis, as parents often
         have a critical perspective on the history and likely causes of a child's or
         adolescent's gender questioning feelings ................................................... 24

     c.  Parental involvement is necessary for treatment of gender dysphoria and/or
         other diagnosed coexisting conditions ...................................................... 26

Declaration of Dr. Erica A. Anderson, PhD

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

  d. A school-facilitated transition without parental consent and buy-in interferes with the parents' ability to pursue a careful, investigative assessment before undergoing a gender identity transition ................................................. 26

  e. A school-facilitated transition without parental consent and buy-in creates unnecessary and additional tension in the parent-child relationship ..................... 27

  f. No professional body that I am aware of has endorsed school-facilitated social transition of minors without parental knowledge and consent ..................... 28

VII. CONCLUDING SUMMATION OF OPINIONS ...................................................... 28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
Error! No text of specified style in document.

I, Dr. Erica E. Anderson, declare and state as follows:

1. I am a clinical psychologist currently practicing in Berkeley, California. I received a Ph.D. in clinical psychology from Fuller Theological Seminary in 1978. I have been actively working as a clinical psychologist for over 40 years, with extensive experience working with clients of all ages. I am licensed in California, Minnesota, and formerly Pennsylvania (no longer active there).

2. I have been retained by Defendant to provide an expert medical opinion in this matter regarding the Chino Valley Unified School District's parental notification policy as related to Board Policy 5020.1, which requires school administrators to notify parents if their child requests to be "identified or treated as a gender other than the student's biological sex or gender listed on the student's birth certificate or any other official records." I have reviewed the Plaintiff's complaint filed in this matter, including its exhibits, and the memorandum of points and authorities in support of Plaintiff's ex parte application for a temporary restraining order and order to show cause regarding a preliminary injunction. My opinions are below. They are based on my own personal knowledge, as applied to the facts of this case, and I could and would testify to them in court if called upon to do so.

## I. CREDENTIALS & SUMMARY OF OPINIONS

3. For the past seven years, my work has focused primarily on children and adolescents dealing with gender-identity related issues. Between 2016 and 2021, I served as a clinical psychologist and member of the medical staff with a behavioral pediatrics appointment at the Child and Adolescent Gender Clinic at Benioff Children's Hospital at the University of California, San Francisco. From 2016 to the present, I have also operated a private consulting and clinical psychology practice serving children and adolescents and their parents, as well as adults and couples. During the past seven years, I estimate that I have seen hundreds of children and adolescents for gender-identity-related issues. Many, though not all, have transitioned—either socially, medically, or both—to a gender identity that differs from their natal sex, with my guidance and support.

4. I am a life member of the American Psychological Association and a member of the World Professional Association for Transgender Health (WPATH). I served as the President of the United

States Professional Association for Transgender Health (USPATH) and as a board member for WPATH between 2019 and 2021.

5.  I myself am a transgender woman. I was born a natal male, but transitioned to living openly in a female identity in 2011. As a result, I have a unique perspective and shared experience with those exploring their gender identity.

6.  A more thorough overview of my professional experience, publications, and list of prior cases I have testified in is provided in my curriculum vitae, a copy of which is attached as Exhibit A.

7.  I am being compensated for my time spent in connection with this case at a rate of $500.00 per hour/$750.00 per hour for depositions and time in court.

8.  A summary of my opinions is as follows:

   a.  A child or adolescent who exhibits a desire to change name and pronouns should receive a careful professional assessment prior to transitioning. (Section III).

   b.  A request to change name and pronouns may be the first visible sign that the child or adolescent may be dealing with gender dysphoria or related coexisting mental-health issues. (Section III.A).

   c.  A child or adolescent's experience of gender incongruence may be influenced by societal or cultural factors and may or may not persist. (Sections III.B, III.C).

   d.  A careful assessment by professionals prior to transitioning is critical to understand the causes of the child's or adolescent's feelings of gender incongruence, the likelihood that those feelings will persist, to provide guidance about the implications of any kind of transition, to diagnose and treat any gender dysphoria or coexisting conditions, and to provide ongoing support to both youth and parents during any transition. (Section III.D).

   e.  Social transition itself is an impactful psychotherapeutic intervention that has the potential to increase the likelihood of persistence of gender incongruence. Transitioning socially can also be psychologically hard to reverse for a child or adolescent. (Section IV).

Declaration of Dr. Erica A. Anderson, PhD

f. For some children experiencing gender incongruence, social transition is not the best approach. Some cease desiring to transition after an exploratory process and/or therapy to understand the source of their feelings, and some who do transition later come to regret it. (Sections V.A, V.B).

g. Social transition often leads to other medical interventions later in life, some of which are irreversible. (Section V.C).

h. No professional medical association that I am aware of recommends social transition of children and adolescents without a careful assessment and treatment plan. (Section V.D).

i. Parental involvement is necessary to obtain professional assistance for a child or adolescent experiencing gender incongruence, to provide accurate diagnosis, and to treat any gender dysphoria or other coexisting conditions. (Sections VI.A, VI.B, VI.C).

j. A school-facilitated transition without parental consent interferes with parents' ability to pursue a careful assessment and/or therapeutic approach prior to transitioning, prevents parents from making the decision about whether a transition will be best for their child, and creates unnecessary tension in the parent-child relationship. Nor is facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts, in their best interests. (Sections VI.D, VI.E).

k. No professional medical association that I am aware of recommends that school officials facilitate the social transition of a child or adolescent without parental knowledge and consent. (Section VI.F).

l. The Chino Valley Unified School District's BP 5020.1 parental notification policy is consistent with the best practices of all leading mental health professional associations with respect to parental notification when their children ask to be socially transitioned at school and is more likely to lead to student safety than harm. (Section VII).

## II. BACKGROUND ON TERMS AND SOURCES

9. Throughout this report, I use the term "social transition" (and variations) to refer primarily to adopting a new name and/or pronouns that differ from one's natal sex. A social transition can include more than just name-and-pronoun changes—individuals adopting a transgender identity

sometimes change their hairstyle, clothing, or their appearance in other ways, begin using opposite-sex facilities, and/or make other social changes. In the literature, however, the phrase "social transition" is primarily used to refer to name-and-pronoun changes. "Social transition" is used as a contrast to medical transition, which refers to various medical interventions to bring one's physical appearance closer into alignment with one's asserted gender identity, such as puberty blockers, cross-sex hormone therapy, and various surgical interventions. The primary purpose of social transitioning is to relieve the psychological distress associated with having a mismatch between one's natal sex and gender identity.

10. The term "gender dysphoria," as defined in the American Psychiatric Association's current *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5"), refers to "clinically significant distress or impairment related to gender incongruence" (i.e., a mismatch between one's natal sex and one's felt, perceived, or desired gender identity). I use the phrases "gender incongruence" or "gender variance" as broad catch-all terms for those who experience, perceive, or desire a gender identity that differs from their natal sex. As the DSM-5 notes, not everyone who is gender variant experiences gender dysphoria, in the sense of clinically significant distress. Gender Dysphoria as a psychiatric diagnosis should be appropriately evaluated by a qualified mental health professional.

11. WPATH is a scientific, professional, and educational organization that, among other things, produces a set of recommendations for transgender health care. Its "Standards of Care" document ("SOC") is one of the more widely known and cited set of guidelines for transgender care, though its recommendations are not universally agreed upon by professionals in the field. As noted above, I recently served as the president of USPATH (the United States arm of WPATH) and on the board of WPATH. In late 2021, however, I resigned from my offices within USPATH and WPATH because I disagreed in important respects with some of the directions the organization was going. Until September last year (2022), the latest version of WPATH's SOC was its 7th version, released

Declaration of Dr. Erica A. Anderson, PhD

in 2012 ("SOC7").[1] The 8th version was released publicly on September 6, 2022 ("SOC8").[2] How the SOC8 will be received by the wider mental health community beyond the WPATH membership remains to be seen. For this reason, and given how recently SOC8 was released, its size, and the time it will take to fully process and consider its recommendations, I rely more heavily in this report on SOC7, though I quote from SOC8 as well.

### III. A CHILD OR ADOLESCENT WHO EXHIBITS A DESIRE TO CHANGE NAME AND PRONOUNS SHOULD RECEIVE A CAREFUL PROFESSIONAL ASSESSMENT BEFORE TRANSITIONING

#### a. A child's or adolescent's request or desire to go by a different name and pronouns is a sign that may indicate the presence of gender dysphoria—and may be the first specific sign.

12. As WPATH notes, "many adolescents and adults presenting with gender dysphoria do not report a history of childhood gender nonconforming behaviors," so "it may come as a surprise to others (parents, other family members, friends, and community members) when a youth's gender dysphoria first becomes evident in adolescence."[3]

13. As WPATH's more recent SOC8 acknowledges, a recent "phenomenon occurring in clinical practice is the increased number of adolescents seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years."[4] Such "late-onset gender dysphoria and [transgender] identification may come as a significant surprise" to parents and others.[5]

---

[1] The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7, 2012), *available at* https://www.wpath.org/publications/soc ("WPATH SOC7").

[2] *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, International J. Trans. Health 2022, Vol. 23, No. S1, S1–S258 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC8").

[3] WPATH SOC7 at 12.

[4] WPATH SOC8 at S45.

[5] American Psychological Association, *Guidelines for Psychological Practice With Transgender* (continued)

**b. The recent surge of children and adolescents reporting a transgender identity suggests that social and cultural factors may play a significant role.**

14. Recent surveys indicate that the number of children and adolescents asserting a transgender identity has dramatically increased in recent years. As WPATH's SOC8 notes, there has been a "sharp increase in the number of adolescents requesting gender care" recently, both in the United States and internationally.[6]

15. Recent surveys also show a significantly higher percentage of young people asserting a transgender identity than older adults. A recent survey by the Pew Research Center reported that 5.1% of adults ages 18–29 identify as transgender or non-binary, whereas only 1.6% of adults ages 30–49 identify as transgender or non-binary.[7] Similarly, a 2021 Gallup poll reported that 2.1% of Gen Z adults (born 1997-2003) identify as transgender (up from 1.8% in 2020), while only 1% of Millenials (born 1981-1996), .6% of Gen X adults (born 1965-1980), and .1% of Baby Boomers (born 1946-1964) reported a transgender identity.[8]

16. These changes are consistent with what I have seen in my clinical practice in recent years. While I have not attempted to quantify this, the number of youth and parents of youth contacting me for assistance with gender-identity issues has increased in recent years, and continues to increase year after year.

17. Various surveys and studies have also shown an increase in the ratio of natal female adolescents reporting gender incongruence. Until recently, more natal male children and adolescents

_and Gender Nonconforming People_, APA 70(9):832–64, at 843 (2015) ("APA Guidelines").

[6] WPATH SOC8 at S43.

[7] Anna Brown, _About 5% of young adults in the U.S. say their gender is different from their sex assigned at birth_, Pew Research Center (June 7, 2022), https://www.pewresearch.org/fact-tank/2022/06/07/about-5-of-young-adults-in-the-u-s-say-their-gender-is-different-from-their-sex-assigned-at-birth/.

[8] Jeffrey M. Jones, _LGBT Identification in U.S. Ticks Up to 7.1%_, Gallup (Feb. 17, 2022), https://news.gallup.com/poll/389792/lgbt-identification-ticks-up.aspx; Jeffrey M. Jones, _LGBT Identification Rises to 5.6% in Latest U.S. Estimate_, Gallup (Feb. 24, 2021), https://news.gallup.com/poll/329708/lgbt-identification-rises-latest-estimate.aspx.

have presented with gender incongruence than natal females, but that ratio has flipped in recent years, with far more adolescent girls experiencing gender incongruence than adolescent boys.[9] WPATH's SOC8, for example, notes that gender clinics in recent years have reported natal female adolescents "initiating care 2.5-7.1 times more frequently as compared to" natal male adolescents.[10]

18. That change in the sex ratios of children and adolescents asserting a transgender identity is consistent with my experience in my clinical practice. In the last few years, I estimate that I see roughly twice as many natal female adolescents for gender-identity-related issues than natal male adolescents. I also conduct parent consultations for gender-related issues much more often for natal female youth.

19. To my knowledge, to date these dramatic changes in the population of children and adolescents reporting a transgender identity and the differences between age cohorts have not been adequately studied or explained, but these statistics suggest that cultural and/or societal factors may contribute—even substantially—to a young person's experience of gender variance.[11] Indeed, WPATH SOC8 acknowledges that the recent phenomenon of "adolescents seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years" suggests that for some young people, "susceptibility to social influence impacting gender may be an important differential to consider."[12]

### c. A child's or adolescent's experience or perception of a transgender identity may or may not persist.

20. Multiple studies across different groups and times have reported that, for the vast majority of children, gender incongruence does not persist (most of these studies involved children who did

---

[9] *E.g.*, Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Refections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior 48(7) at 1983–1992 (2019).

[10] WPATH SOC8 at S43.

[11] *See* WPATH SOC8 at S44 (noting that "research [has] demonstrated [that] psychosocial and social factors also play a role").

[12] WPATH SOC8 at S45.

Declaration of Dr. Erica A. Anderson, PhD

not transition). As WPATH notes, these studies show a persistence rate between 6% and 27%.[13] One researcher summarized these studies as follows: "every follow-up study of [gender diverse] children, without exception, found the same thing: Over puberty, the majority of [gender diverse] children [identifying before puberty] cease to want to transition."[14]

21. In my clinical practice, I have worked with youth who, after a period of exploration and therapy as appropriate, ultimately conclude that they no longer desire to transition to a different gender identity.

>**d. When children or adolescents begin to experience gender incongruence, they should receive a careful evaluation and assessment by a professional mental health provider before transitioning, for a variety of reasons.**

22. Given the broad variety of factors that can contribute to a child's or adolescent's experience of gender incongruence and the reality that those feelings may be transitory, a mental health provider's first job is a careful evaluative process to understand the causes of the child's or adolescent's gender incongruence, assess the likelihood that those feelings will persist, and to help the child or adolescent and their parents process those feelings and make decisions about next steps.[15]

23. WPATH's SOC7, for example, recommends a "thorough assessment" of "gender dysphoria and mental health" to "explore the nature and characteristics of a child's or adolescent's gender identity," as well as a "psychodiagnostic and psychiatric assessment" that covers "areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement," "an evaluation of the strengths and weaknesses of family functioning," any "emotional or behavioral problems," and any "unresolved issues in a child's or youth's environment."[16] Similarly, the

---

[13] WPATH SOC7 at 11.

[14] James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, Journal of Sex & Marital Therapy, 46(4), 307–313 (2019).

[15] *See* WPATH SOC8 at S45 ("Since it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person, a comprehensive clinical approach is important and necessary.").

[16] WPATH SOC7 at 15.

Declaration of Dr. Erica A. Anderson, PhD

Endocrine Society recommends "a complete psychodiagnostic assessment" including "an assessment of the decision-making capability of the youth."[17] Endocrinology is the subspecialty in medicine having to do with hormones. Pediatric endocrinologists are the physicians who prescribe puberty blockers or cross-sex hormones in the gender clinics.

24. While young people sometimes "self-transition," responsible mental health practice requires that this assessment should occur *before* a child or adolescent socially transitions. WPATH SOC7 notes that mental health professionals "should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families throughout any *subsequent* social changes," (i.e., after the diagnostic process it recommends), which "ensures that decisions about gender expression and the treatment of gender dysphoria are thoughtfully and recurrently considered."[18] Similarly, the Endocrine Society's Guidelines "advise that decisions regarding the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of [a mental health provider] or another experienced professional."[19]

25. In my practice, consistent with WPATH's recommendations, I employ a comprehensive evaluative and exploratory process before recommending any form of transition, including a social transition, and I certainly would never recommend any kind of medical interventions before a careful assessment. My clients often find this process helpful—and many of them seek it out—even if they ultimately transition, which many do.

