No. 23-16031

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant,*

v.

KELLY STALEY, Superintendent,

*Defendant-Appellee,*

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO; EILEEN ROBINSON; MATT TENNIS,

*Defendants.*

On Appeal from the United States District Court for the
Eastern District of California
Case No. 2:23-cv-00032
Senior District Judge John A. Mendez

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 22 OTHER STATES SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

AUSTIN KNUDSEN
  *Attorney General of Montana*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406)-444-2026
peter.torstensen@mt.gov

CHRISTIAN B. CORRIGAN
  *Solicitor General*

PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*

*Counsel for Amicus Curiae*
*State of Montana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTERESTS OF AMICI CURIAE ...................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 1

ARGUMENT ..................................................................................................... 5

I. Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children. ................................................. 5

II. The District's Policy Violates Parents' Fundamental Right to Care for Their Children. ................................................................................ 15

    A. The Policy authorizes school officials to make decisions about a gender identity behind parents' backs ...................................... 15

    B. School districts across the country have adopted similar parental exclusion policies. ........................................................ 18

CONCLUSION ................................................................................................ 22

ADDITIONAL COUNSEL .............................................................................. 23

CERTIFICATE OF COMPLIANCE ................................................................. 25

## TABLE OF AUTHORITIES

## Cases

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ............................................................... 16

*Dobbs v. Jackson Women's Health Org.,*
  142 S. Ct. 2228 (2022) ...................................................... 6, 11

*Doe v. Pub. Health Tr.,*
  696 F.2d 901 (11th Cir. 1983) ...................................... 13-14

*Finch v. Finch*
  22 Conn. 411 (1853) ............................................................. 10

*Furman v. Van Sise,*
  56 N.Y. 435 (1874) .............................................................. 10

*Gruenke v. Seip,*
  225 F.3d 290 (3d Cir. 2000) .............................................. 14

*Jenness v. Emerson,*
  15 N.H. 486 (1844) .............................................................. 10

*Jones v. Tevis,*
  14 Ky. (4 Litt.) 25 (1823) ................................................... 10

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ............................................ 21

*May v. Anderson,*
  345 U.S. 528 (1953) ............................................................... 1

*Meachum v. Fano,*
  427 U.S. 215 (1976) .......................................................... 6-7

*Meyer v. Nebraska,*
  262 U.S.390 (1923) ........................................... 1, 6, 10, 13

*Parham v. J.R.,*
  442 U.S. 584 (1979) ................................................... *passim*

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ...................................................... 10-11, 12, 13

*Porter v. Powell*,
    44 N.W. 295 (Iowa 1890) ................................................... 10

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ........................................................ 11, 12, 13

*Reno v. Flores*,
    507 U.S. 292 (1993) .............................................................. 1

*Sch. Bd. Dist. No. 18 v. Thompson*,
    103 P. 578 (Okla. 1909) ......................................................... 9

*Smith v. Org. of Foster Families for Equal. & Reform*,
    431 U.S. 816 (1977) .............................................................. 6

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ......................................................... 1, 11

*Thompson v. Oklahoma*,
    487 U.S. 815 (1988) ......................................................... 11-12

*Troxel v. Granville*,
    530 U.S. 57 (2000) ........................................................ 1, 6, 13, 22

*Washington v. Glucksberg*,
    521 U.S. 702, 720 (1997) ....................................................... 6, 16

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................ 11, 13

## Other

### United States Constitution

    U.S. Const. amend. XIV ......................................................... 5

    U.S. Const. amend. XXVI ....................................................... 12

### United States Code

    10 U.S.C. § 505 ................................................................. 12

iv

23 U.S.C. § 158 ................................................................ 12

42 U.S.C. § 1983 .............................................................. 16

**Publications**

1 William Blackstone, *Commentaries on the Laws of England* (1753) ................................................ 7, 8, 10, 12

2 Baron De Montesquieu, *The Spirit of the Laws* (1749) ................... 8

2 Hugo Grotius, *The Rights of War and Peace* (Richard Tuck ed., 2005) (1625) ....................................... 8

After Being Denied Tattoo, *Sixth Grader Decides to Have Gender Reassignment Surgery Instead, The Babylon Bee* (Apr. 13, 2022) ................................................ 16

