No. 23-16031

# IN THE UNITED STATES COURT OF APPEAL
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff–Appellant,*

v.

KELLY STALEY,

*Defendant–Appellee,*

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO; EILEEN ROBINSON;
MATT TENNIS

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of California
No. 2:23-cv-00032-JAM-DMC
Hon. John A. Mendez

## APPELLEE'S ANSWERING BRIEF

<div style="margin-left:40%">

BRIAN A. DUUS, ESQ. (SBN: 263403)
JIMMIE E. JOHNSON, ESQ. (SBN: 223344)
**LEONE ALBERTS & DUUS, APC**
1390 Willow Pass Road, Suite 700
Concord, CA 94520
Telephone: (925) 974-8600
Facsimile: (925) 974-8601

*Attorneys for Defendant-Appellee*
KELLY STALEY

</div>

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION............................................................................ 1

STATEMENT OF JURISDICTION ................................................. 4

STATEMENT OF THE ISSUES ...................................................... 4

PERTINENT AUHTORITIES........................................................... 6

STATEMENT OF CASE.................................................................. 6

A.    The Parties ....................................................................... 6

B.    Pertinent Legislative Background ................................. 7

C.    Pertinent Procedural Background.................................. 12

D.    Pertinent Allegations ..................................................... 13

SUMMARY OF ARGUMENT........................................................ 15

ARGUMENT................................................................................... 19

I.     The District Court Correctly Determined that Regino Failed to
       Plead an Established Liberty Interest in Connection with Her
       Due Process Claims...................................................... 19

   A.   Parents Do Not Hold an "Ultimate Decision-Maker" Liberty
        Interest Over Matters that Affect the Informational Privacy
        Rights of their Minor Children................................... 19

   B.   The Supreme Court Has Long Rejected the Argument that
        Parents Hold an Absolute "Veto" Authority Over the Privacy-
        Related Decisions of their Minor Children .............. 21

   C.   The Supreme Court Has Long Required State Supervision of
        Parental Decisions Affecting the Constitutionally-Protected
        Liberty Interests of Minors....................................... 23

D.    Minors Have an Informational Privacy Right in Maintaining the Confidentiality of their Gender Identity from Parents ............. 26

E.    Parental Rights on Childrearing Do Not Afford Parents the Authority to Compel State Action ............................................ 29

F.    Accommodating Social Transitioning Decisions Does Not Amount to "Medical Treatment" ............................................. 32

G.    A Parental "Ultimate Decision-Maker" Right Over Minor Children Has No Roots in this Nation's History and Tradition    36

H.    Any Parental "Veto" Authority Would Be Untenable .............. 39

II.    The District Court Correctly Determined that AR 5145.3 Satisfies Rational Basis Review ................................................. 42

III.    Regino Failed to Plead a Cognizable Executive Abuse of Power Which "Shocks the Conscience" ............................................... 43

IV.    Regino Failed to Plead Facts Establishing that AR 5145.3 Violates the Constitution in Every Circumstance ...................... 46

V.    The District Court Correctly Determined that Regino Failed to Plead Facts Establishing that the District Applied AR 5145.3 to Her in a Manner that Violated the Constitution ......................... 47

VI.    Regino Failed to Plead Facts Establishing that the Legislative Process in which the District Adopted AR 5145.3 Failed to Comport with Due Process ......................................................... 51

VII.    The District Court Correctly Determined that Regino Failed to Plead an Established Familial Association Right Protected by the Constitution ............................................................................... 52

**CONCLUSION** ..................................................................................... 56

**STATEMENT OF RELATED CASE**

**CERTIFICATE OF COMPLIANCE**

**ADDENDUM**

# TABLE OF AUTHORITIES

## Federal Cases

*Afroyim v. Rusk*,
    387 U.S. 253 (1967) ........................................................................ 17

*Agostino v. Simpson*,
    2012 U.S. Dist. LEXIS 207375 (S.D.N.Y. Mar. 29, 2012) ............................. 54

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ................................................................... 19, 51

*Arnold v. Bd. of Educ. of Escambia Cnty.*,
    880 F.2d 305 (11th Cir. 1989) .......................................................... 54

*Bellotti v. Baird*,
    443 U.S. 622 (1979) ........................................................................ 40

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ........................................................................ 52

*Bohn v. Dakota Cnty.*,
    772 F.2d 1433 (8th Cir. 1985) .......................................................... 54

*Brentwood Acad. v. Tennessee Secondary School Athletic Assn.*
    531 U.S. 288 (2001) ........................................................................ 29

*Brittain v. Hansen*,
    451 F.3d 982 (9th Cir. 2006) ............................................... 19, 43-44

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ........................................................................ 44

*Cruzan v. Dir., Mo. Dep't. of Health*,
    497 U.S. 261 (1990) ........................................................... 18, 30, 40

*Doe v. Dickenson*,
    615 F. Supp.2d 1002 (D. Ariz. 2009) ................................................. 54

*Doe v. Irwin*,
    615 F.2d 1162 (6th Cir. 1980) .......................................................... 28

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ............................................................ 34

*Fields v. Palmdale Sch. Dist.*,
    427 F.3d 1197 (9th Cir. 2005) ......................... 4, 27, 31, 36, 38, 39, 48

*Foote v. Town of Ludlow,*
  2022 U.S. Dist. LEXIS 236102, (D. Mass. Dec. 14, 2022) ........................ 34, 35

*Franceschi v. Yee,*
  887 F.3d 927 (9th Cir. 2018) ................................................................ 42

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ................................................................ 33

*Gruenke v. Seip,*
  225 F.3d 290 (3d Cir. 2000) ................................................................ 54

*Halverson v. Skagit County,*
  42 F.3d 1257 (9th Cir. 1994) ................................................................ 52

*Hameetman v. City of Chicago,*
  776 F.2d 636 (7th Cir. 1985) ................................................................ 54

*Hoye v. City of Oakland,*
  653 F.3d 835 (9th Cir. 2011) ............................................................ 47-48

*In re Gault*
  387 U.S. 1 (1967) ............................................................................ 39-40

*Janiah v. Meeks,*
  584 F.Supp.3d 643 (S.D. Ill. 2022) .................................................... 33

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
  622 F.Supp.3d 118 (D. Md. 2022) ........................... 16, 27, 43, 44, 47

*Keates v. Koile,*
  883 F.3d 1228 (9th Cir. 2018) ............................................................ 53

*Keohane v. Fla. Dep't. of Corr. Sec'y,*
  952 F.3d 1257 (11th Cir. 2020) .......................................................... 33

*Khachatryan v. Blinken,*
  4 F.4th 841 (9th Cir. 2021) ................................................................ 36

*L.W. v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ................................................................ 30

*Linsangan v. United States,*
  2021 U.S. App. LEXIS 37902 (9th Cir. 2021) .................................. 37

*M.H. v. Jeppesen,*
  2023 U.S. Dist. LEXIS 108023 (D. Idaho June 20, 2023) ................ 33

*Mann v. City of Sacramento*,
  748 Fed.Appx. 112 (9th Cir. 2018) ..................................................... 53

*Mann v. Cnty. of San Diego*,
  907 F.3d 1154 (9th Cir. 2018) .................................................... 25, 26

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ................................................................. 17, 38

*Mueller v. Auker*,
  700 F.3d 1180 (9th Cir. 2012) ......................................................... 44

*Munoz v. United States Dep't of State*,
  73 F.4th 769 (9th Cir. 2019) .................................................... 37, 38

*Nelson v. NASA*,
  568 F.3d 1028 (9th Cir. 2009) .................................................. 16, 27

*Nev. Rest. Servs. v. Clark Cnty.*,
  638 Fed.Appx. 590 (9th Cir. 2016) .................................................. 52

*Nguon v. Wolf*,
  517 F.Supp.2d 1177 (C.D. Cal. 2007) ............................................... 27

*Nunez by Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) .................................................... 17, 40

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*,
  451 U.S. 77 (1981) ....................................................................... 31

*Ovando v. City of Los Angeles*,
  92 F.Supp.2d 1011 (C.D. Cal. 2000) ................................................ 54

*Parham v. J.R.*,
  442 U.S. 584 (1979) ................................................. 23, 24, 25, 29, 30

*Pierce v. Soc'y of Sisters*,
  268 U.S. 510 (1925) ............................................................ 17, 25, 38

*Planned Parenthood of Idaho, Inc. v. Wasden*,
  376 F.Supp.2d 1012 (D. Idaho 2005) ............................................... 22

*Planned Parenthood of S. Ariz. v. Lawall*,
  307 F.3d 783 (9th Cir. 2002) ......................................... 15, 22, 26, 28

*Planned Parenthood v. Danforth*,
  428 U.S. 52 (1976) ................... 15, 17, 21, 23, 25, 28, 37, 41, 47

v

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ........................................ 39

*Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*
628 Fed.Appx. 527 (9th Cir. 2016) ........................ 18, 54

*Sinclair v. City of Seattle*,
61 F.4th 674 (9th Cir. 2023) ............................. 36

*Sterling v. Borough of Minersville*,
232 F.3d 190 (3d Cir. 2000) .......................... 16, 26, 27

*Sylvia Landfield Trust v. City of Los Angeles*,
729 F.3d 1189 (9th Cir. 2013) ........................... 44

*Roberts v. U.S. Jaycees*
468 U.S. 609 (1984) .................................... 53

*Thomas v. Evansville-Vanderburgh Sch. Corp.*,
258 Fed.Appx. 50 (7th Cir. 2007) ....................... 28

*Troxel v. Granville*,
530 U.S. 57 (2000) .................................. 16, 17, 39

*United States v. Salerno*,
481 U.S. 739 (1987) .................................... 46

*Wallis v. Spencer*,
202 F.3d 1126 (9th Cir. 2000) ....................... 25, 26, 53

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ................................. 36, 38, 43

*Whalen v. Roe*,
429 U.S. 589 (1977) .................................... 26

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs*,
2023 U.S. Dist. LEXIS 113818 (D. Wy. June 30, 2023)........ 38

*Willkinson v. Torres*,
610 F.3d 546 (9th Cir. 2010) ........................... 53

*Witt v. Dep't. of the Air Force*,
527 F.3d 806 (9th Cir. 2008) ........................... 42

**State Cases**

*California v. Chino Valley Unified School District*,
San Bernardino Sup. Ct., Case No. CIV SB 2317301 (Aug. 28, 2023)............... 8

**Federal Statutes**

42 U.S.C. § 1983 .................................................................................. 15, 19, 51, 53

**State Statutes**

California Education Code § 33308.5 ................................................................. 7, 8

**Rules**

Federal Rule of Civil Procedure 12 .............................................................. 12, 13

**Other**

Article I, Section I of the California Constitution .................................................. 9
California Assembly Bill No. 1266 (2013).............................................................. 8
First Amendment to the United States Constitution ............................ 6, 15, 18, 53
Fourteenth Amendment to the United States Constitution ............................ 39, 53

# INTRODUCTION

In accordance with directives issued by the California Department of Education ("CDE"), the Chico Unified School District ("District") adopted an administrative regulation, Administrative Regulation 5145.3 ("AR 5145.3"), prescribing how District employees are to respond when a student provides notice that they identify as a gender different from their sex assigned at birth. In further accordance with CDE directives, the administrative regulation also prescribes how District employees are to respond to requests from students who wish to be identified by a name different from that set forth in their official records, and/or who wish to be addressed with pronouns different from those typically employed with the sex assigned at their birth. Specifically, both the CDE directives and AR 5145.3 provide that District personnel shall (1) accept a student's asserted gender identity and treat that student consistent therewith; (2) address the student by the name and pronouns requested by the student; and (3) not disclose the student's gender identity to anyone without the student's prior consent unless otherwise required by law, or to preserve the physical and/or mental well-being of the student. Countless other school districts throughout the State of California have likewise adopted a similar, if not identical, administrative regulation.

