No. 23-16031

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

AURORA REGINO,

*Appellant*,

v.

KELLY STALEY,

*Appellee*.

————————————

**On Appeal from the United States District Court
for the Eastern District of California**
No. 23-cv-00032
Hon. John A. Mendez, District Judge

————————————

**BRIEF OF AMICI CURIAE CALIFORNIA, COLORADO,
CONNECTICUT, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW
JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT,
AND WASHINGTON IN SUPPORT OF APPELLEE**

————————————

ROB BONTA
*Attorney General of California*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
LAURA FAER
*Supervising Deputy Attorney General*
BRIAN BILFORD
DELBERT TRAN
*Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
(415) 229-0110
Delbert.Tran@doj.ca.gov
*Attorneys for Amicus Curiae the Attorney
General of California*
(*Additional counsel on signature pages*.)

January 9, 2023

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ............................................................1

ARGUMENT.........................................................................................3

I.     Policies like AR 5145.3 Provide Flexible, Case-by-Case Frameworks to Protect Transgender Students while Involving Parents where Possible............................................3

II.     Substantive Due Process Does not Empower Parents to Undermine Protective School Policies Like AR 5145.3 ..........7

      A.     The District Court Correctly Held that Appellant's Challenge is Subject to Rational Basis Review and that AR 5145.3 Reasonably Relates to a Legitimate Interest in Protecting Students.......................................7

      B.     Respecting a Person's Pronouns Does Not Constitute Professional Medical or Psychological Treatment Requiring Parental Involvement Under Substantive Due Process ...............................................13

III.     States Have a Legitimate and Compelling Interest in Making Schools a Safe and Supportive Environment for All Students, Including Transgender and Gender Nonconforming Students ......................................................16

      A.     Transgender and Gender Nonconforming Students Face Unique Risks of Harms at Home and Policies Like AR 5145.3 Mitigate These Risks While Providing Support for Conversations Between Students and Families .................................................17

      B.     Transgender Youth Also Face Unique Struggles That Policies Like AR 5145.3 Ameliorate by Maintaining a Safe and Supportive School Environment ...............................................................19

      C.     Policies like AR 5145.3 Benefit All Students Because They Provide Students With Safety and a Sense of Belonging .....................................................23

i

# TABLE OF CONTENTS
## (continued)

**Page**

IV.   Appellant's Proposed Framework Undermines States'
      Ability to Make Schools a Safe and Supportive
      Environment for Transgender Students ................................. 24

CONCLUSION ........................................................................... 32

# TABLE OF AUTHORITIES

**Page**

CASES

*Blau v. Fort Thomas Pub. Sch. Dist.*
401 F.3d 381 (6th Cir. 2005).....................................................................13

*Collins v. City of Harker Heights*
503 U.S. 115 (1992)......................................................................................7

*Damiano v. Grants Pass Sch. Dist. No. 7*
No. 1:21-cv-00859-CL, 2023 WL 2687259 (D. Or. Mar. 29,
2023) ...........................................................................................................30

*Fields v. Palmdale Sch. Dist.*
427 F.3d 1197 (9th Cir. 2005)............................................. 11, 13, 16, 31

*Foote v. Town of Ludlow*
2022 WL 18356421 (D. Mass. 2022)................................................12, 15

*H.L. v. Matheson*
450 U.S. 398 (1981).....................................................................................9

*Hecox v. Little*
79 F.4th 1009 (9th Cir. 2023)...................................................................27

*Holcomb v. Iona College*
521 F.3d 130 (2d Cir. 2008).......................................................................12

*Immediato v. Rye Neck Sch. Dist.*
73 F.3d 454 (2d Cir. 1996).........................................................................13

*Johnson v. Poway Unified Sch. Dist.*
658 F.3d 954 (9th Cir. 2011).....................................................................30

*Keates v. Koile*
883 F.3d 1228 (9th Cir. 2018).....................................................................7

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Littlejohn v. Sch. Bd. of Leon Cnty.*
2022 WL 18670372 (N.D. Fla 2022) ....................................12

*Loving v. Virginia*
388 U.S. 1 (1967)................................................................12

*Meyer v. Nebraska*
262 U.S. 390 (1923)...........................................................8, 9

*Mirabelli v. Olson*
No. 323CV00768BENWVG, 2023 WL 5976992 (S.D. Cal.
Sept. 14, 2023) .......................................................................11

*New York v. Ferber*
458 U.S. 747 (1982).............................................................16

*Norwood v. Harrison*
413 U.S. 455 (1973)..........................................................8, 11

*Obergefell v. Hodges*
576 U.S. 644 (2015).............................................................7

*Palmore v. Sidoti*
466 U.S. 429 (1984).......................................................12, 27

*Parents for Privacy v. Barr*
949 F.3d 1210 (9th Cir. 2020)...............................10, 11, 13

*Parker v. Hurley*
514 F.3d 87 (1st Cir. 2008) ...............................................10

*People of the State of Cal. v. Chino Valley Unified Sch. Dist.*
No. CIVSB 2317301 (San Bernardino Cnty. Super. Ct.)
.......................................................... 14, 15, 29, 30

*Pierce v. Society of Sisters*
268 U.S. 510 (1925)..........................................................8, 9

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Prince v. Massachusetts*
321 U.S. 158 (1944)....................................................................9, 32

*Regino v. Staley*
No. 2:23-cv-00032-JAM-DMC, 2023 WL 4464845 (E.D.
Cal. Jul. 11, 2023) ..............................................................................13

*Reno v. Flores*
507 U.S. 292 (1993)...............................................................................7

*Ricard v. USD 475 Geary Cnty., Kansas Sch. Bd.*
No. 522CV04015HLTGEB, 2022 WL 1471372 (D. Kan.
May 9, 2022) ......................................................................................11

*Runyon v. McCrary*
427 U.S. 160 (1976)......................................................................8, 9, 11

*Serrano v. Priest*
5 Cal.3d 584 (Cal. 1971) ...................................................................16

*SmithKline Beecham Corp. v. Abbott Lab'ys*
740 F.3d 471 (9th Cir. 2014)..........................................................26, 27

*T.F. v. Kettle Moraine Sch. Dist.*
No. 2021CV1650, 2023 WL 6544917 (Wis. Cir. Oct. 03,
2023) ..................................................................................................11

