# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AURORA REGINO,
*Plaintiff-Appellant*,

v.

KELLY STALEY, Superintendent,
*Defendant-Appellee*,

v.

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO; EILEEN
ROBINSON; and MATT TENNIS,

*Defendants*.

On Appeal from United States District Court
for the Eastern District of California
Case No. 2:23-CV-00032-JAM-DMC (Honorable John A. Mendez)

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AND AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

Elizabeth O. Gill
Jennifer Chou
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
egill@aclunc.org
jchou@aclunc.org

Amanda Goad
Ariana Rodriguez
Christine Parker
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
(213) 977-9500
agoad@aclusocal.org
arodriguez@aclusocal.org
cparker@aclusocal.org

Harper Seldin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
hseldin@aclu.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................5

INTEREST OF *AMICI CURIAE* ..........................................................10

INTRODUCTION ...............................................................................11

ARGUMENT ......................................................................................15

    I.    The Policy does not implicate a parent's fundamental right to the care, custody, and control of their children.................................16

        A.    Fundamental parental rights do not include dictating public school policies.........................................................................17

        B.    Substantive due process does not require schools to ignore students' expressed gender identity or to notify parents of a student's expressed gender identity...........................................19

        C.    Respecting a student's request to use a certain name and pronouns does not implicate parents' rights to direct their children's medical care. ..........................................................21

        D.    Allowing students to decide when and how to share their gender identity does not violate the parental right to familial association and respects the child's reciprocal right.................24

    II.    The District's Policy is narrowly tailored to serve a compelling interest in fostering an educational environment conducive to learning, free from discrimination, and protective of student privacy. ..............................................................................28

        A.    Schools have a compelling interest in fostering inclusive educational environments. ........................................................29

        B.    Schools have a compelling interest in protecting the privacy and autonomy of transgender students. ...........................................32

      C.     The Policy is narrowly tailored to further compelling state interests. ........................................................................34

CONCLUSION ........................................................................36

CERTIFICATE OF SERVICE ................................................38

CERTIFICATE OF COMPLIANCE .......................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*American Academy of Pediatrics v. Clovis Unified School District*, 12CECG02608,
    (Fresno County Super. Ct., Aug. 22, 2012), ........................................................11

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*,
    503 F.3d 256 (3d Cir. 2007) ...................................................................21

*Arroyo Gonzalez v. Rossello Nevares*,
    305 F. Supp. 3d 327 (D.P.R. 2018) .......................................................34

*Bailey v. Va. High Sch. League, Inc.*,
    488 F. App'x 714 (4th Cir. 2012)...........................................................18

*Blau v. Fort Thomas Pub. Sch. Dist.*,
    401 F.3d 381 (6th Cir. 2005)..................................................................18

*Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*,
    347 U.S. 483 (1954)........................................................................ 31, 32

*Brown v. Hot, Sexy & Safer Prods., Inc.*,
    68 F.3d 525 (1st Cir. 1995) ...................................................................19

*C.N. v. Ridgewood Bd. of Educ.*,
    430 F.3d 159 (3d Cir. 2005)..................................................................18

*C.N. v. Wolf*,
    410 F. Supp. 2d 894 (C.D. Cal. 2005) ...............................................11, 33

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020).......................................................... 17, 18

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019)..................................................................28

*Doe by & through Doe v. Boyertown Area School District*,
    897 F.3d 518 (3d Cir. 2018) ......................................................... *passim*

*Doe v. Irwin*,
    615 F.2d 1162 (6th Cir. 1980)................................................................20

*Fields v. Palmdale Sch. Dist.*,
427 F.3d 1197 (9th Cir. 2005) .................................................. 16, 18, 20

*Fleischfresser v. Directors of Sch. Dist. 200*,
15 F.3d 680 (7th Cir. 1994) ....................................................19

*Goehring v. Brophy*,
94 F.3d 1294 (9th Cir. 1996) ....................................................29

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) ........................................ 10, 22, 29, 31

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ....................................................34

*Hardwick v. County of Orange*,
980 F.3d 733 (9th Cir. 2020) .................................................. 24, 25, 26

*Hodgers–Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) ....................................................26

*K.C. v. Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-
cv-00595-JPH-KMB, (S.D. Ind. Apr. 5, 2023), ....................................................21

*Keates v. Koil*,
883 F.3d 1226 (9th Cir. 2018) ....................................................25

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) ....................................................19

*Martinez v. Cui*,
608 F.3d 54 (1st Cir. 2010) ....................................................19

*Ngoun v. Wolf*,
517 F. Supp. 2d 1177 (C.D. Cal. 2007) ........................................ 26, 33

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ....................................................16

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) .................................................. *passim*

6

*Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*,
148 F.3d 260 (3d Cir. 1998) ...................................................................19

*Poe v. Labrador*, No. 1:23-cv-00269-CWD, (D. Idaho, May 31, 2023), ...............21