26. Another reason for a comprehensive assessment by a mental health professional is to determine whether and to what extent the child or adolescent is experiencing gender dysphoria (i.e., clinically significant distress associated with their experience of gender incongruence). As noted above, not every child or adolescent who exhibits gender variance experiences distress about that variance, but many do, and, as WPATH notes and I have personally encountered in my practice,

---

[17] Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dyshporic/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society, J Clin Endocrinol Metab, 102(11):3869–3903 at 3877 (Nov. 2017) ("Endocrine Society Guidelines").

[18] WPATH SOC7 at 16.

[19] Endocrine Society Guidelines at 3870.

children and adolescents can be "intensely distressed about it" and require professional support.[20]

27. Yet another reason for a professional assessment is to identify and address any coexisting mental health concerns. Gender incongruence is often accompanied by other mental health issues, like anxiety, depression, self-harm, and others. WPATH's SOC8, for example, notes studies showing that transgender youth have higher rates of depression, emotional and behavioral problems, suicide attempts and ideation, self-harm, eating disorders, autism spectrum disorders/characteristics, and other mental health challenges than the general population.[21] Thus, WPATH and other professional associations recommend screening children and adolescents presenting with gender incongruence for coexisting mental health issues and treating those as necessary.[22]

28. The assistance of a mental-health professional can also be critically important *during* any social transition. As the Endocrine Society's Guidelines note, a social transition "may test the person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports," and processing the transition is often "a major focus of the counseling" during the transition.[23] I have seen firsthand the benefits of having professional support during a social transition. In my experience, youth are not always prepared for all of the challenges associated with transitioning.

## IV.   SOCIAL TRANSITION IS AN IMPORTANT PSYCHOTHERAPEUTIC INTERVENTION THAT CAN CHANGE OUTCOMES IN CHILDREN AND ADOLESCENTS

### a.   Multiple respected voices agree that social transition does or may affect gender identity outcomes, increasing the likelihood that identification with a transgender identity will persist.

29. As noted above, numerous studies prior to the widespread adoption of social transition reported that gender incongruence did not persist through adolescence for a majority of children

---

[20] WPATH SOC7 at 12.

[21] WPATH SOC8 at S62.

[22] WPATH SOC7 at 24–25; Endocrine Society Guidelines at 3876; APA Guidelines at 845.

[23] Endocrine Society Guidelines at 3877.

Declaration of Dr. Erica A. Anderson, PhD

1  who experience it.

2      30. By contrast, a recent study of 317 transgender youth found that, 5 years after transitioning,

3  94% continued to identify as transgender, whereas only 6% had retransitioned back to a cisgender

4  or nonbinary identity.[24] A significant difference between this study and the prior studies is that all

5  of the children in this study had already socially transitioned. The dramatic difference in persistence

6  rates reported in prior studies and this and similar studies of children who have transitioned demands

7  an explanation and raises multiple questions. While there are a variety of possible explanations for

8  this difference in persistence rates, one possible explanation that cannot yet be ruled out is that social

9  transition itself has a causal effect on persistence rates by reinforcing a child's or adolescent's beliefs

10  about their identity.

11      31. Indeed, multiple well-respected researchers in this area have raised this concern. A study in

12  2013, which reported higher persistence rates among children who had transitioned, noted that

13  "[c]hildhood social transitions were important predictors of persistence, especially among natal

14  boys. Social transitions were associated with more intense GD in childhood, but have never been

15  independently studied regarding the *possible impact of the social transition itself on cognitive*

16  *representation of gender identity or persistence*."[25] The authors went on to note that "the

17  hypothesized link between social transitioning and the cognitive representation of the self" may

18  "influence the future rates of persistence."[26] "Until there is more knowledge about this mechanism,"

19  the authors wrote, they endorsed the approach in WPATH SOC7 of deferring to parents and helping

20  them "weigh the potential benefits and challenges" and "make decisions regarding the timing and

21  process of any gender role changes for their young children."[27]

22  _____

23  [24] Kristina R. Olson, *Gender Identity 5 Years After Social Transition*, Pediatrics

24  2022;150(2):e2021056082 (Aug. 2022), https://doi.org/10.1542/peds.2021-056082.

25  [25] Steensma, T. D., at al., *Factors Associated with Desistence and Persistence of Childhood*

26  *Gender Dysphoria: A Quantitative Follow-Up Study*. Journal of the American Academy of Child & Adolescent Psychiatry, 52(6), 582–590, at 588 (2013).

27  [26] *Id*. at 589.

28  [27] *Id*. (quoting WPATH SOC7 at 17).

Declaration of Dr. Erica A. Anderson, PhD

32. Another well-known researcher and long-time practitioner in this field, Dr. Kenneth J. Zucker, commented on this study as follows: "With the emergence in the last 10–15 years of a pre-pubertal gender social transition as a type of psychosocial treatment [citations omitted]—initiated by parents on their own (without formal clinical consultation) or with the support/advice of professional input—it is not clear if the desistance rates reported in the four core studies will be 'replicated' in contemporary samples. Indeed, the data for birth-assigned males in Steensma et al. (2013a) already suggest this: of the 23 birth-assigned males classified as persisters, 10 (43%) had made a partial or complete social transition prior to puberty compared to only 2 (3.6%) of the 56 birth-assigned males classified as desisters. Thus, *I would hypothesize that when more follow-up data of children who socially transition prior to puberty become available, the persistence rate will be extremely high*."[28] Dr. Zucker then adds that, in his view, "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence."

33. The Endocrine Society Guidelines also recognize that "[s]ocial transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence."[29]

34. A recent, comprehensive review by Dr. Hillary Cass of the U.K.'s model of transgender care, notes that "it is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning. There are different views on the benefits versus the harms of early social transition. Whatever position one takes, it is important to acknowledge that it is not a neutral act, and better information is needed

---

[28] Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, International Journal of Transgenderism 19(2) 231–245 (2018).

[29] Endocrine Society Guidelines at 3879.

Declaration of Dr. Erica A. Anderson, PhD

about outcomes."[30]

35. I share the concerns of these researchers and writers that transitioning may affect the likelihood of persistence, *especially* transitions without a careful assessment by a mental health professional prior to transitioning.

36. Again, the effects of social transition on a child's or adolescent's psychological development are still open to conjecture and hypothesis, since, to my knowledge, there have not yet been adequate long-term studies of social transitions during childhood or adolescence, as this is a relatively recent phenomenon. Indeed, WPATH's SOC8, released last year acknowledges that "there is a dearth of empirical literature regarding best practices related to the social transition process."[31]

37. WPATH and others have acknowledged that, in light of the paucity of long-term evidence about the effects, social transitions during childhood and adolescence are a controversial issue among mental-health professionals in this field. WPATH's SOC7, for example, notes that "[Social transition in early childhood] is a controversial issue," that "divergent views are held by health professionals," and that "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood."[32] Another group of researchers that is attempting to study this recently wrote: "Relatively unheard-of 10 years ago, early childhood social transitions are a contentious issue within the clinical, scientific, and broader public communities. [citations omitted]. Despite the increasing occurrence of such transitions, we know little about who does and does not transition, the predictors of social transitions, and *whether transitions impact children's views of their own gender*."[33]

38. Thus, while social transition is too often described as nothing more than a harmless "exploration" of gender and identity, at this time we cannot rule out that a social transition may have

---

[30] Cass, H., *Independent review of gender identity services for children and young people: Interim report* (2022), https://cass.independent-review.uk/publications/interim-report/.

[31] WPATH SOC8 at S76.

[32] *See* WPATH SOC7 at 17.

[33] James R. Rae, *Predicting Early-Childhood Gender Transitions*, Psychological Science Vol. 30(5) 669–681 at 669–70 (2019).

a causal effect on a child's or adolescent's future development of their internal sense of identity. On the contrary, the early research we have is consistent with the hypothesis that social transition causes some children to persist who otherwise might have desisted from experiencing gender dysphoria and transgender identification.

### b. Social transition erects psychosocial barriers to potential desistence.

39. One way in which social transition may *decrease desistence* is the psychological difficulty children and adolescents may face in transitioning back to an identity aligned with their natal sex after publicly transitioning to a transgender identity.

40. One group of researchers, in a qualitative study of 25 gender variant youth, found that "some girls, who were almost (but not even entirely) living as boys in their childhood years, experienced great trouble when they wanted to return to the female gender role."[34] In light of that possibility, they "suggest[ed] a cautious attitude towards the moment of transitioning." I agree.

41. WPATH also recognizes that "[a] change back to the original gender role can be highly distressing and even result in postponement of this second social transition on the child's part."[35] So does the Endocrine Society: "If children have completely socially transitioned, they may have great difficulty in returning to the original gender role upon entering puberty."[36]

42. In short, a social transition represents one of the most difficult psychological changes a person can experience. For all these reasons embarking upon a social transition based solely upon the self-attestation of the youth without consultation with parents and appropriate professionals is unwise.

43. Further to place teachers in the position of accepting without question the preference of a minor and further direct such teachers to withhold the information from parents concerning their

---

[34] Steensma, T. D., et al., *Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study*, Clin. Child. Psychol. Psychiatry (Jan. 7, 2011), http://ccp.sagepub.com/content/early/2011/01/06/1359104510378303.

[35] WPATH SOC7 at 17; *see also* WPATH SOC8 at S78 ("Another often identified social transition concern is that a child may suffer negative sequelae if they revert to the former gender identity that matches their sex designated at birth.").

[36] Endocrine Society Guidelines at 3879.

Declaration of Dr. Erica A. Anderson, PhD

minor children is hugely problematic.

## V. SOCIAL TRANSITION IS NOT ALWAYS THE BEST OPTION FOR A CHILD OR ADOLESCENT

### a. Some children and adolescents stop wanting to transition after an exploratory process to understand the cause of their feelings and self-perceptions.

44. As discussed above, multiple studies have reported that many children who experience gender incongruence ultimately revert to identifying with their natal sex. I personally have worked with youth, who, after an exploratory and therapeutic process, ultimately decided that transitioning was not the best approach for them.

45. WPATH's SOC8 argues that "recognition that a child's gender may be fluid and develop over time [citations omitted] is not sufficient justification to negate or deter social transition for a pre-pubescent child when it would be beneficial."[37] I understand the SOC8's caveat, "when it would be beneficial," as an implicit recognition that a social transition is not *always* beneficial for every child or adolescent experiencing gender incongruence. Indeed, SOC8 repeatedly "emphasizes the importance of a nuanced and individualized clinical approach to gender assessment,"[38] both for children and for adolescents.[39] While SOC8's focus is on medical interventions, the same is true for social transitions.

46. WPATH's SOC8 asserts that the fluidity of gender variance during youth is not a reason to "negate or deter social transition," however, the reality that gender variant feelings can be fluid for many young people warrants caution before making any significant changes, including a social transition. Part of a mental-health provider's role is to counsel patients to exercise caution and

---

[37] WPATH SOC8 at S76.

[38] WPATH SOC8 at S68.

[39] WPATH SOC8 at S45 ("Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary.").

Declaration of Dr. Erica A. Anderson, PhD

explore what they are feeling before making major changes.[40]

**b. We are becoming more aware of cases in which young people have transitioned and later desist or are detransitioning.**

47. Yet another reason for caution is the growing awareness of "detransitioners"—youth who previously transitioned to a transgender identity but later decide to revert to an identity that aligns with their natal sex. Many of these youth express regret about their prior transition.[41] Some go further and express anger at providers who they feel gave them an inadequate evaluation.[42]

48. This population has not yet been adequately studied or quantified—indeed it has only recently been acknowledged in the literature—but the existence of this population is undeniable at this point.[43] WPATH's SOC8 recognizes that "detransitioning may occur in young transgender adolescents and health care professionals should be aware of this."[44]

49. In a recent survey of 237 detransitioners (92% of which were natal females), 70% reported that one reason for their detransition was the realization that their "gender dysphoria was related to other issues."[45] Half reported that transition did not help with the dysphoria, and 34% reported that their dysphoria "resolved itself over time." Nearly half of those surveyed (45%) reported "not feeling properly informed about the health implications of the accessed treatments and interventions before undergoing them." And 60% listed "learning to cope with feelings of regret" as one of their

---

[40] *E.g.*, APA Guidelines at 843 (noting that, for adolescents in which "late-onset gender-dysphoria and TGNC identification [ ] come[s] as a significant surprise," "[m]oving more slowly and cautiously in these cases is often advisable.").

[41] WPATH SOC8 at S47.

[42] *E.g.*, Grace Lidinsky-Smith, *There's No Standard for Care When it Comes to Trans Medicine*, Newsweek (June 25, 2021), https://www.newsweek.com/theres-no-standard-care-when-it-comes-trans-medicine-opinion-1603450.

[43] *E.g.*, Irwig, M.S., *Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon*, J. Clin. Endocrinology & Metab. (June 9, 2022), https://doi.org/10.1210/clinem/dgac356.

[44] WPATH SOC8 at S47.

[45] Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, Journal of Homosexuality, 69:9, 1602–1620 (2022).

Declaration of Dr. Erica A. Anderson, PhD

psychological needs during the detransitioning process.

50. The recent and dramatic increase in the number of natal female adolescents who assert a transgender identity, and the reality reflected in the study above that a subset of these later detransition and regret transitioning, also warrants caution before rushing into a social transition. As WPATH acknowledges, this recent trend among adolescent girls may be driven in part by "excessive peer and social media influence."[46] A number of recent surveys have documented a significant deterioration in the health of adolescents in recent years, especially during the pandemic and among adolescent girls.[47] We are also becoming increasingly aware of the effect of social media on adolescent girls in particular—that population appears to be uniquely susceptible to negative mental health outcomes and imitations of behavior related to heavy social media use.[48]

51. I regularly monitor an online community of detransitioners on reddit (/r/detrans), and have observed many similar stories reported in that online community.

52. The potential for a difficult detransition process in the future and regret over a prior transition are important considerations that a mental-health provider should help a child or adolescent and their parents understand before they decide to undertake a social transition.

### c. Social transition sets children down a path that often leads to medical interventions.

53. Yet another reason for caution is that social transition often leads to medical interventions, many of which have permanent, long-term effects (or the effects are not yet fully known).[49] Not everyone who socially transitions goes on to pursue medical interventions, but many do.

---

[46] WPATH SOC8 at S58.

[47] *E.g.*, CDC, *Adolescent Behaviors and Experiences Survey* (Mar. 31, 2022), https://www.cdc.gov/healthyyouth/data/abes.htm

[48] *E.g.*, Amy Orben, *Windows of development sensitivity to social media*, Nature Communications 13, 1649 (2022); Robert H. Shmerling, *Tics and TikTok: Can social media trigger illness?*, Harvard Health Publishing, Harvard Medical School (Jan. 18, 2022), https://www.health.harvard.edu/blog/tics-and-tiktok-can-social-media-trigger-illness-202201182670.

[49] *E.g.*, WPATH SOC8 at S46 (noting the "lifelong implications of medical treatment").

Declaration of Dr. Erica A. Anderson, PhD

54. In the Olson study discussed above, only 37 of the 317 participants (11.7%) had started puberty blockers when the study began. By the end of the study (five years later), 190 of the 317 participants (59.9%) had started either puberty blockers and/or cross-sex hormones.[50]

55. The fact that a high percentage of children who socially transition later feel the need to undergo medical interventions to maintain or further align their appearance with the identity adopted during a social transition further highlights the fact that social transition is itself a major health and mental health decision that may lead to important long-term consequences in the life of the child, for good or ill. This is itself an important consideration that children and adolescents, and their parents, should understand and weigh when deciding whether to undertake a social transition. Without the involvement of a mental health professional, they are unlikely to obtain the information and counsel necessary to make an informed decision.