Charlotte-Mecklenburg Schs., *Supporting Transgender Students* (June 20, 2016) .......................................... 20

Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students* (2019) ............ 19

D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance* (2015) ......................................... 19

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. Homosexuality 1602 (2021) ..................................... 18

GLSEN & ACLU, *Know Your Rights: A Guide for Transgender and Gender Nonconforming Students* (2016) ............ 21

GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students* (Rev. Oct. 2020) ...................................... 21

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* ..................................................... 20

*Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022 ................................................... 17

InDoctriNation Map, *Parents Defending Educ.,* (last accessed
Oct. 23, 2023) ................................................................ 18

Jean-Jacques Burlamaqui, *The Principles of Natural and
Politic Law* (1747) ........................................................... 9

John Locke, *The Two Treatises of Civil Government*
(Thomas Hollis ed., A. Millar et al.) (1689) ...................... 8-9

John Witte, Jr., *The Nature of Family, The Family of
Nature: The Surprising Liberal Defense of the Traditional
Family in the Enlightenment*, 64 Emory L.J. 591 (2015) .............. 7, 9

Kenneth J. Zucker, *The Myth of Persistence: A Response to "A
Critical Commentary on Follow-Up Studies and 'Desistance'
Theories About Transgender and Gender Non-Conforming
Children" by Temple Newhook et al.* (2018), Int'l J. of
Transgenderism ................................................................ 17

L.A. Unified Sch. Dist., *Pol'y Bulletin BUL-2521.3, Title IX
Policy/Nondiscrimination Complaint Procedures*
(Aug. 14, 2020) ............................................................... 19

Luke Berg, *How Schools' Transgender Policies Are Eroding
Parents' Rights* (Mar. 2022) ........................................... 17, 18

M.D. Kittle, *Wisconsin School District: Parents are not
'Entitled to Know' if Their Kids are Trans, Federalist*
(Mar. 9, 2022) ................................................................ 19

N.J. Dep't of Educ., *Transgender Student Guidance for
Sch. Dists.* ..................................................................... 20

N.Y.C. Dep't of Educ., *Guidelines to Support Transgender
and Gender Expansive Students: Supporting Students* ................ 20

Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students'
Rights* (2016) ................................................................ 21

Sch. Dist. of Phila., *Transgender and Gender Non-Conforming
Students* (June 16, 2016) ................................................ 19

### INTERESTS OF AMICI CURIAE

The States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia file this amicus brief to ensure that parents retain their fundamental right to direct the upbringing of their minor children—a right the Supreme Court has described as "essential" and "far more precious … than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) and *May v. Anderson*, 345 U.S. 528, 533 (1953)).

### SUMMARY OF ARGUMENT

Our constitutional system has "historically … recognized that the natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). So without a reason to believe a parent is unfit, courts presume that the State may not "inject itself into the private realm of the family [and] question the ability of that parent to make the best decisions concerning the rearing of [their] children." *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000) (plurality op.) (citing *Reno v. Flores*, 507 U.S. 292, 304 (1993)). And that presumption is

not overcome "[s]imply because the decision of a parent [about a child's care or medical treatment] is not agreeable to [the] child or because it involves risks." *See Parham*, 442 U.S. at 603. School districts can't shut a parent out of their child's decision about their gender identity because the child objects or because the school believes the parent isn't supportive enough of an immediate gender transition.

Aurora Regino is a single mother with sole custody over her two minor daughters, A.S. (age twelve) and C.S. (age nine), who both live with her in Chico, California. ER-56 ¶ 16. During the 2021-22 school year, Regino's oldest daughter, A.S., was a fifth-grade student at Sierra View Elementary School ("Sierra View") in the Chico Unified School District ("District"). ER-63 ¶ 55. During the fall semester, A.S. began feeling depressed and anxious, likely stemming from substantial changes in her home life, including her grandfather's recent passing, Regino's breast cancer treatments, and her increased role in caring for her younger sister, C.S. ER-63 ¶ 56.

During this time, Sierra View's school counselor, Mandi Robertson, visited classrooms to advise students of counseling services, and she routinely addressed issues of gender identity and sexuality in these visits.