In this appeal, Plaintiff-Appellant AURORA REGINO ("Regino") seeks to enjoin enforcement of AR 5145.3 because she disagrees with the public policy of the underlying CDE directives. She further contends that AR 5145.3 violates an

alleged constitutional right that parents[1] must be the "ultimate decision-maker regarding … decisions related to [a minor's] gender identity…." ER[2] 72 (FAC, ¶ 101.f.). In accordance therewith, Regino argues that government agencies such as public school districts should be required to proactively notify parents of a minor's choices regarding their gender identity so that the parents can then make that "ultimate decision" – regardless of the minor's own thoughts on the matter, regardless of the maturity of that particular minor, and regardless of whether the parents themselves agree on the question.

Certainly, reasonable minds may differ as to how much authority parents should have in determining a child's gender identity. For example, would "ultimate decision-maker" authority include the right of a parent to force a child to newly adopt a gender identity different from the sex assigned at their birth even when the child is perfectly happy with their birth identity? Likewise, what happens when one parent supports a child's gender identity decision while the other strongly disagrees? Nonetheless, such policy concerns are the purview of the legislative branch, not the judicial. Courts do not have the authority to expand the reach of the Constitution of the United States ("Constitution") and create out of whole cloth a new parental right of notification simply due to public policy

---

[1] For the purposes of this appeal, any reference by the District to "parents" includes both parents and legal guardians.

[2] Citations to "ER" are references to the Excerpts of Record, Volume 1 of 1.

concerns.  It was a proposition the United States District Court for the Northern District of California ("District Court") below correctly rejected – and a decision this Court should affirm.

At the same time, while it is outside the jurisdiction of this Court to arbitrate whether it is a "good idea" for public agencies to notify parents of a minor's gender identity decisions, it is indeed the purview of the judiciary to determine the scope of that minor's privacy rights; and whether the Constitution *permits* government agents to pierce those rights – let alone *mandates* public agencies do so even when it runs contrary to their own policy preferences.  To that end, this Court has long recognized a right of informational privacy held by minors, and even when a State has wanted to divulge protected information to parents, both the Supreme Court of the United States ("Supreme Court") and this Circuit have (1) consistently employed strict scrutiny judicial review over such efforts, and (2) have required any such State effort to provide the minor an opportunity to avoid the disclosure by establishing sufficient maturity to make their own decisions either alone or in consultation with an adult surrogate.

In short, while the Constitution may *permit* a State rule requiring disclosure of a minor's protected information to parents if such a policy preference satisfies strict scrutiny judicial review, there is no constitutional mandate *requiring* a State to impose such a regulation – and certainly not one devoid of any opportunity for the minor to avoid the disclosure.  Instead, whether a State chooses to carry out

such efforts is constitutionally prescribed to the wisdom of legislative officials. "We note at the outset that it is not our role to rule on the wisdom of the School District's actions. That is a matter that must be decided in other fora. The question before us is simply whether the parents have a constitutional right…." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1203 (9th Cir. 2005). To that end, the holding of the District Court should be affirmed: "…Plaintiff's FAC and opposition to this motion to dismiss is filled with policy arguments challenging the wisdom of the Regulation. While reasonable minds may certainly differ as to whether Plaintiff's policy preferences are advisable, this Court is not the venue for this political debate. The issue before this Court is not whether it is a good idea for school districts to notify parents of a minor's gender identity and receive consent before using alternative names and pronouns, but whether the United States Constitution mandates such parental authority. This Court holds that it does not." ER 14 (citation omitted).

## STATEMENT OF JURISDICTION

Defendant-Appellee KELLY STALEY ("Superintendent Staley") agrees with the jurisdictional statement provided by Regino in her Brief of Appellant.

## STATEMENT OF THE ISSUES

1.     Did the District Court correctly determine that Regino failed to state a claim upon which relief could be granted in connection with the substantive due process and procedural due process actions raised in Counts One, Two, Three, and

Four of the operative First Amended Complaint ("FAC") by failing to plead an established liberty interest protected by the Constitution?

2.      Did the District Court correctly determine that Regino failed to state a claim upon which relief could be granted in connection with the substantive due process and procedural due process actions raised in Counts One, Two, Three, and Four of the FAC on account that AR 5145.3 satisfies rational basis judicial review?

3.      Did Regino fail to state a claim upon which relief could be granted in connection with the substantive due process actions raised in Counts One and Two of the FAC on account of failing to allege a cognizable level of executive abuse of power as that which shocks the conscience?

4.      Did Regino fail to state a claim upon which relief could be granted in connection with the facial, substantive due process action raised in Count One of the FAC by failing to plead facts establishing that AR 5145.3 would violate the Constitution in every circumstance?

5.      Did the District Cout correctly determine that Regino failed to state a claim upon which relief could be granted in connection with the as-applied, substantive due process action raised in Count Two of the FAC by failing to plead facts establishing that the District applied AR 5145.3 to her in a manner that violated the Constitution?

6.       Did Regino fail to state a claim upon which relief could be granted in connection with the facial and as-applied procedural due process actions raised in

Counts Three and Four of the FAC by failing to plead facts establishing that the legislative process in which the District adopted AR 5145.3 failed to comport with due process?

7.     Did the District Cout correctly determine that Regino failed to state a claim upon which relief could be granted in connection with the facial and as-applied First Amendment claims raised in Counts Five and Six of the FAC by failing to plead an established familial association right protected by the Constitution?

## PERTINENT AUHTORITIES

AR 5145.3 is reproduced in the addendum to this brief.

## STATEMENT OF CASE

### A. The Parties

The District is a public school district based in Chico, California. It operates twenty-three campuses, including Sierra View Elementary School ("Sierra View"). In total, the District educates over 12,000 students per school year.  ER 56, 63 (FAC, ¶¶ 18, 55).  Although not named as a defendant, the District is the real party in interest in this litigation.

Defendants CAITLIN DALBY, REBECCA KONKIN, TOM LANDO, EILEEN ROBINSON, and MATT TENNIS (collective, "Board Members") are members of the District's Board of Education ("Board").  The Board is the governing body of the District.  Each of the individual Board members were

named as parties to the litigation in their official capacities only, and later dismissed.  ER 57 (FAC, ¶¶ 19-24).

Defendant-Appellee Superintendent Staley is the District's Superintendent. In her position, Superintendent Staley is responsible for overseeing implementation of District policies.  Superintendent Staley is named as a party to the litigation in her official capacity only.  ER 57-58 (FAC, ¶ 25).

Plaintiff-Appellant Regino is the mother of "A.S." and "C.S.," minor students who attend District schools.  In particular, during the 2021-2022 school year, A.S. attended Sierra View.  ER 54, 56, 63 (FAC, ¶¶ 4, 16, 55).

## B. Pertinent Legislative Background

The CDE is responsible for administering and enforcing the laws in California pertaining to education, and for identifying "critical needs for which effective programs and practices are to be identified, developed, and disseminated to public schools."  Cal. Ed. Code, § 33321, subd. (a).  In turn, California Education Code section 33308.5 ("Section 33308.5") authorizes the CDE to provide public school districts guidance for complying with those laws under its jurisdiction.  Cal. Ed. Code, § 33308.5, subd. (a).  Pursuant to Section 33308.5, the

///

///

///

///

CDE may only issue such guidelines if they are "necessary" and "consistent with[]" existing statutes and regulations." Cal. Ed. Code, § 33308.5, subd. (b).[3]

Based upon this authority, the CDE has issued directives concerning compliance with California Assembly Bill No. 1266 (2013) ("AB 1266") and other transgender-related legal authorities. SER[4] 94-95 (District Court taking judicial notice), 110-119. Included therein, the CDE has promulgated the following directives for public schools on their official, publicly-available website:

> 5.    How can a teacher or school administrator determine whether a student is transgender or not?
>
> [A:]   The first and best option is always to engage in an open dialogue with the student and the student's parent or parents if applicable (but see FAQs 6 and 7). Gender identity is a deeply rooted element of a person's identity. *Therefore, school districts should accept and respect a student's assertion of their gender identity where the student expresses that identity at school or where there is other evidence that this is a sincerely held part of the student's core identity.* … [¶] If a student meets one or more of those requirements, a school may not question the student's assertion of their gender identity except in the rare circumstance where school personnel have a credible basis for believing that the student is making that assertion for some improper purpose. … [¶]  A school cannot require a student to provide any particular type of diagnosis, proof of medical treatment, or meet an age requirement as a condition to receiving the protections afforded under California's antidiscrimination statutes. …

---

[3] While Education Code section 33308.5 provides that any guidelines issued by the CDE are not necessarily "mandatory," school districts who have not complied with the guidance at issue in this litigation have been sued by the California Department of Justice.  See e.g., *California v. Chino Valley Unified School District*, San Bernardino Sup. Ct., Case No. CIV SB 2317301 (Aug. 28, 2023).

[4] Citations to "SER" are references to the Supplemental Excerpts of Record, Volume 1 of 1.

6. May a student's gender identity be shared with the student's parents, other students, or members of the public?

[A:]  A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home. *Revealing a student's gender identity or expression to others may compromise the student's safety. Thus, preserving a student's privacy is of the utmost importance.* The right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws. Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy. [¶] … *California Constitution - Minors enjoy a right to privacy under Article I, Section I of the California Constitution that is enforceable against private parties and government officials. The right to privacy encompasses the right to non-disclosure (autonomy privacy) as well as in the collection and dissemination of personal information such as medical records and gender identity (informational privacy).* …

7. What steps should a school or school district take to protect a transgender or gender nonconforming student's right to privacy?

[A:]  *… Pursuant to the above protections, schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family.* With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents. …

8. What steps should a school or school district take to protect a transgender or gender nonconforming student's right to privacy? What is a school or school district's obligation when a student's stated gender identity is different than the student's gender marker in the school's or district's official records?

[A:]  *…If the school district has not received documentation supporting a legal name or gender change, the school should nonetheless update all unofficial school records (e.g. attendance sheets, school IDs, report cards) to reflect the student's name and*

*gender marker that is consistent with the student's gender identity. This is critical in order to avoid unintentionally revealing the student's transgender status to others in violation of the student's privacy rights,* as discussed above in section 6.

  *If a student so chooses, district personnel shall be required to address the student by a name and the pronouns consistent with the student's gender identity, without the necessity of legal documentation or a change to the student's official district record. ...*

SER 113-116 (emphasis added).

  In accordance with these CDE directives, the California School Boards Association ("CSBA") – which is a membership organization comprised of approximately 962 local educational agencies (school districts, county offices of education, etc.) responsible for the education of approximately 99.9% of all public school students statewide in levels kindergarten through grade 12 – circulated a sample anti-harassment administrative regulation, "Regulation 5145.3," to its members in 2014 to consider for adoption in their respective districts. The sample regulation concerned most, if not all, forms of unlawful harassment. With regard to transgender-based harassment, the proposed regulation read, in pertinent part: "1. Right to privacy: A student's transgender or gender-nonconforming status is his/her private information and the district will only disclose the information to others with the student's prior consent, except when the disclosure is otherwise required by law or is necessary to preserve the student's physical or mental well-being. … As appropriate, the Coordinator [for Nondiscrimination] shall discuss with the student any need to disclose the student's transgender or gender-nonconformity status to his/her parents/guardians and/or others, including other

students, teacher(s), or other adults on campus.  Any decision to disclose the student's status to others shall be based on the student's best interest." SER 94-95 (District Court taking judicial notice), 120, 124-125.

The proposed regulation further read, in pertinent part: "6. Name and Pronouns: If a student so chooses, district personnel shall be required to address the student by a name and the pronouns consistent with his/her gender identity, without the necessity of a court order or a change to his/her official district record." SER 126.

Thereafter, like numerous other school districts, the District adopted its own version of the CSBA sample regulation.  As of the 2021-2022 school year in question, the District's own AR 5145.3 read, in pertinent part:

**Transgender and Gender-Nonconforming Students**
…
To ensure that transgender and gender-nonconforming students are afforded the same rights, benefits, and protections provided to all students by law and Board policy, *the district shall address each situation on a case-by-case basis, in accordance with the following guidelines:*
1. Right to privacy: A student's transgender or gender-nonconforming status is the student's private information and *the district shall only disclose the information to others with the student's prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being.* … As appropriate given the student's need for support, the compliance officer may discuss with the student any need to disclose the student's transgender or gender-nonconformity status or gender identity or gender expression to the student's parents/guardians and/or others, including other students,

teacher(s), or other adults on campus. The district shall offer support services, such as counseling, to students who wish to inform their parents/guardians of their status and desire assistance in doing so.