*Troxel v. Granville*
530 U.S. 57 (2000)...............................................................................10

*Washington v. Glucksberg*
521 U.S. 702 (1997)...............................................................................7

*Wisconsin v. Yoder*
406 U.S. 205 (1972)...............................................................................9

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

775 Ill. Comp. Stat.
  5/5/-102 ..............................................................................................16
  5/5A-102(A)-(B) .................................................................................16

Cal. Educ. Code
  § 220 ....................................................................................................16
  § 35183(a)(1) ......................................................................................16

Iowa Code
  § 216.2(10) ..........................................................................................16
  § 216.9 .................................................................................................16

Mass. Gen. Laws
  Chapter 76, § 5 ...................................................................................16

Me. Rev. Stat. Ann. Title 5
  § 4553(9-C) .........................................................................................16
  § 5601 ..................................................................................................16

Minn. Stat.
  § 363A.13 ............................................................................................16

N.H. Rev. Stat. Ann.
  § 354-A:27 ...........................................................................................16

N.J. Stat. Ann.
  § 10:5-12(f)(1) ....................................................................................16
  § 18A:36-41 ...........................................................................................5

N.Y. Educ. Law
  § 3201-a ...............................................................................................16

N.Y. Exec. Law
  § 291 ....................................................................................................16
  § 296....................................................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page**

Or. Rev. Stat.
§ 659.850 ........................................................................................16

S.B. 107, 2021-2022 Reg. Sess. (Cal. 2022) ...............................15

Wash. Rev. Code Ann.
§ 28A.642.010 ...............................................................................16

**CONSTITUTIONAL PROVISIONS**

Cal. Const.
Article I, § 28(a)(7) .....................................................................16

**COURT RULES**

Federal Rules of Appellate Procedure
Rule 29(a)(2) ....................................................................................1

**OTHER AUTHORITIES**

Ashley Austin et al., *Suicidality Among Transgender Youth:
Elucidating the Role of Interpersonal Risk Factors*, 37 J.
Interpersonal Violence 2696 (2022) ........................................21

Caitlin Ryan et al., *Family Rejection as a Predictor of Negative
Health Outcomes in White and Latino Lesbian, Gay, and
Bisexual Young Adults*, 123 Pediatrics 346 (2009) ................18

Cal. Dep't of Educ., Frequently Asked Questions .........................4

Centers for Disease Control, *LGBTQ-Supportive School
Policies and Practices Help All Students Thrive* (June 2022)................24

Centers for Disease Control, *Youth Risk Behavior Survey: Data
Summary & Trends Report 2011-2021 at 72 (2023)*...............24

Chico Unified School District Administrative Regulation
5145.3 ...........................................................................*passim*

vii

# TABLE OF AUTHORITIES
## (continued)

Page

Chino Valley Unified Sch. Dist. Bd., *CVUSD Meeting of the Board of Education - July 20th, 2023*, YouTube (Jul. 20, 2023) ...........................................................................................26, 27

De Pedro et al., *Exploring Physical, Nonphysical, and Discrimination-Based Victimization Among Transgender Youth in California Public Schools*, 1 Int'l J. of Bullying Prevention 218, 222 (2019).............................................................19, 20

Emily A. Greytak et al., *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools*, GLSEN 14 (2009) ................................................................................................21

*Equality Maps: Safe Schools Laws*, Movement Advancement Project (2022) ...........................................................................................5

*Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment*, Mass. Dep't of Elementary and Secondary Educ. (2022) ..................................................6

Hanson et al., *Understanding the Experiences of LGBTQ Students in California*, The California Endowment 9, 52 (Oct. 2019)................................................................................................20

Harper Seldin, *Trans Students Should Be Treated With Dignity, Not Outed By Their Schools*, ACLU (Jan. 26, 2023) ..............................28

Hawaii Dep't of Educ., *Guidance on Supports for Transgender Students* ...........................................................................................6

Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-teacher Trust and School Identification*, The European Conference on Ed. 2021 (Sept. 2021)..............................24

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 3 (Aug. 2020) ...................................................................23

# TABLE OF AUTHORITIES
## (continued)

**Page**

Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN at xix-xx (2019)..................................................................20, 22

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, Pediatrics, Mar. 2016, at 5-7 ...................................................................21

Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90 Rev. of Educ. Rsch. 712 (Aug. 4, 2020) ...................................................................24

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97-98 (Feb. 17, 2019) ..............................23

Marc-André Cornier, *A Review of Current Guidelines for the Treatment of Obesity*, 28 Am. J. Mgmt. Care S288 (2022).....................15

Megan Tschannen-Moran et al., *Student Academic Optimism: A Confirmatory Factor Analysis*, 51 J. Educ. Admin. 150-154, 157-158, 167-171 (Mar. 2013)................................................24

Michelle Marie Johns et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263-301 (2018) ...................................................................23

Misha Valencia, *Why We Need to Stop Outing LGBTQIA Students*, Parents (Aug. 29, 2023) ..........................................................28

N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* 4-5 .............................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023) ................................................................6

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey, Nat'l Ctr. for Transgender Equal.* 65 (2016) .......................17, 20

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 4 (2017) ................................................................19, 20

Stephen Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018) .........................................................22

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 29-30 (Wash. Off. of Superintendent of Pub. Instruction 2012) ................................5

The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* 4 ........................................................18, 19

*The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (December 2020) .......................22

World Professional Ass'n of Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* S53 (Version 8, 2022) ...................18, 21

## INTERESTS OF AMICI CURIAE

*Amici Curiae* States of California, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington ("*Amici States*") submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) to defend school policies that make schools safe and supportive environments for transgender and gender nonconforming students who may otherwise have no place to express who they are.[1]

The *Amici* States share a sovereign and compelling interest in providing public schools where all students are included and can thrive. Like other state and local school authorities around the country, Defendant-Appellee Chico Unified School District (CUSD) Superintendent Kelly Staley and the CUSD Board are charged with one of the most important functions of government—nurturing successive generations of children into capable citizens of a diverse and unified nation. Consistent with the paramount importance of this responsibility, the Constitution affords States significant authority to ensure a safe and supportive learning environment for all students.

---

[1] By gender nonconforming students, the *Amici* States refer to students including, but not limited to, those who identify as gender non-binary (*i.e.* neither male nor female).