*Shanks v. Blue Cross & Blue Shield United of Wis.*,
979 F.2d 1232 (7th Cir. 1992) ..............................................................23

*Smith v. City of Fontana*,
818 F.2d 1411 (9th Cir. 1987) ..............................................................26

*Smith v. Univ. of Washington*,
392 F.3d 367 (2004) ..........................................................................34

*Sterling v. Borough of Minersville*,
232 F.3d 190 (3d Cir. 2000) ................................................................33

*Thomas v. Evansville-Vanderburgh Sch. Corp.*,
258 F. App'x 50 (7th Cir. 2007) ..........................................................18

*Troxel v. Granville*,
530 U.S. 57 (2000) ............................................................................16

*U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) ..........................................................................33

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ..........................................................................16

**Statutes**

Cal. Const. art. I, § 7 ....................................................... 12, 35

Cal. Educ. Code § 200 ....................................................... 12, 35

Cal. Educ. Code § 201 ....................................................... 12, 35

Cal. Educ. Code § 220 ....................................................... 12, 35

Cal. Educ. Code § 221.5(f) ................................................ 12, 35

Cal. Educ. Code § 234-234.5 ............................................. 12, 35

**Other Authorities**

Assembly Bill No. 1266 ..............................................................................11

Augustus Klein & Sarit A. Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults*, 3 LGBT Health 193 (2016) ......................................................28

Brandon A. Robinson, *Conditional Families and Lesbian, Gay, Bisexual, Transgender, and Queer Youth Homelessness: Gender, Sexuality, Family Instability, and Rejection*, 80 J. Marriage & Fam. 383 (2018) ............................27

Brodie Frasier et al., *LGBTIQ+ Homelessness: A Review of Literature*, 16 Int'l J. Env't Rsch. Pub. Health (2019) ..........................................................32

California Department of Education (CDE), *Supporting LGBTQ+ Students* .........13

CDE, *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)* ..................................................................................................13

Chico Unified School D*istrict, Administrative Regulation #5145.3 Nondiscrimination/H*arassment ................................................................ *passim*

Chico Unified School D*istrict, Board Polic*y #5145.3 Non-*Discrimination/H*arassment .......................................................................... *passim*

Gerald T. Montano, et al., *Disparities in Parental Support and Parental Attachment Between Heterosexual and Sexual Minority Youth: A Meta-Analysis*, 62 J. Adolescent Health (2018) ......................................................................27

GLSEN, *School Climate for LGBTQ Students in California*, (2019) .....................30

Laura Baams et al., *LGBTQ Youth in Unstable Housing and Foster Care*, The Williams Institute (March 2019) ........................................................................32

M. H. Morton et al., *Missed Opportunities: LGBTQ Youth Homelessness in America*, Chaplin Hall at University of Chicago (2018) ......................................32

Soon Kyu Choi *et al., LGBTQ Youth in California's Public Schools: Differences Across th*e State, The Williams Institute (October 2017) ......................................30

Thomas Hanson et al., *Understanding the Experiences of LGBTQ Students in California*, WestEd (October 2019) ......................................................................30

Wojceich Kaczowski *et al., Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual* Students, 9 LGBT Health 43 (2021)...............................................................................................................31

INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union ("ACLU") is a nationwide, non-profit, non-partisan civil liberties organization. The American Civil Liberties Union of Northern California and the American Civil Liberties Union of Southern California are regional affiliates of the national ACLU. As organizations that advocate for lesbian, gay, bisexual, transgender, and queer people to live openly without discrimination and enjoy equal rights, personal autonomy, and freedom of expression and association, the ACLU and its regional affiliates have a strong interest in preventing discrimination against transgender and gender non-conforming students in public schools.

The national ACLU has appeared as counsel-of-record and as amicus curiae in many cases nationwide to ensure that transgender students can participate fully in public schools, including as counsel-of-record in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), *as amended* Aug. 28, 2020, *cert. denied*, 141 S. Ct. 2878 (2021); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020); and *Doe by & through Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019).

In California, the regional ACLU affiliates have a long history of vigorous advocacy to defend and advance the rights of LGBTQ+ Californians and the rights

of students. On LGBTQ+ student rights issues in particular, this work has included

litigation, including *C.N. v. Wolf*, 410 F. Supp. 2d 894 (C.D. Cal. 2005) and

*American Academy of Pediatrics v. Clovis Unified School District*, 12CECG02608,

(Fresno County Super. Ct., Aug. 22, 2012); administrative advocacy; sponsorship

of legislation, such as Assembly Bill No. 1266, 2013-2014 Reg. Sess. (Cal. 2013)

("AB 1266"); technical assistance to government agencies and other organizations;

and community engagement and public education efforts.[1]