> **d. Social transition upon request without assessment and a treatment plan is not endorsed by *any* medical or mental health organization.**

56. For the reasons I have explained above, an assessment process and plan can be critically important *before* a child or adolescent transitions. I recognize that some children and adolescents do socially transition before meeting with a mental-health professional. But the fact that some individuals and families disregard sound practice is a problem that mental health professionals and schools should work to address, not a reason to ignore sound practice.

57. As far as I am aware, no medical or mental health organization recommends that adults facilitate a social transition upon a child or adolescent's request without a careful evaluation by an appropriately trained mental health professional. WPATH's SOC7 recommends a careful, psychological assessment and guidance from a mental health professional to help parents "weigh the potential benefits and challenges" of a social transition.[51] The Endocrine Society's Guidelines "advise that decisions regarding the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of an MHP or another experienced professional" (the

---

[50] Olson (2022) at 2, 4.

[51] WPATH SOC7 at 14–15, 17.

Declaration of Dr. Erica A. Anderson, PhD

guidelines do not say anything different about adolescents). [52] The American Psychological Association recommends that "[p]sychologists are encouraged to complete a comprehensive evaluation and ensure the adolescent's and family's readiness to progress," to discuss "the advantages and disadvantages of social transition during childhood and adolescence" with parents and their children, and to assist parents and their children with "developmentally appropriate decision-making about their education, health care, and peer networks, as these relate to children's and adolescent's gender identity and gender expression."[53]

58. While its recommendations focus on medical interventions, WPATH's SOC8 likewise recognizes that "a comprehensive clinical approach is important and necessary" and recommends "a comprehensive biopsychosocial assessment of adolescents who present with gender-identity concerns."[54] SOC8 even emphasizes that "[t]reatment in this context (e.g., with limited or no assessment) has no empirical support and therefore carries the risk that the decision to start gender-affirming medical interventions may not be in the long-term best interest of the young person at that time."[55]

59. In a few places, although it is not entirely clear about this, certain statements in SOC8 could be read to suggest that social transition should be implemented immediately upon the request of a child or adolescent. SOC8 says that "social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process,"[56] and that any "efforts at blocking reversible social expression or transition [like] choosing not to use the youth's identified name and pronouns" are "disaffirming behaviors" that are always inappropriate

---

[52] Endocrine Society Guidelines at 3870.

[53] APA Guidelines at 843.

[54] WPATH SOC8 at S45, S50; *see also id.* ("Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary.").

[55] WPATH SOC8 at S51.

[56] WPATH SOC8 at S76.

Declaration of Dr. Erica A. Anderson, PhD

1    and equivalent to conversion therapy.[57]

2    60. To the extent that one reads these statements as an endorsement of the view that children
3    and adolescents should always immediately be allowed to socially transition upon request, this goes
4    too far. As I have noted above, social transition may not in fact be easily "reversible." As a result,
5    it can be appropriate for parents to say "no" to a social transition (whether at school or elsewhere)
6    to, among other things, allow time for assessment and exploration with the help of a mental health
7    professional before making such a significant change. Part of parents' job is to help their children
8    avoid making bad decisions. That ordinary parental role is not remotely comparable to or properly
9    characterized as "conversion therapy." As WPATH's SOC7 recognizes, it is appropriate for parents
10   to decide whether to "allow" a social transition for their children.[58] Neither SOC 7 nor SOC 8
11   suggest that school personnel should decide whether a minor should socially transition, let alone
12   doing so and hiding this information from parents.

### VI.    PARENTAL INVOLVEMENT IS ESSENTIAL AT EVERY STAGE IN THE PROCESS

#### a.    Parental involvement is essential as a practical matter in order for a child or adolescent to be seen by a mental-health provider.

17   61. Aside from a few limited exceptions, medical and mental-health providers generally cannot
18   see or treat a minor without informed consent from the parent(s)/legal guardian(s), both as a matter
19   of state laws and as a matter of medical ethics.[59]

20   62. As WPATH's section on adolescents recognizes, many adolescents lack the "skills for future
21   thinking, planning, big picture thinking, and self-reflection" that are necessary for informed
22   decision-making.[60] Adolescents' decisions are often influenced by factors that are unrelated to their

---

[57] WPATH SOC8 at S53.

[58] WPATH SOC7 at 17.

[59] *E.g.*, WPATH SOC8 at S61 ("In most settings, for minors, the legal guardian is integral to the informed consent process: if a treatment is to be given, the legal guardian (often the parent[s]/caregiver[s]) provides the informed consent to do so.").

[60] WPATH SOC8 at S62.

Declaration of Dr. Erica A. Anderson, PhD

long-term best interests, like "a sense of urgency that stems from hypersensitivity to reward," a "heightened focus on peer relationships," and "increased risk-taking behaviors."[61] In light of the ongoing and unfinished development of emotional and cognitive maturity during adolescence, "[i]n most settings, for minors, the legal guardian is integral to the informed consent process."[62]

63. Parental involvement is also necessary as a practical matter. Many children and adolescents could not get to any appointments with a mental-health provider without their parents' assistance. And most children and adolescents do not have their own health insurance and would have no way to pay for those appointments.

64. For these and other reasons, in my practice, I will not (nor have I ever, that I can recall) see a minor child or adolescent without informed consent from a parent/legal guardian. During my years at the Child and Adolescent Gender Clinic at UCSF, we routinely would decline to see minors without a parent present. And our standard practice was to obtain an informed consent form from a parent prior to initiating any form of treatment. If a minor presented for treatment without a parent present or if there were questions about which parent had decision-making authority, we would cease further contact until we could confirm that we had proper informed consent from the parent or parents with decision-making authority.

**b. Parental involvement is important for accurate diagnosis, as parents often have a critical perspective on the history and likely causes of a child's or adolescent's gender questioning feelings.**

65. Parents are often the only people who have frequently and regularly interacted with a child or adolescent throughout the child's or adolescent's entire life, and therefore they have a unique view of the child's development over time. Indeed, parents often have more knowledge than even the child or adolescent does of whether their child or adolescent exhibited any signs of gender incongruence or gender dysphoria during the earliest years of life.

66. Thus, parental involvement is a critical part of the diagnostic process to evaluate how long

---

[61] WPATH SOC8 at S44.

[62] WPATH SOC8 at S61.

the child or adolescent has been experiencing gender incongruence, whether there might be any external cause of those feelings, and a prediction of how likely those feelings are to persist.

67. WPATH, for example, notes that "parent(s)/caregiver(s) may provide key information for the clinical team, such as the young person's gender and overall developmental, medical, and mental health history as well as insights into the young person's level of current support, general functioning, and well-being."[63]

68. And, as WPATH notes, "a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept."[64] In my practice, it is a common occurrence that the reconstructed history from a child or adolescent does not match the reported history from the parent. Likewise, children and adolescents often acknowledge that they have consumed many hours of social media from other transgender youth and have absorbed these experiences in some personal way.

69. Indeed, WPATH's SOC8 recommends "involving parent(s) or primary caregiver(s) in the assessment process … in almost all situations," and adds that "including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available."[65] In my practice, I find it critical that I, the parents, and the child come to consensus about the truth about each individual child.

70. In assessing an individual child or adolescent, it is my own practice to meet with the parent(s) before seeing a child or adolescent, to get their perspective on when, where, and how their child's feelings began, and I will often meet with parents throughout the assessment process as well, as necessary.

---

[63] WPATH SOC8 at S58.

[64] WPATH SOC8 at S58.

[65] WPATH SOC8 at S58.

Declaration of Dr. Erica A. Anderson, PhD

### c. Parental involvement is necessary for treatment of gender dysphoria and/or other diagnosed coexisting conditions.

71. Given the need for informed consent, as explained above, parental involvement is a necessary prerequisite for any kind of treatment by a medical professional, whether for gender dysphoria or any coexisting mental-health condition. For example, a child experiencing depression/anxiety related to gender incongruence ordinarily could not receive counseling or medication to treat the depression/anxiety without the informed consent of a parent/guardian.

72. Parents should also be involved to make important decisions about next steps for their minor child or adolescent, especially given the somewhat complicated risk-benefit calculus in this context and the limited knowledge about long-term effects and outcomes. WPATH's SOC7, for example, recommends that mental health professionals "help *families* to make decisions regarding the timing and process of any gender role changes for their young children," and to provide "counsel and support" even "[i]f parents do not allow their young child to make a gender role transition."[66] Similarly, WPATH's SOC8 recommends that mental health providers "should provide guidance *to parents/caregivers* and supports to a child when a social gender transition is being considered" and to "facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child."[67]

73. In my practice, I always contact the parent(s) at the end of the assessment process to share my thoughts and recommendations so that they can ultimately make the decision about what is best for their child.

### d. A school-facilitated transition without parental consent and buy-in interferes with the parents' ability to pursue a careful, investigative assessment before undergoing a gender identity transition.

74. If a school facilitates a social transition at school without parental consent and buy-in, it necessarily interferes with the parents' ability to take a cautious approach and pursue an evaluation and assessment before allowing their child or adolescent to make significant changes to their identity.

---

[66] WPATH SOC7 at 17.

[67] WPATH SOC8 at S78.

75. A school-facilitated transition without parental consent also interferes with parents' ability to pursue a treatment approach that does not involve an immediate transition—such as an exploratory process to understand the cause of the feelings or self-perceptions of gender incongruence.

76. Finally, a school-facilitated transition without parental consent necessarily interferes with the parent(s') ability to say "no" to a social transition, which can be appropriate in some circumstances.

### e. A school-facilitated transition without parental consent and buy-in creates unnecessary and additional tension in the parent-child relationship.

77. A school-facilitated transition over the objection of parents (or possibly worse, without their knowledge) necessarily creates tension in the parent-child relationship. A common principle in the training for psychotherapists who work with children and adolescents is to never create or aggravate any tensions in the parent-child relationship. By facilitating a social transition at school over the parents' objection or without their knowledge, a school would drive a wedge between the parent and child.

78. Similarly, facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts, is not in their best interest.

79. WPATH recognizes that "social transition for children typically can only take place with the support and acceptance of parents/caregivers."[68] Likewise, "adolescents are typically dependent on their caregivers/parents for guidance in numerous ways," including as they "navigate[ ] through the process of deciding about treatment options."[69]

80. As WPATH notes elsewhere, "[p]arent and family support of TGD youth is a primary predictor of youth well-being."[70] Circumventing, bypassing, or excluding parents from decisions about a social transition undermines the main support structure for a child or adolescent who

---

[68] WPATH SOC8 at S77.

[69] WPATH SOC8 at S49.

[70] WPATH SOC8 at S58.

Declaration of Dr. Erica A. Anderson, PhD

1    desperately needs support.

2          **f.   No professional body that I am aware of has endorsed school-facilitated**
3                **social transition of minors without parental knowledge and consent.**

4    81. I am not aware of any professional body that has endorsed school-facilitated social

5    transitions without parental consent. As noted above, WPATH's SOC7 recommends that *mental-*

6    *health professionals* advise, but ultimately defer to, parents whether or not they "allow their young

7    children to make a social transition to another gender role."[71] The Endocrine Society's Guidelines

8    "advise that decisions regarding the social transition of prepubertal youths with GD/gender

9    incongruence are made with the assistance of an MHP or another experienced professional" (which

10   would require the informed consent of the parents).[72] And the American Psychological Association

11   advises psychologists to discuss "the advantages and disadvantages of social transition during

12   childhood and adolescence" with parents and their children, to promote discussion between parents

13   and their children about "developmentally appropriate decision making."[73]

14         **VII.    CONCLUDING SUMMATION OF OPINIONS**

15   82. In light of the above, it is my expert opinion that Chino Valley Unified School District's

16   policies encouraging and facilitating parental involvement and decision-making regarding the care

17   of their gender incongruent or gender dysphoric children are consistent with widely accepted mental

18   health principles and practice relating to parental notification when their child or adolescent

19   expresses a desire to be socially transitioned at school. Specifically, I am not aware of any

20   professional body that would endorse the State of California's position, which encourages policies

21   that envision adult personnel socially transitioning a child or adolescent without evaluation of

22   mental health professionals and without parental involvement.

23   83. When a child presents with a desire to use a new name or pronouns, the very first step should

24   be to notify parents and involve them in the process of considering whether the child should undergo

25   _____

26   [71] WPATH SOC7 at 17.

27   [72] Endocrine Society Guidelines at 3870.

28   [73] APA Guidelines at 843.

a careful professional assessment by a mental health professional with expertise in child gender incongruence.

84. Social transition is an impactful psychotherapeutic intervention. It may or may not be the best therapeutic approach for any specific child. Parents must be notified and involved in the process to determine whether social transition is appropriate. Chino Valley Unified School District's BP 5020.1 facilitates this process. Any contrary policies that may require immediate social transition of children who request it may increase persistence among children who may have desisted had they received evaluation by a competent mental health professional. Persistence for such children is not in their best long-term interest.

85. Finally, Chino Valley Unified School District's policies are consistent with best practices relating to parental notification when their child or adolescent expresses a desire to be socially transitioned at school insofar as they encourage and facilitate maintaining the relationship between parents and their children. Best mental health practices abhor activity that maintains secrets between children and their parents, which create distrust and tension. In all cases, parental consent is required to provide medical and psychological treatment to minors. In part, this is because the science of mental health recognizes that the best evidence regarding a minor's mental and emotional well-being comes from first-hand accounts by parents, rather than potentially biased accounts from immature children.

86. In sum, the Chino Valley Unified School District's policies, which include parental involvement and decision-making regarding the care of their children, are consistent with best mental health practices relating to parental notification when their child or adolescent expresses a desire to be socially transitioned at school.

I declare under penalty of perjury under the State of California that the foregoing is true and correct.

Executed on October 2, 2023, in Berkeley, California.

*Dr. Erica Anderson*

Erica E. Anderson, PhD

Declaration of Dr. Erica A. Anderson, PhD

# EXHIBIT E

87 FR 47824-01, 2022 WL 3082867(F.R.)

PROPOSED RULES

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Medicare & Medicaid Services

42 CFR Parts 438, 440, 457, and 460

Office of the Secretary

45 CFR Parts 80, 84, 86, 91, 92, 147, 155, and 156

[Docket ID: HHS-OS-2022-0012]

RIN: 0945-AA17

Nondiscrimination in Health Programs and Activities

Thursday, August 4, 2022

AGENCY: Centers for Medicare and Medicaid Services; Office for Civil Rights (OCR), Office of the Secretary, HHS.

**\*47824** ACTION: Notice of proposed rulemaking; notice of Tribal consultation.

SUMMARY: The Department of Health and Human Services (HHS or the Department) is issuing this proposed rule on Section 1557 of the Affordable Care Act (ACA) (Section 1557). Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. Section 1557(c) of the ACA authorizes the Secretary of the Department to promulgate regulations to implement the nondiscrimination requirements of Section 1557. The Department is also proposing to revise its interpretation regarding whether Medicare Part B constitutes Federal financial assistance for purposes of civil rights enforcement and to revise nondiscrimination provisions to prohibit discrimination on the basis of sexual orientation and gender identity in regulations issued by the Centers for Medicare & Medicaid Services (CMS) governing Medicaid and the Children's Health Insurance Program (CHIP); Programs of All-Inclusive Care for the Elderly (PACE); health insurance issuers and their officials, employees, agents, and representatives; States and the Exchanges carrying out Exchange requirements; agents, brokers, or web-brokers that assist with or facilitate enrollment of qualified individuals, qualified employers, or qualified employees; issuers providing essential health benefits; and qualified health plan issuers.