ER-63–64 ¶ 58.  Robertson encouraged students to consider whether they felt that their gender was different than their sex and, if it was, to embrace it.  ER-63–64 ¶ 58.  In December 2021, A.S. began feeling like she might be a boy, and before her winter break, A.S. met with Robinson to discuss her anxiety and depression—without mentioning any potential gender confusion.  ER-64 ¶¶ 59–61.  Robinson encouraged A.S. to join the Girls Group, a small girls arts-and-crafts group, when she returned from break, and she sent a permission slip home with A.S., which Regino signed.  ER-64 ¶¶ 61–62.  A.S. attended her first Girls Group meeting in January 2022, and the initial sessions were, as expected, geared towards arts and crafts.  ER-64 ¶ 63.

But after a couple of Girls Group meetings, A.S. told Robertson that she "felt like a boy," and Robinson immediately asked if she had a boy's name and wanted to be referred to by male pronouns.  ER-64–65 ¶ 64. A.S. was unsure, but feeling pressured, she said yes and told Robinson her boy's name was "J.S."  ER-64–65 ¶ 64.  Robinson informed A.S.'s teacher about the new name and pronouns, and her teacher began using the new name and pronouns.  During the spring semester, A.S. met one-on-one with Robinson a couple more times, and at these meetings,

3

Robinson referred A.S. to a local group that advocated for LGBTQ+ causes and discussed "top surgery" and "breast binding" with her. *See* ER-65 ¶ 68 & nn.2–3.

During the spring semester, A.S. was known as "J.S." at school and referred to by male pronouns, and she was known as "A.S." at home and referred to by female pronouns. As required by the District's policy, neither Robinson nor any District officials informed Regino that A.S. "felt like a boy" and had socially transitioned at school. ER-64–66 ¶¶ 64, 70–71; *see also* ER-62–63 ¶¶ 51–54. When she told Robinson that she wanted to tell her mother, Robinson was unsupportive and suggested speaking with other family members instead. ER-66 ¶ 69. So, in early April 2022, A.S. told her grandmother about her new gender identity, and her grandmother informed Regino later that day. ER-66 ¶ 72.

Regino was supportive of A.S.'s choice but shocked that the District socially transitioned A.S. without involving her. ER-66 ¶¶ 73–74. Even more troubling, A.S.'s feeling about being a boy subsided over the course of the semester. *See* ER-67 ¶¶ 76–77. Rather than helping her anxiety and depression, A.S.'s immediate social transition left her feeling stuck with a male name and pronouns because the Sierra View community now

viewed her as a boy.  *See* ER-67 ¶ 76.  A.S. used the male name and pro-nouns for the rest of the school year.  ER-67 ¶ 76.  Rather than diminish A.S.'s gender-related distress and anxiety, the District amplified it.  *See* ER-67 ¶ 76 (A.S.'s "depression and anxiety worsened to the point where she wanted to transfer to a different school").

The District's policy infringes on Regino's substantive due process rights by withholding critical information about whether her children have taken any action concerning their gender identity, leaving Regino (and other parents) completely in the dark about her children's mental and emotional well-being.  This is no isolated occurrence: school districts across the country have adopted similar policies under the mistaken be-lief that to do otherwise would be unlawful.  Yet here, the district court erroneously held that Regino failed to allege a liberty interest protected by the Constitution.  *See* ER-11–13.  This Court should correct that error and reverse.

**ARGUMENT**

## I. Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children.

Under the Fourteenth Amendment, states may not "deprive any per-son of … liberty … without due process of law."  U.S. Const. amend. XIV.

The Fourteenth Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," *see Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))—including those unenumerated rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Glucksberg*, 521 U.S. at 721). To conduct this inquiry, courts must "engage[] in a careful analysis of the history of the right at issue." *Id.* at 2246.

The right of parents to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65 (citing *Meyer*, 262 U.S. at 399). But parents' liberty interest in the care and custody of their minor children has a much earlier origin than *Meyer. See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (arguing that "the liberty interest in family privacy" is "older than the Bill of Rights" and "has its source … not in state law, but in intrinsic human rights" (cleaned up)); *see also Meachum v. Fano*, 427 U.S. 215, 230 (1976)

6

(Stevens, J., dissenting) ("[N]either the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects.").