…

5. Names and Pronouns: If a student so chooses, *district personnel shall be required to address the student by a name and the pronoun(s) consistent with the student's gender identity*, without the necessity of a court order or a change to the student's official district record. …

SER 94-95 (District Court taking judicial notice), 127, 131-134 (emphasis added).

### C. Pertinent Procedural Background

On or about January 6, 2023, Regino filed her original Complaint in the above-captioned matter.  SER 135-162.

On March 27, 2023, Superintendent Staley and the Board Members collectively filed a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12.  SER 89-91.

On April 10, 2023, while the dismissal motion remained pending, Regino filed the operative FAC in lieu of a substantive opposition.  ER 52-102 (FAC); SER 84-88.  In doing so, she again named Superintendent Staley and the Board Members as defendants.  ER 57-58 (FAC, ¶¶ 20-25).

On April 12, 2023, the District Court found that Regino's filing of the FAC mooted the pending dismissal motion as to Superintendent Staley, but not the Board Members.  In turn, the District Court denied the motion as to Superintendent Staley, but granted the motion with prejudice as to the other defendants.  SER 82-

83.

On April 25, 2023, Superintendent Staley filed a motion to dismiss the FAC under Federal Rule of Civil Procedure 12. ER 30-51.

On July 11, 2023, after the parties had fully briefed the matter and presented their oral arguments, ER 256-267 (Dkt. Nos. 50-54, 56); the District Court granted the dismissal motion with prejudice, ER 4-23. Later that same day, the District Court entered its judgment on the matter. ER 3.

On July 20, 2023, Regino filed her notice of the instant appeal. ER 253-255.

### D. Pertinent Allegations

The FAC includes the following allegations:

51. The District has adopted and implemented the Parental Secrecy Policy—which is set forth in an administrative regulation that was developed, adopted, and implemented by Superintendent Staley and/or her predecessor in office—at all schools within the District. *See* Administrative Regulation #5145.3…. Under [AR 5145.3], which is a policy, practice, procedure, and/or custom of the District, schools in the District will (1) socially transition any student who claims to have a transgender identity and asks to be socially transitioned in the school environment and (2) keep the social transitioning secret from the student's parents unless the student specifically authorizes parental notification. *Id.* at 5–7.
…

55. Ms. Regino's oldest daughter, A.S., is a twelve-year-old girl. During the 2021–2022 school year, A.S. attended fifth grade at [Sierra View]….
…

57. Mandi Robertson was a school counselor at Sierra View. …
…

64. [Around January 2022] A.S. went to Ms. Robertson's office to

13

tell her that she 'felt like a boy' or words of similar effect. Ms. Robertson asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns. A.S. was unsure whether she wanted others at school to start calling her by a male name and pronouns, but she felt pressured by Ms. Robertson, so she responded in the affirmative and told Ms. Robertson her boy's name was "J.S." Ms. Robertson asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not. At the time, A.S. … thought that her mother would be "mad" at her for wanting to identify as a boy. …

…

66.     After the meeting, Ms. Robertson walked A.S. back to her classroom and told her teacher that A.S. was now going by the name "J.S." and male pronouns, and her teacher immediately began referring to her as such. In addition, pursuant to [AR 5145.3] Ms. Robertson and/or A.S.'s teacher arranged for other school personnel to begin referring to A.S. by "J.S." and male pronouns, which they did.

…

68.     Over the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with Ms. Robertson. At these meetings, Ms. Robertson provided A.S. with additional resources regarding her supposed new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing "top surgery" and "breast binding" with her.

69. A.S. told Ms. Robertson that she wanted to tell her mother about her new male identity, but Ms. Robertson was not supportive of this course of action. [Ms. Robertson] … encouraged [A.S.] to speak with other family members before telling her mother.

70. During this time, pursuant to [AR 5145.3], school personnel and students continued referring to A.S. by her new name and pronouns. Every day at school, A.S. was known as "J.S." and referred to with male pronouns, while at home, she remained A.S. …

…

72. On or about April 8, 2022, A.S. told her grandmother about her new gender identity. A.S.'s grandmother informed Ms. Regino of the news later that day.

ER 62-66 (FAC, ¶¶ 51, 55, 57, 64, 66, 68-70, 72; emphasis in original, footnotes omitted).

Based upon these allegations, the FAC raises the following causes of action:

- Count One – 42 U.S.C. § 1983 – Substantive Due Process (Facial Challenge), ER 70-74 (FAC, ¶¶ 99-106);

- Count Two – 42 U.S.C. § 1983 - Substantive Due Process (As Applied Challenge), ER 74-78 (FAC, ¶¶ 107-113);

- Count Three – 42 U.S.C. § 1983 – Procedural Due Process (Facial Challenge), ER 78 (FAC, ¶¶ 114-118);

- Count Four – 42 U.S.C. § 1983 – Procedural Due Process (As Applied Challenge), ER 78-79 (FAC, ¶¶ 119-122);

- Count Five – 42 U.S.C. § 1983 – First Amendment (Facial Challenge), ER 79-80 (FAC, ¶¶ 123-128); and

- Count Six – 42 U.S.C. § 1983 – First Amendment (As Applied Challenge), ER 80 (FAC, ¶¶ 129-133).

## SUMMARY OF ARGUMENT

This case concerns the long-recognized Constitutional right of minors to informational privacy. "This interest … applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002). The informational privacy rights of minors include maintaining the confidentiality of protected information from parents. *Id.* at 786-90; *Planned Parenthood v. Danforth*, 428 U.S. 52, 72-75 (1976).

A minor's gender identity is protected by their informational privacy rights.

*Sterling v. Borough of Minersville*, 232 F.3d 190, 193-96 (3d Cir. 2000) (sexual orientation information, cited with approval in *Nelson v. NASA*, 568 F.3d 1028, 1037 (9th Cir. 2009) (J. Wardlaw concurring); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ. ("J&J Parents")*, 622 F.Supp.3d 118 (D. Md. 2022) (vacated on appeal on standing grounds); ER 7-8 (District Court taking judicial notice), SER 67-81 (Order, *Jane Doe v. Manchester Sch. Dist. et al.*, Case No. 216-2022-CV-00117, at *6-7 (N.H. Superior Court, Hillsborough County, N.D., Sept. 5, 2022)). As such, a minor has the right to keep their gender identities confidential from parents.

Based upon this right, and the State of California's *parens patriae* interest in protecting minors from harm, the CDE published directives several years ago barring school districts from disclosing the gender identities of minors to parents absent extenuating circumstances such as student safety. SER 110-119. Regino disagrees with the public policy of the CDE directives. As such, she now seeks to expand the constitutional right recognized in *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) of parents "to make decisions concerning the care, custody, and control of their children" free from unwarranted intrusion by the State, to newly include both (1) the right to pierce the constitutionally-protected, informational privacy rights of their minor children; and (2) the right to compel state action to accommodate their child-rearing decisions by forcing government agents to divulge the protected gender identity information they possess. However,

16

the federal parental rights recognized by *Troxel* and its progeny are limited to enjoining States from proactively taking steps designed to significantly limit the decisions a parent may make concerning how they personally raise their children. See e.g., *Meyer v. Nebraska*, 262 U.S. 390 (1923) (finding unconstitutional a State law prohibiting parents from having their children taught certain languages in private schools until the children passed eighth grade); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (finding unconstitutional a State law requiring parents to enroll their children in public schools). In other words, these cases concern limiting State power. They do not additionally stand for the proposition that parents hold special power to infringe upon the informational privacy rights of their minor children. One must remember, the Constitution is a charter which limits the powers of the State to interfere with the fundamental rights of individuals. *Afroyim v. Rusk*, 387 U.S. 253, 257-6 (1967). It does not confer new powers upon favored citizens to dominate and infringe upon the rights of others.

Importantly, "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Danforth*, 428 U.S. at 74. The State can legislatively infringe upon those rights, both as to adults and minors alike, so long as it can establish a compelling interest, and devise a narrowly tailored manner of doing so. *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944-45 (9th Cir. 1997). The difference between the protected

gender identity rights of a minor, as compared to an adult, is that given the acknowledged lack of experience, perspective, and judgment of some minors – i.e., those minors who lack the maturity to make their own decisions, courts afford States more leeway when reviewing rules and regulations that permit parents to intrude upon those rights. *Id*. To that end, if the State legislatively enacts a statute authorizing parental access to a minor's gender identity, the Constitution may permit such access if the rule satisfies strict scrutiny judicial review. However, if the State does not legislatively permit parental intrusion upon a minor's protected information, the Constitution does not otherwise compel it. *Cruzan v. Dir., Mo. Dep't. of Health*, 497 U.S. 261, 285-86 (1990).

Finally, with regard to Regino's additional argument that AR 5145.3 violates her familial rights as protected by the First Amendment to the Constitution ("First Amendment"), this Court has generally limited familial relationship claims to instances where a State actor has committed an underlying constitutional violation against one person that affects another with whom the victim had an intimate human relationship. *Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail (Det. Facility)*, 628 Fed.Appx. 527, 528 (9th Cir. 2016). Here, given that the District has not violated any purported Constitutional rights by maintaining the confidentiality of a student's protected gender identity absent exigent circumstances such as student safety, Regino's First Amendment Argument is equally unavailing.

///

## ARGUMENT

**I.  The District Court Correctly Determined that Regino Failed to Plead an Established Liberty Interest in Connection with Her Due Process Claims**

### A. <u>Parents Do Not Hold an "Ultimate Decision-Maker" Liberty Interest Over Matters that Affect the Informational Privacy Rights of their Minor Children</u>

As noted above, Count One of the FAC raises a claim under title 42, United States Code section 1983 ("Section 1983"), alleging that AR 5145.3 facially violates Regino's substantive due process rights.  ER 70-74 (FAC, ¶¶ 99-106). Similarly, Count Two raises a second claim under Section 1983, alleging that the particular manner in which the District applied AR 5145.3 to Regino violated substantive due process.  ER 74-78 (FAC, ¶¶ 107-113).  In tandem therewith, Counts Three and Four raise additional Section 1983 claims asserting that AR 5145.3 violates Regino's procedural due process rights both facially and in the particular manner the District is applying that regulation to her.  ER 78-79 (FAC, ¶¶ 114-122).

In order to state a cognizable substantive due process claim under Section 1983, the complainant must allege a "deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (internal grammatical marks and citation omitted).  This standard equally applies to procedural due process claims.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  Here, Regino alleges that AR 5145.3 deprives her of an alleged liberty interest in being the

19

"ultimate decision-maker" as to which gender her children will identify. She contends that children should have no say in the matter – regardless of their own wishes, and regardless of their own particular levels of maturity:

> [AR 5145.3] *usurps parents' responsibility as the ultimate decision-maker regarding* their children's mental health and well-being, including but not limited to *decisions related to their gender identity* ….

ER 72 (FAC, ¶ 101.f.; emphasis added, quoted language from subparagraph (f)).

Additionally, for the purpose of effectuating this alleged, parental liberty interest, Regino further contends that this Court should interpret the Constitution as imposing a mandatory duty upon public agencies to divulge the gender identities of minors to their parents if the agencies possess such information – even if such disclosure is contrary to the policy preference of the governmental body. ER 74 (FAC, ¶ 104.). However, not only do these arguments ignore well-established, binding precedent that (1) parents do not hold a "veto" liberty interest over the privacy-related decisions of their minor children; but also (2) parents cannot compel State action to accommodate their child-rearing decisions; and (3) minors do in fact have a privacy right to maintain the confidentiality of their sex-related information from parents. Indeed, as the District Court correctly found, "Despite Plaintiff's claims to the contrary, she is advocating for an expansion of her parental substantive due process rights that is not supported by precedent." ER 12.