The *Amici* States respectfully submit this brief to explain: (1) how CUSD's regulation—like similar policies enacted by the *Amici* States—has crafted a careful balance, consistent with due process, to support transgender and gender nonconforming students and their families; (2) how transgender and gender nonconforming students are particularly vulnerable to abuse, suicide, and other concrete harms caused by familial rejection and environments hostile to their gender identity; (3) the legitimate and compelling interest that States have in protecting these students by ensuring a safe and supportive school environment; and (4) how Appellant's proposed framework undermines these efforts to protect transgender and gender nonconforming students.

Consistent with the policies endorsed by the *Amici* States, CUSD's Administrative Regulation 5145.3 (AR 5145.3) is a flexible, case-by-case policy that seeks to include families in creating plans to meet the needs of transgender and gender nonconforming students at school; provides support and counseling to encourage students to have these conversations with their families; only withholds parental notice when a student expressly does not consent; and includes an exception so that parents are notified if needed to protect a student's "physical and mental well-being." 1-ER-98-99.

But CUSD's policy recognizes that not all transgender and gender nonconforming youth have supportive families, and that such students may face

serious harms if they are prematurely forced to reveal their gender identity. One in ten transgender individuals experience overt violence from a household member; 15% are forced to leave their home because of their transgender identity; "coming out" to adverse parents has been shown to increase the risks of major depressive symptoms, suicide, homelessness, and drug use; and fewer than one in three transgender youth identified their home as supportive of their identity.[2] Thus, where the student expressly asks the school not to disclose the student's transgender status, CUSD's regulation takes appropriate steps to protect the student's physical and emotional safety, well-being, and privacy.

The *Amici* States therefore join CUSD in supporting affirmance of the decision below.

## ARGUMENT

### I. POLICIES LIKE AR 5145.3 PROVIDE FLEXIBLE, CASE-BY-CASE FRAMEWORKS TO PROTECT TRANSGENDER STUDENTS WHILE INVOLVING PARENTS WHERE POSSIBLE

In 2014, the California Department of Education (CDE) issued a "Frequently Asked Questions" ("FAQ") document explaining that because a transgender student "may not express their gender identity openly in all contexts" and "[r]evealing a student's gender identity . . . may compromise the student's safety," CDE recommends that schools "consult with a transgender student" and "respect

---

[2] *Infra* pp. 17-18.

the limitations that a student places on the disclosure of their transgender status," including with respect to the student's family.[3]

CUSD adopted Administrative Regulation 5145.3 to protect transgender students by providing many ways for schools to partner with parents, while limiting unnecessary disclosures of student gender identity that could place students at risk. 1-ER-98-99. To begin, AR 5145.3 encourages CUSD schools to partner with parents wherever possible, instructing schools to "meet[] with the student and, if appropriate, the student's parents/guardians to identify and develop strategies" to maintain "the student's access to educational programs and activities." 1-ER-99. AR 5145.3 further permits school personnel to disclose a student's gender identity to a student's parents or guardians "with the student's prior written consent." 1-ER-98.

Additionally, even where the student does not consent to disclosure, AR 5145.3 permits schools to disclose a student's gender identity to a student's parents or guardians where there is "compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being." 1-ER-98-99. Moreover, AR 5145.3 requires schools to "offer support services, such as counseling," to help and

---

[3] Cal. Dep't of Educ., Frequently Asked Questions, https://tinyurl.com/y54447xf.

encourage "students who wish to inform their parents/guardians of their status and desire assistance in doing so." 1-ER-99.

Thus, AR 5145.3: includes parents when safe to do so or necessary to protect the student's physical or mental well-being; allows students or parents to initiate these conversations about student identity in the time and manner they choose; and provides support services—like counseling—to encourage and facilitate such conversations in a way that respects the emotional, physical, and psychological safety of students.

Recognizing the need to protect transgender students while including families where possible, *Amici* States have adopted policies or nonbinding guidelines similar to AR 5145.3.[4] For example, New York's Education Department guidelines provide that "[t]he student is in charge of their gender transition" and that, with the student's permission, "[s]chools will want to work closely with the students and their parents/guardians," to devise an appropriate plan mindful of "each student's

---

[4] *See, e.g.*, *Equality Maps: Safe Schools Laws*, Movement Advancement Project (2022), https://tinyurl.com/28j7mhjn ("nondiscrimination" tab compiling laws of all states); N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* 4-5, http://tinyurl.com/ypb5jwa3; N.J. Stat. Ann. § 18A:36-41; Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 29-30 (Wash. Off. of Superintendent of Pub. Instruction 2012), http://tinyurl.com/j2axsu4u.

sense of safety."[5] Hawaii's Department of Education has issued guidance similar to AR 5145.3, recommending that schools not disclose a student's transgender status to others unless legally required or with the student's consent.[6] And the Massachusetts Board of Elementary and Secondary Education provides guidance to school districts to ensure safe and gender-inclusive schools, stating that the best practice is to speak with the student about their name and pronoun usage before discussing a student's gender nonconformity with that student's guardians to ascertain whether a student is not open about their gender identity at home, for example, due to safety concerns.[7]

Policies like AR 5145.3 thus reflect approaches within *Amici* States and other jurisdictions supported by research (and experience) that show that providing an inclusive, supportive educational environment benefits all students, including and especially transgender and gender nonconforming youth. *See* Section III.C. *infra*.

---

[5] New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023), https://tinyurl.com/4z7muwtx.

[6] Hawaii Dep't of Educ., *Guidance on Supports for Transgender Students*, http://tinyurl.com/356enp57.

[7] *See* Mass. Dep't of Elementary and Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (2022), https://tinyurl.com/jx9a8nsf.

## II.    SUBSTANTIVE DUE PROCESS DOES NOT EMPOWER PARENTS TO UNDERMINE PROTECTIVE SCHOOL POLICIES LIKE AR 5145.3

### A.    The District Court Correctly Held that Appellant's Challenge is Subject to Rational Basis Review and that AR 5145.3 Reasonably Relates to a Legitimate Interest in Protecting Students

The Fourteenth Amendment's Due Process Clause protects substantive "fundamental rights and liberties" which are "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (citation omitted). And while the Supreme Court has expanded the doctrine to protect "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015), it has also made clear courts should be "reluctant to expand the concept of substantive due process." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Thus, "'[s]ubstantive due process' analysis must begin with a careful description of the asserted right" and its context. *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citation omitted).[8]

---

[8] Appellant also claims a First Amendment right of familial association, Opening Br. 17, but the claim duplicates her Fourteenth Amendment claim, underscoring the need for judicial caution. *See, e.g.*, *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("the constitutional right to familial association . . . does not appear in the text of the Constitution itself" and courts have not "been entirely clear regarding the source of the right," relying "on the Fourteenth, First, and Fourth Amendments").