## INTRODUCTION

This lawsuit involves a challenge to a Chico Unified School District (the

"District") policy aimed at "provid[ing] a safe school environment that allows all

students equal access and opportunities in the district's academic, extracurricular,

and other educational support programs, services, and activities." Chico Unified

School District, *Board Policy #5145.3 Non-Discrimination/Harassment*,

https://www.chicousd.org/documents/Board%20Policies%20and%20Administrativ

e%20Regulations/Board%20Policies/BP%205000/BP-5145.3-Nondiscrimination-

---

[1] *Amici curiae* file this brief in support of Defendant-Appellee and affirmance, but pursuant to Circuit Advisory Committee Note to Rule 29-1, *amici* do not repeat arguments made by Defendant-Appellee. Nor do they take any position on Defendant-Appellee's arguments except as set forth in this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici curiae* also certify that no person or entity, other than *amici curiae*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored the brief in whole or in part.

Harassment.pdf (last visited Jan. 7, 2024). In outlining various measures the District must take to combat discrimination, the policy's implementing regulations direct staff not to disclose a student's transgender or gender non-conforming status to others, including the student's parents or guardians, except "with the student's prior written consent." Chico Unified School District, *Administrative Regulation #5145.3 Nondiscrimination/Harassment*, https://www.chicousd.org/documents/Board%20Policies%20and%20Administrativ e%20Regulations/Administrative%20Regulations/AR%205000/AR-5145.3-Nondiscrimination-Harassment.pdf (last visited Jan. 7, 2024). (Together with Board Policy #5154.3, the "Policy").

All students deserve to feel safe, supported, and affirmed at school—and transgender and nonbinary students are no different. California law has long required schools to affirm LGBTQ+ students' identities, protect students from unlawful discrimination and harassment, including on the basis of gender, gender identity, gender expression, and sexual orientation, and create an inclusive and welcoming school learning environment. Cal. Const. art. I, § 7; Cal. Educ. Code §§ 200, 201, 220; *see also* Cal. Educ. Code §§ 221.5(f), 234-234.5 (providing additional statutory protections for LGBTQ+ youth). To this end, the State has developed guidance and resources for schools on supporting and affirming LGBTQ+ and specifically transgender and gender non-conforming students,

including on the use of names and pronouns in the classroom, ensuring all students can access school facilities, programs and activities according to their gender identity, incorporating inclusive curricular materials, and supporting students as they navigate sharing their LGBTQ+ status at school and/or home. *See* California Department of Education (CDE), *Supporting LGBTQ+ Students*, https://www.cde.ca.gov/pd/ee/supportlgbtq.asp (last visited Jan. 7, 2024). Chico Unified's Policy is based on and conforms to guidance issued by the California Department of Education "to promote the goals of reducing the stigmatization of and improving the educational integration of transgender and gender nonconforming students, maintaining the privacy of all students, and supporting healthy communication between educators, students, and parents to further the successful educational development and well-being of every student." CDE, *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)*, https://www.cde.ca.gov/re/di/eo/faqs.asp (last visited Jan. 7, 2024). Thus, the District's Policy is part of a constellation of laws and policies that further the District's compelling interest in creating a safe and supportive learning environment for all students, including LGBTQ+ students.

Plaintiff-Appellant argues that the Policy violates a parent's fundamental right to the care, custody, and control of their children by failing to notify parents and obtain their consent before honoring a student's request to use different names

and pronouns. However, this Court has long held that once parents enroll their child in public school, they do not have the right to control public school administration. That is particularly true where, as here, public schools have an obligation to create an equal educational environment and students have their own privacy rights. The constitutional protection against government interference in parental rights does not extend to public schools being prohibited from affirming students' expressed gender identity without parental consent, or to mandatory notification by public school officials of a student's gender identity without the student's consent.

Even if the Policy implicated a fundamental parental right—which it does not—it is narrowly tailored to the compelling state interest of ensuring that schools provide a safe and supportive learning environment for all students, including those who are transgender and gender non-conforming. Although many transgender young people are supported and affirmed by their families, for others, school is their only source of support. Decades of research has shown that when transgender students are not affirmed and protected at school, they are at greater risk of suicide, poor academic outcomes, bullying, and harassment. Research also shows that, in contrast, transgender and gender non-conforming students thrive at school when they are allowed to participate in school life consistent with their gender identity. Because the Policy is narrowly tailored to further the District's

compelling interest in fostering an affirming learning environment for students, it would survive even strict scrutiny.

*Amici* therefore urge the Court to affirm the district court's dismissal of Plaintiff's claims.

## ARGUMENT

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children. But that right is neither absolute nor unqualified. As this Court has previously recognized, parents have the right to decide *whether* to send a child to public school, but this right does not extend to dictating the scope of policies *within* the school. Consistent with these well-established contours, the district court correctly held that the Policy did not infringe Plaintiff-Appellant's fundamental parental rights. Substantive due process does not require public schools to affirmatively notify parents of their child's gender identity without that student's consent or to seek parental consent before addressing students consistent with their gender identity. And addressing a student in accordance with their gender identity does not infringe parents' constitutional right to direct their children's medical care, because respecting a person's name and pronouns is not medical treatment, even though social transition may be medically indicated for some transgender individuals.