DATES:

Comments: Submit comments on or before October 3, 2022.

Meeting: Pursuant to Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, the Department of Health and Human Services' Tribal Consultation Policy, and the Department's Plan for Implementing Executive Order 13175, the Office for Civil Rights solicits input by tribal officials as we develop the implementing regulations for Section 1557 of the Affordable Care Act at 45 CFR part 92. The Tribal consultation meeting will be held on August 31, 2022, from 2 p.m. to 4 p.m. Eastern Daylight Time.

ADDRESSES: You may submit comments, identified by RIN Number 0945-AA17, by any of the following methods. Please do not submit duplicate comments.

To participate in the Tribal consultation meeting, you must register in advance at https://www.zoomgov.com/meeting/register/vJIsfu-rqzksEl2T8gUp_lDrWBqkU0223CY.

Federal Rulemaking Portal: You may submit electronic comments at https://www.regulations.gov by searching for the Docket ID number HHS-OS-2022-0012. Follow the instructions for submitting electronic comments. If you are submitting comments electronically, the Department strongly encourages you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Adobe Portable Document Format (PDF), the Department strongly encourages you to convert

the PDF to "print-to-PDF" format, or to use some other commonly used searchable text format. Please do not submit the PDF in a scanned format. Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions to assist in the rulemaking process.

Regular, Express, or Overnight Mail: You may mail written comments to the following address only: U.S. Department of Health and Human Services, Office for Civil Rights, Attention: 1557 NPRM (RIN 0945-AA17), Hubert H. Humphrey Building, Room 509F, 200 Independence Avenue SW, Washington, DC 20201.

All comments received by the methods and due date specified above may be posted without change to content to https:// www.regulations.gov, which may include personal information provided about the commenter, and such posting may occur after the closing of the comment period. However, the Department may redact certain non-substantive content from comments before posting, including threats, hate speech, profanity, graphic images, or individually identifiable information about a third-party individual other than the commenter. In addition, comments or material designated as confidential or not to be disclosed to the public will not be accepted. Comments may be redacted or rejected as described above without notice to the commenter, and the Department will not consider in rulemaking any redacted or rejected content that would not be made available to the public as part of the administrative record.

Because of the large number of public comments normally received on Federal Register documents, OCR is not able to provide individual acknowledgments of receipt.

Please allow sufficient time for mailed comments to be received timely in the event of delivery or security delays.

Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted.

Docket: For complete access to background documents or posted comments, go to https://www.regulations.gov and search for Docket ID number HHS-OS-2022-0012.


FOR FURTHER INFORMATION CONTACT:

**Office for Civil Rights**

Dylan Nicole de Kervor, (202) 240-3110 or (800) 537-7697 (TDD), or via email at 1557@hhs.gov, for matters related to Section 1557.


**Centers for Medicare & Medicaid Services**

John Giles, (410) 786-5545, for matters related to Medicaid.

Emily King, 410-786-8537, for matters related to CHIP.

Timothy Roe, (410) 786-2006 for matters related to Programs of All-Inclusive Care for the Elderly.

Becca Bucchieri, (301) 492-4341, Agata Pelka, (667) 290-9979, or Leigha Basini, (301) 492-4380, for matters related to 45 CFR 155.120, 155.220, 156.125, 156.200, and 156.1230.

Lindsey Murtagh, (301) 492-4106, for matters related to 45 CFR 147.104.

Hannah Katch, (202) 578-9581, for general questions related to CMS amendments.

Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record: Upon request, the Department will provide an accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the proposed regulations. To schedule an appointment for this type

414    See, e.g., Daphna Strousma et al., The Power and Limits of Classification—A 32-Year-Old Man with Abdominal Pain, 380 N. Eng. J. Med. 1885 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7395710/pdf/nihms-1609250.pdf.

In particular, this provision would prohibit the adoption of a policy, or engaging in a practice, that prevents any individual from participating in a covered entity's health program or activity consistent with their gender identity. The 2016 Rule required that covered entities "treat individuals consistent with their gender identity" at former § 92.206; as discussed previously, the 2020 Rule preamble indicated that Section 1557 likely did not prohibit discrimination on the basis of gender identity as a form of prohibited sex discrimination, and therefore did not include a similar provision. The Department believes this provision is necessary to better effectuate Section 1557's purpose: to eliminate sex discrimination in a range of health programs and activities. Reading Section 1557's prohibition of sex discrimination consistently with the reasoning in Bostock, discrimination on the basis of gender identity necessarily involves consideration of an individual's sex—even if that term is narrowly defined—and Section 1557's prohibition covers discrimination on that basis. For example, a hospital that assigns patients to dual-occupancy rooms based on sex would be prohibited from requiring a transgender woman to share a room with a cisgender man,  **\*47867** regardless of how her sex is recorded in her insurance or medical records.[FN415]

415    See, e.g., Bulletin, U.S. Dep't of Health & Human Servs., The Brooklyn Hospital Center Implements Non-Discriminatory Practices to Ensure Equal Care for Transgender Patients (July 14, 2015), https://www.hhs.gov/sites/default/files/ocr/civilrights/activities/agreements/TBHC/statement.pdf.

Proposed paragraph (b)(4) prohibits a covered entity from denying or limiting health services sought for the purpose of gender-affirming care that the covered entity would provide to a person for other purposes if the denial or limitation is based on a patient's sex assigned at birth, gender identity, or gender otherwise recorded.

This preamble generally uses the phrase "gender transition or gender-affirming care." Relevant clinical guidelines acknowledge that not all individuals for whom such care is clinically appropriate will specifically identify as transgender, nor will all gender-affirming care specifically be related to transition from one binary gender to another.[FN416] For example, people seeking gender-affirming care may refer to their gender identity using terms other than "transgender," such as "nonbinary," "gender nonconforming," "genderqueer," or "genderfluid." Individuals using any of these terms may have a gender dysphoria diagnosis and seek clinically appropriate gender-affirming care. A person's use of particular identity terminology is not determinative of whether the care in question is appropriate.

416    WPATH Standards, supra note 139, at pp. 8-9.

There also may be variations in the types of health services that are sought or are clinically appropriate for each person (e.g., some people undergo hormone therapy as part of gender transition but do not seek any surgical care).[FN417] Additionally, some transgender people might not seek or require health interventions as part of their gender transition or gender-affirmation process. Nothing in this preamble or the regulatory text is intended to limit the application of provisions discussing gender-affirming care or transition-related care based on whether an individual uses particular terms to describe their gender identity or seeks only certain types of gender-affirming or transition-related care. The Department welcomes comments on this choice of terminology in the regulatory text, particularly from individuals seeking and providing such care.

417    Id.

Importantly, this provision does not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action. This is consistent with the Department's position under Section 504 regarding medical specialization. As explained in Appendix A to the Department's Section 504 implementing regulation, "[a] burn treatment center need not provide other types

of medical treatment to [individuals with disabilities] unless it provides such medical services to [persons without disabilities]. It could not, however, refuse to treat the burns of a deaf person because of his or her deafness." [FN418] This provision also does not compel a provider to prescribe a specific treatment that the provider decides not to offer after making a nondiscriminatory bona fide treatment decision. For example, a family practice covered by the rule would not be required to provide transition-related surgery where surgical care is not within its normal area of practice. Nor would the proposed rule require a pediatrician to prescribe hormone blockers for a prepubescent gender-nonconforming minor if that health care provider concluded, pursuant to a nondiscriminatory bona fide treatment decision, that social transition was the clinically indicated next step for that child.

418    See 45 CFR pt. 84, app. A, subpt. F.

By contrast, a gynecological surgeon may be in violation of the rule if they accept a referral for a hysterectomy but later refuse to perform the surgery upon learning the patient is a transgender man. If OCR were to receive a complaint in a case such as this, it would evaluate whether the provider had a legitimate basis for concluding that the surgery would not be clinically appropriate for the patient. If the surgeon invokes such a justification, OCR would make a determination as to whether the reason was a pretext for discrimination. OCR would also consider the application of Federal conscience and religious freedom laws, where relevant.

Proposed paragraph (c) provides that nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity reasonably determines that such health service is not clinically appropriate for that particular individual. However, a provider's view that no gender transition or other gender-affirming care can ever be beneficial for such individuals (or its compliance with a state or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate. Paragraph (c) is consistent with the general principle in nondiscrimination law that covered entities facing allegations of discrimination have the opportunity to articulate a legitimate, nondiscriminatory basis for their challenged action or practice.[FN419] For example, a covered entity would not be required to perform a cervical exam on an individual who does not have a cervix, or to perform a prostate exam on an individual who does not have a prostate.

419    See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); U.S. Dep't of Just., Title IX Legal Manual, sec. IV.A.1; id. at sec. VI.B.3; see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) (enumerating factors to be considered in evaluating whether a policy or practice is motivated by discriminatory intent); U.S. Dep't of Just., Title VI Legal Manual, sec. VI.B.2.

In evaluating whether a facially sex-neutral asserted basis is pretextual, OCR may consider whether a determination that care is not clinically appropriate is based on generally accepted scientific or medical standards. For example, a clinic could not raise a defense under this provision if they denied a transgender woman a prostate exam based on the provider's belief that prostate exams are never clinically appropriate for women, if in fact the particular patient has a prostate. Nor would this provision provide a defense to a provider denying testosterone therapy to an intersex woman with complete androgen insensitivity syndrome based on a categorical belief that such therapy is never clinically appropriate for women.[FN420]

420    See Wiebke Birnbaum et al., Oestrogen Versus Androgen in Hormone-Replacement Therapy for Complete Androgen Insensitivity Syndrome: A Multicentre, Randomised, Double-Dummy, Double-Blind Crossover Trial, 10 Lancet Diabetes Endocrinol. 771 (2018), https://pubmed.ncbi.nlm.nih.gov/30075954/.

Similarly, OCR recognizes that providers often need to make inquiries about a patient's sex-related medical history, health status, or physical traits related to sex in the course of providing care. Such inquiries are not per se discriminatory, even where they touch on intimate or sensitive matters, but should be related to the underlying condition. For example, it is not discriminatory —i.e., it does not result in more than de minimis harm—for a provider treating a patient presenting with symptoms consistent with an ectopic pregnancy to inquire about the possibility that the patient could be pregnant, regardless of that patient's gender identity. However, where they are relevant to allegations of  **\*47868**  discrimination, OCR may consider whether such inquiries

are related to providing the care sought. Where such inquiries do not have a relationship to the care provided, or where they are made in a manner that is harassing, hostile, or evinces disregard for a patient's privacy, OCR may consider whether a provider's inquiries may be evidence of discrimination. For example, if a provider refused to provide treatment for a broken arm unless the patient answered questions about their history of genital surgery, OCR would consider whether there was any medical rationale for asking the question or whether it was mere pretext for discrimination, given the lack of connection between the question and the care being provided.[FN421] Similarly, a provider's repeated questions about whether a patient had had breast augmentation surgery could be considered as evidence of discrimination where such questions were unrelated to the care provided, especially if the manner of the questioning had other indicia of harassment. Where relevant, OCR will consider the totality of the circumstances in determining whether overbroad, irrelevant, or hostile inquiries may constitute evidence of discrimination.

421    See, e.g., David Oliver, 'Being Transgender Is Not a Medical Condition': The Meaning of Trans Broken Arm Syndrome, USA Today (last updated Mar. 31, 2022), https://www.usatoday.com/story/life/health-wellness/2021/07/27/trans-broken-arm-syndrome-what-it-how-combat-discrimination-health-care/8042475002/; Douglas Knutson et al., "Trans Broken Arm": Health Care Stories from Transgender People in Rural Areas, 7 J. of Rsch. on Women & Gender 30 (2016), https://journals.tdl.org/jrwg/index.php/jrwg/article/download/97/50.

Proposed paragraph (d) provides that the enumeration of specific forms of discrimination in paragraph (b) does not limit the general applicability of the prohibition in paragraph (a) of this section.

The Department believes that the provisions in proposed § 92.206 are consistent with, and in furtherance of, Section 1554 of the ACA, which prohibits the Secretary of HHS from promulgating a regulation that "interferes with communications regarding a full range of treatment options between patient and the provider," or "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions." [FN422] The provision as written supports and encourages health care providers' ability to discuss a full range of treatment options with their patients and in no way restricts providers' ability to share the range of risks and benefits associated with each treatment option. As discussed throughout this section, the provisions here do not compel a particular treatment for any given condition; rather, this section prohibits health care providers from discriminating against individuals on the basis of sex, including gender identity. Gender-affirming care, like all medical care, should follow clinical practice guidelines and professional standards of care.[FN423] Informed consent to any medical treatment is both a legal and ethical standard, regardless of the type of care, and serves as a basis for shared decision making.[FN424] When providing gender-affirming medical care for minors, informed consent involves discussions among providers, minors, and parents or guardians.[FN425]

422    42 U.S.C. 18114(3), (4).

423    See e.g., WPATH Standards, supra note 139; Wylie Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869 (2017), https://academic.oup.com/jcem/article/102/11/3869/4157558.

424    Am. Med. Ass'n, Informed Consent, https://www.ama-assn.org/delivering-care/ethics/informed-consent (last visited June 15, 2022).

425    Hilary Cass, The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Interim Report (2022), https://cass.independent-review.uk/publications/interim-report/.

We seek comment on this section, including whether it adequately addresses the forms of discrimination faced by individuals on the basis of sex (including pregnancy, sexual orientation, gender identity, and sex characteristics) when seeking access to and participating in health programs and activities; whether the proposed regulation text captures the policies set forth in this

# EXHIBIT F





## International Journal of Transgenderism

ISSN: 1553-2739 (Print) 1434-4599 (Online) Journal homepage: http://www.tandfonline.com/loi/wijt20

# The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018)

Kenneth J. Zucker

**To cite this article:** Kenneth J. Zucker (2018): The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018), International Journal of Transgenderism, DOI: 10.1080/15532739.2018.1468293

**To link to this article:** https://doi.org/10.1080/15532739.2018.1468293

Published online: 29 May 2018.

Submit your article to this journal 🗗

View related articles 🗗

View Crossmark data 🗗

INTERNATIONAL JOURNAL OF TRANSGENDERISM
https://doi.org/10.1080/15532739.2018.1468293





# The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018)

Kenneth J. Zucker

Department of Psychiatry, University of Toronto, Toronto, Ontario, Canada

**ABSTRACT**

Temple Newhook et al. (2018) provide a critique of recent follow-up studies of children referred to specialized gender identity clinics, organized around rates of persistence and desistance. The critical gaze of Temple Newhook et al. examined three primary issues: (1) the terms persistence and desistance in their own right; (2) methodology of the follow-up studies and interpretation of the data; and (3) ethical matters. In this response, I interrogate the critique of Temple Newhook et al. (2018).