During the late-eighteenth and early-nineteenth century, Sir William Blackstone's writings greatly influenced the American common-law understanding of the reciprocal rights and duties that the natural law imposes on parents and children. *See* John Witte, Jr., *The Nature of Family, The Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591, 598, 658–62 (2015). Blackstone defined the parent-child relationship as "the most universal relation in nature" and explained that parents have a duty to provide for their children's maintenance, protection, and education. 1 William Blackstone, *Commentaries on the Laws of England* *446 (1753). While recognizing that municipal laws reinforce these duties, he argued that "Providence has done it more effectually … by implanting in the breast of every parent that natural … affection, which not even the deformity of person or mind, … wickedness, ingratitude, … [or] rebellion of children[] can totally suppress or extinguish." *Id.* *447. Parental authority stems from parents' duties to provide for their children's maintenance, protection, and education and includes, as a necessary incident,

the authority to perform those duties without unreasonable state interference. *See id.* *452–53

Blackstone was not writing on a blank slate. Instead, he drew from influential natural law thinkers like Samuel Pufendorf and Baron Montesquieu. *See id.* *447 (arguing, by reference to Pufendorf, that parents' duty to "provide for the *maintenance* of their children is a principle of natural law … laid on them not only by nature herself, but by their own proper act[] in bringing them into the world"); *see id.* ("[T]he establishment of marriage in all civilized states is built on this natural obligation for the father to provide for his children." (citing 2 Baron De Montesquieu, *The Spirit of the Laws* 69 (1749))). Similar views on the parent-child relationship can be found in the earlier writings of Hugo Grotius, John Locke, Jean-Jacques Burlamaqui, and others. *See, e.g.*, 2 Hugo Grotius, *The Rights of War and Peace* 208–12 (Richard Tuck ed., 2005) (1625) ("Children need to be educated and conducted by the Reason of another. And none but Parents are naturally [e]ntrusted with this Charge."); John Locke, *The Two Treatises of Civil Government* 243 (Thomas Hollis ed., A. Millar et al.) (1689) ("The *power … that parents have* over their children arises from that duty which is incumbent on them to take care of their

offspring during the imperfect state of childhood." (cleaned up)); Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* 61 (1747) (arguing that "Providence … has inspired parents with that instinct or natural tenderness … for the preservation and good of those whom they have brought into the world").

State courts often leaned on Blackstone's collected wisdom to resolve questions about the nature of parental rights and duties—including parent-school disputes and parental support cases—thus incorporating these natural law conceptions of parental rights into the corpus of early American common law. *See* Witte, Jr., *Nature of Family*, *supra* at 597–98 (arguing that the views of the Enlightenment thinkers like Grotius, Pufendorf, Locke, Montesquieu, and others "penetrated deeply into the Anglo-American common laws of the eighteenth and nineteenth centuries, courtesy especially of William Blackstone"); *see also, e.g.*, *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578, 581–82 (Okla. 1909) (parents may exclude their child from some courses of study because, under the common law, they retained authority "sufficient to keep the[ir] child in order and obedience" and "the common law presum[ed] that the[ir] natural love and affection … for their children would impel them to faithfully perform

9

th[e] duty [to provide an education]" (citing Blackstone, *Commentaries*, *supra* at *451–53)); *Furman v. Van Sise*, 56 N.Y. 435, 439–40 (1874) (grounding parents' right to the services of their children in their natural law obligation to "maintain, educate and take care of [their minor] children," which entitles parents to "the custody and control of such children" and "to the services of the children").[1]

And a century ago, the Supreme Court grounded that common-law right—parents' right to direct the care and custody of their minor children—in the "liberty" secured by the Fourteenth Amendment's Due Process Clause. *See Meyer*, 262 U.S. at 399–400 (Due Process Clause secures parents' right to "establish a home and bring up children"). In doing so, the Court drew on "the natural duty of the parent"—which "[c]orrespond[ed] to the right of control"—"to give his children education suitable to their station in life." *Id.* at 400. And over the last century, the Court has reaffirmed that right time and again. *See Pierce v. Soc'y of Sisters*,

---

[1] *See also, e.g.*, *Porter v. Powell,* 44 N.W. 295, 297 (Iowa 1890) (parents' "right to exercise care, custody and control over the[ir] child" arises out of their natural law duty to "provide for the maintenance of their children" (citing Blackstone, *Commentaries*, *supra* at *446)); *Finch v. Finch*, 22 Conn. 411, 415 (1853) (same); *Jenness v. Emerson*, 15 N.H. 486, 488–89 (1844) (same); *Jones v. Tevis*, 14 Ky. (4 Litt.) 25, 27 (1823) (same).