///

///

## B. The Supreme Court Has Long Rejected the Argument that Parents Hold an Absolute "Veto" Authority Over the Privacy-Related Decisions of their Minor Children

Here, Regino argues that the Constitution provides parents a "veto" over the gender identity decisions of their minor children. However, even when State law has attempted to provide parents such a veto over issues concerning the liberty interests of their children, both the Supreme Court and this Circuit have consistently held that due process requires any such legislation to include (1) a "bypass" which affords minors the opportunity to establish sufficient maturity to make their own decisions – either alone or in consultation with an adult surrogate; and (2) State oversight of the parental veto authority. For example, with regard to the bypass requirement, in *Danforth*, 428 U.S. at 52, the Supreme Court struck down a Missouri state law which had given parents veto authority over any decision by a minor to undergo an abortion. In finding the law unconstitutional, the federal high court counseled, "We agree with appellants and with [lower federal courts] that the State may not impose a blanket provision … requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor…. Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Id.* at 74. In addition, the *Danforth* court expressly

found that "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. … One suggested interest [for providing parents veto authority over a minor's decision to undergo an abortion] is the safeguarding of the family unit and of parental authority.  It is difficult, however, to conclude that providing a parent with absolute power to overrule a determination, made by the physician and his minor patient … will enhance parental authority or control where the minor and the nonconsenting parent are so fundamentally in conflict…. Any independent interest the parent may have … is no more weighty than the right of privacy of the competent minor…." *Id.* at 74-75 (citations omitted).  On account of these findings, "[i]f a state chooses to encourage parental involvement, such as requiring the parental consent of one or both parents, the Supreme Court has held that the state must provide an alternative or bypass procedure." *Lawall*, 307 F.3d at 786.

Similarly, a federal trial court within this Circuit has noted, "when the minor is mature enough to make her own … decisions independent of her parents, the State has no more interest in notifying her parents than it would in notifying the parents of an adult woman -- namely, none." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.Supp.2d 1012, 1019 (D. Idaho 2005).

In short, where a minor establishes that they can make mature decisions alone, or in consultation with a surrogate adult, the State cannot afford parents a

"veto" over the minor's own privacy-related decisions, even when providing such authority is consistent with its policy preferences. *Danforth*, 428 U.S. at 74. Here, notably, AR 5145.3 provides that a minor can only withhold their gender identity from parents upon a surrogate school official determining that maintaining the confidentiality is not harmful to "the student's physical or mental well-being" – a provision consistent with that approved in *Danforth*. SER 124; *Danforth*, 428 U.S. at 74-75.

C. **The Supreme Court Has Long Required State Supervision of Parental Decisions Affecting the Constitutionally-Protected Liberty Interests of Minors**

Similarly, with regard to State oversight of any parental "veto" authority, the Supreme Court has never held that parents hold unfettered discretion over decisions that affect the constitutionally-protected liberty interests of minors. Indeed, in *Parham v. J.R.*, 442 U.S. 584 (1979) (a decision relied upon heavily by Regino in her opening brief), the high court reviewed a Georgia state law which empowered parents to commit their minor children to state-administered, mental health institutions subject to independent review by state officials. Specifically, based upon the attestations of a minor's parents, the Georgia statute permitted a hospital superintendent to temporarily admit a minor for observation. If after the observation, the superintendent independently determined that the minor exhibited evidence of mental illness suitable for treatment, the statute then authorized the superintendent to fully admit the minor "for such period and under such conditions

as may be authorized by law." *Id.* at 587-96. In challenging this Georgia law, the *Parham* plaintiff raised a procedural due process claim, arguing in pertinent part that the temporary admission procedure did not adequately protect a minor's liberty interest against improper incarceration because it did not afford a pre-confinement adversarial hearing. *Id.* at 588, 596-99. In its review of the matter, the Supreme Court recognized that minors do have a liberty interest in protecting themselves against improper incarceration. *Id.* at 600. However, it nonetheless determined that the procedures provided by the Georgia law adequately protected those interests, despite the lack of a pre-confinement adversarial hearing, because parents were not afforded unfettered discretion in the incarceration. "We conclude that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied. … In general, we are satisfied that an independent medical decisionmaking process, which includes the thorough psychiatric investigation described earlier, followed by additional periodic review of a child's condition, will protect children who should not be admitted; we do not believe the risks of error in that process would be significantly reduced by a more formal, judicial-type hearing." *Id.* at 606, 613. In coming to this conclusion, the Supreme Court recognized that "parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations[,]' …

24

rest[ing] on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* at 602 (quoting *Pierce*, 268 U.S. at 535). However, the high court then further counseled, "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized. Moreover, the Court recently declared unconstitutional a state statute that granted parents an absolute veto over a minor child's decision to have an abortion." *Id.* at 603 (citations omitted).

In short, *Parham* did not recognize a new substantive right affording parents "ultimate decision-making" authority over questions affecting the liberty interests of minor children. Rather, as it concerns procedural due process rights, *Parham* simply afforded States leeway in statutorily authorizing parents to make initial decisions affecting the liberty interests of minor children on account of the assumption that parents generally make decisions in the interests of their children – but only so long as those initial decisions are subject to independent review by the State.[5]

---

[5] In a similar vein, Regino mischaracterizes *Wallis v. Spencer*, 202 F.3d 1126, 1141-42 (9th Cir. 2000) and *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) as holding that parents have the right to make important medical decisions for a minor child, regardless of the preferences of that minor. However, as discussed above, such a holding would run afoul of Supreme Court precedent as determined in the abortion context. See e.g., *Danforth*, 428 U.S. at 72-75. Rather, both *Mann* and *Wallis* simply determined that the State cannot coerce minor

### D. **Minors Have an Informational Privacy Right in Maintaining the Confidentiality of their Gender Identity from Parents**

While neither the Supreme Court nor this Court have ever recognized an "ultimate-decision maker" parental right, both have recognized that the Constitution does provide individuals a right of privacy concerning "personal matters." *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977). "This interest, often referred to as the right to 'informational privacy,' applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Lawall*, 307 F. 3d at 789-90 (citations omitted).

In relevant part, this privacy right bars the disclosure of information concerning a minor's sex life to parents. *Sterling*, 232 F.3d at 193-96. In *Sterling*, the United States Court of Appeals for the Third Circuit ("Third Circuit") found that minors have a privacy right to maintain the confidentiality of their sexual orientation, and that schools cannot disclose such information to parents without the minor's consent. *Id.* In doing so, the court found that "[i]t is difficult to imagine a more private matter than one's sexuality…." *Id.* at 196. This Circuit

_____

children to undergo investigatory medical procedures of which they did not initially request, without the consultation of a parent *or* independent judicial surrogate. "We agree with the Second Circuit … that the Constitution assures parents that, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials [absent court approval]." *Wallis*, at 1141 (internal grammatical marks and citation omitted); see also *Mann*, at 1161-62.

has adopted the *Sterling* determination. See e.g., *Nelson,* 568 F.3d at 1037-38 (J. Wardlaw concurring); *Nguon v. Wolf*, 517 F.Supp.2d 1177, 1191 (C.D. Cal. 2007).

In addition, citing this Court's decision in *Fields* that parental rights do not compel the State to accommodate child-rearing decisions,[6] a federal trial court recently acknowledged that the informational privacy rights of minors include the right to keep one's gender identity confidential from parents, as much as it does keeping one's sexual orientation private. *J&J Parents*, 622 F.Supp.3d at 118 (vacated on appeal on standing grounds). In doing so, coextensive with the grounds announced by the CDE for its own directives, the *J&J Parents* court counseled that maintaining a "student's gender identity confidential unless and until that student consents to disclosure … both protect[s] the student's privacy and create[s] … a zone of protection . . . in the hopefully rare circumstance when disclosure of the student's gender expression while at school could lead to serious conflict within the family, and even harm." *Id.* at 138-39 (internal grammatical marks omitted).

In similar fashion, a month after the *J&J Parents* decision, a New Hampshire Superior Court likewise expressly found that minors have a privacy right to maintain the confidentiality of their gender identity. Noting that this privacy right corresponds with similar rights recognized by federal courts – such as the right of minors to keep confidential their conversations with school counselors,

---

[6] *Fields* is discussed in greater detail below.

*Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 Fed.Appx. 50, 53-54 (7th Cir. 2007), as well as their use of a school's birth control clinic, *Doe v. Irwin*, 615 F.2d 1162, 1168-69 (6th Cir. 1980), the New Hampshire court emphasized that "the Policy does not prevent parents from observing their children's behavior…; talking to their children; providing religious or other education to their children; choosing where their children live and go to school; obtaining medical care and counseling for their children; monitoring their children's communications…; choosing with whom the children socialize; and deciding what their children may do in their free time. In short, the Policy places no limits on the plaintiff's ability to parent her child as she sees fit." SER 74 (Order, *Manchester Sch. Dist.*, Case No. 216-2022-CV-00117, at *7).

Likewise, as discussed above, both the Supreme Court and this Court have determined that minors have an informational privacy right in maintaining the confidentiality of undergoing medical treatments from their parents, such as abortions. *Danforth,* 428 U.S. at 72-75; *Lawall*, 307 F.3d at 786-90. Therefore, even assuming *arguendo* that Regino is correct in her contention that the mere recognition of a student's gender identity is a form of medical treatment,[7] the disclosure of that purported treatment is still protected by the student's informational privacy interests.

---

[7] As discussed below, such recognition does not actually amount to "medical treatment."

In short, notwithstanding the constitutionally-protected rights of parents to make decisions concerning the care, custody, and control of children free from governmental intrusion, parents do not additionally have the constitutional authority to themselves infringe upon the informational privacy rights of their minor children. Parental rights regarding child-rearing concern the relationship between parents and the State. Informational privacy rights regarding gender identity, on the other hand, concern the relationship between minors and parents. The Constitution regulates the State from intruding upon the rights of parents. *Brentwood Acad.,* 531 U.S. at 295. It does not, however, additionally confer a favored status upon parents, authorizing them to infringe upon the constitutional rights of their children.

### E. <u>Parental Rights on Childrearing Do Not Afford Parents the Authority to Compel State Action</u>

With regard to Regino's argument that public school districts should be compelled to disclose gender identity information to parents, the Constitution does not afford parents the right to compel State action to accommodate their child-rearing decisions. To that end, despite the fact that *Parham* concerned a procedural due process inquiry – not a question of substantive rights, and despite the fact that the case concerned a State statute empowering parents with authority over their minor children – not a claim of parental rights arising from the Constitution itself, and despite the fact that the opinion expressly provided that

States have the authority to control the amount of parental discretion exercised, parents have cited *Parham* for the proposition that they are the "ultimate decision-makers" for their minor children, and that such an alleged right includes the authority to compel State action to accommodate their child-rearing decisions. However, the Supreme Court has already rejected this argument. In *Cruzan*, the Court reviewed whether a public agency must accede to the decisions of those persons claiming guardianship over an incapacitated adult. In rejecting the contention, the Supreme Court held: "Petitioners alternatively contend that [a State] must accept the 'substituted judgment' of close family members even in the absence of substantial proof that their views reflect the views of the patient. They rely primarily upon our decision[] in ... *Parham*[]. But we do not think the[] case[] support[s] their claim. In ... *Parham*, where the patient was a minor, we … upheld the constitutionality of a state scheme in which parents made certain decisions for mentally ill minors. Here … petitioners would seek to turn a decision which *allowed* a State to rely on family decisionmaking into a constitutional *requirement* that the State recognize such decisionmaking. But constitutional law does not work that way." 497 U.S. at 285-86 (emphasis added, emphasis in original omitted); see also *L.W. v. Skrmetti*, 83 F. 4th 460, 476-77 (6th Cir. 2023) (*Parham* was a procedural due process decision that did not recognize new substantive parental rights).