In the context of education in particular, the Supreme Court has recognized and applied parental substantive due process sparingly. In *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923), the Court observed that the Fourteenth Amendment's substantive Due Process Clause includes the right to "establish a home and bring up children," including the "right of parents to engage [a teacher] to instruct their children [in foreign languages]." *Id.* In *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), the Court affirmed this parental right when striking down a law that required parents to enroll their children in public school, as opposed to private school. Even in these early decisions, the Court recognized that policies that allegedly infringed on such rights must only bear a "reasonable relation" to a legitimate government purpose. *Meyer*, 262 U.S. at 400; *id.* at 402 ("The power of the state to . . . make reasonable regulations for all schools . . . is not questioned."); *Pierce*, 268 U.S. at 534-535 (same).

Since *Pierce* and *Meyer*, the Supreme Court and this Court have repeatedly declined attempts to expand the scope of parental substantive due process in the educational setting, instead affirming that such rights have "limited scope" when schools enact regulations to ensure the well-being of children. *Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *see also Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (same).

8

In *Runyon*, the Court rejected the claim that parental rights permitted private schools to refuse admission to students based on race, stating that parental rights to direct the upbringing of their children—in the school context—are limited to the facts of *Pierce*, 268 U.S. at 510 (right to send child to private school) and *Meyer v. Nebraska*, 262 U.S. 390 (1923) (right to provide instruction in non-English languages at private school), and that "*Meyer* and its progeny entitle [plaintiffs] to no more." *Runyon*, 427 U.S. at 177. Indeed, the Court has consistently upheld policies that protect youth where, as here, parental decisions may "jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin v. Yoder*, 406 U.S. 205, 233-234 (1972); *see also H.L. v. Matheson*, 450 U.S. 398, 449 (1981) ("[L]egal protection for parental rights is frequently tempered if not replaced by concern for the child's interest"); *Prince v. Massachusetts*, 321 U.S. 158, 166-167 (1944) (parental rights do "not include liberty to expose the community or the child to . . . ill health or death").

Consequently, this Court has held that while substantive due process may afford certain parents "a fundamental right to decide *whether* to send their child to a public school," they "lack [substantive due process] rights to direct school administration more generally," whether it is "the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code."

*Parents for Privacy v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020) (citation

omitted), *cert. denied* 141 S. Ct. 894 (2020); *see also Parker v. Hurley*, 514 F.3d

87, 102 (1st Cir. 2008) (collecting cases for this "well recognized" principle that

parents do not have a substantive due process right to direct school administration

more generally).

In *Parents for Privacy*, 949 F.3d at 1210, this Court specifically rejected

claims by parents that a school district's policy—of allowing transgender students

to use school bathrooms, locker rooms, and showers that match their gender

identity—violated parents' substantive due process rights to control whom their

children may be exposed to in such settings. In doing so, this Court rejected many

of the same arguments raised by Appellant here. There, as here, appellants relied

on *Troxel v. Granville*, 530 U.S. 57 (2000). *See* Opening Br. at 16, 18, 23, 28, 40.

But this Court recognized that "*Troxel* concerned a state government's interference

with a mother's decision about the amount of visitation" rights and "did not

address the extent of parents' rights to direct the policies of the public schools that

their children attend." *Parents for Privacy*, 949 F.3d at 1230. There, as here,

appellants claimed that parental rights are limited only with respect to decisions

about school curricula. *See* Opening Br. at 20. But this Court held that as a matter

of substantive due process, "parents not only lack a constitutional right to direct the

curriculum that is taught to their children . . . they also lack constitutionally

10

protected rights to direct school administration more generally." *Parents for Privacy*, 949 F.3d at 1230.

The only other federal cases in the school context that Appellant cites to are unavailing.[9] Though *Mirabelli v. Olson*, No. 323CV00768BENWVG, 2023 WL 5976992, at *11 (S.D. Cal. Sept. 14, 2023) addressed a challenge to a similar school district policy, it involved two teachers bringing First Amendment free speech and free exercise claims, claims not raised here.[10] To the extent *Mirabelli* discussed parental rights, it did so through dicta, not once addressing *Runyon*, 427 U.S. at 177; *Norwood*, 413 U.S. at 461; *Fields*, 427 F.3d at 1204; or *Parents for Privacy*, 949 F.3d at 1231. *Mirabelli*, 2023 WL 5976992 at **8-9, 11 ("However, no parents have joined as plaintiffs at this time. . . . Consequently, the issue is not resolved here."). Similarly, *Ricard v. USD 475 Geary County, Kansas School Board*, No. 522CV04015HLTGEB, 2022 WL 1471372, at *4 (D. Kan. May 9, 2022), addressed a similar challenge based solely on a teacher's "free exercise

---

[9] Appellant also cites *T.F. v. Kettle Moraine School District*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Oct. 03, 2023), but the court there erroneously concluded that respecting a student's pronouns amounted to a "medical" decision because that claim went "uncontested." Here, Appellee and the district court correctly observed that this policy involves no medical decisions. *Infra* Section II.B.

[10] *Amici* States disagree with the *Mirabelli* court's First Amendment analysis, which is neither relevant to the facts of this case nor binding upon this Court.

rights." In contrast, federal courts addressing due process parental rights challenges to policies similar to AR 5145.3 have dismissed those claims, as the district court properly did here. *See Foote v. Town of Ludlow*, 2022 WL 18356421, *9 (D. Mass. 2022); *Littlejohn v. Sch. Bd. of Leon Cnty.*, 2022 WL 18670372, *9 (N.D. Fla 2022).