Nonetheless, even if the Policy implicated a fundamental parental right—which it does not—the Policy is narrowly tailored to meet the compelling state interest of creating a safe and supportive learning environment. It therefore survives strict scrutiny.

## I. The Policy does not implicate a parent's fundamental right to the care, custody, and control of their children.

As *amici* argue in many contexts, parents have a fundamental right "to make decisions concerning the care, custody, and control of their children," which provides heightened protection against government interference. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion).[2] This right encompasses parents' decision whether to send their children to public school. At the same, this Court has long recognized that public schools have the broad authority to administer themselves as they deem best to serve the needs of their students, without being subjected to individual parental veto power over every aspect of school policy. *See, e.g.*, *Parents for Priv.*, 949 F.3d at 1231; *see also Fields v.*

---

[2] Although *amici* agree with the district court that no fundamental parental right is implicated here, they disagree with the court's misapplication of *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), to the extent that it would require litigants to allege a new "asserted liberty interest" when pleading the violation of an already recognized fundamental right. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015) ("*Loving* did not ask about a 'right to interracial marriage'; *Turner* did not ask about a 'right of inmates to marry'; and *Zablocki* did not ask about a 'right of fathers with unpaid child support duties to marry.' Rather, each case inquired about the right to marry in its comprehensive sense . . . .").

*Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005). Chico Unified's Policy, adopted to ensure all students have equal access and opportunity to safe and supportive school environment, clearly falls within the District's administrative power.

### A. Fundamental parental rights do not include dictating public school policies.

Parents possess "the right to choose the educational forum, but not what takes place inside the school." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2583 (2021). Once a family elects to send a child to public school, parental rights are "substantially diminished," and parents "do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities" within public schools. *Id.* Parents who disagree with school policies "have the right to remove their children" from public schools, but do not have the right to dictate the policies within those schools. *Parents for Priv.*, 949 F.3d at 1230.

The authority of public schools to direct their own administration and control the school environment is broad. "Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally

committed to the control of state and local authorities." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (internal quotation marks and citations omitted). As such, a parent's right to "control individual components of their [child's public] education . . . is not constitutionally protected." *Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (per curiam).

This Court has consistently applied this long-standing principle regarding public schools in a broad range of contexts. *See, e.g.*, *Cal. Parents for the Equalization of Educ. Materials*, 973 F.3d at 1020 (no fundamental parental right to challenge curricular materials based on religious objections); *Parents for Priv.*, 949 F.3d at 1231-33 (no fundamental parental right to object to school policy allowing transgender students to use single-sex facilities consistent with their gender identity); *Fields*, 427 F.3d at 1206 (no fundamental parental right to "interfere with a public school's decision as to how it will provide information to its students or what information it will provide, in its classrooms or otherwise," with respect to survey addressing sex and sexuality).

Other courts agree. *See Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F. App'x 50, 54 (7th Cir. 2007) (fundamental parental right not violated by private conversation between school counselor and student regarding student's academic performance); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005) (fundamental parental right not violated by student participation in survey seeking

information about drug and alcohol use, sexual activity, physical violence, and suicide attempts); *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) (fundamental parental right not violated by student participation in mandatory health classes); *Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 277 (3d Cir. 1998) (fundamental parental right not violated by school's consensual condom distribution program); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995) (fundamental parental right not violated by mandatory high school sex education assembly program), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994) (fundamental parental right not violated by mandatory reading program).

**B.** **Substantive due process does not require schools to ignore students' expressed gender identity or to notify parents of a student's expressed gender identity.**

The Policy at issue here pertains to what happens in a public school district: Chico Unified. It does not require parents to send their children to that school district; it does not mandate what parents teach their children about gender identity at home; and it does not in any way alter how parents address their children's gender identity at home, including what names or pronouns parents use for their children. Substantive due process is thus not offended by the Policy—which affirms students' gender identity at school, without parental consent or

notification—because parents do not have the right to control the administration of the public school, even when the school provides an educational environment inconsistent with the parents' own views about how their child should be raised.

Indeed, this Court has already rejected one attempt by parents to invoke purported fundamental parental rights to prevent public schools from affirming transgender students at school. *See Parents for Priv.*, 949 F.3d at 1231-33. In dismissing parents' substantive due process challenge to an Oregon school district's policy allowing transgender students to use restrooms and other facilities consistent with their gender identity, this Court frankly assessed the "practical issue" posed by extending parental control to the school district policy at issue: "accommodating the different personal, moral, or religious concerns of every parent would be impossible for public schools." *Id.* at 1233 (cleaned up) (citing *Fields*, 427 F.3d at 1206-07.