**KEYWORDS**

Desistance; developmental psychiatry; DSM-5; gender dysphoria; gender identity disorder; persistence; transgender

## Prolegomenon

As Temple Newhook et al. (2018) noted in the Introduction to their critical essay, they focused on "…the four most recent follow-up studies…which are most often cited as evidence for desistance theories" with regard to children variously labeled as "transgender," "gender non-conforming," etc.[1]

Four thoughts: (1) From an historical perspective, are Temple Newhook et al., in fact, "systematically [not] engaging scholarly literature" by eliding a critical discussion of the earlier studies, particularly the follow-up by Green (1987) (for references to the other "early" studies, see Ristori and Steensma (2016, Table 1])? In my view, this is a form of empirical and intellectual erasure, which should be problematized. (2) With regard to the analysis of persistence vs. desistance rates, I would not have included the study by Steensma, Biemond, de Boer, and Cohen-Kettenis (2011), since it was an intentionally selective sample and not representative of the potential pool of clients seen at the Amsterdam clinic between the years 2000 and 2007. Perhaps even more importantly, some of the participants in Steensma et al. (2011) were part of the earlier study by Wallien and Cohen-Kettenis (2008) (T. D. Steensma, personal communication, March 29, 2018); hence, Temple Newhook et al. in their

Table 1 are doing a partial "duplicate" counting of the follow-up data from the Dutch clinic. (3) I think that Temple Newhook et al. should have included the follow-up study by Singh (2012), since it contains the largest number of children ($n = 139$ birth-assigned males[2]) among the recent follow-up studies (and, for that matter, any follow-up study). Temple Newhook et al. appear to implicitly devalue the Singh study (which they do not even reference) because it has not yet been published in a peer-reviewed journal.[3] However, a doctoral dissertation approved by a decent university with three Ph.D. committee members and an external Ph.D. examiner should not be ignored. (4) Temple Newhook et al. used the phrase "desistance theories," which is a bit odd. The first step is to summarize the data on persistence and desistance. The second step would be to theorize or hypothesize not only why desistance occurs when it does, but also to theorize or hypothesize why persistence occurs when it does. In my view, this is no trivial matter because, as I will discuss below, there might be very good reasons to predict that, in at least some subgroups of contemporary transgender children (or as Meadow [in press] calls them, "trans kids"), the rate of persistence is going to be much higher than reported in the follow-up studies to date.

**CONTACT** Kenneth J. Zucker ✉ ken.zucker@utoronto.ca ◆ Department of Psychiatry, University of Toronto, Toronto, Ontario, M5T 1R8, Canada.

© 2018 Taylor &amp; Francis Group, LLC

## On the terms persistence and desistance

Temple Newhook et al. (2018) offer up a brief discussion of the etymology of the word desistance, which I appreciated. Here, I will offer up how I think the terms persistence and desistance became part of the linguistic landscape with regard to children with a diagnosis of gender identity disorder/gender dysphoria.[4] At the 2003 meeting of the Harry Benjamin International Gender Dysphoria Association (now the World Professional Association for Transgender Health) in Gent, Belgium, I was a Discussant in a symposium and the title of my talk was "Persistence and desistance of gender identity disorder in children" (Zucker, 2003). As far as I can remember, I stumbled across the terms persistence and desistance after reading a paper by August, Realmuto, Joyce, and Hektner (1999), who reported on the rates of persistence and desistance of oppositional defiant disorder in a community sample of children with a diagnosis of attention-deficit hyperactivity disorder. At the time, the terms sounded pretty cool to me and they have been used for a long time now in clinical developmental child and adolescent psychology/psychiatry research (e.g., Farrington, 1991; Simonoff et al., 2013; Verhulst & Althaus, 1988).

For scholars writing about gender dysphoria, the terms caught on. Of course, there is no law that says these terms should be privileged. One could use alternative terms like continuation vs. discontinuation (persistence and desistance have fewer syllables), continuation vs. "in remission," etc. "In remission" is a bit too medical for my taste, but it is not necessarily an incorrect term. One could even add the term "recurrence" for those children and adolescents where gender dysphoria desists but then recurs. In any case, the "real" objection to the term "desistance" is that some clinicians, some researchers, and some activists simply don't like the empirical fact that there are some children who received the DSM-5 diagnosis of gender dysphoria (or its predecessor DSM-III/DSM-IV labels gender identity disorder of childhood or gender identity disorder) who do not continue to have "it" when they are older. That is really the crux of the discourse implicit in Temple Newhook et al.'s attempt to "reconstruct" the extant empirical literature, which the most ardent critics like to call "junk science" (e.g., Ford, 2017; Tannehill, 2016).

## The data

Temple Newhook et al. (2018) use an 80% desistance rate "from a prior transgender identity" as the launching pad for their critique of the literature. I have two problems with this: one that is perhaps semantics; the other is empirical.

The term "transgender identity" is hardly an objective label for a child's gendered subjectivity. It is a label imposed by Temple Newhook et al. Of course, there may have been some children in the reviewed follow-up studies who self-identified as "trans" or "transgender" (in childhood) but I suspect that they constituted a (small) minority. And, of course, there are, no doubt, many children nowadays who would meet the DSM-5 diagnostic criteria for gender dysphoria and who self-identify as "trans" or whose parents label them as "trans" or whose clinician labels them as "trans." But a transgender identity is not isomorphic with a mental health diagnosis of gender dysphoria or even the alternative label of gender incongruence proposed for the forthcoming ICD-11 (Drescher, Cohen-Kettenis, & Reed, 2016). One could use alternative wording to summarize the data, at least as how Temple Newhook et al. see them: Of X children referred to specialized gender identity clinics at one of two academic health science centers, the majority of whom met DSM criteria for gender identity disorder of childhood or gender identity disorder, "[a]n oft-accepted interpretation of [the] findings is that approximately 80%" did not appear to have, at the time of follow-up, the developmentally equivalent adolescence or adulthood diagnosis.

Temple Newhook et al. could have done a bit of a better job in summarizing the Wallien and Cohen-Kettenis (2008) and Steensma, McGuire, Kreukels, Beekman, and Cohen-Kettenis (2013a) data by providing separate percentages by birth-assigned sex in Row 13 ("Reported desistance rate") of Table 1. In Wallien and Cohen-Kettenis, the persistence rate for birth-assigned males was 20.3% and for birth-assigned females was 50.0%. In Steensma et al., the corresponding percentages were 29.1% and 50.0%, respectively. Singh (2012), who used a methodology very similar to Drummond, Bradley, Peterson-Badali, and Zucker (2008), found a persistence rate of 12.2%. Green's (1987) study, which is arguably the most important of the "earlier" follow-up studies, found a persistence rate of 2.2% (see, for example, Zucker and Bradley [1995, pp. 283–287]). In the two Dutch studies, the

persistence rate for birth-assigned females was 2.46 and 1.71 times more likely than it was for birth-assigned males. In contrast, in the two Toronto studies, the persistence rate was similar for birth-assigned females and males. These variations deserve scrutiny and thought.

These follow-up studies were the ones used by the Gender Identity Disorders Subworkgroup to summarize the extant follow-up data in the DSM-5, where it was asserted that the "Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30.0%. In natal females, persistence has ranged from 12% to 50%" (American Psychiatric Association, 2013, p. 455). I would have preferred that Temple Newhook et al. relied on this statement rather than make vague reference to "…the media…[the] lay public, and in [unnamed] medical and scientific journals" or they could have referenced the summary article by Ristori and Steensma (2016).

I must confess having some trouble in understanding Row 7 (T1-desistant/N) in Temple Newhook et al.'s Table 1. For example, in Row 7 for Drummond et al. (2008), they give a figure of 59%. This appears to have been derived by counting the 22 participants seen for follow-up who were classified as desisters and dividing by 37 (the total number of eligible participants, of whom 12 were not part of the follow-up study because they could not be traced, their parents did not want them to take part in the study, etc.: 22/37 = 59% instead of 22/25 = 88% (as reported in Row 13).[5] The 59% figure could be interpreted as implying that as many as 41% of the potential participants could have been persisters, which is an absurd inference with no empirical basis.

## Methodological and interpretive issues

### Sampling

Temple Newhook et al. (2018) expressed concern about the "broad inclusion criteria" in the follow-up studies and that they were not "a representative group of transgender children." That is true. Until there is a formal epidemiological, population-based study of children who meet diagnostic criteria for gender dysphoria, it would be prudent to limit any claims about generalizability to clinic-referred samples seen during

the same period of time during which the extant follow-up studies were conducted (cf. Steensma, van der Ende, Verhulst, & Cohen-Kettenis, 2013b). One could say the very same thing about contemporary samples of trans children recruited via support groups, conferences, word of mouth, etc., as in the recent studies by Olson's research group (e.g., Durwood, McLaughlin, & Olson, 2017; Olson, Durwood, DeMeules, & McLaughlin, 2016; see also Kuvalanka, Weiner, Munroe, Goldberg, & Gardner, 2017; Meadow, 2011).

Temple Newhook et al. (2018) also asserted the following:

> …this research was limited to children whose parents chose to bring them to a clinic for diagnosis and treatment and thus may have believed the child's difference was a problem, and one that required psychological treatment. Children whose parents affirmed their gender (or who did not wish to…access clinical treatment for any reason) were likely not included in these studies.

Ok, well Temple Newhook et al. (2018) were not entirely sure about this ("may have believed…likely not included…"). In Toronto, there is no question that some parents/many parents were concerned about their child's gender identity development. Others were not sure how they felt – they wanted professional advice. Others were not concerned at all but brought their child anyway (for different reasons). It would certainly be important in future studies to see how parental attitudes about their child's gender-variant behavior/gender dysphoria are associated with long-term developmental outcomes. In Steensma et al. (2013a), Temple Newhook et al. are, in my view, wrong about their "affirmation" argument because some of the children in that study "socially transitioned" from one gender to another prior to puberty, which one can only assume occurred in the context of "supportive" parents. One definition of "supportive" in the *Oxford Dictionary of Current English* (Soares, 2001) is "encouraging."

### Changes in diagnostic criteria

A second issue noted by Temple Newhook et al. (2018) is that diagnostic criteria have changed over time, between the DSM-III in 1980 and the DSM-5 in 2013. That is true. Indeed, Temple Newhook et al. state that "…these studies included children who, by current DSM-5 standards, would not likely have been categorized as transgender (i.e., they would not meet

the criteria for gender dysphoria) and therefore…it is not surprising that they would not identify as transgender at follow-up." There is a lot to unpack in this statement. First, even using the earlier criteria for the diagnosis of gender identity disorder of childhood/gender identity disorder, not all of the referred children were threshold for the diagnosis (see below). Second, it is an empirical question about what the degree of overlap would be if one used DSM-III, DSM-III-R, DSM-IV, and DSM-5 criteria to classify children referred for possible gender dysphoria. I doubt that anyone will ever do such a study, so it is not worth ruminating about it. It is my clinical opinion that the similarities across the various iterations of the DSM are far greater than the differences (Zucker, 2010) and, as part of the work done by the Subcommittee on Gender Identity Disorders for the DSM-IV, provided one example of this (Zucker et al., 1998).

One minor point about changes in the diagnostic criteria: Temple Newhook et al. stated that "Evidence of the actual distress of gender dysphoria…was dropped as a requirement for [Gender Identity Disorder] in the DSM-IV…" This is wrong. Criterion D reads as follows: "The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning" (American Psychiatric Association, 1994, p. 538). Of course, how exactly one operationalizes distress is a complex matter, as I have discussed elsewhere (e.g., Zucker, 1992, 2005).

### Predictors of developmental psychosexual trajectories

An important point discussed by Temple Newhook et al. (2018) is that not all children seen in the follow-up studies were threshold for the DSM diagnosis in childhood (see also Olson, 2016). Indeed, they quoted from Drummond et al. (2008) the following:

> …40% of the girls were not judged to have met the complete DSM criteria for GID [Gender Identity Disorder] at the time of childhood assessment…it could be argued that if some of the girls were subthreshold for GID in childhood, then one might assume that they would not be at risk for GID in adolescence or adulthood. (p. 42)

Since I was a co-author of Drummond et al., how could I disagree with this statement?

Ten years later, here is how. On the one hand, the clinical reality is more complicated than this statement suggests. For example, there is ample contemporary

clinical experience that there are many adolescents who come in the front-door for evaluation who meet the diagnostic criteria for gender dysphoria, but, retrospectively, would not have met the complete DSM-5 criteria in childhood (either by their own self-report, by their parent's perspective, or both). Some of these adolescents would not have met any of the criteria. Other adolescents (particularly birth-assigned females in my opinion) had some degree of gender-variant behavior during childhood (sometimes markedly so), but not at the level where they would have been threshold for the diagnosis because they did not express the desire to be of the other gender or some alternative gender different from their assigned gender. Thus, I would argue that degree of gender-variant behavior in childhood (with or without the presence of gender dysphoria per see) is a potential predictor of gender dysphoria in adolescence or adulthood that should not be too readily dismissed (see, e.g., Scholinski, 1997; https://dylanscholinski.weebly.com/bioinfocv.html).

On the other hand, what can we learn about the predictive value of the childhood diagnosis with regard to persistence? Table 1 shows the percentage of children classified as persisters or desisters from four follow-up studies as a function of whether or not they were threshold or subthreshold for the diagnosis in childhood. Of the 127 children who were subthreshold for the diagnosis, only 9 (7.1%) were classified as persisters. Of the 241 children who were threshold for the diagnosis, 79 (32.8%) were classified as persisters. This yields a sensitivity rate of 89.7%, which is pretty good, but a specificity rate of 42.1%, which is not so good. In absolute terms, that 7% of the subthreshold cases were classified as "persisters" at follow-up is low; nonetheless, a 7% "prevalence" rate would be substantially higher than the base rate in the general population, if, for example, one relies on some recent epidemiological studies of high-school students or

**Table 1.** Gender dysphoria ("persistence") at follow-up as a function of diagnostic status in childhood.

| | | Persistence | |
|---|---|---|---|
| | | Yes | No |
| DSM diagnosis in childhood | Yes | 79 (32.8%) | 162 (67.2%) |
| | No | 9 (7.1%) | 118 (92.9%) |

Note. Data from Drummond et al. (2008), Singh (2012), Steensma et al. (2013a), and Wallien and Cohen-Kettenis (2008). DSM diagnosis in childhood: Yes = threshold for the diagnosis of gender identity disorder of childhood/gender identity disorder in DSM-III, DSM-III-R, or DSM-IV. No = subthreshold.

adults who self-identify as transgender (Clark et al., 2014; Eisenberg et al., 2017; Guss, Williams, Reisner, Austin, & Katz-Wise, 2017; Wilson, Choi, Herman, Becker, & Conron, 2017). The relatively low specificity rate challenges the "No True Scotsman" argument (https://en.wikipedia.org/wiki/No_true_Scotsman), namely that desisters were not truly gender-dysphoric to begin with, so there was nothing to desist from. Only persisters were truly gender-dysphoric in childhood. But unless one wants to completely dismiss the validity of the childhood criteria, one must contemplate the fact that 67% of children who met the criteria in childhood were classified as desisters at follow-up.

In this regard, I would like to make one additional point about the Steensma et al. (2013a) study, which Temple Newhook et al. did not appreciate. Because Steensma et al. conducted what might be characterized as a relatively short-term follow-up study, they had to select from their patient pool those who were, at the time of the initial assessment, relatively old (M age, 9.15 years). Indeed, when compared to the other three follow-up studies, their probands were, on average, the oldest at the time of the childhood assessment. In other words, patients seen in the clinic at relatively younger ages were not yet old enough to be eligible to participate in the follow-up study. It is conceivable that children seen at a relatively younger age might be more likely to desist than children seen at a relatively older age.

It should, of course, be recognized that the use of the DSM diagnosis as a categorical metric (unless one does a symptom count, which no one has done) has its limitations. Accordingly, both Steensma et al. (2013a) and Singh (2012) also used dimensional metrics as predictors of persistence vs. desistance, including a childhood measure of gender identity (Wallien et al., 2009; Zucker et al., 1993), consistent with Temple Newhook et al.'s incisive reference to Schreier and Ehrensaft (2016): "Want to know a child's gender? Ask." Indeed, I have been asking for a long time (per Wallien et al., 2009 and Zucker et al., 1993).