268 U.S. 510, 534–35 (1925) ("liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Stanley*, 405 U.S. at 651 (raising one's children has been treated as an "essential" and "basic civil right[] of man" (citation and quotation marks omitted)); *see Dobbs*, 142 S. Ct. at 2257 (identifying, among a list of longstanding rights, "the right to make decisions about the education of one's children"). A century after *Meyer*, this much is clear: "Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

That parental authority is based in part on the commonsense recognition "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. The law thus makes a basic assumption about children as a class: "[It] assumes that they do not yet act as adults do,

and thus [it] act[s] in their interest by restricting certain choices that … they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S. 815, 826 n.23 (1988). That basic assumption justifies many restrictions on minor children's rights, including their right to vote, *see* U.S. Const. amend. XXVI, enlist in the military without parental consent, *see* 10 U.S.C. § 505, or to drink alcohol, *see, e.g.,* 23 U.S.C. § 158. And that same principle is traditionally at work in public schools, which routinely require parental consent before a student can receive medication or participate in certain school activities.

But this authority is based also—and perhaps more importantly—on the idea that parents are best suited to "prepar[e their children] for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166; *see also Pierce*, 268 U.S. at 535 (declaring that "[t]he child is not the mere creature of the State," but "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations"). Indeed, Blackstone explained that "the *power* of parents over their children is derived from … their duty." *Commentaries*, *supra* at *452. And Blackstone's understanding of the

reciprocal rights and duties that the natural law imposes on parents and children permeates the Court's decisions in cases like *Meyer*, *Pierce*, *Prince*, *Yoder*, *Parham*, and *Troxel*. *See, e.g.*, *Meyer*, 262 U.S. at 400 ("natural duty of the parent"—which "[c]orrespond[s] to the right of control"—is "to give his children education suitable to their station in life"); *Pierce*, 268 U.S. at 535 (parents have "the right" and "high duty" to prepare [their children] "for additional obligations");[2] *Prince*, 321 U.S. at 166 ("[C]ustody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."). Parents' obligation to care and provide for their minor children necessarily requires that they not be denied access to information necessary to perform those functions.

Yet this parental authority is not absolute—parents have no license to abuse or neglect their children. *Parham*, 442 U.S. at 602–04. Nor does the parental relationship give parents the right to disregard lawful limitations on the use of medical procedures or drugs. *See Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) ("John Doe's rights to make

---

[2] *Parham, Yoder*, and *Troxel* rely on this principle from *Pierce*. *See Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 233; *Troxel*, 530 U.S. at 68–69.

decisions for his daughter can be no greater than his rights to make medical decisions for himself."). Relatedly, some parental decisions about their child's medical care may be "subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604; *but see id.* ("[Yet parents] retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and the traditional presumption that the parents act in the best interests of their child should apply."). But parents are not stripped of their authority to act in the best interest of their children "[s]imply because the[ir] decision … is not agreeable to a child or because it involves risks." *See id.* at 603–04 ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment.").

When a school district's policies "conflict with the fundamental right of parents to raise and nurture their child," "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). But school districts have no interest—much less a

compelling one—in concealing minor students' social gender transitions from their parents.

## II. The District's Policy Violates Parents' Fundamental Right to Care for Their Children.

### A. The Policy authorizes school officials to make decisions about a gender identity behind parents' backs.

The District applies Admin. Reg. #5145.3 ("Policy")—which requires all District personnel to refer to a student by a new name and pronouns at school if the student informs them of their new identity and preferred name and pronouns, *see* ER-62 ¶ 52—to each of its twenty-three schools. ER-56 ¶ 18; ER-62 ¶ 51. But District personnel may not inform the student's parents of the transition *unless* the student specifically authorizes the disclosure, except where disclosure to parents is "otherwise required by law" or there is "compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being." ER-62 ¶ 52. Apart from these few exceptions, the District may take disciplinary measures against employees and students that violate the Policy, including the requirement to refer to a student with their new name and pronouns. ER-62–63 ¶ 53. So under the Policy, students of any age can

insist that their parents are kept in the dark about their transgender status, even when they must get parental consent for lesser matters.[3]