Indeed, the fact that parental rights do not afford parents the authority to

compel State action to accommodate their child-rearing decisions was litigated in *Fields,* 427 F.3d at 1206. In *Fields*, parents argued that a sex-related survey circulated to students by a public school district violated their parental rights to control the upbringing of their children. However, while recognizing that parents hold a liberty interest in making decisions concerning the care, custody, and control of their children, *id.* at 1203-04; this Court explained that "once parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished," and "they do not have a fundamental right generally to direct *how* a public school teaches their child," *id.* at 1206 (emphasis in original; rejecting a substantive due process challenge to a public school's questioning of children about sexual topics). In particular, this Court determined, "We also hold that parents have no due process or privacy right to override the determinations of public schools as to the information to which their children will be exposed while enrolled as students." *Id.*, at 1200.

Consistent with *Fields*, the District Court below quoted from *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981) in finding, "On the Regulation's face, it is undisputable that the decision to openly express a transgender identity through the use of a different name and pronouns is made by the student, not the District; and Plaintiff has failed to demonstrate that the Court has the authority under substantive due process to direct the District's

response to such a decision on the grounds that her parental rights apply. Federal courts are 'courts of limited jurisdiction that have not been vested with open-ended lawmaking powers,' so in the absence of an established constitutional right, the legislature is best suited to address Plaintiff's concerns." ER 13 (footnote omitted).

In short, while the parental rights protected by the Constitution significantly restrict States from infringing upon the decisions parents make concerning how they will personally care for their children, it does not additionally afford parents the right to restrict the decisions States make as to how governmental actors will perform their public duties – even when those public duties include interaction with a parent's minor children.

## F. Accommodating Social Transitioning Decisions Does Not Amount to "Medical Treatment"

Regino expends a significant portion of her brief alleging that AR 5145.3 constitutes the District, itself, "socially transitioning" a child; and that such "transitioning" constitutes the provision of medical treatment for which parental consent is required. However, aside from the fact that the Constitution does not necessarily require parental consent for medical treatment – including abortions as discussed above, federal courts have long rejected both (1) Regino's definition of "social transitioning" and (2) her assertion that a third-party's recognition of a person's non-conforming gender identity constitutes medical treatment. As to the

former, "[s]ocial transition entails a transgender individual living in accordance with their gender identity in all aspects of life (e.g., wearing certain clothing, following particular grooming practices, and using pronouns consistent with that individual's gender identity)." *M.H. v. Jeppesen*, 2023 U.S. Dist. LEXIS 108023, *3 (D. Idaho June 20, 2023). In other words, "social transitioning" is the decision and action of the transgender person themself – not a third party. Rather, a third party recognizing one's social transitioning decisions is a form of "accommodating" or "facilitating" those choices. *Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020); *Janiah v. Meeks*, 584 F.Supp.3d 643, 647, 666-68 (S.D. Ill. 2022).

In turn, with regard to whether accommodating the social transitioning decisions of a transgender person constitutes "medical treatment," the United States Court of Appeal for the Fourth Circuit has expressly determined, "Being transgender is … not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (internal grammatical marks and citation omitted). Indeed, while social transitioning may

///

///

///

potentially be prescribed as a treatment for gender dysphoria[8] or other disorders,

see e.g., *Edmo v. Corizon, Inc.* 935 F.3d 757, 769-70 (9th Cir. 2019); the act of

social transitioning itself is not necessarily a device to affect the medical nor

psychological state of a person.  In other words, simply because social

transitioning can be used as a treatment in some cases does not mean every

instance of transitioning is a medical event.  Sometimes it is simply a life choice

devoid of any medical connection.  For example, in a similar case where a parent

accused a school district of improperly providing "medical treatment" to their child

by accommodating the student's social transitioning decisions, the federal trial

court in *Foote v. Town of Ludlow*, 2022 U.S. Dist. LEXIS 236102, (D. Mass. Dec.

14, 2022) noted, "Gender dysphoria is a recognized mental health disorder, but

Plaintiffs have not alleged either child has been diagnosed with gender dysphoria,

or even that Defendants erroneously believed the children suffered from gender

dysphoria.  [Citation.]  Plaintiffs have not alleged Defendants' actions were

undertaken as part of a treatment plan for gender dysphoria or explained how

referring to a person by their preferred name and pronouns, which requires no

special training or skill, has clinical significance when there is no treatment plan or

---

[8] Separate and distinct from simply being transgender, "gender dysphoria" is
"[d]istress that is caused by a discrepancy between a person's gender identity and
that person's sex assigned at birth…." *Edmo*, 935 F.3d at 768 (quoting from World
Prof'l Ass'n for Transgender Health¸ *Standards of Care for the Health of
Transsexual, transgender, and Gender-Nonconforming People*, 2 (7th ed. 2011)
("WPATH")).

diagnosis in place." *Id.* at *15.

Likewise, here, the FAC does not allege that A.S. suffered from gender dysphoria. Rather, Regino asserts that her daughter was simply suffering from "a confluence of factors, including the stress of other external difficulties…." ER 55 (FAC, ¶ 9). Nor, here, does the FAC allege that the District accommodated A.S.'s social transitioning decision as the result of any treatment plan. Instead, Regino acknowledges that the accommodation was made due to the non-discretionary requirements of an administrative regulation applied to the entire student body. ER 53-54 (FAC, ¶ 3). Accordingly, as concluded by the *Foote* court, "Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally, and, more specifically, in … public schools where discrimination on the basis of gender identity is not permitted. … In the absence of supporting factual allegations, such as a relevant medically-recognized diagnosis and treatment plan, the court disregards Plaintiffs' conclusory statements describing the use of preferred names and pronouns as mental health treatment. Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment to [students] simply by honoring their requests to use preferred names and pronouns at school. Accordingly, Plaintiffs have not adequately stated a claim that Defendants usurped their right to make medical and mental health treatment decisions for their children." *Id.* at *16 (citations omitted).

### G. A Parental "Ultimate Decision-Maker" Right Over Minor Children Has No Roots in this Nation's History and Tradition

This Court has recognized that when determining the existence of any new fundamental right in the context of substantive due process, courts must follow the standard set forth in *Washington v. Glucksberg*, 521 U.S. 702 (1997). "The Supreme Court has admonished that [courts] must be wary of recognizing new substantive due process rights 'lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences' of judges. *Washington v. Glucksberg*[]. Before recognizing a substantive due process right, the Court requires 'a careful description' of the asserted right and then a determination that it is 'deeply rooted in this Nation's history and tradition.'" *Sinclair v. City of Seattle*, 61 F.4th 674, 685 (9th Cir. 2023) (J. Nelson concurring, citations omitted); see also *Fields*, 427 F.3d at 1203-04; *Khachatryan v. Blinken,* 4 F.4th 841, 856 (9th Cir. 2021).[9]

To that end, determining whether an asserted fundamental right is "deeply rooted in this Nation's history and tradition" does not include turning a blind eye to all legislative, jurisprudent, and morality shifts that have occurred over time, and where history shows that the law on a particular matter has shifted through the years, such impermanence "demonstrates, at a minimum, that any liberty interest

---

[9] Notably, the only exception the United States Supreme Court has recognized to the standards set forth in *Glucksberg* is "with respect to the right to marry and the rights of gays and lesbians." *Khachatryan,* 4 F. 4th at 856.

[concerning the matter] has shallow roots. And given the deep foundation of the political branches' plenary authority…, we shouldn't let such sparse evidence define a new substantive right." *Munoz v. United States Dep't of State*, 73 F.4th 769, 784 (9th Cir. 2019) (J. Bumatay, joined by J. Callahan, J. Ikuta, J. Bennett, J. Nelson, J. Bade, J. Vandyke, J. Collins, J. Lee, and J. Bress, dissenting denial of en banc review); see also *Linsangan v. United States*, 2021 U.S. App. LEXIS 37902, *2-3 (9th Cir. 2021).

Here, while seventeenth century philosophers may have described the interrelation between child and parent as the equivalent of that between slave and master;[10] legislative, jurisprudent and moral stances on the relationship have significantly shifted over the past four hundred years – as illustrated by *Danforth*. In short, any contention that parents should have unfettered authority over their minor children because of the long-deserted ways parents used to dominate their

---

[10] Hugo Grotius made such a comparison (as well as a justification for slavery) in the very same *The Rights of War and Peace* cited by amicus curiae as another historical source from which they believe this Court should determine one's fundamental liberty rights. Hugo Grotius, *The Rights of War and Peace* (A.C. Campbell, A.M. ed., 1901), Book 1, Ch. I, Prt. V, p. 19 (child-slave comparison); Book 3, Ch. VII, pp. 345-347 (justification for slavery). Likewise, in a similar vein, in the very same *Commentaries of the Laws of England* cited by Regino as a historical source from which she believes this Court should determine one's fundamental liberty rights, William Blackstone commented that homosexual sodomy constituted a "crime against nature" of "still deeper malignity" than rape, and deserving of capital punishment. William Blackstone, *Commentaries on the Laws of England. Book The Fourth*, (Univ. Chicago Press, ed., 1979) Ch. 15, Prt. IV., pp. 215-16.

children during times preceding the Declaration of Independence, is based upon nothing more than a history of impermanence for which this Court "shouldn't let such sparse evidence define a new substantive right." *Munoz*, at 784.

Moreover, as the District Court correctly determined, "None of the cases cited by Plaintiff opine on whether the state has an affirmative duty to inform parents of their child's transgender identity nor whether the state must obtain parental consent before referring to a transgender child by their preferred name and pronouns." ER 12; see also *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs*, 2023 U.S. Dist. LEXIS 113818, *33-34 (D. Wy. June 30, 2023) ("In regard to the Preferred Names Policy, to support an intrusion of the Willeys' fundamental parental rights, this Court would have to significantly expand the contours of the parental rights articulated in *Meyer* and *Pierce*. Such expansion would be at odds with *Dobbs'* and *Glucksberg's* warning that courts must proceed with the upmost care in breaking new ground in the field of substantive due process rights.")

Indeed, for nearly two decades this Court has held, "It is clear … that no court has ever held that parents have a specific fundamental right 'to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs.' In fact, no such specific right can be found in the deep roots of the nation's history and tradition or implied in the concept of ordered liberty." *Fields*, 427 F.3d at 1203-04. Moreover, while the Supreme Court has held that the right of parents to make decisions

concerning the care, custody, and control of their minor children is a fundamental liberty interest, *Troxel*, 530 U.S. at 66 (plurality opinion); this Court has counseled that said right is limited, and "does not reside [with parents] *exclusively*, nor is it beyond regulation by the state in the pubic interest." *Fields*, at 1204 (emphasis in original, internal grammatical marks omitted). Indeed, for nearly 80 years, the Supreme Court has counseled, "But the family itself is not beyond regulation in the public interest, … [a]nd neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. … [T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) (citations omitted).

### H. <u>Any Parental "Veto" Authority Would Be Untenable</u>

As illustrated above, minors, even so-called "immature" minors, are protected by the Constitution. "A child, merely on account of his minority, is not beyond the protection of the Constitution. As the Court said in *In re Gault*, 387 U.S. 1, 13 (1967), 'whatever may be their precise impact, neither the Fourteenth

Amendment nor the Bill of Rights is for adults alone.'" *Bellotti v. Baird*, 443 U.S. 622, 633 (1979). "The Court's concern for the vulnerability of children is demonstrated in its decisions dealing with minors' claims to constitutional protection against deprivations of liberty or property interests by the State. With respect to many of these claims, we have concluded that the child's right is virtually coextensive with that of an adult." *Id.* at 634. Given these constitutional protections, while at the same time "recogni[zing] that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," the Supreme Court "has held that the States validly *may* limit the freedom of children to choose for themselves in the making of important affirmative choices with potentially serious consequences," but only if the limitation survives strict judicial scrutiny. *Id.* at 635 (quoted language, emphasis added); *Nunez by Nunez*, 114 F.3d at 945-46 (strict scrutiny). In turn, as discussed in *Cruzan*, the fact that the Constitution *permits* States to afford parents such extra authority over minors, does not constitute a *mandate* to do so. 497 U.S. at 285-86.