Furthermore, there is no limiting principle to Appellant's argument that the First and Fourteenth Amendments force schools to notify parents of a child's gender status. Appellant's argument would extend to a parental demand to be notified of a student's inclusion in or association with *any* protected rights or characteristics, *e.g.*, a student's decision to pray during lunch, two male students hugging, or Black and white students becoming friends. As with Appellant's request here, any mandate requiring school staff to provide notification because of a parent's potential bias against a protected class would raise serious constitutional concerns. *Cf. Loving v. Virginia*, 388 U.S. 1, 2, 11-12 (1967) (ban on interracial marriage violates equal protection); *cf. also Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (holding that employer who "disapproves of interracial association" violates Title VII by "taking adverse action"). "[T]he Constitution cannot control [private] prejudices, but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

Thus, the district court properly determined that Appellant advocates "for an expansion of" parental substantive due process rights "not supported by precedent." *Regino*, 2023 WL 4464845 at *3; *see also Parents for Privacy*, 949 F.3d at 1230 ("Supreme Court and Ninth Circuit case law not only have not recognized the specific rights asserted by Plaintiffs, but further forecloses recognizing such rights as being encompassed by the fundamental parental rights protected by the Fourteenth Amendment's Due Process Clause.").

Accordingly, Appellant's claims are subject to rational basis review, and the district court correctly held that AR 5145.3 bears a rational relationship to the legitimate state interest in protecting transgender and gender nonconforming students "from adverse hostile reactions, including but not limited to, domestic abuse and bullying." *Regino v. Staley*, No. 2:23-cv-00032-JAM-DMC, 2023 WL 4464845 at *4 (E.D. Cal. Jul. 11, 2023); *see Fields*, 427 F.3d at 1208 (applying rational basis review to parental substantive due process claim in school context); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 396 (6th Cir. 2005) (same); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461 (2d Cir. 1996) (same).

### B. Respecting a Person's Pronouns Does Not Constitute Professional Medical or Psychological Treatment Requiring Parental Involvement Under Substantive Due Process

The District Court also correctly rejected Appellant's conclusory allegations that respecting a student's pronouns or name amounts to a medical or

psychological decision that requires parental involvement pursuant to substantive due process. In reasserting these allegations, Appellant cites and misrepresents extrinsic evidence—in particular, expert declarations from *People of the State of California v. Chino Valley Unified School District*, No. CIVSB2317301 (San Bernardino Cnty. Super. Ct.). Opening Br. at 34. Contrary to Appellant's claims, social transition is not a medical intervention, as the expert testimony in that case demonstrates. California's expert in *Chino Valley*, Dr. Christine Brady, unequivocally states that "social transition is non-medical." Mot. for Jud. Notice, Ex. C, ¶ 36. Defendant's expert in *Chino Valley*, Dr. Erica Anderson, agrees: "'[s]ocial transition' is used *as a contrast to medical transition*," since social transition does not encompass "various medical interventions . . . such as puberty blockers, cross-sex hormone therapy, and various surgical interventions." Mot. for Jud. Notice, Ex. D, ¶ 9 (emphasis added).

Given the implausibility of alleging that social transition is a medical intervention, Appellant pivots, seizing on the words "treatment" or "psychological treatment"—referenced by Dr. Brady or court decisions—to claim that honoring a student's request to use their pronoun or name in school requires a psychiatrist's pre-approval or prescription. Opening Br. at 32-34. Again, Dr. Brady expressly refutes this, explaining that describing an act as "treatment" does not mean it requires professional consultation or prescription:

> Prospective Intervenors misinterpret paragraph 19.C. of my initial declaration, where I state that "social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria." In that statement, I referred to the medically recognized benefits of transgender and gender non-conforming youth being able to socially transition. For example, while aerobic exercise is not a "medical intervention," medical professionals might recognize research documenting its physical and psychological benefits for certain health conditions. Likewise, social transition, though not requiring or constituting medical intervention, does provide numerous important and well-documented psychological and physical benefits . . . .[11]

Put simply, no professional consultation, prescription, or psychological license is required to respect a person's pronouns. As another court concluded, "[a]ddressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally," meaning that "Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment . . . simply by honoring their requests to use preferred names and pronouns at school." *Foote v. Town of Ludlow*, No. CV 22-30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022).[12]

---

[11] Suppl. Decl. of Dr. Christine Brady, ¶ 12, *People of the State of Cal. v. Chino Valley Unified Sch. Dist.*, No. CIVSB2317301 (San Bernardino Cnty. Superior Ct.) (citations omitted); *see also, e.g.*, Marc-André Cornier, *A Review of Current Guidelines for the Treatment of Obesity*, 28 Am. J. Mgmt. Care S288 (2022) (describing "aerobic exercise" as a "treatment" and a "healthy meal plan" as a "therapy").

[12] Appellant's discussion of "additional" medical interventions, Opening Br. at 31, is irrelevant, as any parent right to decide whether minors receive specific surgical or hormonal treatment is not implicated by AR 5145.3. *See, e.g.*, S.B. 107, 2021-2022 Reg. Sess. (Cal. 2022).

### III. STATES HAVE A LEGITIMATE AND COMPELLING INTEREST IN MAKING SCHOOLS A SAFE AND SUPPORTIVE ENVIRONMENT FOR ALL STUDENTS, INCLUDING TRANSGENDER AND GENDER NONCONFORMING STUDENTS

"[E]ducation is not merely about teaching the basics of reading, writing, and arithmetic. Education serves higher civic and social functions, including the rearing of children into healthy, productive, and responsible adults and the cultivation of talented and qualified leaders of diverse backgrounds." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1209 (9th Cir. 2005). Thus, States have a compelling interest in guaranteeing safe and supportive school environments for all students, including transgender students, to enable them to learn and thrive.[13] *New York v. Ferber*, 458 U.S. 747, 756-757 (1982); *cf. Serrano v. Priest*, 5 Cal.3d 584, 608-609, 616-617 (Cal. 1971) (fundamental right to education); Cal. Const., Art. I, § 28(a)(7) ("students . . . have the right to be safe and secure in their persons"); Cal. Educ. Code § 35183(a)(1) ("[R]ight to an effective public school education. . . [and] to be safe and secure in their persons at school.").[14]

---

[13] While rational basis review should apply, *see supra* Section II.A, given these compelling interests, CUSD's policy should withstand any level of scrutiny.