Similarly, the fundamental parental right does not extend to immediate notification by the school of a student's expressed gender identity without the student's consent. Just as parents might want their children's public school to adhere to their family's personal, moral, or religious preferences, but cannot constitutionally compel that outcome, so too is there a difference between what parents might want to know from the school about their child's gender identity and what is constitutionally required. *See, e.g.*, *Doe v. Irwin*, 615 F.2d 1162, 1169 (6th

Cir. 1980) ("The desire of the parents to know of such activities by their children is understandable. However[,] the only issue before the district court and this court is whether there is a constitutional obligation on the Center to notify them" regarding contraceptive distribution); *see also, e.g.*, *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 269 (3d Cir. 2007) (holding that there is "no constitutional right to parental notification of a minor child's exercise of reproductive privacy rights.").

In sum, there is no fundamental constitutional right for parents to immediately be notified of a student's expressed gender identity without the student's consent or to force schools to address a student contrary to the student's preferences.

### C. Respecting a student's request to use a certain name and pronouns does not implicate parents' rights to direct their children's medical care.

*Amici* routinely litigate to protect parents' fundamental right to make decisions about their children's medical care, including for gender affirming medical care. *See, e.g.*, *Poe v. Labrador*, No. 1:23-cv-00269-CWD, Complaint for Declaratory and Injunctive Relief (D. Idaho, May 31, 2023), ECF No. 1 (alleging that Idaho's ban on gender affirming medical care for minors violates the fundamental rights of parents to care for their children); *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595-JPH-

KMB, Complaint for Declaratory and Injunctive Relief (S.D. Ind. Apr. 5, 2023), ECF No. 1 (alleging same as to Indiana's law). But the Policy does not implicate that right because honoring a student's request to be called by a certain name and pronouns during the school day is not medical treatment. As the district court rightly found, Plaintiff-Appellant cannot use conclusory allegations to redefine an ordinary part of the school day—using names and pronouns—as medical treatment to extend parental control beyond the scope of constitutional protections. ER-13.

Using someone's chosen name and pronouns is a matter of basic courtesy and respect. Every person has a gender identity that is central to their sense of self. For cisgender people, it is generally understood that this identity is innate and does not require confirmation by a medical professional, and it is no different for transgender and non-binary people. Addressing someone in a way that honors their sense of identity—by using their correct name, pronouncing it correctly, or using their preferred honorific—is a simple act of civic decency, not medicine.

To be sure, for some transgender youth diagnosed with gender dysphoria,[3] "social transition"—non-medical steps taken to align one's gender expression with one's gender identity, including the use of gender-affirming names and pronouns—

---

[3] According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. *See, e.g.*, *Grimm*, 972 F.3d at 594-95.

may be part of a medical provider's package of recommendations for alleviating the gender dysphoria. The fact that social transition may be medically indicated for some transgender youth diagnosed with gender dysphoria, however, does not transform the Policy, or individual instances of honoring students' name and pronoun preferences, into a form of medical treatment.

School personnel who honor a student's preferences for what they are called during the school day are not themselves prescribing or providing medical care. "Treatment, as commonly understood, occurs when a *health care provider* takes steps to remedy or improve a malady that caused the patient to seek [the provider's] help." *Shanks v. Blue Cross & Blue Shield United of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992) (emphasis added). Recognizing students as they asked to be recognized (whether by a given name, nickname, or some other moniker) and using the pronouns they request (whether corresponding with sex assigned at birth or not) is part of the basic level of respect expected in civil society generally, and necessary for a safe and supportive learning environment. That the use of gendered names and pronouns may be medically indicated for some students does not mean that respecting every student's stated name and pronouns is a form of medical treatment.

School personnel perform any number of tasks during the school day that may relate to a medical condition—for example, seating a student with known

vision challenges closer to the front of a classroom—but a teacher does not become a medical provider by facilitating learning with tools that can help students focus. Using a student's name and pronouns is that kind of facilitation: transgender students cannot focus during school if they are persistently addressed using a name and pronouns that undermine their sense of self. This is likely true of all students, to some degree; one can imagine the distraction posed by a teacher who persistently called a student Josh instead of John, or who mispronounced Jorge. But there is no substantive due process right for parents to be informed if their child asks to be called Sam instead of Samantha, or to insist over their child's objection that they be called Andrew instead of Andy.

Schools are charged with helping students focus and thrive, and the Policy does precisely that: it creates an opportunity for transgender students to learn from their teachers and peers by putting them on the same footing as other students, all of whom should be addressed by a name and pronouns that reflect who they are and how they want to be recognized.

### D. Allowing students to decide when and how to share their gender identity does not violate the parental right to familial association and respects the child's reciprocal right.

This Court has recognized a constitutional liberty interest of family association to protect certain familial relationships from unwarranted state interference. *See Hardwick v. County of Orange*, 980 F.3d 733, 740-41 (9th Cir.