In Singh (2012; see also Zucker, 2017), three demographic variables (age at assessment, IQ, and parent's social class background) and a composite measure of gender behavior from the childhood assessment were used in a multinomial logistic regression to predict persistence at the time of follow-up. In Table 2, the persisters (all of whom were classified as biphilic or androphilic in their sexual orientation) were compared to the desisters who were classified as (cisgender) biphilic or androphilic in

their sexual orientation. It can be seen that age at assessment (older) was weakly related to prediction of persistence ($p = .09$), but that social class (lower social class background) and degree of gender-variant behavior in childhood were both significant predictors of persistence ($p < .001$ and .02, respectively). In Steensma et al. (2013a), for birth-assigned males, age at the time of assessment (older), several measures of gender-variant behavior, and whether or not the child was classified as having either a partial or complete gender role social transition prior to puberty significantly predicted persistence. For birth-assigned females, two measures of gender-variant behavior, but not age at the time of assessment or classification as having either a partial or complete gender role social transition, predicted persistence.

These studies suggest that dimensional measurement of gender-variant behavior, including measures of the child's self-reported gender identity/gender dysphoria, within a population of clinic-referred children, has the potential to predict persistence, albeit imperfectly. The data also have therapeutic implications, which I will discuss further below.

## Age at the time of follow-up

I have no quarrel with Temple Newhook et al.'s (2018) cautionary remark about the relatively young age at the time of follow-up in the four core studies (in Drummond et al., 2008: M age, 23.24 years; range, 15–36; in Wallien and Cohen-Kettenis, 2008: M age, 18.9 years; range, 16–28; Singh, 2012: M age, 20.5 years; range, 13–39; Steensma et al., 2013a: M age, 16.14 years; range, 15–19). In Green's (1987) earlier follow-up study, the mean age at follow-up was 19 years (range, 14–24). However, to my knowledge, no serious

**Table 2.** Demographic and gender behavior predictors: multinomial logistic regression for the bisexual/androphilic persisters.

| Predictor | $\beta$ | SE | Wald | $p$ | Exp ($B$) |
|---|---|---|---|---|---|
| Age | .26 | .16 | 2.90 | .09 | 1.30 |
| IQ | .02 | .03 | .58 | ns | 1.02 |
| Social class | −.12 | .03 | 13.28 | <.001 | .89 |
| Gender $z$-score | 1.32 | .55 | 5.82 | .02 | 3.74 |

Note. Reference group was the bisexual/androphilic desisters ($n = 16$). For the bisexual/androphilic persisters, $n = 66$. Data from Singh (2012; see also Zucker, 2017). Social Class was measured with the Hollingshead (1975) Four-Factor Index of Social Status (absolute range, 8–66). The Gender metric was a combination of several dimensional measures administered at the baseline assessment in childhood. Exp ($B$), sometimes written $e^\beta$, is the multiplicative change in the odds of membership in the persister group for a one-unit increase in the corresponding predictor; thus, $100 \times (e^\beta - 1)$ represents the percentage change in the odds for a one-unit increase in that predictor.

scholar has claimed that "by default" it can be assumed that the desisters have been "…'correctly' categorized as cisgender for their lifetime." That is an empirical question. I certainly have seen some adolescent patients who, for example, "fluctuate" between self-identification as transgender vs. gay. For example, one young birth-assigned male with whom I worked self-identified as trans at the age of 13 but by age 15 self-identified as gay, stating "I was having a hard time accepting myself as a gay boy…I wanted to be normal" (i.e., a girl who was sexually attracted to boys); or some adolescents who initially self-identify as gay and later on shift to a transgender identity; or some adolescents who initially identify as cisgender heterosexual and then shift to cisgender gay. Temple Newhook et al., however, then go on to cite Reed, Rhodes, Schofield, and Wylie (2009): "Research has found that many trans-identified individuals come out or transition later in adulthood."

On this point, I am not sure if Temple Newhook et al. are being intentionally deceptive or do not fully appreciate that we have known for a long time that, among birth-assigned males, there are two developmental pathways leading to gender dysphoria in adulthood: early-onset (the object of this exercise) and late-onset (e.g., Blanchard, 1989, 1991; Blanchard, Clemmensen, & Steiner, 1987; Lawrence, 2010, 2017).[6] Using late-onset patients as an argument for the possibility that early-onset patients will only come out or transition in adulthood does not strike me as particularly compelling – it borders on pure sophistry, mixing apples with oranges. Nonetheless, I have no problem with the suggestion that longer term follow-up studies would be worthwhile.

### Patients "lost" to follow-up

Temple Newhook et al. (2018) worry about the significance of patients lost to follow-up. Agreed. In Drummond et al. (2008; see also Drummond, 2006) and Singh (2012), an effort was made to evaluate the "internal validity" (Campbell & Stanley, 1969) of the samples by comparing those who participated in the follow-up study with those who did not on a number of demographic variables, a general measure of behavioral and emotional problems, and measures of gender-variant behavior at the time of the assessment in childhood. The data strongly suggested that there were minimal differences between those who

participated in the study and those who did not. This is important. For example, suppose that the patients not seen at the time of follow-up had significantly more gender-variant behavior or were disproportionately more likely to meet the full criteria for a DSM diagnosis in childhood. Then one would indeed be worried that the followed-up sample was not representative of the entire pool of patients; it would threaten the internal validity of the sample. But this was not the case.

### Authentic identities

Temple Newhook et al. (2018) make the argument that "Assertion of a cisgender identity at any point in the life cycle is often assumed to be valid and invalidates any previous assertion of transgender identity…a transgender identity is only viewed as valid if it is static and unwavering throughout the life course…" This is an absurd claim – one that is not even referenced. Who exactly makes this assertion? Who exactly is doing the invalidating? I don't think that any of the authors of the four core studies have ever made this type of assertion. Identity is a subjective construction (Zucker & VanderLaan, 2016). Of course, some "identities" are more stable and "authentic" than others (consider, for example, the chaotic subjectivities of some people with a diagnosis of borderline personality disorder [e.g., Jørgenson, 2006, 2010]). One birth-assigned male who I assessed at the age of 7 had transitioned socially around a year prior, in a sort of passive way. This child's mother asked: "So, do you want to be a boy or a girl?" The child's response was "What do you want me to be?" In my view, exploration of this child's "true" or authentic self could be explored in a psychotherapeutic safe space.

### Conflation of gender identity and sexual orientation

Temple Newhook et al. (2018) argued that the follow-up studies "conflate" gender identity and sexual orientation, citing Drescher and Pula (2014) as guilty of making this conflation. This is a ridiculous assertion. In the four core follow-up studies, gender identity/ gender dysphoria and sexual orientation (in relation to natal sex) were assessed with distinct measures. I am really baffled why Temple Newhook et al. make this claim. Temple Newhook et al. also suggested that the follow-up studies were too binary in their evaluations. If one makes a DSM diagnostic judgment of

gender dysphoria (present vs. absent), then, yes, one has made a binary diagnostic decision (that is the way the DSM rocks and rolls for all diagnoses). However, for many years now, I have, with colleagues, used a dimensional measure of gender identity/gender dysphoria (Deogracias et al., 2007; Singh et al., 2010), which can, in principle, capture gendered shades of grey. However, in using a binary cut-off score of caseness (cf. Wing, Bebbington, & Robins, 1981), sensitivity and specificity were shown to be quite high when comparing adolescents and adults seen in specialized gender identity clinics vs. comparison groups (Deogracias et al., 2007; Singh et al., 2010; see also Singh, McMain, & Zucker, 2011). Given the apparent increase of patients who self-identify as "non-binary" (e.g., Beek, Kreukels, Cohen-Kettenis, & Steensma, 2015; Koehler, Eyssel, & Nieder, 2018; Richards et al., 2016), employing dimensional measures of gender identity/gender dysphoria should always accompany the use of a binary diagnostic system, such as the DSM-5.

### Generalization to contemporary samples of transgender children

It is not clear to me if there will be any additional follow-up studies from other specialized gender identity clinics who assessed children during a similar period of time as the four core studies, where the year of initial assessment ranged from 1975 to 2008 (the Gender Identity Development Service in London or the patients seen in-person or via internet consultation at the Children's National Medical Center in Washington, DC come to mind as having samples where such a follow-up study could be done).

The recent proliferation of gender identity clinics in North America, Europe, and elsewhere should, in theory, allow for new follow-up studies of contemporary samples (Hsieh & Leinger, 2014), along with samples obtained from outside clinical settings, as in the studies by Olson's research group (op. cit.). With the emergence in the last 10–15 years of a pre-pubertal gender social transition as a type of psychosocial treatment – initiated by parents on their own (without formal clinical consultation) or with the support/advice of professional input (e.g., Ehrensaft, 2014; Vanderburgh, 2009; Wong & Drake, 2017) – it is not clear if the desistance rates reported in the four core studies will be "replicated" in contemporary samples. Indeed, the data for birth-assigned males in Steensma et al. (2013a) already suggest this: of the 23 birth-assigned males classified as persisters, 10 (43%) had made a partial or complete social transition prior to puberty compared to only 2 (3.6%) of the 56 birth-assigned males classified as desisters. Thus, I would hypothesize that when more follow-up data of children who socially transition prior to puberty become available, the persistence rate will be extremely high. This is not a value judgment – it is simply an empirical prediction. Just like Temple Newhook et al. (2018) argue that some of the children in the four follow-up studies included those who may have received treatment "to lower the odds" of persistence, I would argue that parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence.

### Meditations on ethics

#### Do contextual effects matter?

Temple Newhook et al. (2018) identified putative ethical concerns about the reviewed follow-up studies. They begin with the rhetorical statement that "research itself is an intervention." I am not quite sure what Temple Newhook et al. mean. The *Oxford Dictionary of Current English* (Soares, 2001) defines intervention as an "action…to improve or control a situation." In developmental clinical psychology and psychiatry, there are, of course, hundreds of research studies in which patients are assigned to a treatment group and some type of control group (e.g., a sham psychosocial treatment, placebo, wait-list, etc.), but the core follow-up studies were not part of any formal therapeutic (an "intervention") protocol. Now, of course, it could be argued that participation in a research study per se might have an effect on an individual and that is why ethics protocols must weigh the benefits and risks of participation. Suppose one is conducting a survey on suicidality among adolescents from the general population. It is conceivable that answering questions about suicidal thoughts might cause distress, so it is common that the protocol would give the adolescent options as to whom they could talk to about such feelings.

Temple Newhook et al. (2018) then drill down and assert that "These studies took place in the context of gender clinics in which children were put through a

substantial degree of testing over periods of months or years." I can't speak for my Dutch colleagues, but, with regard to the Toronto follow-studies, on what basis do Temple Newhook et al. make this claim? Zucker, Wood, Singh, and Bradley (2012, Tables 1 and 2) provided a summary of their clinical assessment protocol, at least around the time that their article was published. It included a family assessment interview (3 hours), an individual interview with the child (1 hour), and psychological testing (4 hours). A feedback session, often with parents alone, was estimated at 1–2 hours. I view this protocol as comprehensive and thorough, yet Temple Newhook et al. write as if it was some kind of psychological waterboarding. The "testing" hardly took place over periods of months or years.[7] Other than to imply some kind of clinical malevolence, I really don't understand what Temple Newhook et al. are trying to say. As far as I know, there is no "gold standard" for what constitutes a clinically sound assessment for children referred for gender dysphoria. If Temple Newhook et al. want to bid for an assessment hegemony, they should propose one and open it up to debate.

With regard to the children who participated in the follow-up studies, I can say this. Some of these children and their families were seen for an assessment and never seen again until the family was contacted for the follow-up (in Drummond et al., 2008, the mean interval between the baseline assessment and follow-up was 14.34 years; in Singh [2012], the mean interval was 12.88 years). Other children (and their parents) were seen for a long time in therapy (sometimes in the clinic; sometimes with clinicians in the community) because they needed it. But, to be clear, there was a lot of variability in how much clinical contact there was with families between the time of the assessment in childhood and the follow-up.

Temple Newhook et al. (2018) stated that there was "…an absence of information about whether research participation was optional and if steps were taken to ensure that children could decline research consent while continuing to received needed services." In the Toronto follow-up studies, I will make it perfectly clear the answer to this query. Yes, participation in the follow-up studies was optional and, yes, patients could decline to participate. Of the 25 participants in Drummond et al. (2008) at the time of follow-up, none were in treatment in the clinic. The one exception was an adolescent who returned to the clinic for reasons

unrelated to gender identity and, at the time, was enrolled in the study. To be transparent, both studies were approved by the Institutional Review Boards at the Centre for Addiction and Mental Health and the University of Toronto. The consent form for the Drummond et al. (2008) study can be found in Drummond (2006, Appendix C); for the Singh (2012) study, Appendix F.

### Do therapeutic models matter?

…we cannot rule out the possibility that early successful treatment of childhood GID [Gender Identity Disorder] will diminish the role of a continuation of GID into adulthood. If so, successful treatment would also reduce the need for the long and difficult process of sex reassignment which includes hormonal and surgical procedures with substantial medical risks and complications. (Meyer-Bahlburg, 2002, p. 362)

Relatively little dispute exists regarding the prevention of transsexualism, though evidence about the effectiveness of treatment in preventing adult transsexualism is also virtually nonexistent. (Cohen-Kettenis & Pfäfflin, 2003, p. 120)

Over the last decade, we have seen a sea change in approach to pediatric transgender care, with the gender affirmative model now widely adopted as a preferred practice… (Chen, Edwards-Leeper, Stancin, & Tishelman, 2018, p. 74)

Temple Newhook et al. (2018) critique the follow-up studies in relation to therapeutic models that have been described in some detail elsewhere (deVries & Cohen-Kettenis, 2012; Zucker et al., 2012). Therapeutic models, one would hope, are informed by a conceptual/theoretical formulation about gender identity development, which, in turn, might be applied to help children, one way or the other, reduce their gender dysphoria (see also Ehrensaft, 2012, 2014; Menvielle, 2012; Pyne, 2014; Turban & Ehrensaft, 2017). A very significant problem in the field is that there are no randomized control trials (RCT) with regard to treatment of children with gender dysphoria, as has been noted in several authoritative reviews (American Academy of Child and Adolescent Psychiatry, 2012; American Psychological Association, 2015; Byne et al., 2012; see also Dreger, 2009; Edwards-Leeper, Leibowitz, & Sangganjanavanich, 2016; Green, 2017). And there won't be, because many, if not most, parents would refuse to have their children randomized into



different treatment arms (and, quite frankly, I don't blame them). A parent who would like their child's gender dysphoria reduced via psychotherapeutic methods would refuse to allow their child assigned to a gender social transition treatment approach. A parent who would like their child's gender dysphoria reduced via a gender social transition would refuse to have their child assigned to a psychotherapeutic approach. It is possible that some parents would agree to randomize their child to a "wait-and-see" (Menvielle, Tuerk, & Perrin, 2005) or "watchful waiting" (Zucker, 2008) approach as opposed to their preferred therapeutic approach, but, to my knowledge, no one has attempted such a partial RCT.