The District's policy gives ultimate decisionmaking authority to children and displaces parents of their longstanding, primary role in ensuring their child's safety and well-being. Now, the question is, do schools have an obligation to facilitate the immediate transition of a student who believes they are transgender and to hide this change from parents who aren't on board? The answer is obviously: No.[4] As a recent review of youth gender treatments recognized, "[s]ocial transition[ing]" is "an active intervention because it may have significant effects on the

---

[3] One rightly fears what's next. *See After Being Denied Tattoo, Sixth Grader Decides to Have Gender Reassignment Surgery Instead*, THE BABYLON BEE (Apr. 13, 2022). After all, today's satire too often becomes tomorrow's reality.

[4] While the district court didn't address the merits of Regino's substantive due process claim because it held that she failed to assert a constitutionally protected liberty interest, it said that if her claims proceeded to the merits, she would have to satisfy the "shocks-the-conscience" standard for claims under 42 U.S.C. § 1983. ER-11–13. If this Court reverses and remands, it should clarify whether the "shocks-the-conscience" or strict scrutiny standard applies to facial challenges to policies that resemble "legislative" enactments. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998); *Glucksberg*, 521 U.S. at 720.

child or young person in terms of their psychological functioning."[5] The District presumably does not treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress either.

Worse still, the District's 'immediate transition' approach lacks any solid, scientific foundation. Many medical professionals believe that this approach "can become self-reinforcing and do long term harm." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, at 3, (Mar. 2022).[6] Given the recent explosion of students dealing with gender identity issues, there is a greater need for caution. *See id.* Not only that, but existing research suggests that these feelings eventually recede for most children—that is, for those who do not transition. *See id.* And there is a spike in "detransitioners," which further supports a cautious,

---

[5] *Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022, at 62, https://perma.cc/D5XP-EXAL.

[6] *See, e.g.*, Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), INT'L J. OF TRANSGENDERISM, at 7 (arguing that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence").

rather than hasty, approach. *See id.* (citing Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. Homosexuality 1602 (2021)).

**B. School districts across the country have adopted similar parental exclusion policies.**

Regrettably, the Policy is neither groundbreaking nor unique. In recent years, school districts nationwide have quietly implemented similar gender transition guidelines.[7] These parental exclusion policies differ in execution—*i.e.*, whether they place students or school officials in the driver's seat—but they both relegate parents to the back seat. All such policies thus prevent parents from helping their children make crucial decisions about their identity and mental health, in direct violation of parents' fundamental rights. *Parham*, 442 U.S. at 603.

Some policies leave parental involvement to the student's discretion. These policies forbid school officials from disclosing information

---

[7] Parents Defending Education ("PDE"), a nationwide membership organization that seeks to prevent the politicization of K-12 education and to protect parental rights, has compiled a list of public school districts across the country with similar policies. *See InDoctriNation Map*, PARENTS DEFENDING EDUC., (last accessed Oct. 23, 2023) (filtering for "incidents," "public schools," and "parents rights" yields over 150 results for school policies), https://defendinged.org/map/.

about a student's transgender status to parents unless the student has authorized the disclosure. Policies like this have shown up in large cities like Washington, D.C.,[8] Philadelphia,[9] Chicago,[10] and Los Angeles,[11] as well as smaller cities like Eau Claire, Wisconsin.[12] And the New Jersey

---

[8] *See* D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance*, at 8 (2015) (instructing educators not to share transgender status with parents without permission from the child), https://perma.cc/G94K-YQ9C.

[9] *See* Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students*, at 3 (June 16, 2016) ("School personnel should not disclose … a student's transgender identity … to others, including parents … unless the student has authorized such disclosure."), https://www.philasd.org/src/wp-content/uploads/sites/80/2017/06/252.pdf.

[10] *See* Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students*, at 4 (2019) (asserting that children have a right to keep their transgender status from their parents), https://perma.cc/WT5W-E52T.

[11] *See* L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy/Nondiscrimination Complaint Procedures*, at 18 (Aug. 14, 2020) (describing gender identity as confidential), https://perma.cc/2LLZ-5XAH.