In other words, the gender identity of a minor is subject to the same privacy protections of the Constitution as that of an adult. In both instances, the State can legislatively infringe upon those rights only if it can establish a compelling interest, and devise a narrowly tailored manner of doing so. The difference between the protected gender identity rights of a minor, as compared to an adult, is that given

the acknowledged lack of experience, perspective, and judgment of some minors – i.e., those minors who lack the maturity to make their own decisions, courts afford States more leeway when reviewing rules and regulations that permit parents to intrude upon those rights. To that end, if the State legislatively enacts a statute authorizing parental access to a minor's gender identity, the Constitution may permit such access if the rule satisfies strict scrutiny judicial review. However, if the State does not legislatively permit parental intrusion upon a minor's protected information, the Constitution does not otherwise compel it.

Indeed, the complications inherent in the type of "ultimate decision-maker" veto power championed by Regino exemplify how such authority is inundated with public policy considerations, not Constitutional principles. For example, as the Supreme Court noted in *Danforth*, "The dissenting [district court] judge observed that one could not seriously argue that a minor must submit to an abortion if her parents insist…." 428 U.S. at 73. Likewise, here, *one could not seriously argue that Regino could force her daughter – assigned as a female at birth – to change her gender identity against her own will, and start identifying as a male.* Accordingly, *is the "ultimate decision-maker" authority a one-way street*?

Similarly, we assume that Regino believes *both* parents share the "ultimate decision-maker" authority. Yet, what happens in the circumstance where the parents disagree on the gender identity of their child. Who prevails – the most stubborn? Or, does the Constitution require that the federal courts must decide?

These unanswered questions are not proffered to debate whether the type of parental veto championed by Regino is a "good idea," but rather to highlight the policy preference implications necessarily engrained in any determination as to how much, if any, parental authority should be afforded, and why such questions are naturally – and constitutionally – left to the purview of legislators, not judicial officers. Likewise, these questions are further proffered to highlight the dangers of the unintended consequences of expanding parental constitutional rights in this area.

For all of these reasons, the District Court correctly found that Regino failed to plead the deprivation of an established liberty interest protected by the Constitution when she alleged that AR 5145.3 deprives her of a purported, unfettered right to determine the gender identity of her minor children.

## II. The District Court Correctly Determined that AR 5145.3 Satisfies Rational Basis Review

When a substantive due process claim does not involve a fundamental right, rational basis review applies. *Witt v. Dep't. of the Air Force*, 527 F.3d 806, 817 (9th Cir. 2008). Rational basis review also applies where a procedural due process claim challenges a legislative act which does not infringe upon fundamental rights. *Franceschi v. Yee*, 887 F.3d 927, 939 (9th Cir. 2018). Whereas, for the reasons discussed above, Regino's substantive and procedural due process claims do not concern a fundamental right, the District Court correctly determined that rational

basis review applies to AR 5145.3.

To that end, rational basis review only requires the rule in question to bear a "reasonable relation to a legitimate state interest." *Glucksberg*, 521 U.S. at 722. Here, as discussed in *J&J Parents*, 622 F.Supp.3d at 136-39, the District has a legitimate state interest to protect the student's privacy and create a zone of protection from potential harm if the student's gender identity is revealed without the student's consent. In turn, maintaining the confidentiality of a student's gender identity has a reasonable relationship with that interest. Indeed, as the District Court correctly determined, "[The District] has demonstrated a legitimate state interest in creating a zone of protection for transgender students and those questioning their gender identity from adverse hostile reactions, including, but not limited to, domestic abuse and bullying; this is in line with the Regulation's general purpose to combat discrimination and harassment against students." ER 14. Additionally, again, the confidentiality provisions of AR 5145.3 apply on a case-by-case basis accounting for "the physical or mental well-being" of the child.

### III. Regino Failed to Plead a Cognizable Executive Abuse of Power Which "Shocks the Conscience"

Aside from pleading the deprivation of a life, liberty, or property interest protected by the Constitution, any substantive due process claim must also plead a "cognizable level of executive abuse of power as that which shocks the conscience." *Brittain*, 451 F.3d at 991 (internal grammatical marks and citation

omitted).  "[I]n order to establish a constitutional violation based on substantive due process, [a complainant] must show *both* a deprivation of her liberty and conscience shocking behavior by the government."  *Id.* at 991 (emphasis added, footnote omitted).

Given the District Court had already determined that Regino failed to plead the deprivation of a life, liberty, or property interest, it did not reach the subsequent question of whether Regino had also pled sufficient facts to satisfy the "shocks the conscience" standard.  Nonetheless, this Court has expressly held that "we consider conduct to be conscience-shocking if it was taken with deliberate indifference toward a plaintiff's constitutional rights."  *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Here, as discussed above, controlling case precedent has long held that students have an informational privacy interest, especially as it concerns matters of sex.  In addition, this Court has long held that the State has a *parens patriae* interest in protecting minors from domestic violence, *Mueller v. Auker*, 700 F.3d 1180, 1186-87 (9th Cir. 2012).  Again, as articulated in *J&J Parents*, maintaining a "student's gender identity confidential unless and until that student consents to disclosure … create[s] …a zone of protection . . . in the hopefully rare

circumstance when disclosure of the student's gender expression while at school could lead to serious conflict within the family, and even harm." 622 F.Supp.3d at 138-39. Indeed, as quoted above, the underlying CDE directives expressly provide this very reason for its directive on the question of gender identity confidentiality: "A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home. Revealing a student's gender identity or expression to others may compromise the student's safety. Thus, preserving a student's privacy is of the utmost importance." SER 114. Thus, given (1) the *parens patriae* governmental interest in protecting minors from domestic violence, (2) the design of AR 5145.3 to protect minors from potential domestic violence, (3) the long-standing case precedent protecting the informational privacy of minors concerning their sex lives, (4) AR 5145.3 expressly providing that District employees will approach students to discuss potentially disclosing their gender identities to their parents – and provide support services to students who agree to do so, and (5) Regino's failure to plead any facts suggesting the District adopted AR 5145.3 with an intention other than that expressed in the underlying CDE directives, the pleading wholly fails to allege facts of any "deliberate indifference toward a [parent's] constitutional rights" by the District in adopting and enforcing the regulation in question. Indeed, as the District Court correctly noted, "the sections of the Regulation at issue in the instant case are not proactive, but reactive; District staff are not directed to force students

45

to adopt transgender identities or keep their identities secret from their parents. Instead, District staff are directed to affirm a student's expressed identity and pronouns and disclose that information only to those the student wishes, with an exception for the student's health."  ER 13.

For this additional reason – the failure to allege conduct which "shocks the conscience," Regino failed to plead sufficient facts to raise valid substantive due process claims in Counts One and Two of the FAC.

## IV.   Regino Failed to Plead Facts Establishing that AR 5145.3 Violates the Constitution in Every Circumstance

In addition to pleading the deprivation of a life, liberty, or property interest, and in addition to further pleading an abuse of power which shocks the conscience, any facial substantive due process claim must also plead facts establishing that the governmental policy in question could never be valid under any circumstance.  "A facial challenge to a [policy] is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [policy] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Here, similar to the "shock the conscience" standard, the District Court did not reach the question of whether Regino's facial substantive due process claim sufficiently pled facts establishing that AR 5145.3 could never be valid under any circumstance.  On that question, however, Regino cannot meet this pleading

standard for several reasons.  First, not all students are minors.  It is axiomatic that parents do not have the right to decide the gender identity of their adult children.

Second, as discussed above, a parent has no Constitutional right to make decisions concerning the liberty interests of their minor child if that minor demonstrates a sufficient level of maturity.  *Danforth*, 428 U.S. at 74.

Third, unquestionably, there are potential circumstances in which disclosing a student's gender identity to a particular parent will "lead to serious conflict within the family, and even harm," as found in *J&J Parents*, 622 F.Supp.3d at 139 (internal grammatical marks omitted).  There is no reasonable dispute that AR 5145.3 could be enforced in a valid manner in connection with such circumstances, as well.

In short, Regino cannot establish that AR 5145.3 would be invalid under all circumstances; and therefore, for this additional reason, Regino failed to plead sufficient facts to raise the facial, substantive due process claim in Count One of the FAC.

### V.    The District Court Correctly Determined that Regino Failed to Plead Facts Establishing that the District Applied AR 5145.3 to Her in a Manner that Violated the Constitution

In connection with Count Two of the FAC, an "as-applied attack … challenges only … a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can separate valid from invalid subrules or applications."  *Hoye v. City of Oakland*, 653

F.3d 835, 857 (9th Cir. 2011) (internal grammatical marks and citation omitted).

Here, with regard to how the District specifically applied AR 5145.3 to Regino, the FAC first alleges that the District instructed its students to "explore their sexual identities and consider whether they felt like they were not the gender associated with their sex." ER 63 (FAC, ¶ 58); see also ER 65 (FAC, ¶ 67). Again, however, as discussed above, a school's curriculum choices do not interfere with parental rights. *Fields*, 427 F. 3d at 1206.

From there, the FAC admits that A.S. "began feeling like she might be a boy." ER 64 (FAC, ¶ 60). Notably, the FAC does not allege that it was the District who instructed or suggested to A.S. that she "might be a boy." The FAC then admits that "A.S. went to Ms. Robertson's office to tell her that she 'felt like a boy' or words of similar effect." ER 64 (FAC, ¶ 64). In other words, the pleading admits that it was A.S. who approached District personnel regarding her gender identity, not vice-versa.

Next, the pleading admits that Ms. Robertson responded by simply "ask[ing] A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns." ER 64 (FAC, ¶ 64). Notably, the FAC does not allege that Ms. Robertson directed A.S. that she must do so. While the FAC alleges that A.S. "felt pressured" by this simple request, nothing in the FAC suggests that Ms. Robertson's question would "shock the conscience" – especially in light of the CDE guidance requiring school districts to address

48

transgender students in the manner the student prefers.  ER 64-65 (FAC, ¶ 64).

The FAC then admits that A.S. "responded in the affirmative and told Ms. Robertson her boy's name was 'J.S.'"  ER 65 (FAC, ¶ 64).  *In other words, A.S. had already chosen her own gender identity, not the District.* The FAC then provides that "[a]fter the meeting, Ms. Robertson walked A.S. to her class and told her teacher that A.S. was now going by the name 'J.S.' and male pronouns, and her teacher immediately began referring to her as such," in line with the CDE directives and AR 5145.3 requirements. ER 65 (FAC, ¶ 66).

In addition, the FAC alleges that "[o]ver the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with Ms. Robertson. At these meetings, Ms. Robertson provided A.S. with additional resources regarding her new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing 'top surgery' and 'breast binding' with her."  ER 65 (FAC, ¶ 68, footnotes omitted). Notably, however, as to the former, the pleading merely alleges that Ms. Robertson notified A.S. of a local community group to which she might be interested. The FAC does not allege that Ms. Robertson directed A.S. to join, visit, or even review the group as a mandatory requirement. As to the latter, the pleading notably does not allege who started the purported conversations regarding "top surgery" and "breast binding;" how brief those discussions may have been; nor, if Ms. Robertson's contribution to the conversations included anything more than general support for

A.S.

With regard to maintaining the confidentiality of A.S.'s gender identity, the FAC admits that during the same meeting in which A.S. advised Mr. Robertson that she "felt like a boy," "Ms. Robertson asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not. At the time, A.S. … thought that her mother would be 'mad' at her for wanting to identify as a boy." ER 65 (FAC, ¶ 64). In other words, it was A.S. who directed the District to keep their gender identity confidential from Regino, not the other way around – and A.S. did so out of fear of her mother. The FAC then alleges that a few months later "A.S. told Ms. Robertson that she wanted to tell her mother about her new male identity, but Ms. Robertson was not supportive of this course of action. [Ms. Robertson] … *encouraged* [A.S.] to speak with other family members *before* telling her mother. … On or about April 8, 2022, A.S. told her grandmother about her new gender identity. A.S.'s grandmother informed [Regino] of the news later that day." ER 66 (FAC, ¶¶ 69, 72 (emphasis added)). Notably, the pleading does not allege that the District directed, nor even advised, A.S. to keep their gender identity secret from Regino. Rather, the FAC admits that the District simply "*encouraged*" A.S. to "speak with other family members *before* telling her mother," with the unsurprising result that those family members notified Regino before A.S. did so. Again, the District has a *parens patriae* interest in protecting its students from hostile reactions by family members – and, again, "[a]t the time,

A.S. ... thought that her mother would be 'mad' at her for wanting to identify as a boy." ER 65 (FAC, ¶ 64).