[14] Numerous states also expressly prohibit discrimination based on gender identity in education. *E.g.*, Cal. Educ. Code § 220; 775 Ill. Comp. Stat. 5/5/-102; *id.* 5/5A-102(A)-(B); Iowa Code §§ 216.2(10), 216.9; Mass. Gen. Laws ch. 76, § 5; Me. Rev. Stat. Ann. tit. 5, §§ 4553(9-C), 5601; Minn. Stat. § 363A.13; N.H. Rev. Stat. Ann. § 354-A:27; N.J. Stat. Ann. § 10:5-12(f)(1); N.Y. Educ. Law § 3201-a; N.Y. Exec. Law §§ 291, 296; Or. Rev. Stat. § 659.850; Wash. Rev. Code Ann. § 28A.642.010.

Safe and supportive school environments that nurture the whole student, foster trusting relationships, and promote a sense of belonging are critical to student success, in terms of both academics and social and emotional well-being. Conversely, discriminatory, unsafe, or unsupportive environments that place students at risk of harm at school, at home, or in the community adversely impact academic performance and student health. The experiences of *Amici* States and other jurisdictions show that policies and practices that support all students' gender identities facilitate trusting school relationships that yield benefits for all students.

### A. Transgender and Gender Nonconforming Students Face Unique Risks of Harms at Home and Policies Like AR 5145.3 Mitigate These Risks While Providing Support for Conversations Between Students and Families

Although many transgender youth have supportive families, some face serious harms within the home, especially when prematurely forced to reveal their transgender identity. One in ten transgender individuals experience overt violence from a household member, and 15% are forced to leave their home because of their transgender identity.[15] Transgender youth rejected by parents or subjected to non-affirming environments have "increased anxiety, depression, suicidal ideation,

---

[15] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey, Nat'l Ctr. for Transgender Equal.* 65 (2016), https://tinyurl.com/bdcpb8hr.

suicide attempts, and health care avoidance."[16] For example, lesbian, gay, and bisexual young adults who experience parental rejection are more than eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.[17]

These risks of household rejection are substantial: according to the Trevor Project's 2022 LGBTQ survey, fewer than one in three transgender and nonbinary youth found their home to be gender-affirming.[18] Thus, contrary to Appellant's arguments, policies like AR 5145.3 make no presumption about parents, *see, e.g.*, Opening Br. at 14—societies place rails by the sides of roads, not because they presume that all drivers will drive off the edge, but because they cannot risk the severe harm when it happens. Where transgender youth face hostility or rejection in the home, supportive and affirming environments at school can significantly lessen the risks of severe harm, especially concerning physical safety.

---

[16] World Professional Ass'n of Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* S53 (Version 8, 2022), https://tinyurl.com/mswz6phz (WPATH SOC8) ("disaffirming behaviors" intended "to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood").

[17] Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009), https://tinyurl.com/4hscxv6f.

[18] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* 4, https://tinyurl.com/4y6psfjs.

### B. Transgender Youth Also Face Unique Struggles That Policies Like AR 5145.3 Ameliorate by Maintaining a Safe and Supportive School Environment

In addition to addressing the risks transgender youth may face at home, policies like AR 5145.3 are especially important for creating supportive and affirming school environments for transgender students who without such policies suffer higher levels of discrimination and violence than their cisgender peers. According to a 2022 mental health survey, 71% of transgender and nonbinary youth respondents reported being discriminated against because of their gender identity.[19] As many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[20]

In California, specifically, a study found that in 2015-16 more than 40% of transgender students reported being bullied because of their gender identity, as opposed to only 7.3% of non-transgender students who reported gender-based bullying.[21] This same study also reported that more than half (55.6%) of the State's

---

[19] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health*, *supra*, at 4.

[20] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 4 (2017), https://tinyurl.com/ukvkv8tf.

[21] De Pedro et al., *Exploring Physical, Nonphysical, and Discrimination-Based Victimization Among Transgender Youth in California Public Schools*, 1 Int'l J. of Bullying Prevention 218, 222 (2019).

transgender students reported physical victimization (such as being threatened with a weapon, threatened with harm, or in a physical fight).[22] Due to such bullying and harassment, California transgender students reported negative mental health outcomes and school experiences "at higher rates" than any other subgroup.[23]

Such discriminatory harassment and bullying undermines students' sense of connection to their schools and their own sense of belonging, which in turn undermines academic achievement.[24] Transgender students who experience higher levels of gender-based victimization in school, including bullying and harassment, are less likely to plan to graduate high school, have lower grade point averages, and are three times more likely to have missed school in a given month.[25] Nationwide, 17% of transgender students reported that they left a K-12 school due to the severity of the harassment they experienced at school.[26] And nearly 46% of

---

[22] *Id.*

[23] Hanson et al., *Understanding the Experiences of LGBTQ Students in California*, The California Endowment 9, 52 (Oct. 2019) https://tinyurl.com/v452ty7s.

[24] Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN at xix-xx (2019), http://tinyurl.com/52s5x3vu.

[25] Movement Advancement Project & GLSEN, *supra*, at 4; Kosciw et al., *supra*, at xix, 35.

[26] Sandy E. James et al., *supra*, at 132-135.

transgender students reported missing at least one school day in the preceding month because they felt unsafe or uncomfortable at school.[27]

When transgender youth experience both a lack of school belonging and familial rejection, they are significantly more likely to attempt suicide or experience suicidal thoughts.[28]

However, because the harm experienced by transgender and gender nonconforming students relates to the way they are treated at school and at home, policies like AR 5145.3 that provide an affirming and supportive space have been proven to counteract such harm. When transgender youth have their gender identity affirmed in any or all settings, their mental health outcomes mirror those of their cisgender peers, experiencing reduced gender dysphoria/incongruence, depression, anxiety, self-harm ideation and behavior, suicidal ideation and attempts, and enhanced well-being and functioning.[29]

---

[27] Emily A. Greytak et al., *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools*, GLSEN 14 (2009).

[28] Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. Interpersonal Violence 2696 (2022), https://tinyurl.com/y8jwhktb.

[29] Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, Pediatrics, Mar. 2016, at 5-7; *see also* WPATH SOC8, *supra*, at S107.