2020). The right to familial association includes, for parents, a right of care and custody, and for both parents and children, of companionship. *Id.* at 741. While we agree with Plaintiff-Appellant that the scope of this right is broad,[4] we disagree that the Policy infringes on that right here. If anything, the Policy is consistent with the child's reciprocal right to have their relationship with their parents be free from unwarranted state inference.

As described above, the Policy does not interfere with the fundamental parental right to the care, custody, and companionship of children. The Policy does not remove children from their parents or require parents to do (or not do) anything with respect to their children. Rather, the Policy governs *school personnel conduct* with respect to *students*. It requires school staff to respect students' expressed gender identity and to support students in whether or how they wish to communicate this information with their parents. All decision-making under the Policy originates with the student: the student decides how they want to be addressed in school and, absent compelling evidence that disclosure is necessary to preserve the student's health, with whom that information is shared. To whatever

---

[4] We disagree with the district court's overly narrow characterization of the right of familial association. *See* ER-18–19. Although Plaintiff-Appellant's familial association is not implicated here, that right encompasses includes more than just a "discrete constitutional right in cases where state officials remove children from parents without consent or due process . . . that parents will not be separated from their children without due process of law except in emergencies." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (internal quotations omitted).

extent these decisions impact the "nature of the parent-child relationship,"[5] the catalyst is the student, not the school.

By contrast, adopting the Plaintiff-Appellant's preferred school policy—i.e., mandatory disclosure to parents without the student's consent, and indeed over the student's objection—could run afoul of not only the student's right to privacy, *see, e.g.*, *Ngoun v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007), but also their reciprocal right to familial association, which "protect[s] children from unwarranted state interference with their relationships with their parents." *Hardwick*, 980 F.3d at 741; *accord Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) ("The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship."), *overruled on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). The Policy, as it currently stands, respects students' companionship interests in familial association by preventing

---

[5] Plaintiff-Appellant fails to identify any authority other than gender stereotypes to support their assertion that a young person identifying as transgender is, in and of itself, an act that alters the fundamental nature of a parent-child relationship. Appellant Br. 21 (citing "clothing and toys parents give their children, . . . the friends parents allow their children to have, . . . the sports parents allow their children to play" as examples of how a parent-child relationship is shaped by their child's gender identity). The protected relationship is parent-child, not parent-son or parent-daughter.

schools from interfering with students' rights to decide what information to share with their parents, as well as when to share it.

Nonconsensual disclosure of a student's gender identity to their parents or guardians may result not just in a privacy violation, but also in the rupture of the familial relationship. As the lower court rightly recognized and contrary to what Plaintiff-Appellant claims, the Policy "refrains from interfering with the established parent-child relationship by allowing students to disclose their gender identity to their parents on their own terms." ER-20. The Policy protects both the student's privacy and family integrity by preserving a student's opportunities to build trust with their parents, allowing them to share intimate or personal information at home on their own terms and in a way that strengthens, not undermines, their relationship with their parents. As discussed in further detail below, while many parents and guardians support young people regardless of their gender identity, not all do. Numerous studies show that forcing young people to come out to their parents and guardians before they are ready can have serious consequences for the integrity of their family, including alienation and removal from their homes. *See, e.g.*, Gerald T. Montano, et al., *Disparities in Parental Support and Parental Attachment Between Heterosexual and Sexual Minority Youth: A Meta-Analysis*, 62 J. Adolescent Health (2018); Brandon A. Robinson, *Conditional Families and Lesbian, Gay, Bisexual, Transgender, and Queer Youth*

*Homelessness: Gender, Sexuality, Family Instability, and Rejection*, 80 J. Marriage & Fam. 383 (2018); Augustus Klein & Sarit A. Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults*, 3 LGBT Health 193 (2016).

Chico Unified's Policy of honoring a student's chosen name and pronouns and their wishes regarding with whom to share that information does not implicate a parent's fundamental right to the care, custody, and control of their children or a parent's right to familial association. Therefore, Plaintiff-Appellant has not alleged sufficient facts to support a claim upon which relief can be granted and this Court should affirm the lower court's ruling.[6]

## II. The District's Policy is narrowly tailored to serve a compelling interest in fostering an educational environment conducive to learning, free from discrimination, and protective of student privacy.

Even if the Policy implicated a fundamental parental right—which it does not—the Policy survives strict scrutiny because it is narrowly tailored to compelling government interests.

---

[6] *Amici* acknowledge that, in parts of its order, the district court incorrectly applied a legal standard derived from qualified-immunity precedent to assess Plaintiff-Appellant's claims. Nevertheless, even under the appropriate standard, these claims necessarily fail. *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 652 (9th Cir. 2019) (order granting of motion to dismiss is reviewed *de novo*). As explained, Plaintiff-Appellant has not alleged sufficient facts to support *any* claim upon which relief can be granted.