Now, of course, it would not come as a surprise if Temple Newhook et al. (2018) took umbrage at the mere idea of a treatment arm designed to reduce a child's gender dysphoria via psychotherapeutic methods. They might, for example, offer up the following from the seventh edition of the Standards of Care:

> Treatment aimed at trying to change a person's gender identity…to become more congruent with sex assigned at birth has been attempted in the past without success (Gelder & Marks, 1969; Greenson, 1964)….Such treatment is no longer considered ethical." (Coleman et al., 2011, p. 175)

Yet, on the very same page of the Standards, one finds the following: "Psychotherapy should focus on reducing a child's…distress related to the gender dysphoria…" (p. 175) or "Mental health professionals…. should give ample room for clients to explore different options for gender expression" (p. 175). The lack of internal consistency between the first statement and the second and third statements is rather astonishing. Moreover, the "without success" remark offers up two citations as authoritative proof. One was a reference to a 5-year-old boy seen by a psychoanalyst in Beverly Hills, California (see also Greenson, 1966) and other was a reference to the use of faradic aversion treatments on birth-assigned male adults said to be "transvestites with moderate transsexualism" (Gelder & Marks, 1969, p. 394). Personally, I prefer the following summary statements about therapeutics with regard to children with gender dysphoria:

> Different clinical approaches have been advocated for childhood gender discordance….There have been no randomized controlled trials of any treatment….the proposed benefits of treatment to eliminate gender discordance…must be carefully weighed against… possible deleterious effects. (American Academy of Child and Adolescent Psychiatry, 2012, pp. 968–969)

> Very few studies have systematically researched any given mode of intervention with respect to an outcome variable in GID and no studies have systematically compared results of different interventions….In light of the limited empirical evidence and disagreements…among experts in the field…recommendations supported by the available literature are largely limited to the areas [reviewed] and would be in the form of general suggestions and cautions… (Byne et al., 2012, p. 772)

> …because no approach to working with [transgender and gender nonconforming] children has been adequately, empirically validated, consensus does not exist regarding best practice with pre-pubertal children. Lack of consensus about the preferred approach to treatment may be due, in part, to divergent ideas regarding what constitutes optimal treatment outcomes… (American Psychological Association, 2015, p. 842)

In the Drummond et al. (2008) study, no effort was made to attempt a link between therapeutic intervention and outcome:

> It [was] beyond the scope of this report to describe the types of therapies (as well as their frequency and duration) that the girls and/or their parents may have received between the assessment in childhood and the follow-up (e.g., by a therapist within the Gender Identity Service at the Centre for Addiction and Mental Health or in the community). From the participants' clinic files, 13 of the 25 girls had at least some contact with our clinic during the interval between assessment and follow-up (e.g., as therapy clients or for a reassessment). Of the 25 girls and/or their parents, 18 had been in some type of therapy or counseling during the interval between assessment and follow-up; of these, 5 were patients of staff within the Gender Identity Service, and the remainder were seen by a professional in the community. (p. 36)

The same could be said for Singh's (2012) sample and, to my knowledge, the Dutch group as well.

Temple Newhook et al. (2018) go on to state that "It is important to acknowledge that discouraging social transition [with reference to the Dutch team's putative therapeutic approach] is itself an intervention with the potential to impact research findings…" Fair enough. But Temple Newhook et al. (2018) curiously suppress the inverse: encouraging social transition is itself an intervention with the potential to impact findings. I find this omission astonishing.

### Harm, harm, and more harm

Temple Newhook et al. (2018) argue that attempts to delay or defer a gender social transition may cause harm and that such harm has been underestimated. Much of what is argued here is, shall we say, "anecdotal" with the use of brief clinical clips. Fine. One has to start somewhere with an argument. Deep into this section, Temple Newhook et al. cite the work of Olson and her research group (op. cit.), stating that:

> Emergent research on the health and well-being of trans children who are affirmed in their gender identity… indicates mental health outcomes equivalent with cisgender peers….this is in stark contrast to the high levels of psychological distress and behavioral problems documented among children who were discouraged from asserting their identities in childhood.

This is a gross oversimplification, an oversimplification that Temple Newhook et al. require in order to assimilate their interpretation of the data into their theoretical/ethical argumentation. Disclosure: I think that the work of Olson's research group is excellent, including the studies that have assessed various parameters of gender development (e.g., Dunham & Olson, 2016; Fast & Olson, 2018; Olson & Enright, 2017; Olson & Gülgöz, 2017; Olson, Key, & Eaton, 2015). However, the Olson et al. (2016) study on mental health measurement has serious methodological flaws, which affect the interpretation of the data (cf. Turban, 2017). First, as noted earlier, the sample was not representative of socially transitioned children in general. Second, the mental health outcome data were assayed at some unspecified time interval after the social transition had occurred. Thus, although the children had, on average, scores in the nonclinical range, it is completely unclear if they would have had similar scores prior to the social transition. In other words, Olson et al. had "post-treatment" data, but no "pre-treatment" data.

The reference to the high levels of distress among children who were discouraged from "asserting their identities in childhood" is without any empirical documentation. For example, the reference to the study by Cohen-Kettenis, Owen, Kaijser, Bradley, and Zucker (2003) did not measure whether or not parents (or others) encouraged, discouraged, or were neutral with regard to the gender-variant behavior/gender dysphoria of their children. Cohen-Kettenis et al. (2003) examined other correlates of behavioral and emotional problems, but not the one that Temple Newhook et al. (2018)

assert. So, here, Temple Newhook et al. have defaulted to rhetoric and dogma. In my own research over the years in which I have measured behavioral and emotional problems among children referred for gender dysphoria, I have always noted that there is a great deal of variability in clinical range problems. Gender-referred children under the age of 6 years, for example, do not show, on average, a great deal of behavioral and emotional problems (see, e.g., Zucker & Bradley, 1995, pp. 79–103; Singh, Bradley, & Zucker, 2011; for review, see Zucker, Wood, & VanderLaan, 2014). The determinants of mental health issues in children with gender dysphoria are multifactorial and should not be reduced to the simple narrative of parental support.

In general, it is of course extremely important to have systematic longer-term follow-up data on children with gender dysphoria with regard to their general well-being and psychosocial adaptation, not just information about rates of persistence vs. desistance. So, on this point, I agree with Temple Newhook et al. (2018). Drummond, Bradley, Peterson-Badali, VanderLaan, and Zucker (2018) evaluated the presence of clinical range behavioral/emotional problems and psychiatric diagnoses in the Drummond et al. (2008) cohort. Using the Child Behavior Checklist or Adult Behavior Checklist as rated by their mothers, 39.1% had clinical range scores; on the Youth Self-Report or the Adult Self-Report, 33.3% had clinical range scores. On either the Diagnostic Interview for Children and Adolescents (DICA) or the Diagnostic Interview Schedule (DIS), the participants had, on average, 2.67 diagnoses (range, 0–10). On the one hand, 33% did not meet criteria for any diagnosis; on the other hand, 46% met criteria for three or more diagnoses. (Of the three participants classified as persisters at follow-up, they had 0, 3, and 5 DICA/DIS diagnoses, respectively.) From the childhood assessment, five variables were significantly associated with a composite Psychopathology Index (PI) at follow-up: a lower IQ, living in a non-two-parent or reconstituted family, a composite behavior problem index, and poor peer relations. At follow-up, degree of concurrent homoeroticism (in relation to birth sex) and a composite index of gender dysphoria were both associated with the composite PI. Drummond et al. (2018) summarized their data as follows:

> …girls referred for gender dysphoria show, on average, a general psychiatric vulnerability as they grow up. It is,



however, important to keep in mind that there [was] variability in this vulnerability and that not all gender-dysphoric girls manifest clinical range psychopathology, both at the time of assessment in childhood and at the time of follow-up….our data suggest that it is important to consider…an integrative, holistic approach in the clinical care of these patients, which not only tracks their long-term psychosexual development, but also their mental health in general. (p. 182)

At the end of their long ethical discourse about harm, Temple Newhook et al. (2018) conclude that "…longitudinal studies about identity 'desistance' or 'persistence' are not the best tools for understanding the needs of gender-nonconforming children." Although I agree it should not be the only metric for understanding the needs of children with a diagnosis of gender dysphoria, the implicit message is something like this: Research on persistence and desistance should be suppressed: it should just disappear without a trace. This is empirical and intellectual "no platforming" at its worst. I find this ominous, but not surprising.

## Notes

1 I wrote the first draft of this essay "masked" to the identity of the authors. In the interest of transparency, now that I know who the authors are, two points: The second author, Tosh, has been no fan of mine, as exemplified in the scholarly title of an essay penned for the *Psychology of Women Section Review* of The British Psychological Society entitled "'Zuck off'! A commentary on the protest against Ken Zucker and his 'treatment' of childhood gender identity disorder" (Tosh, 2011). The fourth author, Pyne, has not exactly been a fan either. In March 2016, I filed a "statement of claim" (in plain English, a lawsuit) against Pyne and the *Toronto Star Newspapers* for a piece written by Pyne (2015). As noted in the *Toronto Star* on December 19, 2017, "This material was subject to legal complaint by Dr. Kenneth J. Zucker, which has been resolved" (https://www.thestar.com/opinion/commentary/2015/12/17/discredited-treatment-of-trans-kids-at-camh-shouldnt-shock-us.html).

2 Per Bouman et al. (2017), the term "birth assigned sex" was suggested as part of the language policy for the 2017 meeting of the European Professional Association for Transgender Health. It was recommended over the terms "natal male or natal female." Natal is defined as in "relation to the...time of one's birth" (Soares, 2001). In the *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, 2013), terms such as "natal girls" and "natal boys" were used. It seems to me that all of these options are reasonable.

3 If one googles "Devita Singh doctoral dissertation," the pdf of the dissertation is the first entry (see also https://search.library.utoronto.ca/details?9017513).

4 I use the diagnostic term "gender identity disorder," along with the diagnostic term "gender dysphoria" because the former was the diagnostic label at the time of the follow-up studies that were reviewed.

5 The ethics protocol was such that parents were contacted first to let them know about the study and if they were willing to let us talk to the potential participants. In part, this was because we had no way or knowing if all of the adolescents or adults would have even remembered having been seen in the clinic as a child.

6 Late-onset birth-assigned females with gender dysphoria have, in recent years, become a very salient part of the clinical landscape, particularly among adolescents (see, e.g., Littman, 2017). They are not, however, exactly parallel with some aspects of the gender developmental histories of late-onset birth-assigned males.

7 It is true, however, that, several decades ago, we did a study in which 44 children referred to the clinic and their siblings were seen for psychological testing at a one-year follow-up (median interval, 371 days) that evaluated the evidence for stability and change in gender-typed behavior (Zucker, Bradley, Doering, & Lozinski, 1985). So what? It is common in specialized clinical programs at academic health science centers to conduct such types of follow-ups. Over the subsequent years, some children might have been seen for follow-up assessment, including psychological testing, on an as needed basis for clinical reasons. At times, such a reassessment may have been for reasons completely unrelated to the child's gender identity (e.g., a learning disability, a psychopharmacology consult, etc.). So what? This is nothing more than being clinically responsible for the well-being of one's clients.

## References

American Academy of Child and Adolescent Psychiatry. (2012). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry, 51*, 957–974. doi:10.1016/j.jaac.2012.07.004

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA: American Psychiatric Press.

American Psychological Association. (2015). Guidelines for psychological practice with transgender and gender nonconforming people. *American Psychologist, 70*, 832–864. doi:10.1037/a0039906

August, G. J., Realmuto, G. M., Joyce, T., & Hektner, J. M. (1999). Persistence and desistance of oppositional defiant

disorder in a community sample of children with ADHD. *Journal of the American Academy of Child and Adolescent Psychiatry, 38*, 1262–1270. doi:10.1097/00004583-199910000-00015

Beek, T. F., Kreukels, B. P. C., Cohen-Kettenis, P. T., & Steensma, T. D. (2015). Partial treatment requests and underlying motives of applications for gender affirming interventions. *Journal of Sexual Medicine, 12*, 2201–2205. doi:10.1111/jsm.13033

Blanchard, R. (1989). The classification and labeling of nonhomosexual gender dysphorias. *Archives of Sexual Behavior, 18*, 315–334. doi:10.1007/BF01541951

Blanchard, R. (1991). Clinical observations and systematic studies of autogynephilia. *Journal of Sex & Marital Therapy, 17*, 235–251. doi:10.1080/00926239108404348

Blanchard, R., Clemmensen, L. H., & Steiner, B. W. (1987). Heterosexual and homosexual gender dysphoria. *Archives of Sexual Behavior, 16*, 139–152. doi:10.1007/BF01542067

Bouman, W. P., Schwend, A. S., Motmans, J., Smiley, A., Safter, J. D., Deutsch, M. B., … Winter, S. (2017). Language and trans health [Editorial]. *International Journal of Transgenderism, 18*, 1–6. doi:10.1080/15532739.2016.1262127

Byne, W., Bradley, S. J., Coleman, E., Eyler, A. E., Green, R., Menvielle, E. J., … Tompkins, D. A. (2012). Report of the American Psychiatric Association task force on treatment of gender identity disorder. *Archives of Sexual Behavior, 41*, 759–796. doi:10.1007/s10508-012-9975-x

Campbell, D. T., & Stanley, J. C. (1969). *Experimental and quasi-experimental designs for research*. Chicago, IL: Rand McNally & Company.

Chen, D., Edwards-Leeper, L., Stancin, T., & Tishelman, A. (2018). Advancing the practice of pediatric psychology with transgender youth: State of the science, ongoing controversies, and future directions. *Clinical Practice in Pediatric Psychology, 6*, 73–83. doi:10.1037/cpp0000229

Clark, T. C., Lucassen, M. F. G., Bullen, P., Denny, S. J., Fleming, T. M., Robinson, E. M., & Rossen, F. V. (2014). The health and well-being of transgender high school students: Results from the New Zealand adolescent health survey (Youth'12). *Journal of Adolescent Health, 55*, 93–99. doi:10.1016/j.jadohealth.2013.11.008

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology, 31*, 41–53. doi:10.1023/A:1021769215342

Cohen-Kettenis, P. T., & Pfäfflin, F. (2003). *Transgenderism and intersexuality in childhood and adolescence: Making choices*. Thousand Oaks, CA: Sage Publications.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., … Zucker, K. (2011). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism, 13*, 165–232. doi:10.1080/15532739.2011.700873

Deogracias, J. J., Johnson, L. L., Meyer-Bahlburg, H. F. L., Kessler, S. J., Schober, J. M., & Zucker, K. J. (2007). The Gender Identity/Gender Dysphoria Questionnaire for Adolescents and Adults. *Journal of Sex Research, 44*, 370–379. doi:10.1080/00224490701586730

de Vries, A. L. C., & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch approach. *Journal of Homosexuality, 59*, 301–320. doi:10.1080/00918369.2012.653300

Dreger, A. (2009). Gender identity disorder in childhood: Inconclusive advice to parents. *Hastings Center Report, 39*, 26–29.

Drescher, J., Cohen-Kettenis, P. T., & Reed, G. M. (2016). Gender incongruence of childhood in the ICD-11: Controversies, proposal, and rationale. *Lancet Psychiatry, 3*, 297–304. doi:10.1016/S2215-0366(15)00586-6

Drescher, J., & Pula, J. (2014). Ethical issues raised by the treatment of gender-variant prepubescent children. *Hastings Center Report, 44*(Suppl. 4), S17–S22.