[12] *See* M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, FEDERALIST (Mar. 9, 2022), https://thefederalist.com/2022/03/08/wisconsin-school-district-parents-are-not-entitled-to-know-if-their-kids-are-trans/.

Department of Education has issued similar guidance to all public-school districts in the State.[13]

Other policies require school officials to determine whether it is appropriate to disclose the student's transgender status to their parents. These policies give school officials discretion to determine whether parents should be part of a student's transition plan. Policies like this have shown up in school districts in Charlotte[14] and New York,[15] as well as Hawaii's Department of Education.[16] While these policies condition parental involvement on school officials' consent, they still impair parents' fundamental right to raise their children.

---

[13] *See* N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, at 2–3 ("A school district shall accept a student's asserted gender identity; parental consent is not required."), https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf.

[14] *See* Charlotte-Mecklenburg Schs., *Supporting Transgender Students*, at 34 (June 20, 2016) (describing a case-by-case approach to involve parents in transition plans), https://perma.cc/3GAV-UHHM.

[15] *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ("[S]chools [must] balance the goal of supporting the student with the requirement that parents be kept informed about their children."), https://perma.cc/RT86-YQXT.

[16] *See* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students*, at 5 ("[I]nitial meeting[s] may or may not include the student's parents."), https://perma.cc/ECZ6-NJGE.

The explosion of these policies appears to stem from ideologically driven advocacy groups claiming that federal law requires this result.[17] One such group, the Gay, Lesbian, and Straight Education Network (GLSEN), promotes a so-called "model" policy—similar to the District's—which falsely claims that disclosing a student's "gender identity and transgender status" without the student's consent may violate the Family Education Rights Privacy Act (FERPA). *See* GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students*, at 4 (Rev. Oct. 2020). Even if that strained interpretation of FERPA had any merit (it doesn't), rights created by federal statute yield to those grounded in the U.S. Constitution whenever there is a conflict. *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it."). These

---

[17] *See, e.g.*, Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights*, at 19–20 (2016) (arguing that FERPA precludes sharing transgender status in most circumstances), https://perma.cc/V7U5-ZXGK; GLSEN & ACLU, Know *Your Rights: A Guide for Transgender and Gender Nonconforming Students, at* 5 (2016) ("If your school reveals [transgender status] to anyone without your permission, it could be violating federal law."), https://perma.cc/RPD4-UFJJ.

federal statutes—no matter how laudable their aims—cannot displace parents' longstanding right to care for their children.

## CONCLUSION

When a student considers transitioning genders, parents have a fundamental, constitutional right to not be shut out of that decisionmaking process. *See Troxel*, 530 U.S. at 65. Yet school districts across the country, strong-armed by ideologically driven advocacy groups, have done just that, trampling on parents' fundamental right to be informed of critical information about their child's mental health and well-being. This Court must therefore reverse.

DATED this 3rd day of November, 2023.

> AUSTIN KNUDSEN
>   *Montana Attorney General*
>
> CHRISTIAN B. CORRIGAN
>   *Solicitor General*
>
> */s/ Peter M. Torstensen, Jr.*
> PETER M. TORSTENSEN, JR.
>   *Deputy Solicitor General*
> Montana Department of Justice
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
> p. 406.444.2026
> peter.torstensen@mt.gov
>
> *Attorneys for the State of Montana*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of Alabama*

TREG TAYLOR
*Attorney General of Alaska*

TIM GRIFFIN
*Attorney General of Arkansas*

ASHLEY MOODY
*Attorney General of Florida*

CHRISTOPHER M. CARR
*Attorney General of Georgia*

RAÚL R. LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

KRIS KOBACH
*Attorney General of Kansas*

JEFF LANDRY
*Attorney General of Louisiana*

LYNN FITCH
*Attorney General of Mississippi*

ANDREW BAILEY
*Attorney General of Missouri*

MICHAEL T. HILGERS
*Attorney General of Nebraska*

DREW H. WRIGLEY
*Attorney General of North Dakota*

DAVE YOST
*Attorney General of Ohio*

GENTNER F. DRUMMOND
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

KEN PAXTON
*Attorney General of Texas*

JASON MIYARES
*Attorney General of Virginia*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,529 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.