Thus, in short, none of the allegations set forth in the FAC establish that the District enforced AR 5145.3 in any way divergent from that set forth in the text of the regulation; nor, do the pleadings raise any allegations of District personnel acting in a way that would "shock the conscious." Indeed, as the District Court found, "Plaintiff does not directly contest Defendant's arguments in her opposition brief and the Court finds that Plaintiff has failed to allege sufficient facts to support her as-applied challenge." ER 15.

As such, Regino failed to plead sufficient facts to raise a valid as-applied, substantive due process claim in Count Two of the FAC.

## VI. Regino Failed to Plead Facts Establishing that the Legislative Process in which the District Adopted AR 5145.3 Failed to Comport with Due Process

As noted above, Counts Three and Four of the FAC raise additional Section 1983 claims asserting facial and as-applied violations of Regino's procedural due process rights. ER 78-79 (FAC, ¶¶ 114-122). However, "[t]he first inquiry in every [procedural] due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Sullivan*, 526 U.S. at 59. "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Id.* To that end, the District Court correctly dismissed Counts Three and Four based upon its finding that AR 5145.3 does not

infringe upon Regino's alleged, federal parental rights.

Given this determination, the District Court did not reach the subsequent question of whether Regino alleged facts establishing that the District's procedures were insufficient. Nonetheless, on that question, the Supreme Court has long held that when a public entity deprives a person of a liberty interest through legislative action, that person is not entitled to any procedural due process beyond the standard legislative process. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915). This determination has been repeatedly followed by this Circuit. See e.g., *Nev. Rest. Servs. v. Clark Cnty.*, 638 Fed.Appx. 590, 592 (9th Cir. 2016). "[G]overnmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994).

Here, the FAC lacks any allegation that the District adopted AR 5145.3 in an improper manner. See generally, FAC. Accordingly, on this additional ground, Regino failed to plead sufficient facts to raise valid procedural due process claims in Counts Three and Four of the FAC.

## VII.    The District Court Correctly Determined that Regino Failed to Plead an Established Familial Association Right Protected by the Constitution

Finally, Counts Five and Six of the FAC raise facial and as-applied claims

under Section 1983, respectively, contending that AR 5145.3 violates Regino's "intimate human relationship" rights protected by the First Amendment to the United States Constitution ("First Amendment").  ER 79-80 (FAC, ¶¶ 123-133). The Supreme Court has recognized a right to "enter into and maintain certain intimate human relationships" free from "undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). A parent-child relationship is one such protected relationship. *Wallis,* 202 F.3d at 1136.  This familial relationship right is protected by both the First Amendment and the Fourteenth Amendment to the United States Constitution ("Fourteenth Amendment").  *Keates v. Koile*, 883 F.3d 1228, 1235-36 (9th Cir. 2018).  To that end, this Court has determined that the same elements apply to intimate familial relationship claims regardless of whether the action is brought under the First or Fourteenth Amendments.  *Mann v. City of Sacramento*, 748 Fed.Appx. 112, 115 (9th Cir. 2018) [applying Fourteenth Amendment liberty interest analysis to familial relationship claim raised under First Amendment].  Specifically, a complainant must establish (1) the deprivation of that person's constitutionally-protected liberty interest in companionship and society; and (2) State conduct that "shocks the conscience." *Willkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

With regard to the first element, familial relationship claims are generally limited to instances where a State actor has committed an underlying constitutional violation against one person that has allegedly affected another with whom the

victim had an "intimate human relationship." *Schwarz,* 628 Fed.Appx. at 528 (9th Cir. 2016). For this reason, familial relationship claims have typically been limited to instances such as (1) excessive force causing mental injuries to parent, *Ovando v. City of Los Angeles*, 92 F.Supp.2d 1011, 1021 (C.D. Cal. 2000); (2) molestation of a child, *Doe v. Dickenson*, 615 F.Supp.2d 1002, 1014 (D. Ariz. 2009); (3) published, defamatory accusations made against a parent, *Bohn v. Dakota Cnty.*, 772 F. 2d 1433, 1436 n.4 (8th Cir. 1985); (4) coercing students to undergo abortions, *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989); and (5) compelling students to take pregnancy tests, *Gruenke v. Seip*, 225 F.3d 290, 304-07 (3d Cir. 2000). Federal courts have also found violations in the contexts of: (6) State action infringing upon the right of a parent and child to physically live and/or congregate together, see e.g., *Hameetman v. City of Chicago*, 776 F.2d 636, 642 (7th Cir. 1985); and (7) retaliation suffered by a parent or child on account of the other's conduct, see e.g., *Agostino v. Simpson*, 2012 U.S. Dist. LEXIS 207375, *26-27 (S.D.N.Y. Mar. 29, 2012).

Here, for the reasons set forth above, Regino does not allege the violation of any cognizable, constitutional right. Indeed, the District Court correctly observed, "Plaintiff has cited to no controlling authority that suggests that a policy that forbids disclosure of a student's gender identity absent their consent constitutes unwarranted interference in the parent-child relationship." ER 20. Moreover, as also discussed above, the acts allegedly committed by the District significantly fail

the "shocks the conscious" standard. To this end, the District Court further found, correctly, "The Regulation only governs the conduct of District staff with respect to how students wish to be addressed. Nothing in the Regulation prohibits or discourages students and their parents from associating with each other. To the contrary, in the context of the instant case, the Regulation refrains from interfering with the established parent-child relationship by allowing students to disclose their gender identity to their parents on their own terms." ER 20. Thus, far from proactively interfering in the parent-child relationship, AR 5145.3 simply preserves the status quo of the minor choosing to maintain the confidentiality of their gender identity from their parents – conduct significantly short of "shocking the conscience."

Finally, Regino fails to allege that the purported conduct included any physical separation from her children; nor, do the allegations allege any act of retaliation.

Accordingly, as the District Court correctly concluded, Regino failed to plead sufficient facts to raise a valid familial relationship claims in Counts Five and Six of the FAC.

///

///

///

///

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court

order granting Superintendent Staley's motion to dismiss.

DATED:  January 2, 2024       /s/ Jimmie E. Johnson       
                                       JIMMIE E. JOHNSON
                                       *Attorneys for Defendant-Appellee*
                                       KELLY STALEY

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-16031

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

(○) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

(○) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Jimmie E. Johnson      **Date** | 01/02/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                      *New 12/01/2018*

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Chico Unified School District Administrative Regulation 5145.3 ......    A1



**Chico Unified School District**
*1163 East Seventh Street, Chico, CA 95928-5999*
*(530) 891-3000*

| Administrative Regulation: | #5145.3 |
| Section: 5000 | Students |
| | Page 1 of 7 |

_____

**Nondiscrimination/Harassment**

The district designates the individual(s) identified below as the employee(s) responsible for coordinating the district's efforts to comply with applicable state and federal civil rights laws, and to answer inquiries regarding the district's nondiscrimination policies. The individual(s) shall also serve as the compliance officer(s) specified in AR 1312.3 - Uniform Complaint Procedures as the responsible employee to handle complaints alleging unlawful discrimination targeting a student, including discriminatory harassment, intimidation, or bullying, based on the student's actual or perceived race, color, ancestry, nationality, national origin, immigration status, ethnic group identification, ethnicity, age, religion, marital status, pregnancy, parental status, physical or mental disability, medical condition, sex, sexual orientation, gender, gender identity, gender expression, genetic information, or any other legally protected status or association with a person or group with one or more of these actual or perceived characteristics.. The coordinator/compliance officer(s) may be contacted at: (Education Code 234.1; 5 CCR 4621)

Kristine Keene
Director of State and Federal Programs
1163 East Seventh St.
Chico, CA 95928
(530) 891-3000

*(cf. 1312.1 - Complaints Concerning District Employees)*
*(cf. 1312.3 - Uniform Complaint Procedures)*
*(cf. 5145.7 - Sexual Harassment)*
*(cf. 5145.71 - Title IX Sexual Harassment Complaint Procedures)*

**Measures to Prevent Discrimination**

To prevent unlawful discrimination, including discriminatory harassment, intimidation, retaliation, and bullying, of students at district schools or in school activities and to ensure equal access of all students to the educational program, the Superintendent or designee shall implement the following measures:

1.    Publicize the district's nondiscrimination policy and related complaint procedures, including the coordinator/compliance officer's contact information, to students, parents/guardians, employees, volunteers, and the general public by posting them in prominent locations and providing easy access to them through district-supported communications.

2.    Post the district's policies and procedures prohibiting discrimination, harassment, student sexual harassment, intimidation, bullying, and cyberbullying, including a section on social media bullying that includes all of the references described in Education Code 234.6 as possible forums for social media, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students  (Education Code 234.6)

*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 1113 - District and School Web Sites)*
*(cf. 1114 - District-Sponsored Social Media)*
*(cf. 5131.2 - Bullying)*
*(cf. 5145.9 - Hate-Motivated Behavior)*

3.    Post the definition of sex discrimination and harassment as described in Education Code 230, including the rights set forth in Education Code 221.8, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students  (Education Code 234.6)

**Chico Unified School District**
*1163 East Seventh Street, Chico, CA  95928-5999*
*(530) 891-3000*

Administrative
Regulation:

#5145.3

Section: 5000

Students

Page 2 of 7

24     Post in a prominent location on the district web site in a manner that is easily accessible to parents/guardians and students information regarding Title IX prohibitions against discrimination based on a student's sex, gender, gender identity, pregnancy, and parental status, including the following: (Education Code 221.6, 221.61, 234.6)

   a.     The name and contact information of the district's Title IX coordinator, including the phone number and email address

   b.     The rights of students and the public and the responsibilities of the district under Title IX, including a list of rights as specified in Education Code 221.8 and web links to information about those rights and responsibilities located on the web sites of the Office for Equal Opportunity and the U.S. Department of Education's Office for Civil Rights (OCR)

   c.     A description of how to file a complaint of noncompliance with Title IX, which shall include:

      (1)     An explanation of the statute of limitations within which a complaint must be filed after an alleged incident of discrimination has occurred and how a complaint may be filed beyond thestatute of limitations

      (2)     An explanation of how the complaint will be investigated and how the complainant may further pursue the complaint, including web links to this information on the OCR's web site

      (3)     A web link to the OCR complaints form and the contact information for the office, including the phone number and email address for the office

5.     Post a link to statewide CDE-compiled resources, including community-based organizations, that provide support to youth who have been subjected to school-based discrimination, harassment, intimidation, or bullying and to their families. Such resources shall be posted in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students.  (Education Code 234.5, 234.6)

6.     Provide to students a handbook that contains age-appropriate information that clearly describes the district's nondiscrimination policy, procedures for filing a complaint, and resources available to students who feel that they have been the victim of any such behavior.

7.     Annually notify all students and parents/guardians of the district's nondiscrimination policy, including its responsibility to provide a safe, nondiscriminatory school environment for all students, including transgender and gender-nonconforming students. The notice shall inform students and parents/guardians that they may request to meet with the compliance officer to determine how best to accommodate or resolve concerns that may arise from the district's implementation of its nondiscrimination policies. The notice shall also inform all students and parents/guardians that, to the extent possible, the district will address any individual student's interests and concerns in private.

*(cf. 5145.6 - Parental Notifications)*

8.     Ensure that students and parents/guardians, including those with limited English proficiency, are notified of how to access the relevant information provided in the district's nondiscrimination policy and related complaint procedures, notices, and forms in a language they can understand.