Studies specifically demonstrate the benefits of creating these affirming spaces at school. A recent study found that transgender youth who have their gender identity consistently affirmed in a single context (*e.g.*, school) had their risk of suicidal behavior lessened by 56%.[30] Gender-affirming school environments, specifically, had the strongest association with reduced odds of reporting a suicide attempt within the past year of all the spaces studied.[31]

Similarly, evidence shows that policies like AR 5145.3 that allow educators to be gender-affirming and supportive help mitigate other academic and emotional harms that transgender and gender nonconforming students face due to discrimination. One study confirms that LGBTQ+ students with support from many (11 or more) staff at their school were less likely to feel unsafe, miss school, or say they might not graduate high school because of their gender expression and sexual orientation; had higher GPAs; and felt greater belonging to their school community.[32] Another study found that transgender and gender-nonconforming youth who had a relationship with a supportive educator were less likely to miss

---

[30] Stephen Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018).

[31] *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (Dec. 2020), https://tinyurl.com/2c2p7zkf.

[32] Kosciw et al., *supra*, at xiii.

school or drop out, even if they experienced harassment from others in the school environment.[33]

Thus, because transgender or gender nonconforming youth may face serious physical, emotional, or psychological harms from non-affirming households and environments, policies like AR 5145.3—which honor a student's names and pronouns, prioritize student safety and well-being, and support students' efforts to share their gender identity with their parents in the manner they choose—are vital to address these harms and ensure the safety and success of these students.

### C. Policies like AR 5145.3 Benefit All Students Because They Provide Students With Safety and a Sense of Belonging

Moreover, peer-reviewed research shows that all students need to feel safe and a sense of belonging at school in order to learn. Students who experience safe and supportive school climates see improvements in academic achievement, school success, and healthy development, and such schools are more effective at preventing violence and retaining teachers.[34] "School connectedness, which is the

---

[33] Michelle Marie Johns et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263-301 (2018), https://tinyurl.com/44eek2ss.

[34] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 3 (Aug. 2020), https://tinyurl.com/2kapyb4d; Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97-98 (Feb. 17, 2019), https://tinyurl.com/944szuvh.

feeling among adolescents that people at their school care about them, their well-being, and success, has long-lasting protective effects for adolescents. Youth who feel connected at school are less likely to experience risks related to substance use, mental health, violence, and sexual behavior."[35]

Students feel safe when they can trust that school staff and teachers support them. When trust is established, it results in better student engagement, self-esteem, attendance, graduation rates, and overall academic success.[36] Such trust is fostered for all students when school policies and practices—like AR 5145.3—are supportive of a student's identity and designed to prevent harm. For example, in school districts with LGBTQ-supportive policies and practices, all students experience improved psychosocial health outcomes.[37]

## IV. APPELLANT'S PROPOSED FRAMEWORK UNDERMINES STATES' ABILITY TO MAKE SCHOOLS A SAFE AND SUPPORTIVE ENVIRONMENT FOR TRANSGENDER STUDENTS

---

[35] Centers for Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021* at 72 (2023), https://tinyurl.com/2p6w6yrv.

[36] Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90 Rev. of Educ. Rsch. 712 (Aug. 4, 2020), https://tinyurl.com/3ant56ta; Megan Tschannen-Moran et al., *Student Academic Optimism: A Confirmatory Factor Analysis*, 51 J. Educ. Admin. 150-154, 157-158, 167-171 (Mar. 2013), https://tinyurl.com/3r3cuawt; Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-teacher Trust and School Identification*, The European Conference on Ed. 2021 (Sept. 2021), https://tinyurl.com/5crrjjxx.

[37] Centers for Disease Control, *LGBTQ-Supportive School Policies and Practices Help All Students Thrive* (June 2022), https://tinyurl.com/3nmn36ef.

Policies like AR 5145.3 represent a flexible approach that protects the interests of both students and parents by encouraging parent involvement wherever possible without putting transgender students at risk. As discussed *supra*, *Amici* States have used this case-by-case approach for years to protect students across the country. Appellant's proposed constitutional framework would undermine these protections, exposing students to physical, emotional, and psychological harm, injecting staff into deeply-personal family decisions, depriving students of the ability to learn in a safe and affirming environment, and frustrating schools' fundamental ability to educate students.

First, Appellant's framework would expose students to those who harbor animus toward transgender or gender nonconforming individuals. In this appeal alone, Appellant and amici supporting them have made arguments reiterating the false and invidious stereotypes that transgender or gender nonconforming status is a mental illness or illusion. *See* Opening Br. at 30-31 (alleging that every "child who asks to be socially transitioned should be seen by a mental health professional" to "diagnose the child" and correct "children who are mistaken about whether they have a transgender identity"); Amicus Br. of Foundation for Moral Law at 9 ("[T]hese laws are premised on a falsehood because gender identity is a faith-based ideology"); Mot. for Leave to File Amicus Br. of Our Duty at 4 (explaining *Amicus*'s goal of "counter[ing]" the idea "that transgenderism is . . .

acceptable"). Such pathologizing stereotypes echo those long used to discriminate against other marginalized groups. *See, e.g.*, *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 484–85 (9th Cir. 2014) ("[G]ays and lesbians were [once] . . . made inadmissible under a provision of our immigration laws . . . [as] individuals 'afflicted with psychopathic personality.'").

Other cases have documented similar animus motivating efforts to disclose students' transgender identity. For example, when the Chino Valley Unified School District recently enacted a policy forcing school personnel to "out" transgender students to their parents or guardians, its school board members described transgender students as suffering from a "mental illness" or "perversion," and as a threat to the family and to humanity.[38] The Board President, stated that transgender individuals would benefit from "non-affirming" parental actions so that they could "get better."[39] Another Chino Valley school board member stated, "there's always been man, woman; and then you have this transgender [identity] . . . it is an illusion; it is mental illness."[40] This board member further claimed that forced disclosures were needed because "women are

---

[38] Chino Valley Unified Sch. Dist. Bd., *CVUSD Meeting of the Board of Education - July 20th, 2023*, YouTube at 3:26:10-3:26:44, 3:33:08-3:33:38 (Jul. 20, 2023) (hereafter *CVUSD Board Meeting*), http://tinyurl.com/mudrucp9.

[39] *Id.* at 3:53:02-3:53:23.

[40] *Id.* at 3:26:08-3:26:25.

being erased," and that "[i]t's not going to end with transgenderism. . . . You got to put a stop to it."[41]

While Appellant may not share such animus, policies like AR 5145.3 are vital to protect students from any who do. *See Palmore,* 466 U.S. at 433; *Hecox v. Little*, 79 F.4th 1009, 1029 (9th Cir. 2023) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." (citation omitted)). Appellant's proposed framework would erase protective policies like AR 5145.3, exposing students to overt discrimination—like that expressed by parties in this case or in Chino Valley—and the related harms that follow. *See supra* Section III.A-B.