## A. Schools have a compelling interest in fostering inclusive educational environments.

Ensuring the safety and well-being of students, including by protecting them against discrimination and harassment, is essential to the ability of students to focus on learning and a compelling state interest. Creating a safe and supportive school environment for transgender and non-binary students includes affirming their gender identity. *See Boyertown*, 897 F.3d at 528 (school policy served a compelling state interest in not discriminating against transgender students); *see also Goehring v. Brophy*, 94 F.3d 1294, 1300 (9th Cir. 1996) (holding that a university had a compelling interest in the "health and well-being of its students").

Reducing the stigmatization of and improving the educational integration of transgender students is not an abstract interest. "Transgender students face unique challenges in the school setting," *Grimm*, 972 F.3d at 597, and "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening," *Boyertown*, 897 F.3d at 529. Research confirms that transgender students continue to be uniquely vulnerable to rejection and discrimination even in California schools. An analysis of 2017-2019 California school data found that transgender students were more than twice as likely as their non-transgender peers to report experiences of bullying and harassment, fear of physical violence, and chronic sadness, as well as significantly less likely to report feeling safe at school, having opportunities for meaningful

participation, or having an adult at school who cares about them. *See* Thomas

Hanson et al., *Understanding the Experiences of LGBTQ Students in California*,

WestEd (October 2019), https://www.wested.org/resources/lgbtq-students-in-

california. The same report also found that transgender students were at least three

times as likely to report having seriously considered suicide in the past year when

compared to their non-transgender peers. *Id*. Overall, research has consistently

shown that lack of support for LGBTQ+ students can have significant

consequences for their overall well-being, safety, and academic engagement. *See,*

*e.g.*, Soon Kyu Choi et al., *LGBTQ Youth in California's Public Schools:*

*Differences Across the State,* The Williams Institute (October 2017),

https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBTQ-Youth-CA-

Public-Schools-Oct-2017.pdf; GLSEN, *School Climate for LGBTQ Students in*

*California*, (2019), https://www.glsen.org/sites/default/files/2021-01/California-

Snapshot-2019.pdf.

In contrast, when schools support and affirm transgender students with

appropriate pronouns and names, they have better mental health and academic

outcomes. *See, e.g.*, *Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are

addressed with gender appropriate pronouns and permitted to use facilities that

conform to their gender identity, those students reflect the same, healthy

psychological profile as their peers.") (internal quotation marks and footnote

omitted); *Grimm*, 972 F.3d at 597 (while rejection and harassment at school are correlated with negative mental health outcomes, the "opposite is also true []: transgender students have better mental health outcomes when their gender identity is affirmed"). School policies affirming students' gender identities—i.e., refusing to discriminate against them—therefore serve a compelling state interest.

Policies that protect transgender students also "foster[] an environment of inclusivity, acceptance, and tolerance," which "not only serves the compelling interest of protecting transgender students, but . . . benefits all students by promoting acceptance." *Boyertown*, 897 F.3d at 529. Studies show that when schools implement policies that are supportive of LGBTQ+ students, all students experience better outcomes, including less emotional distress, less violence and harassment, and less suicidal thoughts and behaviors. *See, e.g.*, Wojceich Kaczowski et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9 LGBT Health 43 (2021). As the Supreme Court recognized, the school environment is a "principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 493 (1954). Given the "importance of education to our democratic society" as "the very foundation of good citizenship,"

*id.*, it is well within schools' purview to foster an environment of inclusivity, acceptance, and tolerance for transgender students, for the benefit not only of those particular students, but all students.

**B.    Schools have a compelling interest in protecting the privacy and autonomy of transgender students.**

Given the well-documented discrimination that transgender people face, schools have a compelling interest in protecting the ability of transgender and non-binary students to decide on their own terms with whom to share information about their gender identity and when. Young people thrive when they have parental support and feel safe sharing their full identities at home, but it can be harmful to force young people to share their full identities before they are ready. Transgender young people frequently experience family rejection, and LGBT youth represent up to 40% of the unhoused youth population. *See, e.g.*, Laura Baams et al., *LGBTQ Youth in Unstable Housing and Foster Care*, The Williams Institute (March 2019), https://williamsinstitute.law.ucla.edu/publications/youth-foster-unstable-housing; M. H. Morton et al., *Missed Opportunities: LGBTQ Youth Homelessness in America*, Chaplin Hall at University of Chicago (2018), https://www.chapinhall.org/wp-content/uploads/VoYC-LGBTQ-Brief-FINAL.pdf; Brodie Frasier et al., *LGBTIQ+ Homelessness: A Review of Literature*, 16 Int'l J. Env't Rsch. Pub. Health (2019).