Drummond, K. D. (2006). *A follow-up study of girls with gender identity disorder* (Unpublished Master's thesis). Ontario Institute for Studies in Education of the University of Toronto, Toronto, Ontario, Canada.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., Vander-Laan, D. P., & Zucker, K. J. (2018). Behavior problems and psychiatric diagnoses in girls with gender identity disorder: A follow-up study. *Journal of Sex & Marital Therapy, 42*, 172–187. doi:10.1080/0092623X.2017.1340382

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44*, 34–45. doi:10.1037/0012-1649.44.1.34

Dunham, Y., & Olson, K. R. (2016). Beyond discrete categories: Studying multiracial, intersex, and transgender children will strengthen basic developmental science. *Journal of Cognition and Development, 17*, 642–665. doi:10.1080/15248372.2016.1195388

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental health and self-worth in socially transitioned transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry, 56*, 116–123. doi:10.1016/j.jaac.2016.10.016

Edwards-Leeper, L., Leibowitz, S., & Sangganjanavanich, V. F. (2016). Affirmative practice with transgender and gender nonconforming youth: Expanding the model. *Psychology of Sexual Orientation and Gender Diversity, 3*, 165–172. doi:10.1037/sgd0000167

Ehrensaft, D. (2012). From gender identity disorder to gender identity creativity: True gender self child therapy. *Journal of Homosexuality, 59*, 337–356. doi:10.1080/00918369.2012.653303

Ehrensaft, D. (2014). Found in transition: Our littlest transgender people. *Contemporary Psychoanalysis, 50*, 571–592. doi:10.1080/00107530.2014.942591

Eisenberg, M. E., Gower, A. L., McMorris, B. J., Rider, G. N., Shea, G., & Coleman, E. (2017). Risk and protective factors in the lives of transgender/gender nonconforming

INTERNATIONAL JOURNAL OF TRANSGENDERISM  13

adolescents. *Journal of Adolescent Health, 61*, 521–526. doi:10.1016/j.jadohealth.2017.04.014

Farrington, D. P. (1991). Longitudinal research strategies: Advantages, problems, and prospects. *Journal of the American Academy of Child and Adolescent Psychiatry, 30*, 369–374. doi:10.1097/00004583-199105000-00003

Fast, A. A., & Olson, K. R. (2018). Gender development in transgender preschool children. *Child Development, 89*, 620–637. doi:10.1111/cdev.12758

Ford, Z. (2017). The pernicious junk science stalking trans kids. *ThinkProgress*. Retrieved from https://thinkprogress.org/transgender-children-desistance-a5caf61fc5c6/

Gelder, M. G., & Marks, I. M. (1969). Aversion treatment in transvestism and transsexualism. In R. Green & J. Money (Eds.), *Transsexualism and sex reassignment* (pp. 383–413). Baltimore, MD: The Johns Hopkins Press.

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality*. New Haven, CT: Yale University Press.

Green, R. (2017). To transition or not to transition? That is the question. *Current Sexual Health Reports, 9*, 79–83. doi:10.1007/s11930-017-0106-5

Greenson, R. R. (1964). On homosexuality and gender identity. *International Journal of Psycho-Analysis, 45*, 217–219.

Greenson, R. R. (1966). A transvestite boy and a hypothesis. *International Journal of Psychoanalysis, 47*, 396–403.

Guss, C. E., Williams, D. N., Reisner, S. L., Austin, S. B., & Katz-Wise, S. L. (2017). Disordered weight management behaviors, nonprescription steroid use, and weight perception in transgender youth. *Journal of Adolescent Health, 60*, 17–22. doi:10.1016/j.jadohealth.2016.08.027

Hollingshead, A. B. (1975). *Four factor index of social status* (Unpublished manuscript). Department of Sociology, Yale University, New Haven, CT.

Hsieh, S., & Leininger, J. (2014). Resource list: Clinical care programs for gender-nonconforming children and adolescents. *Pediatric Annals, 43*, 238–244. doi:10.3928/00904481-20140522-11

Jørgenson, C. R. (2006). Disturbed sense of identity in borderline personality disorder. *Journal of Personality Disorders, 20*, 618–644. doi:10.1521/pedi.2006.20.6.618

Jørgenson, C. R. (2010). Identity and borderline personality disorder. *Journal of Personality Disorders, 24*, 344–364. doi:10.1521/pedi.2010.24.3.344

Koehler, A., Eyssel, J., & Nieder, T. O. (2018). Genders and individual treatment progress in (non-)binary trans individuals. *Journal of Sexual Medicine, 15*, 102–113. doi:10.1016/j.jsxm.2017.11.007

Kuvalanka, K. A., Weiner, J. L., Munroe, C., Goldberg, A. E., & Gardner, M. (2017). Trans and gender-nonconforming children and their caregivers: Gender presentations, peer relations, and well-being at baseline. *Journal of Family Psychology, 31*, 889–899. doi:10.1037/fam0000338

Lawrence, A. A. (2010). Sexual orientation versus age of onset as bases for typologies (subtypes) for gender identity disorder in adolescents and adults. *Archives of Sexual Behavior, 39*, 514–545. doi:10.1007/s10508-009-9594-3

Lawrence, A. A. (2017). Autogynephilia and the typology of male-to-female transsexualism: Concepts and controversies. *European Psychologist, 22*, 39–54. doi:10.1027/1016-9040/a000276

Littman, L. (2017). Rapid onset gender dysphoria in adolescents and young adults: A study of parental reports. Manuscript submitted for publication.

Meadow, T. (2011). 'Deep down where the music plays': How parents account for childhood gender variances. *Sexualities, 14*, 725–747. doi:10.1177/1363460711420463

Meadow, T. (in press). *Trans kids: Being gendered in the twenty-first century*. Berkeley, CA: University of California Press.

Menvielle, E. (2012). A comprehensive program for children with gender variant behaviors and gender identity disorders. *Journal of Homosexuality, 59*, 357–368. doi:10.1080/00918369.2012.653305

Menvielle, E., Tuerk, C., & Perrin, E. C. (2005). To the beat of a different drummer: The gender-variant child. *Contemporary Pediatrics, 22*(2), 38–39, 41, 43, 45–46.

Meyer-Bahlburg, H. F. L. (2002). Gender identity disorder in young boys: A parent- and peer-based treatment protocol. *Clinical Child Psychology and Psychiatry, 7*, 360–376. doi:10.1177/1359104502007003005

Olson, K. R. (2016). Prepubescent transgender children: What we do and do not know. *Journal of the American Academy of Child and Adolescent Psychiatry, 55*, 155–156. doi:10.1016/j.jaac.2015.11.015

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics, 137*(3), e20153223. doi:10.1542/peds.2015-3223

Olson, K. R., & Enright, E. A. (2017). Do transgender children (gender) stereotype less than their peers and siblings? *Developmental Science*. doi:10.1111/desc.12606.

Olson, K. R., & Gülgöz, S. (2017). Early findings from the transyouth project: Gender development in transgender children. *Child Development Perspectives*. doi:10.1111/cdep.12268.

Olson, K. R., Key, A. C., & Eaton, N. R. (2015). Gender cognition in transgender children. *Psychological Science, 26*, 467–474. doi:10.1177/0956797614568156

Pyne, J. (2014). The governance of gender non-conforming children: A dangerous enclosure. *Annual Review of Critical Psychology, 11*, 80–96.

Pyne, J. (2015, December 17). Discredited treatment of trans kids at CAMH shouldn't shock us. Toronto Star. Retrieved from https://www.thestar.com/opinion/commentary/2015/12/17/discredited-treatment-of-trans-kids-at-camh-shouldnt-shock-us.html

Reed, B., Rhodes, S., Schofield, P., & Wylie, K. (2009). *Gender variance in the UK. Prevalence, incidence, growth and geographic distribution*. London, UK: GIRESB the Gender Identity Research and Education Society. Retrieved from http://www.gires.org.uk/assets/Medpro-Assets/GenderVarianceUK-report.pdf

Richards, C., Bouman, W. P., Seal, L., Barker, M. J., Nieder, T. O., & T'Sjoen, G. (2016). Non-binary or genderqueer

genders. *International Review of Psychiatry, 28*, 95–102. doi:10.3109/09540261.2015.1106446

Ristori, J., & Steensma, T. D. (2016). Gender dysphoria in childhood. *International Review of Psychiatry, 28*, 13–20. doi:10.3109/09540261.2015.1115754

Scholinski, D. (1997). *The last time I wore a dress: A memoir.* New York, NY: Riverhead Books.

Schreier, H., & Ehrensaft, D. (2016). Want to know a child's gender? Ask. *San Francisco Gate.* Retrieved from http://www.sfgate.com/opinion/article/Want-to-know-a-child-s-gender-Ask-6843665.php

Simonoff, E., Jones, C. R., Baird, G., Pickles, A., Happé, F., & Charman, T. (2013). The persistence and stability of psychiatric problems in adolescents with autism spectrum disorders. *Journal of Child Psychology and Psychiatry, 54*, 186–194. doi:10.1111/j.1469-7610.2012.02606.x

Singh, D. (2012). *A follow-up study of boys with gender identity disorder* (Unpublished doctoral dissertation). Ontario Institute for Studies in Education of the University of Toronto, Toronto, Ontario, Canada.

Singh, D., Bradley, S. J., & Zucker, K. J. (2011). Commentary on "an affirmative intervention for families with gender variant children: Parental ratings of child mental health and gender" by Hill, Menvielle, Sica, and Johnson (2010). *Journal of Sex & Marital Therapy, 37*, 151–157. doi:10.1080/0092623X.2011.547362

Singh, D., Deogracias, J. J., Johnson, L. L., Bradley, S. J., Kibblewhite, S. J., Owen-Anderson, A., … Zucker, K. J. (2010). The Gender Identity/Gender Dysphoria Questionnaire for Adolescents and Adults: Further validity evidence. *Journal of Sex Research, 47*, 49–58. doi:10.1080/00224490902898728

Singh, D., McMain, S., & Zucker, K. J. (2011). Gender identity and sexual orientation in women with borderline personality disorder. *Journal of Sexual Medicine, 8*, 447–454. doi:10.1111/j.1743-6109.2010.02086.x

Soares, C. (Ed.). (2001). *The Oxford dictionary of current English* (3rd ed.). Oxford, UK: Oxford University Press.

Steensma, T. D., Biemond, R., de Boer, F., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry, 16*, 499–516. doi:10.1177/1359104510378303

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013a). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52*, 582–590. doi:10.1016/j.jaac.2013.03.016

Steensma, T. D., van der Ende, J., Verhulst, F. C., & Cohen-Kettenis, P. T. (2013b). Gender variance in childhood and sexual orientation in adulthood: A prospective study. *Journal of Sexual Medicine, 10*, 2723–2733. doi:10.1111/j.1743-6109.2012.02701.x

Tannehill, B. (2016). The end of the desistance myth. *Huffpost.* Retrieved from https://www.huffingtonpost.com/brynn-tannehill/the-end-of-the-desistance_b_8903690.html

Temple Newhook, J., Tosh, J., Winters, K., Pyne, J., Feder, S., Holmes, C., … Jamieson, A. (2018). A critical commentary on

follow-up studies and "desistance" theories about transgender and gender non-conforming children. *International Journal of Transgenderism, 19*(2). doi:10.1080/15532739.2018.1456390

Tosh, J. (2011). 'Zuck off'! A commentary on the protest against Ken Zucker and his 'treatment' of childhood gender identity disorder. *Psychology of Women Section Review, 13* (1), 10–16.

Turban, J. L. (2017). Transgender youth: The building evidence base for early social transition [Editorial]. *Journal of the American Academy of Child and Adolescent Psychiatry, 56*, 101–102.

Turban, J. L., & Ehrensaft, D. (2017). Gender identity in youth: Treatment paradigms and controversies. *Journal of Child Psychology and Psychiatry.* doi:10.1111/jcpp.12833.

Vanderburgh, R. (2009). Appropriate therapeutic care for families with pre-pubescent transgender/gender-dissonant children. *Child and Adolescent Social Work Journal, 26*, 135–154. doi:10.1007/s10560-008-0158-5

Verhulst, F. C., & Althaus, M. (1988). Persistence and change in behavioral/emotional problems reported by parents of children aged 4–14: An epidemiological study. *Acta Psychiatrica Scandinavica, 339*(Suppl.), 1–28. doi:10.1111/j.1600-0447.1988.tb10567.x

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47*, 1413–1423. doi:10.1097/CHI.0b013e31818956b9

Wallien, M. S. C., Quilty, L. C., Steensma, T. D., Singh, D., Lambert, S. L., Leroux, A., … Zucker, K. J. (2009). Cross-national replication of the Gender Identity Interview for Children. *Journal of Personality Assessment, 91*, 545–552. doi:10.1080/00223890903228463

Wilson, B. D. M., Choi, S. K., Herman, J. L., Becker, T. L., & Conron, K. J. (2017). *Characteristics and mental health of gender nonconforming adolescents in California: Findings from the 2015–2016 California Health Interview Survey.* Los Angeles, CA: The Williams Institute and UCLA Center for Health Policy Research. Retrieved from https://www.scribd.com/document/367202210/CHIS-Transgender-Teens-FINAL

Wing, J. K., Bebbington, P., & Robins, L. N. (Eds.) (1981). *What is a case? The problem of definition in psychiatric community surveys.* London: Grant McIntyre.

Wong, W., & Drake, S. J. (2017). A qualitative study of transgender children with early social transition: Parent perspectives and clinical implications. *PEOPLE: International Journal of Social Sciences, 3*, 1970–1985.

Zucker, K. J. (1992). Gender identity disorder. In S. R. Hooper, G. W. Hynd, & R. E. Mattison (Eds.), *Child psychopathology: Diagnostic criteria and clinical assessment* (pp. 305–342). Hillsdale, NJ: Erlbaum.

Zucker, K. J. (2003, September). *Persistence and desistance of gender identity disorder in children* [Discussant]. Paper presented at the meeting of the Harry Benjamin International Gender Dysphoria Association, Gent, Belgium.

Zucker, K. J. (2005). Gender identity disorder in children and adolescents. *Annual Review of Clinical Psychology, 1*, 467–492. doi:10.1146/annurev.clinpsy.1.102803.144050



Zucker, K. J. (2008). On the "natural history" of gender identity disorder in children [Editorial]. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1361–1363. doi:10.1097/CHI.0b013e31818960cf

Zucker, K. J. (2010). The DSM diagnostic criteria for gender identity disorder in children. *Archives of Sexual Behavior, 39,* 477–498. doi:10.1007/s10508-009-9540-4

Zucker, K. J. (2017, February). Gender variations during childhood. In *Development of gender variations: Features and factors* (Chair: H. F. L. Meyer-Bahlburg). Symposium conducted at the meeting of the U.S. Professional Association of Transgender Health, Los Angeles, CA.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York, NY: Guilford Press.

Zucker, K. J., Bradley, S. J., Doering, R. W., & Lozinski, J. A. (1985). Sex-typed behavior in cross-gender-identified children: Stability and change at a one-year follow-up. *Journal of the American Academy of Child Psychiatry, 24,* 710–719. doi:10.1016/S0002-7138(10)60114-8

Zucker, K. J., Bradley, S. J., Lowry Sullivan, C. B., Kuksis, M., Birkenfeld-Adams, A., & Mitchell, J. N. (1993). A gender identity interview for children. *Journal of Personality Assessment, 61,* 443–456. doi:10.1207/s15327752jpa6103_2

Zucker, K. J., Green, R., Bradley, S. J., Williams, K., Rebach, H. M., & Hood, J. E. (1998). Gender identity disorder of childhood: Diagnostic issues. In T. A. Widiger, A. J. Frances, H. A. Pincus, R. Ross, M. B. First, W. Davis, & M. Kline (Eds.), *DSM-IV sourcebook* (Vol. 4) (pp. 503–512). Washington, DC: American Psychiatric Association.

Zucker, K. J., & VanderLaan, D. P. (2016). The self in gender dysphoria: A developmental perspective. In M. Kyrios, R. Moulding, G. Doron, S. S. Bhar, M. Nedeljkovic, & M. Mikulincer (Eds.), *The self in understanding and treating psychological disorders* (pp. 222–232). Cambridge, UK: Cambridge University Press.

Zucker, K. J., Wood, H., Singh, D., & Bradley, S. J. (2012). A developmental, biopsychosocial model for thetreatment of children with gender identity disorder. *Journal of Homosexuality, 59,* 369–397. doi:10.1080/00918369.2012.653309

Zucker, K. J., Wood, H., & VanderLaan, D. P. (2014). Models of psychopathology in children and adolescents with gender dysphoria. In B. P. C. Kreukels, T. D. Steensma, & A. L. C. de Vries (Eds.), *Gender dysphoria and disorders of sex development: Progress in care and knowledge* (pp. 171–192). New York, NY: Springer.