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21

A2

**Chico Unified School District**
*1163 East Seventh Street, Chico, CA 95928-5999*
*(530) 891-3000*

Administrative
Regulation:

#5145.3

Section: 5000

Students

Page 3 of 7

If 15 percent or more of students enrolled in a particular district school speak a single primary language other than English, the district's policy, regulation, forms, and notices concerning nondiscrimination shall be translated into that language in accordance with Education Code 234.1 and 48985. In all other instances, the district shall ensure meaningful access to all relevant information for parents/guardians with limited English proficiency.

9.     Provide to students, employees, volunteers, and parents/guardians age appropriate training and/or information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, including discriminatory harassment, intimidation, retaliation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include details of guidelines the district may use to provide a discrimination-free environment for all district students, including transgender and gender-nonconforming students.

*(cf. 1240 – Volunteer Assistance)*
*(cf. 4131 - Staff Development)*
*(cf. 4231 - Staff Development)*
*(cf. 4331 - Staff Development)*

10.     At the beginning of each school year, inform school employees that any employee who witnesses any act of unlawful discrimination, including discriminatory harassment, intimidation, or bullying against a student is required to intervene if it is safe to do so. (Education Code 234.1)

*(cf. 4112.9/4212.9/4312.9 - Employee Notifications)*

11.     At the beginning of each school year, inform each principal or designee of the district's responsibility to provide appropriate assistance or resources to protect students from threatened or potentially discriminatory behavior and ensure their privacy rights.

**Enforcement of District Policy**
The Superintendent or designee shall take appropriate actions to reinforce BP 5145.3 – Nondiscrimination/Harassment.  As needed, these actions may include any of the following:

1.     Removing vulgar or offending graffiti

*(cf. 5131.5 - Vandalism and Graffiti)*

2.     Providing training to students, staff, and parents/guardians about how to recognize unlawful discrimination, and how to report it or file a complaint, and how to respond

3.     Disseminating and/or summarizing the district's policy and regulation regarding unlawful discrimination

4.     Consistent with the laws regarding the confidentiality of student and personnel records, communicating to students, parents/guardians, and the community the school's response plan to unlawful discrimination or harassment

*(cf. 4112.6/4212.6/4312.6 - Personnel Files)*
*(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)*
*(cf. 5125 - Student Records)*

5.     Taking appropriate disciplinary action against students, employees, and anyone determined to have

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



**Chico Unified School District**
*1163 East Seventh Street, Chico, CA 95928-5999*
*(530) 891-3000*

Administrative
Regulation:

#5145.3

Section: 5000

Students

Page 4 of 7

engaged in wrongdoing in violation of district policy, including any student who is found to have filed a complaint of discrimination that the student knew was not true

*(cf. 4118 – Dismissal/Suspension/Disciplinary Action)*
*(cf. 4218 - Dismissal/Suspension/Disciplinary Action)*
*(cf. 5144 - Discipline)*
*(cf. 5144.1 - Suspension and Expulsion/Due Process)*
*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))*
*(cf. 6159.4 - Behavioral Interventions for Special Education Students)*

**Process for Initiating and Responding to Complaints**
Students who feel that they have been subjected to unlawful discrimination described above or in district policy is strongly encouraged to immediately contact the Compliance Officer, principal, or any other staff member. In addition, students who observes any such incident are strongly encouraged to report the incident to the Compliance Officer or principal, whether or not the alleged victim files a complaint.

Any school employee who observes an incident of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, or to whom such an incident is reported shall report the incident to the Compliance Officer or principal within a school day, whether or not the alleged victim files a complaint.

Any school employee who witnesses an incident of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, shall immediately intervene to stop the incident when it is safe to do so. (Education Code 234.1)

When a report of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, is made to or received by the principal or compliance officer, the principal or compliance officer shall notify the student or parent/guardian of the right to file a formal complaint in accordance with AR 1312.3 - Uniform Complaint Procedures or, for complaints of sexual harassment that meet the federal Title IX definition, AR 5145.71 - Title IX Sexual Harassment Complaint Procedures. Once notified verbally or in writing, the compliance officer shall begin the investigation and shall implement immediate measures necessary to stop the discrimination and ensure that all students have access to the educational program and a safe school environment. Any interim measures adopted to address unlawful discrimination shall, to the extent possible, not disadvantage the complainant or a student who is the victim of the alleged unlawful discrimination.

Any report or complaint alleging unlawful discrimination by the principal, compliance officer, or any other person to whom a report would ordinarily be made or complaint filed shall instead be made to or filed with the Superintendent or designee who shall determine how the complaint will be investigated.

*(cf. 5141.4 - Child Abuse Prevention and Reporting)*

**Transgender and Gender-Nonconforming Students**
Gender identity of a student means the student's gender-related identity, appearance, or behavior, as determined from the student's internal sense, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the student's physiology or assigned sex at birth.

Gender expression means a student's gender-related appearance and behavior, whether stereotypically associated with the student's assigned sex at birth. (Education Code 210.7)

Gender transition refers to the process in which a student changes from living and identifying as the sex assigned to the student at birth to living and identifying as the sex that corresponds to the student's gender identity.

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21

**Chico Unified School District**
*1163 East Seventh Street, Chico, CA  95928-5999*
*(530) 891-3000*

| Administrative Regulation: | #5145.3 |
| Section: 5000 | Students |
| | Page 5 of 7 |

Gender-nonconforming student means a student whose gender expression differs from stereotypical expectations.

Transgender student means a student whose gender identity is different from the gender assigned at birth.

The district prohibits acts of verbal, nonverbal, or physical aggression, intimidation, or hostility that are based on sex, gender identity, or gender expression, or that have the purpose or effect of producing a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment, regardless of whether the acts are sexual in nature. Examples of the types of conduct which are prohibited in the district and which may constitute gender-based harassment include, but are not limited to:

1.    Refusing to address a student by a name and the pronouns consistent with the student's gender identity

2.    Disciplining or disparaging a student or excluding the student from participating in activities, for behavior or appearance that is consistent with his/her gender identity or that does not conform to stereotypical  notions of masculinity or femininity, as applicable

3.    Blocking a student's entry to the restroom that corresponds to the student's gender identity

4.    Taunting a student because the student participates in an athletic activity more typically favored by a student of the other sex

5.    Revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent

6.    Use of gender-specific slurs

7.    Physical assault of a student motivated by hostility toward the student because of the student's gender, gender identity, or gender expression

The district's uniform complaint procedures (AR 1312.3) or Title IX sexual harassment procedures (AR 5145.71), as applicable, shall be used to report and resolve complaints alleging discrimination against transgender and gender-nonconforming students.

Examples of bases for complaints include, but are not limited to, the above list, as well as improper rejection by the district of a student's asserted gender identity, denial of access to facilities that correspond with a student's gender identity, improper disclosure of a student's transgender status, discriminatory enforcement of a dress code, and other instances of gender-based harassment.

To ensure that transgender and gender-nonconforming students are afforded the same rights, benefits, and protections provided to all students by law and Board policy, the district shall address each situation on a case-by- case basis, in accordance with the following guidelines:

1.    Right to privacy: A student's transgender or gender-nonconforming status is the student's private information and the district shall only disclose the information to others with the student's prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being. In any case, the district shall only allow disclosure of a student's personally identifiable information to employees with a legitimate educational interest as determined by the district pursuant to 34 CFR

**Chico Unified School District**
*1163 East Seventh Street, Chico, CA 95928-5999*
*(530) 891-3000*

Administrative
Regulation:

#5145.3

Section: 5000

Students

Page 6 of 7

99.31. Any district employee to whom a student's transgender or gender-nonconforming status is disclosed shall keep the student's information confidential. When disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to notify the compliance officer. If the student refuses to give permission, the employee shall keep the student's information confidential, unless the employee is required to disclose or report the student's information pursuant to this administrative regulation, and shall inform the student that honoring the student's request may limit the district's ability to meet the student's needs related to the student's status as a transgender or gender-nonconforming student. If the student permits the employee to notify the compliance officer, the employee shall do so within three school days.

As appropriate given the student's need for support, the compliance officer may discuss with the student any need to disclose the student's transgender or gender-nonconformity status or gender identity or gender expression to the student's parents/guardians and/or others, including other students, teacher(s), or other adults on campus. The district shall offer support services, such as counseling, to students who wish to inform their parents/guardians of their status and desire assistance in doing so.

*(cf. 1340 - Access to District Records)*
*(cf. 3580 - District Records)*

2.    Determining a Student's Gender Identity: The Compliance Officer shall accept the student's assertion of his/her gender identity and begin to treat the student consistent with that gender identity unless district personnel present a credible and supportable basis for believing that the student's assertion is for an improper purpose.

3.    Addressing a Student's Transition Needs: The Compliance Officer shall arrange a meeting with the student and, if appropriate, the student's parents/guardians to identify and develop strategies for ensuring that the student's access to educational programs and activities is maintained. The meeting shall discuss the transgender or gender-nonconforming student's rights and how those rights may affect and be affected by the rights of other students and shall address specific subjects related to the student's access to facilities and to academic or educational support programs, services, or activities, including, but not limited to, sports and other competitive endeavors. In addition, the Compliance Officer shall identify specific school site employee(s) to whom the student may report any problem related to the student's status as a transgender or gender-nonconforming individual, so that prompt action could be taken to address it. Alternatively, if appropriate and desired by the student, the school may form a support team for the student that will meet periodically to assess whether the arrangements for the student are meeting the student's educational needs and providing equal access to programs and activities, educate appropriate staff about the student's transition, and serve as a resource to the student to better protect the student from gender-based discrimination.

4.    Accessibility to Sex-Segregated Facilities, Programs, and Activities: When the district maintains sex-segregated facilities, such as restrooms and locker rooms, or offers sex-segregated programs and activities, such as physical education classes, intermural sports, and interscholastic athletic programs, students shall be permitted to access facilities and participate in programs and activities consistent with their gender identity. To address any student's privacy concerns in using sex-segregated facilities, the district shall offer available options such as a gender-neutral or single-use restroom or changing area, a bathroom stall with a door, an area in the locker room separated by a curtain or screen, access to a staff member's office, or use of the locker room before or after the other students. However, the district shall not require a student to utilize these options because the student is transgender or gender-nonconforming. In addition, a student shall be permitted to participate in accordance with the student's

**Chico Unified School District**
1163 East Seventh Street, Chico, CA 95928-5999
(530) 891-3000

Administrative
Regulation:

#5145.3

Section: 5000          Students

Page 7 of 7

gender identity in other circumstances where students are separated by gender, such as for class discussions, yearbook pictures, and field trips. A student's right to participate in a sex-segregated activity in accordance with the student's gender identity shall not render invalid or inapplicable any other eligibility rule established for participation in the activity.

*(cf. 6145 - Extracurricular and Cocurricular Activities)*
*(cf. 6145.2 - Athletic Competition)*
*(cf. 6153 - School-Sponsored Trips)*
*(cf. 7110 - Facilities Master Plan)*

5.   Student Records: A student's legal name or gender as entered on the mandatory student record required pursuant to 5 CCR 432 shall only be changed with proper documentation. When a student presents government-issued documentation of a name and/or gender change or submits a request for a name and/or gender change through the process specified in Education Code 49070, the district shall update the student's records. (Education Code 49062.5, 49070)

*(cf. 5125 - Student Records)*
*(cf. 5125.1 - Release of Directory Information)*
*(cf. 5125.3 - Challenging Student Records)*

6.   Names and Pronouns: If a student so chooses, district personnel shall be required to address the student by a name and the pronoun(s) consistent with the student's gender identity, without the necessity of a court order or a change to the student's official district record. However, inadvertent slips or honest mistakes by district personnel in the use of the student's name and/or consistent pronouns will, in general, not constitute a violation of this administrative regulation or the accompanying district policy.

7.   Uniforms/Dress Code: A student has the right to dress in a manner consistent with the student's gender identity, subject to any dress code adopted on a school site.

*(cf. 5132 - Dress Code)*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-16031

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

APPELLEE'S ANSWERING BRIEF

**Signature** | s/ Katherine Alexander    **Date** | January 2, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                          *Rev. 12/01/2018*