Second, Appellant's proposed framework would force school staff to inject themselves into sensitive family dynamics by requiring school staff to "out" children before they are ready, intruding into the private affairs of the parent-child relationship and dictating sensitive family conversations that should occur in the time and manner chosen by the student and their family. *Cf. SmithKline Beecham Corp.*, 740 F.3d at 486–87. Research shows the clear physical, emotional, mental, and psychological harms for children who are outed and forced to have this

---

[41] *Id.* at 3:26:40-3:26:45, 3:29:55-3:30:00, 3:33:13-3:33:20.

discussion with their families before they are ready, especially for children who fear their parents' negative reactions or for their own safety.[42]

A now-college student, Dahlia Bekong, shared with teachers and school staff in high school that they were transgender and it was unsafe to use their chosen name and pronouns around their family.[43] After Dahlia's teacher outed them by using their chosen name in a phone call to their home, Dahlia stated: "my parents were really angry and confrontational. They accused me of destroying our family. I didn't feel safe in my own home . . . I don't think the teacher meant to cause harm—she made a mistake. But one inadvertent mistake can have catastrophic consequences . . . my home went from unsupportive to a war zone."[44]

Third, Appellant's proposed framework would impair trust between students and their teachers, counselors, and other school staff, chilling communication and depriving students of the benefits of a gender-affirming school environment. As explained above, transgender students who have gender-affirming environments

---

[42] *See supra* Section III.A; Harper Seldin, *Trans Students Should Be Treated With Dignity, Not Outed By Their Schools*, ACLU (Jan. 26, 2023), https://tinyurl.com/3yuy4jkz ("Trans people are much more likely to be abused by their immediate family based on their gender identity, and high risks of abuse and family rejection mean trans youth are overrepresented in foster care homes, juvenile detention centers, and homeless shelters." (citing studies)).

[43] Misha Valencia, *Why We Need to Stop Outing LGBTQIA Students*, Parents (Aug. 29, 2023), https://tinyurl.com/p62xj5ae.

[44] *Id.*

have mental health outcomes that mirror their cisgender peers, and gender-affirming and supportive relationships between students and school staff lead to increased student engagement, self-esteem, attendance, graduation rates, and academic success. *See supra* Section III.C. But without the protection of policies like AR 5145.3, schools cannot provide safe and supportive environments for transgender students, depriving students of those benefits and compounding the harms these students experience due to non-affirming environments at home and school.

Such harms were documented in *People of the State of California v. Chino Valley Unified School District*, No. CIVSB2317301 (Bernardino Cnty. Super. Ct.). There, teachers, parents, and current students explained how a policy requiring school staff to out transgender students to their parents terrorized students, inflicting significant emotional, psychological, and mental harm. A teacher reported that the prospect of being outed undermined teacher-student trust, prompting students to discuss which teachers are "safe" and which teachers "might report them."[45] Multiple students reported contemplating the deletion of their gender accommodation plans at school, to avoid the even greater harms from being

---

[45] McFarland Decl. ¶ 46, *Chino Valley Unified Sch. Dist.*, No. CIVSB2317301.

outed, with at least one student reporting that he "did not feel safe."[46] As one transgender student explained, the threat of being outed caused them to withdraw from participating at school, caused a transgender friend to suffer depression and anxiety, and shoved students like them "back into the closet, forever afraid to express who we are."[47]

Thus, Appellant's position would undermine the supportive and trusting environment that transgender or gender nonconforming students need. *See, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 968 (9th Cir. 2011) (noting teachers' "position of trust and authority"); *Damiano v. Grants Pass Sch. Dist. No. 7*, No. 1:21-cv-00859-CL, 2023 WL 2687259, at *6 (D. Or. Mar. 29, 2023) ("[A] public-school teacher must maintain a classroom that is conducive to learning where the student is comfortable and feels safe when interacting with the teacher." (citations omitted)). Rather than facilitating conversations about student identity, Appellant's framework would close off the school as a place where students could express themselves, resulting in lasting emotional, psychological, academic, or physical harm. *See supra* Section III.A-B.

---

[46] *Id.* ¶ 27.

[47] Declaration of Chris R. ¶¶ 11-15, 32-35, 47, *Chino Valley Unified Sch. Dist.*, No. CIVSB2317301.

Finally, Appellant's proposed framework would frustrate schools' ability to carry out their fundamental mission educating students. "Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent" as "[s]uch an obligation would not only contravene the educational mission of public schools, but also would be impossible to satisfy." *Fields*, 427 F.3d at 1206. If a court were to hold that school staff had a constitutional obligation to provide any school-related information beyond that necessary to ensure students' health and safety, then staff could be unduly burdened by having to make time-consuming and case-specific determinations of what kinds of information must be disclosed, along with the additional administrative hurdles of tracking whether the necessary disclosures have been made. *See, e.g.*, *supra* p. 12.

Teachers and school personnel seek to help their students succeed, and they know that success often involves the family. But school policies like AR 5145.3 are important to protect transgender students when family involvement is not possible. Appellant's interpretation of the First and Fourteenth Amendments, which would require schools to "out" students to their parents against the students' wishes, could compromise students' safety by increasing students' vulnerability to harassment, violence, or other forms of abuse at school or at home. "It is the interest of youth itself, and of the whole community, that children be both

31

safeguarded from abuses and given opportunities for growth into free and independent well-developed . . . citizens." *Prince*, 321 U.S. at 165.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Dated: January 9, 2024   Respectfully submitted,


      ROB BONTA
      Attorney General of California
      MICHAEL L. NEWMAN
      Senior Assistant Attorney General
      LAURA FAER
      Supervising Deputy Attorney General
      BRIAN BILFORD
      Deputy Attorney General

      /s/ Delbert Tran

      DELBERT TRAN
      Deputy Attorney General
      *Attorneys for Amicus Curiae the*
      *Attorney General of California*

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
1 Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

Charity R. Clark
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16031

I am the attorney or self-represented party.

**This brief contains** 6,994 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Delbert K. Tran **Date** Jan. 8, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*