Courts have recognized that young people have privacy interests, even with respect to their parents. *See Nguon*, 517 F. Supp. 2d at 1191 (holding that student had "[c]onstitutionally protected privacy right with respect to disclosure of her sexual orientation" by school administrators to her parents, under both federal and state constitutions) (referencing reasoning set forth in *C.N.*, 410 F. Supp. 2d at 903); *see also Sterling v. Borough of Minersville*, 232 F.3d 190, 197 (3d Cir. 2000) (finding police officer's threatened disclosure of an arrested teenager's sexual orientation to the teenager's grandfather—which resulted in the teenager's death by suicide—violated the teenager's constitutionally protected privacy interests). Further, courts have held that a student may reasonably expect a certain level of privacy vis-à-vis their parent, even if they have chosen to share information to some extent at school. In rejecting a school's argument that a student could not have a reasonable expectation of privacy regarding her sexual orientation because she was "openly gay at school," the district court explained that "'[t]he fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of information.'" *C.N.*, 410 F. Supp. 2d at 903 (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 770 (1989)).

Denying students the ability to request these basic protections of confidentiality would be to require them to choose between their privacy or

affirmation of their gender identity in school. *See, e.g.*, *Boyertown*, 897 F.3d at 530

(rejecting position that would "very publicly brand all transgender students with a

scarlet "T," because transgender students "should not have to endure that as the

price of attending their public school"). Respecting students' autonomy to decide

when and to whom they disclose their gender identity or transgender status is part

of a school's compelling interest in recognizing student privacy interests. *See, e.g.*,

*Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018)

(holding that forced disclosure of plaintiffs' transgender status violated their

constitutional rights to decisional privacy).

### C. The Policy is narrowly tailored to further compelling state interests.

The Policy here is narrowly tailored to ensure that schools can provide for

the safety and well-being of students, while affording flexibility to allow disclosure

of information to parents as necessary. Narrow tailoring requires "serious, good

faith consideration of workable [] alternatives," even if the state need not

"exhaust[] . . . every conceivable [] alternative." *Grutter v. Bollinger*, 539 U.S. 306,

339 (2003); *see also Smith v. Univ. of Washington*, 392 F.3d 367, 372 (2004) ("In

assessing whether the Law School has met this burden [of showing a policy is

narrowly tailored], however, we must assume that it acted in good faith in the

absence of a showing to the contrary and defer to its educational judgments.").

The Policy is narrowly tailored because it is the only workable option to protect the state's interests in affirming student gender identity and privacy and includes an exception where there is compelling evidence that disclosure is necessary to preserve the student's health. Plaintiff-Appellant's proposed blanket re-writing of the policy—to require parental notification or consent before allowing any students to use the names and pronouns that reflect who they know themselves to be—invites discrimination against transgender students by, among other things, conditioning the student's request to affirm their gender identity on their parent's approval. In addition, Plaintiff-Appellant's proposed policy would require disclosing students' gender identity to parents, in possible violation of the student's privacy rights and without any individualized consideration of the potential risk to their safety and well-being. Instead, the Policy recognizes that, on a case-by-case basis, schools may share a student's gender identity with parents in some limited circumstances. The Policy is necessary to effectuate California's interest in nurturing LGBTQ+ students, including affirming their identities, protecting them from unlawful discrimination and harassment, and creating an inclusive and welcoming school learning environment. *See* Cal. Const. art. I, § 7; Cal. Educ. Code §§ 200, 201, 220; *see also* Cal. Educ. Code §§ 221.5(f), 234-234.5.

Finally, school policies that affirm student gender identity and privacy at school by their own terms are limited in scope: they extend no further than the schoolhouse door. These policies do not require that parents address their child in any particular way or prevent parents from inculcating their child with their own views about gender identity generally or their child's gender identity specifically. Nor do they prevent parents from asking their own children about their gender identity or what is happening at school. The Policy is narrowly tailored to serve schools' compelling interest in creating a safe and supportive learning environment for students, regardless of their gender identity.

## CONCLUSION

*Amici* fiercely defend fundamental parental rights to the care, custody, and control of their children, which includes deciding where to send children to school and to direct their medical care. Chico Unified's Policy implicates neither right,

///

///

///

///

///

and in any event is narrowly tailored to further compelling state interests. *Amici* respectfully ask this Court to affirm the district court's dismissal of Plaintiff-Appellant's claims.

Dated: January 9, 2024

*/s/ Jennifer Chou*
_____

Jennifer Chou
Elizabeth O. Gill
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
egill@aclunc.org
jchou@aclunc.org

Amanda Goad
Ariana Rodriguez
Christine Parker
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
(213) 977-9500
agoad@aclusocal.org
arodriguez@aclusocal.org
cparker@aclusocal.org

Harper Seldin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
hseldin@aclu.org

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2024, I electronically filed the foregoing with the Clerk of Court using the ECF System, which will send notification of such filing to all counsel of record.

Dated: January 9, 2024
        /s/ Jennifer Chou
        Jennifer Chou
        ACLU Foundation of Northern California

        *Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16031

I am the attorney or self-represented party.

**This brief contains** | 6,183 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jennifer Chou | **Date** | 01/09/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                   *Rev. 12/01/22*